IN THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ROSALIE SIMON
207 North Gladstone Avenue
Margate City, New Jersey 08402-1705,

HELEN HERMAN
3560 Bathurst Street, Room 535RF
Toronto, Ontario M6A 2E1
Canada,

CHARLOTTE WEISS
1106 Laurel Oak Road, Apartment 342
Voorhees, New Jersey 08043,

HELENA WEKSBERG
12 Rean Drive, Apartment 805
Toronto, Ontario M2K 3C6
Canada,

ROSE MILLER
5 Stone Hollow Court
Baltimore, Maryland 21208,

TZVI ZELIKOVITCH
Moshav Nordiyya 42954
Israel,

MAGDA KOPOLOVICH BAR-OR
28 Borochov Street,
Neve Sha'anan,
Haifa 32203
Israel,

ZEHAVA (OLGA) FRIEDMAN
8 Clay Street, Apt. 14
Tel Aviv 62336
Israel,

Case No. _____

CLASS ACTION COMPLAINT

JURY TRIAL DEMANDED
AS TO ALL CLAIMS
THAT ARE TRIABLE BY JURY

**YITZHAK PRESSBURGER**
124 Yahalom Street
Apartment 9
Gilo, Jerusalem 93908
Israel,

**ALEXANDER SPEISER**
55 Komemiyut Street
Tel Aviv 69011
Israel,

**ZE'EV TIBI RAM**
Kibbutz Afikim 15148
Israel,

**VERA DEUTSCH DANOS**
24 Huntingtower Road
Melbourne, Victoria
Australia

and

**ELLA FEUERSTEIN SCHLANGER**
1868 Shore Drive South, Apartment 410
South Pasadena, Florida 33707,

Individually, for themselves and for all
others similarly situated,

PLAINTIFFS,

v.

**THE REPUBLIC OF HUNGARY**
Sándor Palace
H-1014
Budapest, Szent György tér 1
Hungary,

**MAGYAR ÁLLAMVASUTAK Zrt.**
**(MÁV Zrt.)**
1062 Budapest, Andrássy út 73-75
Hungary,

and

*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*

RAIL CARGO HUNGARIA Zrt.,       \*
successor-in-interest to MÁV CARGO   \*
ÁRUFUVAROZÁSI Zrt., f/k/a MÁV Cargo \*
Zrt., a Division of MÁV Zrt.          \*
Váci út 92.                         \*
H-1133 Budapest               \*
Hungary,                       \*
                                \*
DEFENDANTS.              \*
                                \*

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## CLASS ACTION COMPLAINT

## INTRODUCTION

1.     In a century strewn with international upheaval, cataclysmic violence and untold bloodshed, the Holocaust – the Nazis' premeditated murder of six million innocent Jewish men, women, and children during World War II – dwells in a dreadful dimension of its own.  Nowhere was the Holocaust executed with such speed and ferocity as it was in Hungary, where in 1944 over a half a million souls were dispatched to their deaths within a period of less than three months.  This class action complaint is brought by Holocaust survivors, former residents of geographic areas of what is today or what once was, at all times relevant to this Complaint, part of the Republic of Hungary – Rosalie Simon, Helen Herman, Charlotte Weiss, Helena Weksberg, Rose Miller, Tzvi Zelikovitch, Magda Kopolovich Bar-Or, Zehava (Olga) Friedman, Yitzhak Pressburger, Alexander Speiser, Ze'ev Tibi Ram, Vera Deutsch Danos and Ella Feuerstein Schlanger.  These named plaintiffs bring suit on their own behalf and on behalf of all Hungarian Holocaust survivors and the immediate families of Hungarian Holocaust victims.

2.     Suit is brought against three defendants directly complicit in the Hungarian Holocaust: the Republic of Hungary (hereinafter "Defendant Hungary" or "Hungary"), the Hungarian National Railway (Magyar Államvasutak Zrt. or MÁV Zrt) (hereinafter "Defendant

MÁV" or "MÁV") and Rail Cargo Hungaria Zrt., successor-in-interest to MÁV Cargo Árufuvarozási Zrt., f/k/a MÁV Cargo Zrt., a Division of MÁV Zrt. (hereinafter "Defendant MÁV Cargo" or "MÁV Cargo").  (The two railway defendants are identified jointly as "the Defendant Railways.")

3.      These three defendants orchestrated, collaborated and participated in the confiscation of the personal possessions of their Hungarian Jewish victims and their transportation by train to the killing fields and death camps of Nazi-occupied Poland and the Ukraine, where the Jews were tortured and the vast majority died.  Most, but not all, of the Hungarian atrocities occurred near the end of the war in 1944, when the Nazis and Hungary, knowing that they had lost, raced to complete their eradication of the Jews before the Axis surrendered.

4.      In the lexicon of horrors that was World War II, Winston Churchill called Hungary's eager complicity in the gratuitous slaughter of its Jewish population "probably the greatest and most horrible crime ever committed in the history of the world."  Unlike many other sovereign and private perpetrators in the Holocaust, however, Defendant Hungary and the Defendant Railways have never been brought before the bar of justice, nor have they made recompense for their wanton thievery, collaboration in murder and willful and grotesque violations of international law.  This suit seeks to remedy these injustices.

## PARTIES

### The Named Plaintiffs

5.      Named Plaintiff Rosalie Simon ("Rosalie") is a citizen of New Jersey domiciled at 207 North Gladstone Avenue, Margate City, New Jersey 08402-1705.

6.      Named Plaintiff Helen Herman ("Helen") is a citizen of Canada, residing at 3560 Bathurst Street, Room 535RF, Toronto, Ontario M6A 2E1, Canada.

7.      Named Plaintiff Charlotte Weiss ("Charlotte") is a citizen of New Jersey, residing at 1106 Laurel Oak Road, Apartment 342, Voorhees, New Jersey 08043.

8.      Named Plaintiff Helena Weksberg ("Helena") is a citizen of Canada, residing at 12 Rean Drive, Apartment 805, Toronto, Ontario M2K 3C6, Canada.

9.      Named Plaintiff Rose Miller ("Rose") is a citizen of Maryland, residing at 5 Stone Hollow Court, Baltimore, Maryland 21208.

10.     Rosalie, Helen, Charlotte, Helena and Rose are sisters; their maiden name was "Lebovic." They are referred to collectively hereinafter as "the Lebovic sisters." They were raised in Teresva in Hungarian-annexed Ruthenia.

11.     In the late spring of 1944, the Lebovic sisters, their brother and their parents were deported by train, *via* Defendant MÁV, to the ghetto in Mateszalka, and then to Auschwitz.

12.     Some of their possessions were confiscated by officials of the Hungarian government in Teresva, and some were taken by Defendants MÁV and/or MÁV Cargo as the Lebovic family boarded the train for Auschwitz. Their mother and brother perished there, but the Lebovic sisters, though forced to perform slave labor at Auschwitz, nonetheless survived. Later the Nazis moved them to a slave labor camp in Germany. In the spring of 1945 they were again moved by their captors – to the Austrian Tyrol – and left to die or be murdered by the S.S. Again the Lebovic sisters survived, however, and were rescued by the liberating American army.

13.     On information and belief, after being confiscated by Defendants Hungary and/or MÁV or MÁV Cargo, the Lebovic sisters' property and possessions were liquidated in whole or in part to pay Defendants MÁV and/or MÁV Cargo for the cost of transporting the family from

their home in Teresva and later from the ghetto in Mateszalka to Auschwitz. The Lebovic sisters have never been compensated by any of the defendants for their losses and those of their family. They have never been compensated for the injuries that they suffered that were proximately caused by the defendants.

14.     Named Plaintiff Tzvi Zelikovitch ("Tzvi") is a citizen of the State of Israel, living on Moshav Nordiyya near Netanya. The third of seven children, Tzvi was born in 1928 and raised by his parents, both Hungarian citizens, in Igla in Carpatorus, part of Hungarian-annexed Ruthenia (which was in the Kingdom of Austria-Hungary until formation of the Czechoslovak Republic after World War I). Tzvi's father was a prosperous blacksmith, and the Zelikovitch home, located on the stream at the center of Igla, was well-appointed with furniture, valuables and other possessions.

15.     In the summer of 1941, following the German invasion of the former Soviet Union in collaboration with the armed forces of the Defendant Republic of Hungary, the entire Jewish population of Igla, including 13-year old Tzvi and his family, were deported by train, *via* Defendant MÁV or MÁV Cargo, to an area near Kamenetz Podolsk, across the border in Nazi-occupied Ukraine, where they were handed over to the Germans.

16.     Some of the possessions of Tzvi and his family were confiscated by officials of the Hungarian government, and some were taken by MÁV or MÁV Cargo personnel at the train station in Tecevo. Other possessions of Tzvi and his family were taken by MÁV or MÁV Cargo at the station in Jatzin, before the family's deportation into German-occupied Ukraine. These possessions were never returned, and Tzvi has never received compensation for them.

17.     On August 26, 1941, while still in the region of Kamenetz Podolsk, the group was led by their captors to an empty field outside of town, where approximately 60-70 German

soldiers armed with machine guns began wantonly shooting at the group. Some of the German soldiers took photographs. Tzvi and two teenage friends were able to flee the massacre, but the rest, including Tzvi's parents, his six brothers and sisters, were murdered in cold blood.

18.    After wandering on foot for approximately two years and covering nearly 1,000 miles, Tzvi and his friends returned to Igla. Their homes and property had been confiscated and the Jewish community was wiped out. Tzvi fled to the Hungarian capital of Budapest, where he was able to survive, avoiding capture until the spring of 1944.

19.    In the spring of 1944, Tzvi was captured by Hungarian state police, who handed him over to Defendants MÁV and/or MÁV Cargo, which confiscated his remaining possessions and transported him to Auschwitz by cattle car owned and operated by MÁV and/or MÁV Cargo. Upon his arrival he was selected by the infamous Dr. Josef Mengele to be a slave laborer. Tzvi worked as a slave laborer at Auschwitz and later at several other camps, and was eventually deposited at the Theresienstadt concentration camp in Czechoslovakia (now the Czech Republic) where he was left to die. He survived, however, and at the end of the war was liberated from the camp by the Soviet Army.

20.    Thereafter, Tzvi received medical treatment from a Jewish-Russian physician in the service of the Soviet Army. After his recovery, he assisted other displaced Jews in emigrating (illegally) to Palestine. He eventually embarked on the same perilous journey, but was arrested by the British mandatory authorities and imprisoned in a concentration camp on Cyprus. After the State of Israel was proclaimed in 1948, Tzvi was able to emigrate. He served in the Israel Defense Forces and became a founding member of Moshav Nordiyya east of Netanya, where he lives today. He has never been compensated for his injuries or stolen possessions.

21.     Named Plaintiff Magda Kopolovich Bar-Or ("Magda") was born in 1928 in Korosmezo (Jasina), in Hungarian-annexed Ruthenia (formerly Austria-Hungary, then Czechoslovakia and now Ukraine). Her father had a lumber business in Korosmezo. Their house was filled with fine furniture, Judaica and other valuable property.

22.     In the spring of 1944, one week after Passover, Hungarian police threw Magda and her family out of their home, leaving them in the town cemetery under heavy guard. The police later took Magda and her family to the *Krona* theater in Korosmezo to await further Hungarian government directives. While at the theater, Magda's parents bribed a Hungarian policeman to allow the family to keep a large wooden package containing the family's valuables, including jewelry, gold and silver items, diamonds, bedding, clothing, Judaica and other items, which Magda's parents believed might be used for further bribes, allowing them to survive further tribulations.

23.     This package, then valued at more than $1,000 U.S., was placed on a MÁV train that took Magda and her family to the Mateszalka Ghetto in Hungary. The package was confiscated en route by Defendants MÁV and/or MÁV Cargo in collusion with Hungarian government officials. Magda and her family never saw it again, and were never compensated for its value.

24.     The family remained in Mateszalka Ghetto for approximately one month before being taken forcibly by Hungarian police onto a MÁV or MÁV Cargo cattle car with approximately 80 other Jews, bound for Auschwitz. On arrival there, Magda and her family were taken to the selection before Dr. Mengele. Magda's mother and grandmother were gassed immediately.

25.     Magda and her younger sister, Nelly, however, were sent to a quarantine facility and from there to slave labor camps.  They were eventually sent to the Geislingen slave labor camp, and from there to the Wurtemburgische Metalfabrik AG in Germany.  Magda and her sister worked there as slave laborers until the American forces approached, whereupon they were removed to the Dachau concentration camp near Munich, where they were finally liberated by American troops.

26.     After the liberation, Magda and her sister, the only survivors in her family, returned to Hungary, where they learned that their home and all of their property had been confiscated.  Ultimately, they entered Palestine illegally, were arrested by the British mandatory forces, imprisoned on Cyprus and finally allowed to enter the newly created State of Israel after its founding in 1948.  Magda became an Israeli citizen, married and raised her own family, and now lives in Haifa, Israel.  She has never been compensated for her injuries or loss of property.

27.     Named Plaintiff Zehava (Olga) Friedman ("Zehava") is a citizen and resident of Israel.  She was born in Saturoljahhely, Hungary, on May 31, 1932, one of eleven siblings.  Zehava's paternal grandfather was a successful wine merchant.  She and her family lived in her grandfather's large home in Saturoljahhely, on a large lot with outbuildings, some of which were occupied by tenants.  Zehava's brothers attended a yeshiva (Talmudic academy) and served in the Hungarian army.  Her father and her brothers spent much of the year in Budapest conducting business, while Zehava, her sisters and mother remained at home in Saturoljahhely.

28.     The family had a good deal of valuable personal property, including jewelry, silver items, candlesticks, a Chanukah menorah and a celebrated wine collection.

29.     Following the German invasion of Hungary in March 1944, Zehava'a father and her brother Adolph returned to Saturoljahhely from Budapest.  When notice arrived from the

Hungarian government authorities that the Jews of Saturoljahhely must move into the Ghetto, the family transferred title to their home to a Gentile couple, excepting that a single room, in which Adolph hid many of the family's valuables, remained in the control and possession of the Friedman family. In exchange, the Gentile couple transferred to the Friedmans a one-bedroom apartment in the Ghetto.

30.    The family was taken from its home by Hungarian police acting in their capacity as official representatives of Defendant Hungary. Under color of their authority, the police seized most of the valuables that the family members were carrying with them. The family was able, however, to secrete some of valuables on their persons and take them to the Ghetto, for future use as bribes to ameliorate their condition.

31.    When the Ghetto was reduced in size, the family had to move into an attic room. In early June, 1944 they were forcibly taken from there by Hungarian police and herded on foot into the MÁV train station in Saturoljahhely. Zehava and her siblings took knapsacks filled with clothes and valuables that had escaped the attention of the Hungarian gendarmes. Her parents carried expensive suitcases.

32.    At the station they were told by MÁV officials that they could not bring their personal belongings on the train. The suitcases and other items were left behind at the train station in the control and possession of Defendant MÁV or Defendant MÁV Cargo, and were never returned to Zehava and her family, nor was any compensation paid for the loss of these possessions. Likewise, compensation was never paid for the family's valuables previously seized by the Hungarian police, nor has Zehava been compensated for her injuries described herein.

33.     The family was taken to Auschwitz by train, in a cattle car with approximately 80 other people.  It was hot; there was little air, no water and no toilet facilities.  Zehava's father tried to put on his prayer shawl and phylacteries in order to pray, but could not do so because there was no space.

34.     The family arrived at Auschwitz on June 6, 1944.  Upon disembarking, the prisoners were ordered by the German SS troops to form four rows.  Dr. Mengele was awaiting them on the platform.  Zehava's mother, Fanny, stood with her younger sister, Edith, while Zehava and her twin sister, Eva, stood together.  Mengele asked Fanny whether Zehava and Eva were twins, and when she said "yes," the two sisters, who were 12 years old, were pulled off to the side.  They and their other siblings watched as their father, now wearing his prayer shawl and phylacteries, and their mother and sister Edith were taken to their deaths in the gas chambers.

35.     Zehava and Eva slept in the camp washroom that night.  The next day they were given showers and numbers were tattooed on their arms.  Zehava's number was A7202; Eva's was A7203.  They were then taken to the hut where twins were kept, where they remained until transferred to the Gypsy camp in October 1944.  In December 1944, they were told that Auschwitz would be evacuated and the surviving prisoners force-marched elsewhere (this became known as the infamous Death March).

36.     In the cold and snow, they walked for what seemed like an eternity.  Eva wanted to sit, but the others told Zehava that whoever sat down would never get up, and so she kept Eva on her feet.  Eventually they made it to the Ravensbruck concentration camp, and from there to the Bergen Belsen concentration camp, where they were liberated by the British in April 1945.

37.     By then, Zehava was too weak to stand.  A British soldier carried her to a hospital where she recovered.  In June 1945, Zehava and her sister were taken by Count Bernadotte to

Sweden via Lübeck, Germany.  They remained there for two years and were then able to reach Palestine, which later became Israel, where Zehava has lived ever since.

38.     Named Plaintiff Yitzhak Pressburger ("Yitzhak") is a citizen of Israel residing in Jerusalem.  He was born in Slovakia in 1928, the son of Jeno Pressburger, a trader in agricultural products.  The family lived in Bratislava until 1934 when they moved to Prague.  When the Germans occupied Prague in 1939, the family went into hiding.  Eventually they moved back to Slovakia and thence to Budapest, Hungary, where they remained until 1945.  Jeno Pressburger continued to work as an agricultural products merchant, primarily in the Hungarian annexed regions of Slovakia.  Their last address in Budapest was Budapest, VI. Eotvos Str. 38.

39.     In the spring of 1944, after the German invasion, Jeno Pressburger delivered five wagons of dried prunes – worth a considerable sum at the time – for shipment from Ujvidek/Novi Sad in Hungarian-annexed Slovakia to Budapest.  The MÁV station-master and his staff-members confiscated all of Pressburger's goods at the Ujvidek railway station and forcibly expelled him.  The loss of this valuable cargo impoverished the family.  They went into hiding until the end of the war.  MÁV never returned the goods or compensated the Pressburger family for them, nor has Yitzhak, the sole remaining member of the family, been compensated for his injuries caused by the defendants.

40.     Named Plaintiff Alexander Speiser ("Alex") is a citizen of Israel living in Tel Aviv.  He was born on October 12, 1928, in Nove Zamky, Czechoslovakia, the son of Aladar and Ethel Markstein Speiser.  Aladar Speiser was a merchant who produced and sold dairy and other agricultural products.  Alex had three brothers, Frijyes, Miky and Arpi.  In addition, the family adopted Lenke, Alex's first cousin, when her parents died.  The family lived in Nove Zamky until 1930 when they moved to Cesky Tesin, Czechoslovakia until 1938, when the country was

dismembered.  In 1938 the family returned to Nove Zamky in 1938, which was annexed by Hungary, and where the family remained until 1944.

41.     The Hungarian authorities prohibited Aladar Speiser from working and forced him to sell his dairy business to a Hungarian.  Despite these setbacks, however, the family remained affluent, with a beautiful home and many possessions, some of great value.  They owned an automobile and had a telephone and electricity at a time when this was unusual in that region.  Aladar put his money in Hungarian banks and invested in jewelry, particularly diamonds and gold.  One item in particular was a two carat blue-white diamond ring that his father purchased for his mother.

42.     In approximately May 1944 the family was forced to leave its home and move into the Nove Zamky (then known as Ersekujvar) Ghetto.  They buried some valuables and took others with them.  The family was assembled in the city marketplace together with the other Jews of the town and marched for two hours by Hungarian police, in their capacity as officials of Defendant Hungary, to a brick factory outside of town, in a place called Teglajyar.  There they were placed in the open brick factory, fenced in like animals for approximately three weeks and continuously guarded by the Hungarian police.

43.     On June 14, 1944, the family was transported to Auschwitz by Defendant MÁV. The brick factory had a MÁV siding that was controlled and operated by MÁV or MÁV Cargo. MÁV or MÁV Cargo officials were present when Alex and his family along with the other Jews of Nove Zamky were loaded into the cattle cars.  The train came right up to the factory.  The Jews were surrounded by Hungarian police.  The Jews' property was confiscated by Defendant MÁV or Defendant MÁV Cargo; Alex saw MÁV officials carrying away the Jews' possessions, including those of his own family.  One of the MÁV officials took the blue-white diamond ring.

MÁV never returned the ring or any of the other possessions, nor did MÁV compensate Alex or his family therefor.

44.     Eighty or ninety Jews were crammed into the cattle car.  Alex, then 15, was with his father and mother.  His other siblings had been sent by the Hungarian government to forced labor camps, while the adopted daughter remained in Budapest.  She was later captured by the Hungarian police, deported to Auschwitz on a MÁV or MÁV Cargo train (on information and belief) and gassed.

45.     The journey to Auschwitz lasted three days, during which time the doors to the cattle car remained sealed. There were no toilet facilities, and conditions were bestial.

46.     MÁV selected a leader for each car.  Alex's father, Aladar, was chosen to be leader of their car.  He screamed for some water for the Jews.  The train stopped.  As it did, Aladar was holding on to the slats in the car, his fingers protruding.  MÁV officials came and beat his fingers, breaking them.

47.     When they arrived at Auschwitz-Birkenau on June 17, 1944, Dr. Mengele conducted the selection, immediately sending Alex's mother Ethel to her death in the gas chambers.  Alex was given prisoner number 79658.  He spent several weeks at Birkenau and although he was twice condemned to death, he managed to survive both times.  Father and son were eventually sent to a slave labor camp at Dachau-Allach in the suburbs of Munich, Germany, arriving there on July 11, 1944.  They remained there for the duration of the war, and were liberated by American troops on May 1, 1945.  Alex has never been compensated for his injuries.

48.     Named Plaintiff Ze-ev Tibi Ram (f/k/a Tibor Herman) ("Tibi"), is a citizen and resident of Israel.  He was born on December 3, 1930 in Munkács, Hungary, to Bernat and Iren

Herman. Tibi also had an older brother, Miklos, who was born in February 1925. Bernat worked for a firm as a clothing merchant. Nominally Jewish, the Herman family was fully assimilated; Tibi studied in Hungarian public schools for eight years.

49.     Bernat was a Hungarian patriot who fought in the rebellion against Czech rule during the Czechoslovakia occupation (*circa* 1937). Thus the family was exempt from racial laws that were imposed when Hungary annexed the area in 1938, including the requirements to wear the Jewish star and live in the Ghetto. This changed when Germany invaded in 1944.

50.     In mid-April 1944, four SS officers came to the Hermans' home and asked why the family was not in the Ghetto with the rest of the Jews. The SS officers read the exemption papers and then ordered the family to move into the Ghetto immediately.

51.     Tibi and his family, however, were not taken to the Ghetto. Rather, a truck took them to a brick factory outside of Munkács, which served as a collection point for deportation of the Jews by train. There were several Hungarian police and MÁV employees at the brick factory, but no Germans. The Hungarians told the Jews that they were being relocated to work, and, that same day, Tibi and his family were loaded onto the trains.

52.     Each member of the family took a suitcase. Tibi packed an extra pair of shoes, underwear, and his bar mitzvah watch (an Omega). His mother, Iren, packed her jewelry, which included gold, rings, necklaces, diamonds, and earrings, as well as some sausages. Bernat packed his gold watch and chain.

53.     Tibi, who was thirteen years old and had never been on a train, was elated when he saw the trains because he thought the family was going on a trip. (While he had heard rumors of the 1941 deportations, he was not aware of the facts and did not understand the reality of what was occurring).

54.     The family was told by MÁV employees to leave their suitcases. Tibi watched as a MÁV official took a pair of shoes from his father's suitcase as well as his mother's suitcase, which contained all of the valuable jewelry that she was not wearing. No compensation was ever paid for the family's property taken in this fashion, nor has Tibi ever been compensated for his injuries recounted herein.

55.     The officials pushed Tibi and his family into a crowded cattle car. Tibi found a place where there was a small hole in the freight car so he could look out. He noticed that the train passed through Kosice.

56.     The conditions in the cattle car were wretched. There was no water and the people in the car were packed in so tight that it seemed as if there was no air. One bucket served as the bathroom. It was extremely hot, and Tibi was incredibly thirsty throughout the trip, even though the train stopped once for water and Tibi was given some by his parents. Those in the car begged bystanders at train stations for a little water, even offering jewels in return. Several people died during the train trip due to the conditions in the cattle cars. After several days, the train arrived at Auschwitz.

57.     Upon arrival, the survivors were ordered to leave any remaining belongings in the cattle cars, get out of the cars and line up on the platform. When asked by the new arrivals where they were going, prisoners already at the camp pointed to a tall chimney to the right and said, "In a moment, that's where you'll be." Tibi did not understand what they meant. He saw a boy about his age inside the camp, who was dressed in a prisoner's uniform and shepherding a flock of sheep. Tibi wanted to be a farmer, and he grew excited at the thought of getting a uniform and being given a job in agriculture.

58.    The men and women were separated and Tibi walked with his father and brother toward the camp.  They had to pass a tall SS man standing near the entrance gate, who Tibi later learned, was Mengele.  Tibi's father and brother were both tall and strong and passed by with no problem.  Mengele stopped Tibi, however, and asked, "How old are you?"  Tibi, not realizing that his answer would save his life, lied and said that he was fourteen.  He continued to walk straight into the camp.

59.    In the camp, they were shaved, given uniforms, and assigned bunks in the barracks.  After about one week at Auschwitz-Birkenau, they were again packed on extremely crowded cattle cars with no food or water.  After several days on the train, they arrived at a station and detrained.   They walked several kilometers to a place called Fuerstenstein, Wuestegiesdorf, Schlesien (Silesia).  It was another camp where there were about 300-400 inmates.  The barracks consisted of small igloos made from thick cardboard.

60.    Tibi and his father and brother remained there for approximately nine months.  While there, they were forced to do manual labor – road-building and excavation – to help transform a local castle into a command post for Hitler.  The work stopped when the Americans and English began bombing the area.  In winter 1944-1945, Tibi and his father and brother were marched toward Bergen Belsen; the final part of the journey was made by train.  By then they were "Muselmann," the name given to those devoid of personal hygiene and suffering from a combination of starvation and exhaustion that manifested itself in an apathetic listlessness regarding their own fate, as well as unresponsiveness to their surroundings.  (*See* Israel Gutman, *Encyclopedia of the Holocaust*, New York: Macmillan 1990, vol. 3. p. 677 (Hebrew edition)).

61.    Tibi saw his mother at Bergen Belsen, but she disappeared and was never seen thereafter.

62.     Around April 15, 1945, Tibi and the remainder of his family were liberated by the British: His father had died in his arms a few days earlier.  Tibi also lost an aunt, uncle and cousins at Bergen Belsen.

63.     Tibi and his brother, Miklos, were taken to a hospital.  There Miklos died of malnutrition and other complications caused by his brutal maltreatment at Bergen Belsen.  Tibi remained in the British hospital for several months.  That summer, he was then taken by ship to Sweden.  After two years in Sweden, Tibi returned to Hungary.  He later migrated to Israel, where he lives now.

64.     Named Plaintiff Vera Deutsch Danos ("Vera") is a citizen of Australia, residing in Melbourne.  She was born in Verpelet, Hungary in 1926, the daughter of Ferenc Deutsch, a wealthy wine merchant.  They lived in Verpelet, a town of about 5,000 people, until Vera was 10, when they moved to Miskolc, which had a population of 75,000 people.  Of the 15,000 Jews who lived there before the war, only 900 survived.

65.     In 1943 Defendant Hungary confiscated Vera's father's wine business, but the family's lifestyle changed little.  After the Germans arrived in March 1944, however, Defendant Hungary, through the police, deported a number of Miskolc's prominent Jews to Auschwitz on MÁV trains, Vera's uncle among them.

66.     In May 1944, the Hungarian police, acting in their official capacity, appeared at Vera's house.  The family was forced to line up while Hungarian government officials demanded that they surrender all of their jewelry and valuables.  The family were marched to the Ghetto, about a half an hour's walk.

67.     All of the Jewish population remaining in Miskolc – approximately 15,000 less those who had already been transported – was held at the Jewish school in the Ghetto, where

some of them, including Vera's father, were selected to work in forced labor camps. The Jews imprisoned at the school were given little food and water. After a few days, they were marched to a brick factory, about an hour's walk, during which time they endured beatings and cursing by the Hungarian police.

68.     They remained there for about a week, fully exposed to the elements. Then a MÁV or MÁV Cargo train arrived at the brick factory station and MÁV officials forced the Jews into cattle cars. MÁV officials told them to leave their personal belongings, which included clothes and valuables. The MÁV officials took these, including valuable personalty of Vera and her family, and never returned or paid compensation for them, nor has Vera ever been compensated for her injuries summarized herein.

69.     The Jews were taken in three trainloads. Although they had been told they were going to Germany to help in the war effort, in fact, they were destined for Auschwitz. The trip took several days. There were some 70 people in each cattle car, and conditions were unbearable.

70.     Two of Vera's brothers died at Auschwitz. Vera was kept there for three to four weeks, and then moved to Ravensbruck concentration camp and ultimately to Berlin where she was put to work as a slave laborer in an airplane parts factory.

71.     In May 1945 Vera was liberated and returned to Hungary. There she learned that her father had survived the Matthausen concentration camp in Austria but had died from typhus shortly after liberation. Her mother, her sister and one brother, however, had survived. Vera eventually emigrated to Australia, where she lives now.

72.     Named Plaintiff Ella Feuerstein Schlanger ("Ella") is a citizen of Florida domiciled at 1868 Shore Drive South, Apartment 410, South Pasadena, Florida 33707. She was

born in 1930 to a Hungarian family resident in Benedike, Czechoslovakia, approximately 10 km from Munkács. Her parents, Mono Feuerstein and Gisella Salomon, had a large estate of several thousand acres where they grew tobacco and owned a distillery.

73.     In April 1944, Hungarian police removed the Feuerstein family to a brick factory in Munkács, where they were kept for 4-6 weeks. The family was able to take some clothing, bed clothes, personal items and some jewelry with them.

74.     At the brick factory, they and the other Jewish prisoners were forced to live on the floor, without food. They were beaten by the Hungarian police guards. Eventually they were led to MÁV and/or MÁV Cargo cattle cars covered with barbed wire, where the Feuersteins and the other Jewish prisoners were forced onto the train by MÁV and/or MÁV Cargo personnel, who took their personal items and jewelry from them. The Feuersteins lost, among other items, an engagement ring, a diamond, a seal coat and valuable watches.

75.     The conditions on the train were subhuman. Approximately 80 Jewish prisoners were forced into each cattle car. There was only room to stand. There were no toilet facilities. There was no food or water in the cattle car. The trip to their destination – Auschwitz-Birkenau – took two or three days, during which time the train stopped several times for water. Three people in the Feuersteins' cattle car died during the transit.

76.     When they arrived at the camp, they were greeted by kapos (who themselves were prisoners) yelling "Heraus!" – "Get out!"  Guards in the watchtower were singing "Aber jetzt gehts du alle kaput," loosely translated as "But now you are all going to your end."  The selection was being supervised by Dr. Mengele. A kapo asked Ella how old she was, and having been told in advance to say "16" (not her real age, which was 13), she responded accordingly. Dr. Mengele instructed Ella to go in one direction, and told her mother to go in a different

direction. Ella chased after her mother but was followed by Dr. Mengele, who told her that she would see her mother the next day. Ella's mother, in fact, was taken to the gas chamber, and Ella never saw her again. Ella's father was gassed at Auschwitz two months later. Ella's brother, Tibor, was shot by the Germans at Auschwitz in early 1945.

77.     Ella worked at Auschwitz next to the crematorium, where she sorted prisoners' belongings taken from the transports, including bedding and shoes. Ella was able to survive the periodic selections for gassing that occurred at the camp. In October, 1944, she was removed to Grossrosen camp, then Matthausen camp, and then Bergen Belsen camp. She also spent time as an inmate in two other camps, and performing slave labor in a munitions factory.

78.     During this period, Ella contracted typhus. She lost her vision, and had to eat grass to survive. Ella had diarrhea for three months. She was infested with lice, and her skin erupted in boils. She could not sit down. Ella was finally liberated by the British, and returned to her home, only to find that no one was left. Ella stayed briefly in Benedike with a shoemaker, and was then taken to Prague where she was reunited with an uncle who had survived. They obtained papers to emigrate to the United States, where Ella married, raised two children and became a registered nurse, and where she now lives.

79.     Ella received compensation from Hungary, in the amount of $5,000, for the loss of her father ($2,000), her mother ($2,000) and her brother ($1,000). She has never been compensated, however, for the loss of the family's personal property, including the valuable jewelry and watches that were taken by MÁV and/or MÁV Cargo upon embarkation for Auschwitz. She has never been compensated for her injuries suffered at the hands of the defendants.

### The Defendants

80.    Defendant Republic of Hungary is a sovereign nation that can be sued under applicable, well-recognized exceptions to sovereign immunity embodied in the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602 *et seq*.  During World War II, Hungary actively collaborated with the Nazis in their plan to eradicate European Jewry.  Hungary facilitated the destruction of the vast majority of its own Jewish population at the hands of the Nazis. Hungarian officials stripped Jews, including named plaintiffs herein, of their valuable possessions as they boarded the defendants' trains taking them to slave labor camps, concentration camps and extermination camps.  Hungary has never returned these goods, nor has Hungary ever compensated its Jewish victims for them.  Hungary knew, when it forced its Jewish population onto the Defendant Railways' cattle cars, that the Jews were being sent to their doom.

81.    Defendant Hungary engages in an ongoing course of commercial activity throughout, and maintains property in, the United States, that has been exchanged for the property it stole from the plaintiffs herein.  Hungary is amenable to suit in the United States.

82.    Defendant Magyar Államvasutak Zrt. (MÁV), the Hungarian national railway, was established in 1868, and has operated continuously since then.  Its principal place of business is at 1062 Budapest, Andrássy út 73-75, Hungary.  During World War II, MÁV voluntarily collaborated with the Nazis, using its railway lines and freight cars to deport Hungarian Jews from the breadth of Hungary into the Ukraine and Poland to meet their fate at the hands of the Nazis.  MÁV knew that the Jews were being transported to slave labor camps and, in most instances, to their deaths.  At the points of embarkation, MÁV confiscated and kept personal property of the Jews who were about to be deported.  MÁV mistreated the Jewish

deportees who were on it trains during their deportation, causing grievous injury and death to many of them en route. MÁV engages in an ongoing course of commercial activity throughout, and maintains property in, the United States, that has been exchanged for the property it stole from the plaintiffs herein. More specifically, and without limitation, MÁV engages in commercial operations within the United States, including maintenance of an agency for selling tickets, booking reservations, and conducting similar business in the United States. Defendant MÁV is an agency or instrumentality of the Republic of Hungary for purposes of the Foreign Sovereign Immunities Act, and is amenable to suit in the United States.

83.     Defendant Rail Cargo Hungaria Zrt., successor-in-interest to MÁV Cargo Árufuvarozási Zrt., f/k/a MÁV Cargo Zrt., a Division of MÁV Zrt. before and during World War II, was a freight hauling unit or division of MÁV, and actively participated in concert with Defendants Hungary and MÁV, together the German Army and S.S., in confiscating the possessions of Hungarian Jews and transporting them to their intended deaths at Auschwitz and other Nazi concentration and extermination camps. Defendant MÁV Cargo was owned by Defendant MÁV Zrt. until 2008, when it was privatized. Upon information and belief, MÁV Cargo assumed the assets and liabilities of its predecessor entities. Its principal place of business is Váci út 92, H-1133 Budapest, Hungary. MÁV Cargo maintains a robust presence in the United States through its Website, which solicits intermodal freight shipping business originating or terminating in the United States. MÁV Cargo's Website also facilitates the shipping process by providing its customers in the United States with electronic access to the multitude of shipping, customs, consignment and other forms that must be completed as part of the shipping process. The Website also provides its U.S. customers with contact information for the MÁV Cargo personnel who are available to assist in expediting the shipping process. While MÁV

Cargo is not subject to jurisdiction in any state's courts of general jurisdiction, the exercise of federal jurisdiction is consistent with the United States constitution and laws in that the claim arises under federal law, and MÁV Cargo has substantial contacts with the United States as a whole.

## JURISDICTION AND VENUE

84.     The subject matter jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1330, 1331, 1332, 1350, 1350 App., 1367 and 1605.  The amount in controversy exceeds Five Million ($5,000,000) exclusive of interest and costs.

85.     This Court has personal jurisdiction under 28 U.S.C. §§ 1330(b) and 1605(a), and Fed.R.Civ.P. 4(k)(2).

86.     Venue lies in this district pursuant to 28 U.S.C. §§ 1391 (d) and (f)(4).

## FACTS

87.     The Holocaust consisted of the systematic, bureaucratic, state-sponsored persecution and murder of approximately six million Jews, two-thirds of the pre-World War II European Jewish population.  It began in 1933 when the Nazi Party rose to power in Germany, and ended in 1945 with the Nazis' defeat by the Allied powers.  Almost ten percent of the Jewish victims of the Holocaust were Hungarian – over 550,000 men, women and children.

88.     The Nazis called their plan to exterminate the Jewish population of Europe "the Final Solution," by which they meant the organized, bureaucratized and premeditated murder of the Jews, achieved by first isolating them, then expropriating the Jews' property, then ghettoizing them, then deporting them to the camps, and finally, murdering the Jews and in many instances cremating their bodies.

89.     Defendant Hungary and the Defendant Railways were willful collaborators and participants in the Final Solution, including the plundering of the Hungarian Jewish population's wealth and possessions, from which the defendants benefited.

### The First Deportations and Murder of Hungarian Jews: 1941

90.     Although the German army did not occupy Hungary until March 1944, its Jewish inhabitants were not spared the depredations of the Holocaust before then.   Many refugees, including as many as 35,000 Jews, fled to Hungary on the heels of the Nazi annexation of Austria, the dismemberment of Czechoslovakia and the Germans' occupation of Poland.   During July and August 1941, Hungarian authorities rounded up these Jews, together with native Hungarian Jews who could not prove their citizenship, and transported approximately 18,000 of them by Defendant MÁV train to the Polish border.   Named Plaintiff Tzvi Zelikovitch, his parents and siblings were among those transported.   Their possessions, and the possessions of others in the transports, were confiscated by MÁV in the train-boarding process.   At the Polish border, the Jews were delivered by Defendant MÁV to the Nazi Gestapo and taken to the vicinity of Kamenets-Podolsk, where, on August 27-28, 1941, the Gestapo machine-gunned approximately 16,000 to death.   Tzvi survived this massacre by escaping into the woods.   His parents and his siblings were murdered.

91.     A total of approximately 60,000 Hungarian Jews were slaughtered before the German occupation in 1944.

### Hungarian Jewry Following the German Occupation in March 1944

92.     Following the German occupation of Hungary in March 1944, the Hungarian government imposed escalating restrictions on the Jews.   Jews were not allowed to travel, were forbidden from wearing military uniforms and school uniforms, were prohibited from using

public baths and swimming pools, and were barred from public restaurants and cafes. By government decree, all books by Jews or Christians of Jewish background were removed from schools and libraries.

93.     On April 5, 1944, Hungary passed a law requiring every Jew over six years old to wear a yellow six-pointed star on the left chest of the outer garment. Anyone caught violating the law was immediately arrested.

## Ghettoization of Hungarian Jewry

94.     Pursuant to governmental Decree No. 6163/1944, the ghettoization of the Hungarian Jews began in Carpatho-Romania and the northeastern part of the country on April 16, 1944, the first day of Passover. Ghettoization quickly spread to all parts of the country. All Jews, regardless of age or sex, were forced into ghettos from which they were forbidden to leave. All expenses associated with ghettoization were taxed on the Jews. The final stages of the Final Solution were under way for the Jews of Hungary.

## Deportation of Hungarian Jewry

95.     Incarceration in the ghettos lasted only a few weeks for most Jews, as they were quickly deported, *via* the Defendant Railways, to the death camps for liquidation. Named Plaintiffs Rosalie Simon, Helen Herman, Charlotte Weiss, Helena Weksberg, Rose Miller, Magda Kopolovich Bar-Or, Zehava Friedman, Alexander Speiser, Ze'ev Tibi Ram, Vera Deutsch Danos and Ella Feuerstein Schlanger, and members of their families including parents and siblings, were among those transported by Defendants MÁV and/or MÁV Cargo to Auschwitz. Their possessions were taken from them by MÁV and/or MÁV Cargo as they boarded the trains for embarkation. The property of Named Plaintiff Yitzhak Pressburger's family was likewise stolen by MÁV and/or MÁV Cargo, never to be returned.

96.     The Jews did not resist the deportations.   Incarceration in the ghettos had demoralized them, as the shocking conditions of their bare existence – removed from their homes and surroundings, stripped of protective clothing, exposed to the elements, deprived of sanitary facilities, undernourished and diseased – were unbearable.  They lacked the strength and spirit to offer resistance, and they clung to the fantasy that removal to another locale would improve their conditions.

97.     The first deportation occurred on April 29, 1944, when 1,800 Jews were transported from Kistarcsa.  The second deportation occurred the following day, with 2,000 Jews leaving Topolya.

98.     At a conference in Vienna on May 4-6, 1944, attended by representatives of the Hungarian gendarmerie, the *Sicherheitspolizei*, and the German, Slovak and Hungarian railroad systems including the Defendant Railways, the schedule of deportations and the route plan were finalized, pursuant to the Final Solution.  Systematic deportations of Hungarian Jewry via the Defendant Railways began on May 15, 1944.

99.     The deportation schedule called for four trains daily carrying approximately 3,000 to 3,500 Jews per trainload.  The Jews were crammed 70 to 90 per freight car, with the average freight car used in Hungary at the time measuring 26.8 feet long by 7.2 feet wide.  Each freight car was provided, at most, with two buckets: one with water and one for excrement.  Many ill and elderly Jews died en route, mostly from suffocation.

100.    A Hungarian journalist described the entrainment and deportation of the Jews of Munkács as follows:

> On May 22, the ghetto of the city of Munkács was also emptied
> and most of Munkács 12,000 Jews were driven on the route from
> the ghetto to the brickyard by guards using whips, machine-guns,
> and rifle-butts.  There they were compelled to lay down their

baggage and undress - men, women, and children alike. Stark naked, they were then ordered to move back a few steps, and women, who were called in specially, together with the Gestapo men, policemen, and gendarmes went through their baggage and clothing, even opening stitches to discover whether the Jews had hidden anything. Those who did not undress or step back fast enough were beaten. Most of the people were bleeding and stood silently, naked, and numbed. The searches, however, were all the more loud. The clothes were then returned, the personal documents were torn, and everybody became a non-person. They were then driven by night sticks and rifle butts to get dressed. Here, 90 persons were crowded into a freight car: *obviously there were too few cars and too many Jews!* The cars were then chained and padlocked. Each got a bucket full of water and an empty one for excrements. The train, however, was left standing in the station during the hot May day and was allowed to leave only the following day. By that time many became mad and even more died, since the Jewish hospital patients were also included. The doors were not opened the day of the departure. The corpses were removed three days later at Csap, where also the mad were clubbed or shot.[1]

101.    Samu Stern, the head of the Budapest Central Jewish Council during the Holocaust, described "[t]he agony of the Jews assembled for deportation after weeks of dehumanizing treatment in the ghettos and entrainment centers"[2] as follows:

[Searching for the valuables of the Jews] no brutality, no method of torture was spared to make them confess. Wives were beaten under the eyes of their husbands, and when this was of no avail, children were tormented in front of their parents. The favorite methods of the Hungarian gendarmes to make these unfortunates speak up one way or another were tying up the victims, beatings with rubber truncheons, the use of electric devices, blows with sticks upon the soles of the feet and the palms of the hands, boxing the ears, puncturing under the nails, and kicking. When the detectives were through with their job, the SS men of Wisliceny and Zöldi's special unit put in an appearance. They surrounded the ghetto with loaded machine-guns in hand,

---

[1] Randolph L. Braham, The Politics of Genocide: The Holocaust in Hungary, Vol. 1 at 671-72 (emphasis in original) (Columbia University Press rev. ed. 1994) (hereinafter "GENOCIDE") (quoting Jenő Lévai, *Fekete könyv*, pp. 142-43).

[2] *Id.* at 672.

watching with the eyes of lynxes until the trains rolled in. Hereupon they drove the unfortunate people with whips and rifle-butts to the station. At the beginning this was done in the early hours, for they were anxious to avoid sensation; later on, when the pace had to be accelerated, they did not care anymore, chasing their victims across the towns in broad daylight. At this sight kindhearted Christians could often not help bursting into tears, but they had to hide them lest some gendarme might notice their pity and assault them with rifle-butts and foul language. We heard about an instance when a good natured peasant woman tried to hand over edibles to the poor creatures crammed into freight cars. A gendarme caught her in the act and pushed that kind woman into the car which then, carefully sealed, went on with an additional victim.

One car had to hold- depending upon the number of deportees and cars- 60 to 80 persons. . . . In the burning heat of summer, sealed in cattle wagons with two buckets per car, they started their journey via Kassa to Auschwitz, the terminal.[3]

102.    In less than two months, almost 440,000 Hungarian Jews were deported, mostly to Auschwitz, in 47 trains.[4]  *See* TABLE 19.1: DATA RELATED TO THE GHETTOIZATION AND DEPORTATION OF HUNGARIAN JEWRY BY OPERATIONAL ZONES AND GENDARMERIE DISTRICTS, attached hereto as **EXHIBIT A**.[5]  *See also* APPENDIX SIX: DEPORTATION TRAINS PASSING THROUGH KASSA IN 1944: DATES, ORIGIN OF TRANSPORTS AND NUMBER OF DEPORTEES, attached hereto as **EXHIBIT B**.[6]

### Extermination of Hungarian Jewry

103.    From May 15 to July 9, 1944, over 430,000 Hungarian Jews were deported by the Defendant Railways to Auschwitz.

---

[3] *Id.* (quoting Samu Stern, *"A Race With Time": A Statement* 19-20, HUNGARIAN-JEWISH STUDIES, VOLUME 3 (Randolph L. Braham ed. 1973) (1966)).

[4] *Id.* at 673; *After the German Occupation.*

[5] GENOCIDE, VOLUME 1, at 674.

[6] GENOCIDE, VOLUME 2, at 1403-05.

104.    Those who appeared fit for labor upon arrival were tattooed with a number on their left forearm and were allowed for the moment to live.  Approximately 10 percent of the almost 433,000 Hungarian Jews deported to Auschwitz from May 15 to Jul 9, 1944 were selected as fit for labor.  All others, with the exception of those chosen for human medical experiments such as twin children, were sent to the gas chambers.  Named Plaintiffs Rosalie Simon, Helen Herman, Charlotte Weiss, Helena Weksberg, Rose Miller, Magda Kopolovich Bar-Or, Zehava (Olga) Friedman, Alex Speiser, Ze'ev Tibi Ram, Vera Deutsch Danos and Ella Feuerstein Schlanger survived the initial selection at Auschwitz, but they all saw members of their families, including grandparents, parents and siblings, marched away to the gas chambers for liquidation.

105.    The daily arrival of 12,000 to 14,000 Jews from Hungary had been anticipated and huge open pits were dug around the gas chambers to burn the corpses that the crematoria could not handle.  At the height of the deportations from Hungary, nine such pits were used in addition to the crematoria.[7]

106.    A channel was dug in the bottom of the open pits so that the fat secreted from the burning bodies could be "harvested" for use as fuel in the cremation.

### Halting the Deportations

107.    On July 7, 1944, Miklós Horthy ("Horthy"), the Hungarian Regent, ordered a halt to the deportations.

108.    Despite Horthy's order on July 7, the deportation of Jews from the communities surrounding Budapest was completed on July 8, 1944.  1,450 inmates from the Kistarcsa internment camp were deported on July 19, 1944, and close to 1,500 inmates of the Sárvár internment camp were deported on July 24, 1944.

---

[7] GENOCIDE, VOLUME 2, at 780.

109.    By the end of July 1944, the only Jewish community left in Hungary was that of Budapest.

## The Arrow Cross/Nyilas Party Reign of Terror

110.    In October 1944, Horthy, in a coup d'etat, was replaced as the Hungarian Regent by Ferenc Szálasi, the fanatical leader of the fascist and radically anti-Semitic Arrow Cross Party, also known as the *Nyilas* party.  Under this new Hungarian government, the anti-Jewish drive resumed and violent attacks were carried out on the remaining Jews living in Budapest until liberation.

111.    Hundreds of Jews in Budapest, both men and women, were violently murdered by the Arrow Cross regime, and many others died from the brutal conditions of the forced labor To which the Arrow Cross subjected them.  In November 1944, the Arrow Cross ordered all remaining Jews in Budapest into a ghetto.  On December 2, 1944, the transfer of the nearly 70,000 Jews of Budapest into the ghetto - covering an area of only 0.1 square miles- was completed.  Starting on November 8, 1944, under Hungarian guard, several thousand Jews from Budapest were marched on foot to Hegyeshalom and the Austrian border.  Many were shot along the way.

112.    The Soviets liberated the surviving Jews in Budapest on January 16-18, 1945. The Jews who were marched to the Austrian border were not liberated until April 4, 1945, when Hungary was freed of all Nazi-*Nyilas* troops.  The several thousand Jews who were taken along with the withdrawing Nazi forces were not liberated until May 9, 1945, when the war ended.

**Hungarian Jewry Losses During World War II**

113.   In 1941, there were approximately 825,000 Jews in Hungary, including 100,000 converts.  The overall loss of Hungarian Jewry during the Second World War, excluding those who fled abroad, was 564,507.

114.   During the German occupation, over 500,000 Hungarian Jews died from maltreatment or were murdered.  The overwhelming majority of these were among the close to 440,000 Jews who were deported to Auschwitz between May 15 and July 8, 1944.

115.   Without the mass transportation provided by the Defendant Railways, the scale of the Final Solution in Hungary would never have been possible.  The "death trains" helped concentrate Jews in ghettos, transport them to forced labor or concentration camps, and, for most of the unfortunate Hungarian Jewry during World War II, transport them to the death camps. Both the Defendant Railways and the Hungarian government expropriated as much personal property as they could from the helpless Jewish victims, draining the wealth and assets of Hungarian Jewry.

**The Post-Liberation Period**

116.   After the war, the liberated Hungarian Jews were preoccupied with basic day-to-day survival.  Many of them suffered from concentration camp-induced mental and physical disabilities, and thousands would continue to die from them.

117.   The Hungarian government was aware of the anti-Semitism that still prevailed in the country, and "[i]t feared that a massive restitution program at a time when the country was itself in ruin, the population impoverished, and the Soviet forces adamant on having their demands met, would only endanger a new wave of anti-Semitism."[8]

---

[8] *Id.* at 1307.

118.    Nevertheless,

> [s]hortly after the signing of the armistice agreement, the Jewish communal leaders submitted to the party leaders and to the government their demands in support of the deportees and for a swift and generous restitution and indemnification program. They argued that these were not designed to provide a privileged position for the Jews, but merely to compensate the survivors and enable them- the most persecuted segment of Hungarian society- to reestablish themselves.[9]

119.    The government did implement an array of legislative enactments and remedial statutes.[10]    However, the Jews saw no tangible results with respect to restitution and indemnification:

> For one thing, the government never regulated the Hungarian state's responsibility for indemnifying the Jews for losses suffered during the Horthy and *Nyilas* eras. . . . .
> The survivors encountered a series of other difficulties. The new owners were reluctant to yield their recently acquired properties; litigation was producing long delays; resistance by political leaders and parties with conflicting short and long-range interests were causing conflicts; the Communists acquired power and began to transform Hungary into a People's Democracy.    All of this militated against the expectations of the Jews for restitution and compensation.    Following the drive against the Smallholder and other anti-Communist parties in the spring of 1947 and the subsequent elections in August, the new Communist-dominated coalition government became even more adamant in its position, despite its international obligations. The Paris Peace Treaty of February 10, 1947, for example, incorporated a number of provisions relating to the restoration of confiscated property. Paragraph 1 of Article 27 stipulated:
>
>> Hungary undertakes that in all cases where the property, legal rights or interests in Hungary of persons under Hungarian jurisdiction have, since September 1, 1939, been the subject of measures of sequestration, confiscation or control on account of the racial origin or religion of such persons, the said

---

[9] *Id.*

[10] *Id.* at 1308.

> property, legal rights and interests shall be restored together with their accessories or, if restoration is impossible, fair compensation shall be made thereof.

> These provisions, like the many other related ones in the armistice agreement and peace treaty, proved merely declaratory. They embodied desiderata and principles rather than strict, legally binding orders; they were not self-executing (they needed appropriate municipal legislation and enforcement to prevail); and they did not provide for sanction in case of non-compliance, other than the implied possible litigation before an international tribunal.[11]

120.   Moreover, the Jewish demands following liberation in 1945 caused a neo-anti-

Semantic reaction in Hungary.

> The frictions caused by the conflicting interests of the feuding parties, at a time of great economic hardship, led to many anti-Semitic outbursts. The anti-Jewish manifestations had a shattering effect both on the survivors, who were still suffering from the trauma of their experiences and losses, and on those many decent Hungarians who believed that the building of a harmonious democratic order based on justice and equality was possible.[12]

121.   Furthermore,

> The problem of neo-anti-Semitism became intertwined with the complex and troublesome issue of responsibility for the tragedy of Hungarian Jewry. Postwar social critics, including some of the literary figures who showed considerable understanding toward the wartime plight of the Jews, tried to exculpate the Hungarian nation as a whole from moral and historical responsibility for what happened to the Jews. Ignoring and distorting historical reality, they endeavored to place the blame almost exclusively upon the Germans. . . . Some of the writers tried to mitigate Hungary's responsibility by arguing that the Hungarian Christians also had suffered during the war, and that the people at large could not be made responsible for the actions of the *Nyilas*. It is hard to understand this attempt to equate the plight of a people in the course of hostilities with the sufferings of a helpless minority that

---

[11] *Id.* at 1308-09.

[12] *Id.* at 1312.

had for decades been subjected to systematic discrimination by a state that elevated anti-Semitism to official policy and at the end cooperated in the Final Solution.[13]

### The Communist Era

122.   With the Communist party in power in Hungary, "the issue of compensation and restitution was squashed under the impact of the campaign against Zionism and cosmopolitanism that was waged in Hungary as viciously as elsewhere in the former Soviet bloc."[14]

123.   In the 1950's, the Commission for the Administration of Abandoned Properties became the Jewish Restoration Fund.  However, the funds were rarely used for their intended purpose and they were frequently raided by the Communists for financing their own political projects.

### The Post-Communist Era

124.   On April 7, 1992, two years after the downfall of the Communist regime, the Hungarian Parliament adopted a law providing compensation for material losses incurred between May 1, 1939 and June 8, 1949.  This was followed by the adoption of another law on May 12, 1992, providing compensation for those who, for political reasons, were illegally deprived of their lives or liberty between March 11, 1939 and October 23, 1989.  The remedies provided by these statutes, however, were paltry and wholly inadequate.

### The Thwarting of Plaintiffs' Ability to Bring These Claims

125.   Named Plaintiffs are the survivors of families that were subjected to human rights violations, including torture, slave labor and extermination.  The personal property of Named

---

[13] *Id.* at 1347.

[14] *Id.* at 1309.

Plaintiffs and their families was removed and taken in violation of due process of law, international law and human rights.

126.    Named Plaintiffs have been unable to secure the return their personal property, including gold, diamonds, jewelry, pearls and other precious metals and jewels.

127.    Since the end of World War II, the Named Plaintiffs' personal property, including gold, diamonds, jewelry, pearls and other precious metals and jewels, has never been accounted for and has never been returned to the plaintiffs from whom it was taken.

128.    Upon information and belief, Defendant Hungary and Defendant Railways, including predecessors or affiliated institutions, received, took possession of, exerted control over, purchased, converted, and/or transferred the aforementioned personal property, including but not limited to the items of jewelry, household furnishings and family heirlooms made of diamonds, gold, silver, pearls and other precious metals and jewels of plaintiffs' families, through transactions and/or agreements with the international war criminal Adolf Hitler and the criminal Nazi Government during World War II, and all of which was done in violation of the due process and human rights of Named Plaintiffs' families.

129.    The Jewish victims of the Hungarian Holocaust seek only what is due them – compensation and restitution for the atrocities they suffered at the hands of the defendants.

## CLASS ACTION ALLEGATIONS

130.    The allegations of paragraphs 1-129 are incorporated in this paragraph as though fully set forth herein.

131.    Named Plaintiffs, in accordance with Fed.R.Civ.P. 23(b)(1) and (b)(3), bring this action on behalf of themselves and as members of the Class defined below.

132.    The Class consists of (a) all surviving Jewish victims of the Holocaust, whether presently American citizens or aliens, who were stripped of personal property by any of the defendants, and/or transported by rail *via* Defendant MÁV or Defendant MÁV Cargo to locales where they were placed or maintained in the custody of the German, or other hostile, authorities and (b) the heirs (whether American citizens or aliens) and open estates (wherever located) of the deceased Jewish victims of the Holocaust who at any time between September 1, 1939, and May 8, 1945, were stripped of personal property by any of the defendants, and/or transported by rail *via* Defendant MÁV or Defendant MÁV Cargo to locales where they were placed or maintained in the custody of the German, or other hostile, authorities and died while in captivity or thereafter.

133.    The Class is so numerous that joinder of all members is impracticable. *See* F.R.Civ.P. 23(a)(1). The Class consists of over 5,000 survivors, and countless heirs and estates, throughout the world, centered chiefly in Israel, the United States and Canada. Named Plaintiffs and their counsel have thus far identified in excess of 300 survivors, including their contact information, and continue to locate more survivors through word of mouth and various data bases.

134.    There are questions of law and fact common to the Class. *See* F.R.Civ.P. 23(a)(2). These common questions include, but are not limited to:

A.      Whether Defendant Hungary and Defendant MÁV, the Hungarian national railway, are amenable to suit in this Court, entailing proof that the pertinent exceptions to sovereign immunity set forth in the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602, *et seq.* ("FSIA"), apply to Defendant Hungary and its national railway in the context of this case, that this Court has personal jurisdiction in this case, and that venue is properly laid in this Court;

B.      Whether Defendant MÁV Cargo is amenable to suit in this Court, entailing proof that the Alien Tort Claims Act is applicable to the claims brought here by Class members who are aliens, that this Court has personal jurisdiction in this case, and that venue is properly laid in this Court;

C.      Whether limitations, laches, or any other defense bars an action by any member of the Class based on the claims alleged herein.

D.      Whether Defendant Hungary, Defendant MÁV and Defendant MÁV Cargo actively collaborated in the Nazis' extermination of Hungarian Jewry as alleged herein;

E.      Whether the Hungarian Jews deported as alleged herein were transported by Defendants MÁV and MÁV Cargo on Defendant MÁV's rail lines, in the Railway Defendants' freight cars, as alleged herein;

F.      Whether the defendants, as a matter of course, confiscated the property and possessions of the Hungarian Jews contemporaneous with their deportation, and failed to return that stolen property to its rightful owners or provide adequate compensation therefor; and

G.      Whether the claims alleged herein can be stated against the defendants by this Class based on the facts alleged in this complaint.

135.    The claims of the Named Plaintiffs, which arise out of Defendant Hungary's efforts to exterminate its Jewish population during World War II with the active collaboration of the Defendant Railways, are typical of the claims of the Class members.    Likewise, the defendants' defenses to the Named Plaintiffs' claims – both the myriad of legal defenses that can be anticipated, together with the factual defenses – are typical of the defenses to the Class claims. *See* F.R.Civ.P. 23(a)(3):

136.    The Named Plaintiffs will fairly and adequately represent and protect the interests of the Class.  *See* Fed.R.Civ.P. 23(a)(4).  The Named Plaintiffs are articulate and knowledgeable about their claims, and fully able to describe them.  There are no conflicts of interest between the Named Plaintiffs, either *inter se* or with respect to the interests of the Class members.  The Named Plaintiffs, like the Class members, have suffered financial and nonfinancial loss as a result of the acts and omissions of the defendants.  Named Plaintiffs have sufficient financial resources to litigate this case and further the interests of the Class without compromising them.

137.    Counsel for the Named Plaintiffs are well-suited to represent their interests and the interests of the Class at large.  Counsel include Charles S. Fax, Esq. (Rifkin, Livingston, Levitan & Silver, LLC, Bethesda, Maryland), Paul G. Gaston, Esq. (Law Offices of Paul G. Gaston, Washington, D.C.), David H. Weinstein, Esq. (Weinstein Kitchenoff & Asher LLC, Philadelphia, Pennsylvania), and L. Marc Zell, Esq., Zell & Co., Jerusalem, Israel).  The combined experience and areas of professional concentration of these attorneys are well-suited to representation of the interests of the Class.  All of these lawyers practice complex civil litigation and are experienced in class action litigation.  Mr. Fax has a particular concentration in civil procedure and complex discovery, having co-authored two texts on the subject, currently serving as an Adjunct Professor of Law at the University of Baltimore School of Law teaching Discovery Practice and Procedure, and authoring a column on developments in civil procedure that appears regularly in the American Bar Association Section of Litigation on-line and hard copy magazine, "Litigation News."  Mr. Gaston has concentrated in international litigation for the past thirty years, including, most recently, claims against state sponsors of terrorism such as Libya and Iran, as well as other international disputes including import relief proceedings.  Mr. Weinstein has concentrated his practice on commercial class action and complex litigation for

over thirty-eight years – including as Court-appointed Lead Counsel in over 100 separate coordinated asylum habeas corpus cases involving Chinese refugees smuggled aboard the S.S. Golden Venture and as one of two Co-Lead Counsel who negotiated a class-action settlement that resulted in the replacement of defective plumbing pipe in approximately 340,000 homes nationwide, at a value in excess of $1.1 billion. Finally, Mr. Zell, who practiced in Washington, D.C., before emigrating to Israel in the late 1980's, and who continues to maintain his membership in the D.C. bar, concentrates in international litigation and business transactions throughout the world.

138.    Class certification is appropriate pursuant to Fed.R.Civ.P. 23(b)(1).  Prosecuting separate actions would create a risk of adjudications with respect to individual Class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

139.    Class certification is also appropriate under Fed.R.Civ.P. 23(b)(3).  The questions of law or fact common to the members of the Class, described above, predominate over any questions affecting only individual members.

140.    Due to the individual amount at issue as to each Class member, as well as the cost and difficulty in litigating each case separately, the Class members have insufficient interest in individually controlling the prosecution of separate actions. *See* Fed.R.Civ.P. 23(b)(3)(A).

141.    The Class has not previously litigated the claims asserted in this complaint. *See* Fed.R.Civ.P. 23(b)(3)(B).  There is one pending amended complaint against MÁV Zrt. only, styled *Victims of the Hungarian Holocaust v. Hungarian State Railways*, Case No. 1:10-cv-00868, in the United States District Court for the Northern District of Illinois, Eastern Division,

filed February 9, 2010.   On information and belief no answer has yet been filed and no class certified in that case.

142.   This Court is an appropriate forum for the litigation of the Class claims.

143.   Any difficulties that might be incurred in the management of this class action are insubstantial.  *See* Fed.R.Civ.P. 23(b)(3)(D).   The named representative plaintiffs have already undertaken the task of identifying the Class membership, whose names appear on various schedules, registries and documents accessible to the plaintiffs.

## THIS SUIT IS TIMELY FILED

144.   No limitations period should be imposed on the prosecution of this action, due to the heinous and unprecedented quality of the wrongdoing giving rise to this action, and for the same reasons that no limitations period is imposed on criminal prosecutions for the violations of international law, war crimes and crimes against humanity alleged herein.

145.   Alternatively, this complaint is timely filed under the continuing wrong doctrine. Under this doctrine the limitations period does not begin to run until the last wrongful act occurs. Here, the defendants' ongoing failure to return the plaintiffs' assets to them or compensate them for the same, coupled with the defendants' repeated denials of facts and concealment of information relating thereto, which, had disclosure been made, would have enabled the plaintiffs to bring suit much earlier, constitute deliberate, continuous and ongoing violations of international and domestic law.  These violations continue to this day.

146.   Alternatively, any statute of limitations is equitably tolled.  The plaintiffs were kept ignorant of vital information necessary to pursue their claims without any fault or lack of due diligence on their part.  The defendants continually thwarted any attempts to recover assets, as well as facts and information relating thereto.  The deceptive and unscrupulous deprivation of

both assets and of information substantiating plaintiffs' rights to these assets entitles them to the benefit of equitable tolling.

147.   Further, the Holocaust, World War II, and the subsequent diaspora of the survivors of the Hungarian Jewish community constitute extraordinary circumstances in and of themselves sufficient to invoke the doctrine of equitable tolling and to preclude the operation of laches. The Named Plaintiffs and the Class they seek to represent suffered and continue to suffer debilitating trauma resulting from the mental and physical injuries caused by the defendants, disabling and deterring them from pursuing litigation against these defendants. Moreover, for most of the period between the end of World War II and the present, there was no apparent forum in which plaintiffs could bring their claims and safely, and fairly, have them adjudicated.

148.   Alternatively, the facts alleged above give rise to an estoppel. The defendants have continuously denied their participation in the unlawful conduct alleged herein. Further, they have actively concealed information concerning the plaintiffs' assets – information in the defendants' exclusive control. Plaintiffs have thus been prevented from obtaining access to vital information necessary to bring their claims. Defendants are thus estopped to rely on any statutes of limitations or the doctrine of laches as a defense to the claims herein.

149.   The defendants are estopped to raise limitations or laches as a defense for the further reason that they actively lulled the plaintiffs into allowing any otherwise applicable statute(s) of limitations to expire. The defendants did this through a series of legislative enactments and remedial statutes beginning with the Treaty of Paris in 1947 through laws adopted in the 1990's that held out the false promise of providing the plaintiffs with adequate compensation.

150.   Finally, the defendants are estopped to raise any defense of laches due to their own manifestly unclean hands as alleged hereinabove.  The elements of laches cannot be met for the further reason that the defendants have benefitted, rather than suffered injury, by virtue of any failure on the part of the plaintiffs to bring this suit sooner.

## COUNTS

### Count I
(Conversion)

151.   The allegations in Paragraphs 1-150 are incorporated by reference as though fully stated herein.

152.   The named representative plaintiffs and the Class they represent owned and had the right to possess personal property that was taken from them by the defendants, as described hereinabove, and never returned to them.

153.   The defendants' actions were intentional.

154.   The defendants deprived the plaintiffs of such property, and the possession and use thereof.

155.   The defendants' unlawful actions caused severe damages to the plaintiffs.

### Count II
(Unjust Enrichment)

156.   The allegations in Paragraphs 1-150 are incorporated by reference as though fully stated herein.

157.   The plaintiffs were deprived of their personal property by the defendants without consideration or legal cause.

158.   The defendants were enriched thereby.

159.   It would be inequitable and unconscionable for the defendants to continue to enjoy the benefits of possession and use of the plaintiffs' personal property without compensating the plaintiffs therefor.

### Count III
(Breach of Fiduciary and Special Duties Imposed on Common Carriers)

160.   The allegations in Paragraphs 1-150 are incorporated by reference as though fully stated herein.

161.   The Defendant Railways, as common carriers, owed a fiduciary duty – a special duty of care – to the plaintiffs, their passengers during the deportations described hereinabove. That special duty included the highest degree of vigilance, care and precaution for the safety and security of their passengers, embracing all of those risks to which passengers are exposed during the boarding, embarkation and transportation at the hands, and under the control, of the common carrier, including theft and personal injury.

162.   The Defendant Railways breached that duty by confiscating the plaintiffs' possessions before and during their deportations, and by causing and allowing the plaintiffs to be seriously, and in many cases fatally, injured during the deportations.

163.   The Defendant Railways' breach of duty caused the plaintiffs to suffer serious damages.

### Count IV
(False Imprisonment)

164.   The allegations in Paragraphs 1-150 are incorporated by reference as though fully stated herein.

165.    Commencing with the removal of the plaintiffs (excepting Plaintiff Pressburger) from their homes, and throughout the during the deportation process, the defendants forcibly detained the plaintiffs and deprived them of their personal liberty.

## Count V
### (Torture)

166.    The allegations in Paragraphs 1-150 are incorporated by reference as though fully stated herein.

167.    The defendants abused and tortured the plaintiffs by depriving them of their personal property, battering them and forcing them to live in inhumane conditions before and during the deportation process, causing many of them to die or suffer life-long injuries.  Further, the defendants delivered the plaintiffs into the hands of hostile authorities with the knowledge that they would continue the abuse and torture and would murder many.  As a result of the torture that the defendants deliberately and intentionally inflicted, and that which they caused by delivered the plaintiffs into the hands of hostile authorities, the plaintiffs were placed in great fear for their lives, were caused to suffer severe physical and psychological pain and suffering, and were subjected to extrajudicial killing, the threat of severe physical pain and suffering and the threat of imminent death.

## Count VI
### (Assault and Battery)

168.    The allegations in Paragraphs 1-150 are incorporated by reference as though fully stated herein.

169.    Due to the defendants' willful, intentional, wanton, malicious and oppressive acts, the plaintiffs were placed in great fear for their lives and suffered severe physical and psychological abuse and agony.  As a direct and proximate result of the defendants' actions,

plaintiffs have suffered substantial damages including, but not limited to emotional distress, anxiety, fear, apprehension, physical harm and death.

### Count VII
(Wrongful Death)

170.     The allegations in Paragraphs 1-150 are incorporated by reference as though fully stated herein.

171.     As a direct and proximate cause of the defendants' acts, family members of the plaintiffs were mercilessly killed during the deportation process. Plaintiffs suffered pecuniary loss, mental anguish, emotional pain and suffering, loss of society, loss of companionship, loss of comfort, loss of protection, loss of maternal care, loss of attention, loss of advice, loss of counsel and loss of guidance.

### Count VIII
(Survival)

172.     The allegations in Paragraphs 1-150 are incorporated by reference as though fully stated herein.

173     The plaintiffs bring a survival action for the injuries, pain and suffering of their family members whose deaths were proximately caused by the defendants' intentional, reckless, outrageous, intolerable, and negligent conduct discussed herein.

### Count IX
(Intentional Infliction of Emotional Distress)

174.     The allegations in Paragraphs 1-150 are incorporated by reference as though fully stated herein.

175.     While deporting the plaintiffs and their families, the defendants intentionally and maliciously committed outrageous conduct in violation of all normal standards of decency, without privilege or justification. As a direct and proximate result of the defendants' wrongful

acts, the plaintiffs have suffered and will continue to suffer significant physical injury, pain and suffering and extreme and severe mental anguish and emotional distress.

## Count X
(Negligent Infliction of Emotional Distress)

176.   The allegations in Paragraphs 1-150 are incorporated by reference as though fully stated herein.

177.   The defendants carelessly and negligently inflicted emotional distress through wanton and reckless conduct while deporting the plaintiffs and their families. As a direct and proximate result of the defendants' wrongful acts, the plaintiffs have suffered and will continue to suffer significant physical injury, pain and suffering and extreme and severe mental anguish and emotional distress.

## Count XI
(Recklessness)

178.   The allegations in Paragraphs 1-150 are incorporated by reference as though fully stated herein.

179.   The defendants were reckless in their care of the plaintiffs and their families during the deportation process.  The defendants' recklessness caused injury, damage, loss or harm to the plaintiffs and their families.

## Count XII
(Negligence)

180.   The allegations in Paragraphs 1-150 are incorporated by reference as though fully stated herein.

181.   The defendants failed to use ordinary or reasonable care in order to avoid injury to the plaintiffs and their families during the deportation process.  The defendants' negligence caused injury, damage, loss or harm to the plaintiffs.

## Count XIII
### (Conspiracy)

182.    The allegations in Paragraphs 1-150 are incorporated by reference as though fully stated herein.

183.    The defendants agreed with each other to collaborate in the unlawful confiscation of the plaintiffs' personal property and the unlawful deportation of the plaintiffs from Hungary to their imprisonment and torture, and the murder of many, in the Ukraine and in Poland.

184.    Each of the defendants took active steps to further their conspiracy, including the acts described hereinabove.

185.    The defendants' conspiracy caused grievous injury to the plaintiffs.

## Count XIV
### (Aiding and Abetting)

186.    The allegations in Paragraphs 1-150 are incorporated by reference as though fully stated herein.

187.    Each of the defendants independently engaged in tortious conduct as set forth hereinabove, consisting of the conversion of the plaintiffs' personal property.    Each of the defendants substantially assisted and encouraged the other defendants in their unlawful activities toward the plaintiffs, as alleged hereinabove.    Each of the defendants had actual knowledge of the wrongful conduct of the other defendants, and well understood the role of all three in this unlawful misconduct toward the plaintiffs.

188.    The plaintiffs suffered severe damages caused by the defendants' unlawful conduct as alleged hereinabove.

## Count XV
### (Restitution)

189.   The allegations in Paragraphs 1-150 are incorporated by reference as though fully stated herein.

190.   Plaintiffs' personal property was taken as alleged hereinabove, denying them the use and enjoyment thereof.   The defendants have wrongfully used and profited from that property.   Compensation in damages is inadequate, as the property taken cannot be replaced, and the harm inflicted cannot be undone by mere compensation.

191.   As a result of the defendants' wrongful acts, plaintiffs have been damaged, and are entitled to the equitable remedy of restitution.

## Count XVI
### (International Law Violations)

192.   The allegations in Paragraphs 1-191 are incorporated by reference as though fully stated herein.

193.   The defendants' wrongdoing as alleged hereinabove violated customary international and treaty law actionable in this Court as federal common law and the law of nations, as evidenced by various sources including but not limited to:

(a)   The International Covenant on Civil and Political Rights, adopted December 19, 1966, S. Exec. Doc. E, 95-2 (1978), 999 U.N.T.S. 171 (entered into force March 23, 1976) (ratified by the United States, June 8, 1992);

(b)   Article 8, Rome Statute of the International Criminal Court, United Nations Diplomatic Conference of Plenipotentiaries on the Establishment of an International Criminal Court, July 17, 1998, U.N. Doc. A/CONF. 193/9, reprinted in 37 I.L.M. 999 (1998), signed but not ratified by the United States (not yet in force);

(c)     The Charter of the International Military Tribunal, Nuremburg, of August 8, 1945, confirmed by G.A. Res. 3, U. N. Doc. A/50 (1946) and G.A. Res. 95, U.N. Doc. A/236 (1946);

(d)     The Convention on the Non-Applicability of Statutory Limitations to War Crimes and Crimes Against Humanity, G.A. Res. 2391 (XXIII), Annex, 23 U.N. GAOR, Supp.; No. 18, at 40, U.N. Doc. A/7218 (1968); and

(e)     Principles of International Co-operation in the Detection, Arrest, Extradition and Punishment of Persons Guilty of War Crimes and Crimes Against Humanity, G.A. Res. 3074, U.N. GAOR, 28th Sess., Supp. No. 30A, U.N. Doc. A/9039/ Add. 1 (1973).

194.    The defendants' wholesale violation of international laws as exemplified by the provisions set forth above give rise to jurisdiction to adjudicate the substantive claims herein.

**COUNT XVII**
(Alien Tort Claims Act Violations)

195.    The allegations in Paragraphs 1-150 are incorporated by reference as though fully stated herein.

196.    The above described acts of the defendants constitute violations of the law of nations and actionable torts under the Alien Tort Claims Act because such conduct is prohibited by customary international law as reflected, expressed and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

197.    Said violations of the law of nations and actionable torts include, but are not limited to:

(a)     War crimes, including but not limited to an occupying power's mistreatment of prisoners of war, its failure to care for the sick and wounded under its control, its

     (b)    Failure to protect civilians in time of war and international conflict and its failure to prosecute all persons responsible for violations of the laws and customs of war;

     (c)    Crimes against humanity;

     (d))    Torture;

     (e)    Abuse of persons in custody;

     (f))    Murder;

     (g)    Enforced kidnapping and/or wrongful detention;

     (h)    Unlawful seizure of property;

     (i)    Disrespect for religious beliefs;

     (j)    Assault and battery;

     (k)    Intentional infliction of emotional distress;

     (l)    Wrongful death;

     (m)    False imprisonment;

     (n)    Conversion

     (o)    Obstruction of justice; and

     (p)    Negligence.

198.    Defendants are liable for said conduct under the Alien Tort Claims Act in that Defendants directed, ordered, confirmed, ratified, or were otherwise complicit in the torture of the Plaintiffs.

199.    As a direct and proximate result of said violations of the law of nations and tortious acts, Plaintiffs have suffered physical and mental injuries. In addition, they have suffered present and future economic damage.

## Count XVIII
(Accounting)

200.    The allegations in Paragraphs 1-150 are incorporated by reference as though fully stated herein.

201.    The defendants have never accounted for or paid the value of plaintiffs' property or the profits which the defendants have derived from that property since the end of World War II.

202.    As a result of their property having been forcibly taken from them, against their will and without just payment by the defendants, the plaintiffs have been unable to use or invest those assets.

203.    As a result of the defendants' wrongful acts, the plaintiffs have been damaged and demand an accounting of their stolen property, and the profits earned thereby by the defendants.

## PRAYER FOR RELIEF

WHEREFORE, the plaintiffs pray that the Court:

1.    Certify this action as a class action pursuant to Fed.R.Civ.P. 23, designate the Named Plaintiffs as the Class representatives, and counsel for plaintiffs as Class counsel;

2.    Order that the defendants render an accounting to the plaintiffs as sought hereinabove

3.    Award plaintiffs compensatory damages, and/or compensation for unjust enrichment, and/or restitution, in an amount as to each plaintiff to be proven at trial, for the defendants' unlawful conduct, including the theft of the plaintiffs' personal property, as alleged hereinabove;

4.    Award plaintiffs punitive damages;

5.      Award plaintiffs the costs of this action, including attorneys' fees and all reasonable expenses; and

6.      Grant such other and further relief as shall be deemed just and proper by the Court.

_Charles S. Fax_

Charles S. Fax, D.C. Bar No. 198002
Liesel J. Schopler (Fed. Bar application pending)
Rifkin, Livingston, Levitan & Silver, LLC
7979 Old Georgetown Road, Suite 400
Bethesda, Maryland 20814
Telephone: (301) 951-0150
Telecopier: (301) 951-0172
cfax@rlls.com; lschopler@rlls.com

L. Marc Zell*
Zell & Co.
21 Herzog Street
Jerusalem 92387 Israel
Telephone: 011-972-2-633-6300
Telecopier: 011-972-2-672-1767
mzell@fandz.com

David H. Weinstein*
Weinstein Kitchenoff & Asher LLC
1845 Walnut Street, Suite 1100
Philadelphia, Pennsylvania  19103
Telephone: (215) 545-7200
Telecopier: (215) 545-6535
weinstein@wka-law.com

Paul G. Gaston
Law Offices of Paul G. Gaston
1776 Massachusetts Avenue, N.W, Suite 806
Washington, D.C. 20036
Telephone: (202) 296-5856
Telecopier: (202) 296-4154
pgaston@attglobal.net

Attorneys for Plaintiffs

Dated: October 20, 2010
*  Application for admission *pro hac vice* pending.