# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

<table>
<tr><td>

ROSALIE SIMON, *et al.*,
*Individually, for themselves and for all others similarly situated*

Plaintiffs,

v.

REPUBLIC OF HUNGARY, *et al.*,

Defendants.

</td><td>

Civil Action No. 10-1770 (BAH)

Judge Beryl A. Howell

</td></tr>
</table>

## MEMORANDUM OPINION

In the dark chapter of history that is World War II, Winston Churchill called the shipment of hundreds of thousands of Hungarian Jews to the Nazi death camps in Poland and Germany "probably the greatest and most horrible crime ever committed in the history of the world."  First Am. Compl. ("FAC") ¶ 4, ECF No. 21.  The fourteen named plaintiffs in this proposed class action, Rosalie Simon, Helen Herman, Charlotte Weiss, Helena Weksberg, Rose Miller, Tzvi Zelikovitch, Magda Kopolovich Bar-Or, Zehava (Olga) Friedman, Yitzhak Pressburger, Alexander Speiser, Ze-ev Tibi Ram, Vera Deutsch Danos, Ella Feuerstein Schlanger, and Moshe Perel (collectively, "the plaintiffs"), survived this vicious aspect of the greater Holocaust.  FAC ¶¶ 5–81.  The plaintiffs no longer reside in Hungary.  *See* FAC ¶¶ 5–9, 14, 26, 27, 38, 40, 48, 64, 72, 80.  Four of the named plaintiffs, Simon, Weiss, Miller, and Schlanger, are now U.S. nationals; two plaintiffs, Herman and Weksberg, are nationals of Canada; one plaintiff, Danos, is a national of Australia; and the remaining seven plaintiffs are nationals of Israel.  *Id.*  They seek recompense for alleged atrocities committed against and property allegedly stolen from them during the Holocaust by the three defendants, the Republic of Hungary ("Hungary") and the

1

state-owned Magyar Államvasutak Zrt. ("MÁV"), which is the Hungarian national railway

(collectively, "the Hungary Defendants"); and Rail Cargo Hungaria Zrt. ("RCH"), which is a

freight rail company that is the successor-in-interest to MÁV Cargo Árufuvarozási Zrt., f/k/a

MÁV Cargo Zrt., a former division of MÁV.  Pending before the Court are two Motions to

Dismiss filed by the Hungary Defendants, ECF No. 22, and Defendant RCH, ECF No. 70.[1]  For

the reasons explained below, though the plaintiffs may indeed be deserving of greater restitution

than any amounts they have been provided, the defendants' motions are granted.

## I.    BACKGROUND

The plaintiffs observe that "[n]owhere was the Holocaust," which involved the systematic

murder of more than six million people, "executed with such speed and ferocity as it was in

Hungary, where in 1944 over a half a million souls were dispatched to their deaths within a

period of less than three months."  FAC ¶ 1.  The gratuitous nature of this slaughter is apparent

in the fact that "[m]ost, but not all, of the Hungarian atrocities occurred near the end of the war

in 1944, when the Nazis and Hungary, knowing they had lost, raced to complete their eradication

of the Jews before the Axis surrendered."  *Id.* ¶ 3.  It was only through the complicity and

efficiency of Defendants MÁV and RCH's predecessor, the cargo unit of MÁV, that Hungary's

Jewish population was "transport[ed] by train to the killing fields and death camps of Nazi

Germany-occupied Poland and the Ukraine, where the Jews were tortured and the vast majority

died" in such a short period of time.  *Id.*  "In less than two months, over 430,000 Hungarian Jews

were deported, mostly to Auschwitz, in 147 trains."  *Id.* ¶ 108; *see also* FAC ¶ 121 ("During the

German occupation, over 500,000 Hungarian Jews died from maltreatment or were murdered.

The overwhelming majority of these were among the close to 440,000 Jews who were deported

---

[1] The Hungary Defendants' request for oral argument on their motion to dismiss, *see* Hungary Defs.' Mot. Dismiss at 1, ECF No. 22, is denied, in light of the ample briefing of the issues provided by the parties.  *See* LCvR. 7(f) (allowance of oral hearing "shall be within the discretion of the Court").

to Auschwitz between May 15 and July 8, 1944."); *id.* Exs. A–B (data related to Hungarian

Jewish ghettoes during World War II and deportation trains). Indeed, all but two of the named

plaintiffs in this matter were transported, with the concurrent expropriation of their property, in

the spring of 1944. *See id.* ¶¶ 11–81. These plaintiffs, unlike hundreds of thousands of others,

including the plaintiffs' friends and family, survived the Hungarian atrocities. *See id.* ¶¶ 11–81.

The defendants recognize that "the wrongs inflicted upon Plaintiffs and millions of others

were wrongful – they clearly were," and note that "[n]othing said in the defense of this lawsuit

can, or should, diminish the world's condemnation of Nazi wrongdoing during World War II."

Hungary Defs.' Mem. Supp. Mot. Dismiss ("Hungary Defs.' Mem.") at 1 and n.1, ECF No. 22-1.

The FAC describes in vivid detail the horrific experiences endured by the plaintiffs. *See* FAC

¶¶11–81. While the depredations suffered by the plaintiffs are undisputed and the insufficiency

of any direct restitution to them similarly patent, resolution of the instant motions rests on an

examination of the Foreign Sovereign Immunities Act ("FSIA") and the Alien Tort Statute

("ATS"), the combination of which statutes bars the plaintiffs' suit. As background, the Court

first describes the historical events affecting the plaintiffs and underpinning this lawsuit before

turning to the characteristics of the defendants critical to assessing their amenability to suit in the

United States. Next, the Court reviews the efforts of the United States and other sovereign

nations, including Defendant Hungary, to provide compensation to the victims of the Hungarian

Holocaust and the progress of this litigation.

### A.     The Plaintiffs

Twelve of the named plaintiffs allege that they were transported in 1944 by Defendants

MÁV and/or RCH from their homes in Hungary to labor or death camps in various countries as

part of the Nazi-led assault on the Jewish people. *See* FAC ¶¶ 11, 22–24, 31, 43, 50–51, 66–68,

72–74, 80, 100. Plaintiff Zelikovitch was transported in 1941 by MÁV or RCH and again in

1944.  *Id.* ¶¶ 15, 19.  All but two of the plaintiffs were, at some point, sent to the Nazi

concentration camp at Auschwitz on Defendants MÁV and/or RCH's trains.  *Id.* ¶ 100.

Thirteen plaintiffs allege that their possessions and those of their families "were taken

from them by MÁV and/or [RCH] as they boarded the trains for embarkation."  *Id.*  The

plaintiffs complain that defendants MÁV and/or RCH "sold, liquidated or otherwise converted"

the plaintiffs' property and "commingled those funds with other revenues."  *Id.*  Eleven of the

plaintiffs also allege that Hungarian government officials participated or colluded in the

confiscation of their property when they arrived at MÁV train stations or during their transport

by MÁV officials.  *Id.* ¶¶ 12, 16, 23, 30, 43, 65–66, 80.  Specifically, the plaintiffs assert that

during the ghettoization of the Hungarian Jews, Hungarian officials inventoried the property left

behind in Jewish homes, which "was then expropriated by Defendant Hungary and converted to

cash through sales and other means[]" and that "[t]he proceeds were transferred to the Hungarian

government treasury and co-mingled with other Hungarian government revenues."  *Id.* ¶ 99.

Additionally, the plaintiffs allege, "[a]ll expenses associated with ghettoization were taxed on the

Jews, including the Plaintiffs herein."  *Id.* ¶ 98.

The fourteenth plaintiff, Pressburger, was not transported by Defendant Hungary or

Defendant MÁV or RCH, but alleges that his family's property "was likewise stolen by MÁV

and/or [RCH], never to be returned[]" in the spring of 1944, when his father's agricultural cargo

was confiscated by a MÁV stationmaster upon delivery to a train station for shipment.  *Id*. ¶¶ 39,

100.

In addition to confiscating the personal possessions of those who were transported by the

defendants, the plaintiffs complain that the defendants "collaborat[ed] in murder and willful and

grotesque violations of international law[]" by delivering Hungarian Jews in inhumane

conditions to hostile authorities in "Nazi Germany-occupied Poland and the Ukraine."  *Id.* ¶¶ 3–4.

The plaintiffs' Amended Complaint outlines the World War II experiences of each of the named plaintiffs, and the Court will briefly recount below the chilling details of the defendants' roles in persecuting these individuals, their families and communities because they were Jewish.

Plaintiffs Simon, Weiss, Miller, Herman, and Weksberg (collectively, under their maiden names, "the Lebovics sisters") "were raised in Tarackoz in Hungarian-annexed Ruthenia."  *Id.* ¶ 10.  Simon, Weiss, and Miller currently live in the United States, while Herman and Weksberg live in Canada.  *Id.* at ¶¶ 5–9.  In the spring of 1944, the Lebovics sisters, along with their brother and parents, were deported via Defendant "MÁV's trains to the ghetto in Mateszalka, and then to Auschwitz."  *Id.* ¶ 11.  Some of their possessions were confiscated by Hungarian government officials in Teresva, and some were confiscated by Defendants MÁV and/or RCH as they boarded the train for Auschwitz.  *Id.* ¶ 12.  The plaintiffs allege that the Lebovics sisters' property, after being confiscated by the Hungary Defendants and/or Defendant RCH, was liquidated "to pay Defendants MÁV and/or [RCH] for the cost of transporting the family from their home in Teresva and later from the ghetto in Mateszalka to Auschwitz."  *Id.* ¶ 13.

Plaintiff Zelikovitch is a citizen of Israel, but was born "in Uglya in Carpatorus, part of Hungarian-annexed Ruthenia," in 1928.  *Id.* ¶ 14.  In the summer of 1941, "the entire Jewish population of Uglya, including . . . [Zelikovitch] and his family, were deported by" Defendant MÁV or RCH across the border to Ukraine, which was under Nazi control.  *Id.* ¶ 15.  Before arriving in the Ukraine, Zelikovitch's family's possessions "were confiscated by officials of the Hungarian government" and MÁV or RCH personnel at train stations in Tecevo and Jatzin.  *Id.* ¶ 16.  Zelikovitch eventually escaped and returned to Hungary to find that his family's home and

property had been confiscated.  *Id.* ¶ 18.  Zelikovitch was recaptured by Hungarian police in 1944 and handed over to MÁV or RCH.  *Id.* ¶ 19.  His remaining possessions were confiscated and he was transported to Auschwitz by trains "owned and operated by MÁV or [RCH]."  *Id.* ¶¶ 19.

Plaintiff Bar-Or, a citizen of Israel, was born in Hungarian-annexed Ruthania in 1928. *Id.* ¶ 21.  In the spring of 1944, Hungarian police evicted Bar-Or and her family from their home. *Id.* ¶ 22.  Her parents "bribed a Hungarian policeman to allow the family to keep a large wooden package containing the family's valuables, including jewelry, gold and silver items, diamonds, bedding, clothing, Judaica and other items," then valued at more than $1,000.  *Id.* ¶¶ 22–23. While being transported to the Mateszalka Ghetto in Hungary, this package was "confiscated en route by Defendants MÁV and/or [RCH] in collusion with Hungarian government officials."  *Id.* ¶ 23.  The family was later transported by Defendant MÁV or RCH to Auschwitz.  *Id.* ¶ 24.  Bar-Or and her sister, upon liberation, learned that their family's home and property had been confiscated.  *Id.* ¶ 26.

Plaintiff Friedman, a citizen of Israel, was born in Satoraljaujhely, Hungary in 1932.  *Id.* ¶ 27.  Following the German occupation of Hungary, Friedman's family was informed they would have to move to the ghetto.  *Id.* ¶ 29.  They transferred title to their home to a non-Jewish couple, but hid many of the family's valuables in one room in the home to which the Friedman family retained title.  *Id.*  ¶ 29.  Upon removal from their home, however, Hungarian police confiscated many of the valuables the family tried to carry with them.  *Id.* ¶ 30.  In June of 1944, the Friedman family was "forcibly taken from [the ghetto] by Hungarian police and herded on foot into the MÁV train station in Satoraljaujhely."  *Id.*  ¶ 31.  The family was transported to Auschwitz by defendant MÁV or RCH.  *Id.* ¶ 33.  Friedman and her sister were later force-

marched as part of the "infamous Death March" to camps at Ravensbruck and Bergen Belsen before being liberated in April 1945.  *Id.* ¶¶ 35–36.

Plaintiff Pressburger, a citizen of Israel, was born in Prague in 1933 and later immigrated with his family to Budapest, Hungary, where his father worked as an agricultural products trader. *Id.* ¶ 38.  In 1944, Pressburger's father was delivering "five wagons of dried prunes . . . [when] the MÁV station-master and his staff-members confiscated all of [his] goods at the Ujvidek railway station[.]"  *Id.* ¶ 39.  The loss "impoverished the family," of which Pressburger is the sole remaining member.  *Id.*

Plaintiff Speiser, a citizen of Israel, was born in Ersekujvar, Czechoslovakia[2] in 1928.  *Id.* ¶ 40.  In May of 1944, Speiser and his family were forced to move into the Ghetto in Ereskujvar, and later to a brick factory where they were "fenced in like animals for approximately three weeks and continuously guarded by the Hungarian police."  *Id.* ¶ 42.  On June 14, 1944, they were transported to Auschwitz by Defendant MÁV.  *Id.* ¶ 43.  As they were forced onto the train, they were surrounded by Hungarian police and their possessions were confiscated by MÁV or RCH personnel, including "a two carat blue-white diamond ring that [Speiser's] father purchased for his mother."  *Id.* ¶¶ 41, 43.  The family was put in a railway car with "eighty or ninety" other Jews, where they traveled for three days "during which time the doors to the cattle car remained sealed.  There were no toilet facilities, and conditions were bestial."  *Id.* ¶¶ 44–45

Plaintiff Ram, a citizen of Israel, was born in Munkács, Hungary in 1930.  *Id.* ¶ 48.  In mid-April of 1944, Ram and his family were taken to a brick factory "which served as a collection point for deportation of the Jews by train" where "several Hungarian police and MÁV employees" were waiting.  *Id.*  ¶¶ 50–51.  MÁV employees told the family to "leave their suitcases" and Ram "watched as a MÁV official took a pair of shoes from his father's suitcase as

---

[2] Ersekujvar was annexed by Hungary after the partition of Czechoslovakia in 1938.  FAC ¶ 40.

well as his mother's suitcase, which contained all of the valuable jewelry that she was not wearing." *Id.* ¶ 54.  The family was then transported to Auschwitz in a cattle car.  *Id.* ¶ 55.  The plaintiffs state that "conditions in the cattle car were wretched.  There was no water and . . . it seemed as if there was no air.  One bucket served as the bathroom. . . . Several people died during the train trip due to the conditions in the cattle cars." *Id.* ¶ 56.

Plaintiff Danos, a citizen of Australia, was born in Verpelet, Hungary in 1926.  *Id.* ¶ 64.  Danos' father was a "wealthy wine merchant" whose business was confiscated by Defendant Hungary in 1943.  *Id.* ¶ 65. In May 1944, the Hungarian police evicted the family from their house, seized "all of their jewelry and valuables[,]" and marched them to the ghetto.  *Id.* ¶ 66.  After a week of living in the ghetto, Danos and her family were forced to board a MÁV or RCH train "destined for Auschwitz," at which time MÁV officials forced them to abandon their personal belongings, "includ[ing] clothes and valuables." *Id.* ¶ 68.  The train trip took several days with approximately seventy people in each cattle car.  *Id.* ¶ 69.  After being liberated in May 1945, Danos returned to Hungary before emigrating with her surviving family to Australia.  *Id.* ¶ 71.

Plaintiff Schlanger, a citizen of the United States, was born "to a Hungarian family resident in Benedike, Czechoslovakia" in 1930, where her parents "had a large estate of several thousand acres where they grew tobacco and owned a distillery." *Id.* ¶ 72.  In April 1944, when the Hungarian police removed Schlanger and her family to a brick factory, they brought with them "clothing, bed clothes, personal items and some jewelry[.]" *Id.* ¶ 73.  When they were later forced to board a MÁV or RCH train, railway personnel took their "personal items and jewelry from them," including "an engagement ring, a diamond, a seal coat and valuable watches." *Id.* ¶ 74.

Plaintiff Perel, a citizen of Israel, was born in Ersekujvar, Hungary[3] in 1927.  *Id.* ¶ 80.  In 1944, Perel and his family were forced from their home into a ghetto and were later transported to concentration camps via Defendant MÁV trains.  *Id.*  "The transport was orchestrated by MÁV and the Hungarian Police, who took [Perel's] watch and the family's valuables and luggage upon embarkation."  *Id.*

The plaintiffs allege that, following these events, none of the plaintiffs were compensated for their losses, except for Plaintiff Schlanger, who received payment, totaling $5,000, from the Hungarian government.  *Id.* ¶ 79.[4]  The plaintiffs seek damages on their own behalf and on behalf of all Hungarian Holocaust survivors as well as immediate family members of Hungarian Holocaust victims.  *Id.* ¶¶ 143–44.

**B.     The Defendants**

Defendant Hungary is a "sovereign nation" subject to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602 *et seq.*  FAC ¶ 82.  The plaintiffs' claims are based on the activities of Hungarian officials during World War II when the country was allied with Nazi Germany.  *See id.*  Defendant MÁV has "operated continuously" as the Hungarian National Railway since 1868, *id.* ¶ 84, and for the purposes of the FSIA, Defendant MÁV "is an agency or instrumentality of the Republic of Hungary[,]" *id.* ¶ 85.  MÁV's trains and rail lines were used to transport hundreds of thousands of Hungarian Jews from their homes to Nazi concentration camps in Poland and the Ukraine.  *See id.* ¶ 84.  Defendant RCH is the successor-in-interest to MÁV Cargo Árufuvarozási Zrt., f/k/a MÁV Cargo Zrt., a Division of Defendant MÁV.  *Id.* ¶ 86. Defendant RCH was, during World War II, the "freight hauling unit or division of MÁV" and

---

[3] The plaintiffs state that "during the relevant time period [Ersekujvar was in] an annexed part of Hungary, and today [is] part of Slovakia."  FAC ¶ 80.

[4] The FAC does not specify when or under what law Plaintiff Schlanger received this "compensation."  *See* FAC ¶ 79.

worked with the Hungary Defendants to "confiscat[e] the possessions of Hungarian Jews and transport[] them to their intended deaths at Auschwitz and other German concentration and extermination camps."  *Id.*  Defendant RCH is now a private company owned by Rail Cargo Austria, "the freight forwarding subsidiary of the Austrian public railway company[.]"  Decl. of Liesel J. Schopler, Rifkin, Livingston, Levitan & Silver, LLC (Nov. 12, 2012) ("Schopler Decl.") ¶ 2(e), ECF No. 73-1 (quoting Defendant RCH's website).  Thus, Defendant Hungary and Defendant MÁV are sovereigns for the purposes of the FSIA, FAC ¶¶ 82, 85, while Defendant RCH is a private corporation with a principal place of business in Budapest, Hungary, *id.* ¶ 86.

### C.     Post-War Efforts To Compensate Hungarian Holocaust Victims

At the end of World War II, "Jewish communal leaders submitted to [Hungarian] party leaders and to the government their demands in support of the deportees and for a swift and generous restitution and indemnification program."  FAC ¶ 126 (quoting Randolph L. Braham, 2 *The Politics of Genocide: The Holocaust in Hungary* ("*Politics*") at 1307 (1994)).  The Hungarian government was not unsympathetic and "did implement an array of legislative enactments and remedial statutes."  *Id.* ¶ 127 (citing *Politics* at 1308).  These statutes fell short on implementation, however, and the plaintiffs complain that "the Jews saw no tangible results with respect to restitution and indemnification."  *Id.*

In 1947, the allied powers, including the United States, the Soviet Union, and the United Kingdom (the "Allied Nations"), signed a peace treaty formally ending the war with Defendant Hungary.  *See id.*; Treaty of Peace with Hungary (the "1947 Treaty"), Feb. 10, 1947, 61 Stat. 2065.  In this treaty, Defendant Hungary agreed to "restore[]" and, if restoration were impossible, to pay "fair compensation," to people "under Hungarian jurisdiction" whose property was confiscated during the war "on account of the racial origin or religion of such persons."  *Id.*

art. 27(1).  Any "unclaimed" expropriated property would be transferred to refugee aid

organizations six months after the 1947 Treaty came into force.  *See id.* art. 27(2).  The 1947

Treaty provided a three-tiered procedure for resolution of disputes "concerning the interpretation

or execution of the [1947] Treaty," excluding several limited exceptions that are inapplicable

here, starting with  "direct diplomatic negotiations," then referral to the "Heads of the Diplomatic

Missions in Budapest of the Soviet Union, the United Kingdom, and the United States," *id.* art.

40(1) (referencing art. 39(1) to define "Heads of Mission"), and finally, additional dispute

resolution procedures if the three Heads of Mission were unable to agree on a resolution, *id.*  The

plaintiffs do not state whether they ever attempted to invoke relief under the 1947 Treaty's

dispute provisions outlined in Article 40.  *See generally* FAC.

Following the ratification of the 1947 Treaty, the Communist Party took control in

Hungary and showed little interest in upholding the 1947 Treaty's requirements *vis a vis*

Holocaust survivors.  *See* FAC ¶ 130.  The plaintiffs note that a "Jewish Restoration Fund" was

established "[i]n the 1950s," apparently as required by the 1947 Treaty's Article 27(2), but "the

funds were rarely used for their intended purpose and they were frequently raided by the

Communists for financing their own political projects."  *Id.* ¶ 131.

In 1973, the United States and Defendant Hungary entered into an Executive Agreement

"Regarding the Settlement of Claims" to settle all claims "of nationals and the Government of

the United States for . . . property, rights and interests affected by Hungarian measures of

nationalization, compulsory liquidation, expropriation, or other taking on or before the date of

[the] agreement," including "obligations of the Hungarian People's Republic under Articles 26

and 27 of the" 1947 Treaty.  Agreement Regarding the Settlement of Claims ("1973

Agreement"), U.S.-Hung. arts. 1–2, March 6, 1973, 24 U.S.T. 522; *see* Decl. of Meghan A.

McCaffrey, Weil, Gotshal & Manges LLP ("McCaffrey Decl.") Ex. 2 (text of 1973 Agreement), ECF No. 22-5.  Under the terms of the 1973 Agreement, the Hungarian Government paid the United States government $18,900,000 as "full and final settlement and in discharge of all claims" held by United States nationals and the United States government.  *Id.* art. 1.  None of the named plaintiffs, including the four plaintiffs, who are currently United States nationals, claim to have sought or received compensation as a result of the 1973 Agreement.  *See generally* FAC.

Beginning in 1992, shortly after the fall of the Iron Curtain, "the Hungarian Parliament adopted a law providing compensation for material losses incurred between May 1, 1939 and June 8, 1949."  *Id.* ¶ 132.  That law was followed shortly thereafter by another statute, "providing compensation for those who, for political reasons, were illegally deprived of their lives or liberty between March 11, 1939 and October 23, 1989."  *Id.*  Although the FAC does not specify under which law she received compensation, the plaintiffs note that Plaintiff Schlanger "received compensation from Hungary, in the amount of $5,000, for the loss of her father ($2,000), her mother ($2,000) and her brother ($1,000)[,]" and "has never been compensated . . . for the loss of the family's personal property[.]"  *Id.* ¶ 79.  The plaintiffs astutely observe that these remedies, provided for by Hungarian law, "were paltry and wholly inadequate."  *Id.* ¶ 132.

### D.      Procedural History

Sixty-five years after the end of World War II, the named plaintiffs filed the instant action, seeking relief from the defendants for their alleged losses suffered during the Holocaust.  *See* Compl., ECF No. 1.  Soon after the case was filed, upon the plaintiffs' motion, the Court appointed the plaintiffs' counsel as interim class counsel pursuant to Federal Rule of Civil Procedure Rule 23(g)(3).  *See* Order Granting Plaintiffs' Motion for Appointment of Interim

Class Counsel, ECF No. 9.[5]  After all three defendants had appeared and filed motions to

dismiss, the United States filed a Notice of Statement of Interest, pursuant to 28 U.S.C. § 517,[6]

to "express the United States' foreign policy interests implicated by claims brought" against

Defendant RCH, which is now an Austrian company.  *See* Statement of Interest of the United

States of America ("U.S. SOI") at 1, ECF No. 42.[7]  While taking "no position on the merits of

---

[5] The plaintiffs requested and obtained Entry of Default against Defendant RCH, which had initially failed to appear, plead, or otherwise defend itself against the plaintiffs' complaint.  *See* Clerk's Entry of Default, ECF No. 19.  Eventually, Defendant RCH appeared and filed a motion to set aside the entry of default and dismiss the FAC.  *See* Def. RCH's Mot. Set Aside Entry of Default and Dismiss Compl., ECF No. 34.  The plaintiffs opposed Defendant RCH's motion but did not respond substantively to Defendant RCH's motion to dismiss.  Instead, the plaintiffs "reserve[d] their right to oppose dismissal of RCH until such time as the Court permits, if it does, the submission of such a motion."  Pls.' Opp'n Def. RCH's Mot. Vacate Default at 1, ECF No. 40.  The plaintiffs also requested that, if the Court were to consider the merits of Defendant RCH's motion to dismiss, the Court grant the plaintiffs' request for a period of sixty days to conduct jurisdictional discovery.  *See id.* at 25.  This Court granted Defendant RCH's Motion to Set Aside the Entry of Default, denied, without prejudice, Defendant RCH's motion to dismiss, and denied, without prejudice, the plaintiffs' request to seek jurisdictional discovery.  *See* Mem. and Order at 16, ECF No. 67.  Specifically, the plaintiffs' request for jurisdictional discovery was denied because the plaintiffs had "not yet responded to the substance of [RCH's] Motion to Dismiss . . . [nor] offered a proposal for what type of evidence [they] seek[] to obtain during discovery" that would tend to establish a basis for personal jurisdiction over Defendant RCH.  *See id.* at 15–16.

[6] 28 U.S.C. § 517 authorizes "[t]he Solicitor General, or any officer of the Department of Justice," to "be sent by the Attorney General to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States, or in a court of a State, or to attend to any other interest of the United States."

[7] The United States expresses no views with respect to the plaintiffs' claims against Hungary and MÁV, a point highlighted by the plaintiffs.  Pls.' Resp. U.S. SOI at 2, ECF No. 44.  The U.S. SOI. was submitted pursuant to the terms of an agreement between the United States and Austria "to assist Austria and Austrian companies in achieving 'legal peace' in the United States with respect to all claims against Austria and/or Austrian companies arising out of or relating to the National Socialist Era and World War II, excluding certain *in rem*" claims pertaining to "restitution of works of art."  U.S. SOI Ex. 2 (Decl. of Stuart Eizenstat, then-Special Representative of the President and the Secretary of State on Holocaust Issues) ("Eizenstat Decl.") ¶ 14, ECF No. 42-1.  At least one of these forms of assistance was a pledge by the United States to "fil[e] a Statement of Interest indicating [the United States'] own foreign policy interests in assisting Holocaust victims on an expedited basis, and in helping achieve legal peace for Austria and Austrian companies . . . in U.S. courts."  *Id.* ¶ 10.  Consequently, the fact that the United States filed a Statement of Interest regarding Defendant RCH, an Austrian company, but not regarding the Hungary Defendants is of limited probative value in evaluating United States' foreign policy interests regarding the latter.  Indeed, the U.S. SOI indicates support for government-to-government negotiations to resolve Holocaust related claims, stating "[t]he United States' view is that its long-standing, and ongoing, pursuit of cooperative compensation agreements with Austria and other governments has achieved justice for the greatest numbers of Holocaust victims, survivors, and heirs.  Going forward, the United States is focusing its efforts in this regard on the new democracies of Central and Eastern Europe where the preponderance of Europe's Jewish population once lived."  U.S. SOI at 15–16  (quoting U.S. SOI Ex. 4 (Decl. of Douglas A. Davidson, Special Envoy for Holocaust Issues, U.S. Department of State) ("Davidson Decl.") ¶ 5, ECF No. 42-1).  Although the Davidson Declaration does not explicitly identify the countries falling into the category of "new democracies," Hungary may be one of those countries where the United States is "focusing its efforts."  *See id.*  Moreover, although the U.S. SOI was filed only in relation to Defendant RCH, the general statement of the United States' policy toward obtaining "some measure of justice [for] the victims of the Holocaust" was not limited to Austrian Holocaust claims.  *See* U.S. SOI at 2.

the underlying legal claims or arguments advanced by plaintiffs or by defendants," the United

States, "because of [its] strong support for international agreements with Austria involving

Holocaust claims against Austrian companies – agreements that have provided nearly one billion

dollars to Nazi victims[]" recommended "dismissal of the claims against RCH on any valid legal

ground(s)."  *Id*. at 1.  The United States noted that its policy regarding "claims for restitution or

compensation by Holocaust survivors and other victims of the Nazi era has consistently been

motivated by the twin concerns of justice and urgency[]" and that the United States has thus

"advocated that concerned parties, foreign governments, and non-governmental organizations act

to resolve matters of Holocaust-era restitution and compensation through dialogue, negotiation,

and cooperation" rather than extensive litigation.  *Id.* at 2.

With respect to Austria, the country in which Defendant RCH's parent company is

domiciled, the United States explained that, "[s]ince 1945, the United States has sought to work

with Austria to address the consequences of the Nazi era and World War II through political and

governmental acts, beginning with the first compensation and restitution laws in post-war

Austria that were passed during the Allied occupation[]" and continuing with joint efforts to

develop funds to compensate victims of the Holocaust.  *Id*. at 14.

The United States cites, as "[o]ne example of the successful implementation" of its

policy, the 2001 Austrian General Settlement Fund ("GSF"), which was "created to provide a

potential remedy for victims with Nazi-era claims against Austria and/or Austrian companies not

covered" by an earlier Austrian fund, the "Reconciliation, Peace and Cooperation" fund

("Reconciliation Fund").  *Id*. at 2–3, 6.[8]

---

[8] The full text of the GSF Agreement was provided by the United States as Exhibit 5 to the U.S. SOI, ECF No. 42-1.
According to the United States, the GSF "was capitalized with $210 million, plus interest . . . for Nazi-era claims
against Austria and/or Austrian companies, including claims against defunct companies and companies not subject
to jurisdiction in U.S. courts."  U.S. SOI at 8 (citing Eizenstat Decl. ¶ 19).

Although the United States emphasizes that the GSF "is not a government-to-government claims settlement agreement," and did not "extinguish[] the claims of its nationals or anyone else[,]" Eizenstat Decl. ¶ 15, "it is nonetheless aimed at achieving *legal closure* for Austrian companies and the Republic of Austria with respect to claims arising out of World War II and the Nazi era."  U.S. SOI at 12 (emphasis added); *see also* Ex. 1 (Decl. of William J. Burns, U.S. Under Secretary of State for Political Affairs) ¶ 3, ECF No. 42-1 ("The United States' efforts to facilitate these cooperative compensation arrangements is part of a larger policy to ensure the greatest compensation for the greatest number of Holocaust victims and their heirs, in their lifetimes, as well as to support a broad 'legal peace' for countries and companies subject to ongoing claims."); Eizenstat Decl. ¶ 31 ("[A]s a result of the inclusion in the GSF not only of Austrian companies that existed during the Nazi era, but also of the Austrian Federal Government and Austrian companies that did not exist during the Nazi era, the GSF, will be able to comprehensively cover all Nazi-era property/aryanization claims against Austria and/or Austrian companies, and all other claims not covered by the Reconciliation Fund."); *id.* U.S. SOI Ex. 3 (Decl. of then-Secretary of State Madeline Albright) ¶ 3, ECF No. 42-1 ("The establishment of the GSF will significantly reduce the tensions surrounding a number of very sensitive issues.").

In this case, the United States "has determined that Defendant RCH is an 'Austrian company' as defined in Annex B to the GSF Agreement[,]"[9] because it is "primarily (nearly

---

[9] Annex 2 defines "Austrian companies" in relevant part as follows:

1. Enterprises that, at any given time, had or have their headquarters within the borders of the present-day Republic of Austria as well as their parent companies (past or present, direct or indirect), even when the latter had or have their headquarters abroad.
2. Enterprises situated outside the borders of the present-day Republic of Austria in which Austrian enterprises as described in Sentence (1), at any given time, had or have a direct or indirect financial participation of at least 25 percent.

100%) owned by Rail Cargo Austria, an Austrian company that is owned by an Austrian holding company that is in turn owned by the Republic of Austria." U.S. SOI at 11. The United States avers that "maintenance of this suit against RCH runs contrary to the GSF's goal of 'legal closure' and to enduring United States foreign policy interests." *Id.*; *see also* Suppl. Statement of Interest of the United States ("U.S. Suppl. SOI"), ECF No. 52, at 2 n.1 (emphasizing that the definition of "Austrian companies" in the agreement between Austria and the United States "is not tied to the [time of the] creation of the GSF" and that "[t]he United States has determined that RCH is an Austrian company under this definition.").[10]

The plaintiffs assert that the U.S. SOI is "entitled to no weight in the Court's deliberations" because it does not address the merits of the underlying dispute and merely recommends dismissal of this action "on any valid legal ground(s)," a recommendation the plaintiffs call "wholly superfluous." Pls.' Resp. to U.S. SOI at 1–2, ECF No. 44 (internal citation and quotation marks omitted). The plaintiffs also dispute the conclusion in the U.S. SOI that Defendant RCH is "an Austrian company as defined in the Agreement and its accompanying joint statement[,]" since it was not acquired by Rail Cargo Austria until 2008, seven years after the GSF agreement. *See id.* at 2.[11]

---

U.S. SOI Ex. 6 (United States-Austria: Joint Statement and Exchange of Notes Between the United States and Austria Concerning the Establishment of the General Settlement Fund for Nazi-Era and World War II Claims) at 14, ECF No. 42-1.

[10] The Republic of Austria filed an amicus brief in support of Defendant RCH, echoing the United States' contention that this matter should be dismissed as it pertains to Defendant RCH based on the U.S.-Austria agreement. *See* Brief of Amicus Curiae Republic of Austria In Support of Def. RCH at 2, ECF No. 72 ("The Republic of Austria is of the firm view that the litigation against [Defendant RCH] should be dismissed, because the United States and Austria entered into the Executive Agreements in 2000 and 2001 that created funds and other measures for Holocaust victims in exchange for '*all embracing and enduring legal peace*' for the benefit of Austria and/or Austrian companies." (emphasis in original, citation omitted in original)).

[11] The dispute over whether Defendant RCH is properly classified an Austrian company is immaterial to deciding the instant motions, since the Court is dismissing the claims against Defendant RCH for lack of personal jurisdiction, to which the U.S.-Austria agreements are not relevant. Apart from this dispute, the plaintiffs seek jurisdictional discovery pertaining to Defendant RCH if the Court grants Defendant RCH's motion to dismiss. *See* Pls.' Opp'n Def. RCH's Mot. Dismiss ("Pls.' RCH Opp'n") at 9–19, ECF No. 73. As discussed more fully in Part

With the defendants' two motions to dismiss pending, the plaintiffs moved to take an expedited oral deposition of Laszlo Csatary, a man in his late 90s living under house arrest in Budapest, Hungary. *See* Pls.' Mem. Supp. Pls.' Mot. Lv. Take Expedited Oral Dep. at 1, ECF No. 62-2. Although the parties had not yet convened a Rule 26(f) conference, the plaintiffs requested leave, pursuant to Federal Rule of Civil Procedure 30(a)(2)(a)(iii), to proceed with expedited discovery because of the advanced age and importance of the witness and the concern that he "cannot be long for this earth." *See id.* at 6. This motion was granted. *See* Mem. and Order at 11–12, ECF No. 68.[12]

## II.    STANDARD OF REVIEW

### A.    Federal Rule of Civil Procedure 12(b)(1)

"'Federal courts are courts of limited jurisdiction,' possessing 'only that power authorized by Constitution and statute.'" *Gunn v. Minton*, 133 S. Ct. 1059, 1064 (2013) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)). Indeed, Federal courts are "forbidden . . . from acting beyond our authority," *NetworkIP, LLC v. FCC,* 548 F.3d 116, 120 (D.C. Cir. 2008), and, therefore, have "an affirmative obligation 'to consider whether the constitutional and statutory authority exist for us to hear each dispute.'" *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996) (quoting *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 196 (D.C. Cir. 1992)). Absent subject matter jurisdiction over a case, the court must dismiss it. *McManus v. District of Columbia*, 530 F. Supp. 2d 46, 62 (D.D.C. 2007).

---

III.C.3, *infra*, in light of recent Supreme Court precedent regarding the assertion of personal jurisdiction on a general jurisdiction theory, the Court denies this request for jurisdictional discovery because it would be futile.

[12] The parties subsequently attempted to take the deposition of Csatary in Budapest at a hearing held on June 4, 2013 in Budapest; however, Csatary did not attend the hearing due to poor health. *See generally* Hr'g Tr. of Laszlo Csatary, June 4, 2013, ECF No. 95-1. At that time, the judge presiding over the Budapest hearing suggested that it might be possible for the plaintiffs to obtain in discovery the record of criminal examinations of Csatary. *See id*. at 24:9-12. The judge stated, *inter alia*, "that the Court in the penal proceedings would make available . . . some parts of the documentation of the case which we already have in writing." *Id.*

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), the plaintiff must establish the court's jurisdiction over the subject matter by a preponderance of the evidence. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *Bolden-Bey v. U.S. Parole Comm'n*, 731 F. Supp. 2d 11, 13 (D.D.C. 2010) ("On a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), the plaintiff bears the burden of establishing by a preponderance of the evidence that the court has subject matter jurisdiction."). When considering a motion under Rule 12(b)(1), the court must accept as true all uncontroverted material factual allegations contained in the complaint and "construe the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged and upon such facts determine jurisdictional questions." *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (internal citations and quotation marks omitted). The court need not accept inferences drawn by the plaintiff, however, if those inferences are unsupported by facts alleged in the complaint or amount merely to legal conclusions. *See Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). In evaluating subject-matter jurisdiction, the court, when necessary, may look beyond the complaint to "undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Herbert*, 974 F.2d at 197; *see also Alliance for Democracy v. FEC*, 362 F. Supp. 2d 138, 142 (D.D.C. 2005).

### B.     Federal Rule of Civil Procedure 12(b)(2)

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(2), the plaintiff bears the burden of "establishing a factual basis for the [Court's] exercise of personal jurisdiction over the defendant." *Crane v. N.Y. Zoological Soc'y,* 894 F.2d 454, 456 (D.C. Cir. 1990) (citing *Reuber v. United States,* 750 F.2d 1039, 1052 (D.C. Cir. 1984), *overruled on other grounds by Kauffman v. Anglo-Am. Sch. of Sofia,* 28 F.3d 1223, 1226 (D.C. Cir. 1994)). When, as here, the parties rely solely on "affidavits and other written evidence," the plaintiff need only

make a prima facie showing that the court has personal jurisdiction.  5B Charles Alan Wright &

Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE § 1351 (3d ed. 2014); *see Mwani v. bin*

*Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005) ("a court ordinarily demands only a prima facie showing

of jurisdiction by the plaintiffs").  Similarly to a motion to dismiss under Federal Rule of Civil

Procedure 12(b)(6), "the uncontroverted allegations of the complaint must be taken as true, and

the court will draw all reasonable inferences in plaintiff's favor."  William W. Schwarzer *et al.*,

FEDERAL CIVIL PROCEDURE BEFORE TRIAL § 3:412 (2013); *see Walden v. Fiore*, 134 S. Ct. 1115,

1119 n.2 (2014) (accepting jurisdictional allegations in complaint as true at motion to dismiss

stage).  "The plaintiff, however, cannot rest on bare allegations or conclusory statements and

must allege specific facts connecting each defendant with the forum." *GTE New Media Servs.,*

*Inc. v. Ameritech Corp.* (*GTE*)*,* 21 F. Supp. 2d 27, 36 (D.D.C. 1998); *see also Second*

*Amendment Found. v. U.S. Conf. of Mayors*, 274 F.3d 521, 524 (D.C. Cir. 2001) (noting the

"general rule that a plaintiff must make a prima facie showing of the pertinent jurisdictional

facts") (internal quotation marks and alterations omitted); *First Chicago Int'l v. United Exchange*

*Co.*, 836 F.2d 1375, 1378 (D.C. Cir. 1988) ("Conclusory statements . . . do not constitute the

*prima facie* showing necessary to carry the burden of establishing personal jurisdiction")

(internal quotation marks and citation omitted); *Naartex Consulting Corp. v. Watt*, 722 F.2d 779,

787 (D.C. Cir. 1983) (same); *Atlantigas Corp. v. Nisource, Inc.*, 290 F. Supp. 2d 34, 42 (D.D.C.

2003) (stating plaintiff "cannot rely on conclusory allegations" to establish personal jurisdiction).

         As is the case for a motion to dismiss under Rule 12(b)(1), the court "may consider

materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of

jurisdiction." *Jerome Stevens Pharms., Inc. v. FDA,* 402 F.3d 1249, 1253 (D.C. Cir. 2005).  The

court "may receive and weigh affidavits and any other relevant matter to assist it in determining

the jurisdictional facts." *United States v. Philip Morris Inc.*, 116 F. Supp. 2d 116, 120 n.4

(D.D.C. 2000) (internal quotation marks and citation omitted); *see also Mwani*, 417 F.3d at 7

(holding that plaintiffs "may rest their [jurisdictional] argument on their pleadings, bolstered by

such affidavits and other written materials as they can otherwise obtain"). Any "factual

discrepancies appearing in the record must be resolved in favor of the plaintiff," however.

*Crane*, 894 F.2d at 456 (citing *Reuber*, 750 F.2d at 1052); *see also Barot v. Embassy of Republic*

*of Zam.*, No. 13-451, 2014 WL 1400849, at *3 (D.D.C. Apr. 11, 2014) (D.D.C. 2010).

## III.    DISCUSSION[13]

The Hungary Defendants, as sovereign entities, argue that this Court lacks subject matter

jurisdiction over them pursuant to the FSIA.  *See* Hungary Defs.' Mem. at 6–12.  Defendant

RCH challenges this Court's exercise of personal jurisdiction over it, *see* Def. RCH's Mem.

Supp. Mot. Dismiss ("Def. RCH Mem.") at 1, ECF No. 70, and contends that the plaintiffs have

failed to state a claim upon which relief can be granted because their claims are time-barred, *id.*

at 28–41.  All three defendants contend that venue is improper in this District under the doctrine

of *forum non conviens*, Hungary Defs.' Mem. at 24–35; Def. RCH's Mem. at 2, and that the

claims are non-justiciable under the political question doctrine, Hungary Defs.' Mem.  at 12–24;

Def. RCH's Mem. at 13-28.

Even were this United States District Court an appropriate forum to adjudicate claims

arising overseas decades ago from the Holocaust and, in that context, to assess the sufficiency of

a foreign sovereign's efforts to redress those horrors, this Court lacks subject matter jurisdiction

over the Hungary Defendants under the FSIA and personal jurisdiction over Defendant RCH due

---

[13] The Court has reviewed all documents submitted by the parties in this matter, the exhibits, affidavits, and
declarations attached thereto, and all notices of supplemental authority.  Some of these filings will not be referenced
in this Memorandum Opinion since, after review, the Court has determined that they are not sufficiently probative to
resolution of the instant motions so as to warrant citation here.

to the lack of minimum contacts between that defendant and the United States.  Since the Court

finds that the Hungary Defendants are immune from suit under the treaty exception to the FSIA,

and no personal jurisdiction may be exercised over Defendant RCH, the defendants' other

arguments need not be addressed to resolve the pending motions.

The Court begins with a discussion of the evolution of both the law regarding sovereign

immunity, which culminated in the FSIA, and the principles underlying the limits on the

extraterritorial reach of this Court's jurisdiction, as applied under the ATS.  Considerations of

international comity implicated by both of these laws bolster the Court's conclusion that the

plaintiffs' claims are not properly adjudicated here.  The Court then analyzes the separate

jurisdictional concerns of the Hungary Defendants and Defendant RCH.

### A.      Evolving Limits on the Exercise of Jurisdiction Under the FSIA and ATS

The plaintiffs acknowledge that addressing the depredations suffered by Jewish victims,

such as the plaintiffs, during the Hungarian Holocaust has garnered much attention by multiple

governments.  *See* FAC ¶¶ 124–132.  Indeed, the plaintiffs are not complaining that their

complaints have gone unnoticed, but rather that the "remedies provided . . . were paltry and

wholly inadequate."  *Id.* ¶ 132.  The plaintiffs may be correct about their entitlement to

additional restitution and compensation, but statutory requirements, compounded by precedent in

this Circuit and the Supreme Court, restrict the use of this Court as the mechanism to address the

plaintiffs' concerns and obtain such relief.  Among the first Holocaust-era claims filed in any

United States court was *Princz v. Fed. Republic of Ger.*, 26 F.3d 1166 (D.C. Cir. 1995), which

was filed in this District.  *See* Michael J. Bazyler, *Nuremberg in America: Litigating the*

*Holocaust in United States Courts*, 34 U. RICH. L. REV. 1, 23 (2000) (describing *Princz* litigation

as one of fewer than twelve cases filed by Holocaust victims in the United States prior to 1996).

In *Princz*, an American citizen imprisoned by the Nazis and forced into slave labor, sought

damages from the modern German state for the atrocities inflicted upon him.  *See Princz*, 26

F.3d at 1168.  Although "[t]he district court held that it had jurisdiction of the case on the ground

that the FSIA 'has no role to play where the claims alleged involve undisputed acts of barbarism

committed by a one-time outlaw nation[,]'" the D.C. Circuit dismissed the case, commenting that

the district court's conclusion was "not the law."  *Id.* at 1169.

      The question before the *Princz* court is the same one with which the Court wrestles

today: the application of the FSIA where the acts alleged are so egregious and reprehensible that

members of civilized society feel propelled to rectify the wrongs.  The D.C. Circuit retraced the

history of sovereign immunity in U.S. courts, where prior to 1952, "the United States, as a matter

of grace and comity, granted foreign sovereigns 'virtual absolute immunity' from suit in the

courts of this country."  *Id.* (citing *Verlinden B.V. v. Cent. Bank of Nigeria* (*Verlinden*), 461 U.S.

480, 486 (1983)).  Courts "consistently . . . deferred to the decisions of the political branches—in

particular, those of the Executive Branch—on whether to take jurisdiction over actions against

foreign sovereigns and their instrumentalities."  *Id.* (quoting *Verlinden* 461 U.S. at 486)

(alteration in original).  Prior to 1952, it was assumed that a U.S. court did not have jurisdiction

over foreign sovereigns *unless* the Executive Branch advised the court that it could exercise

jurisdiction.  *See id.*

      This "virtual absolute immunity" gave way in the "first half of the 20th century," to the

modern "restrictive theory of sovereign immunity," limiting the immunity conferred on a

sovereign to "public acts of the foreign state" and not extending such immunity "to its

commercial or private acts."  *Id.* (citation omitted).  By 1976, Congress had codified the

restrictive theory in the FSIA.  *Id.*  The FSIA became the sole basis by which jurisdiction over a

foreign sovereign could be exercised by a United States court.  *See id.* at 1170; *see also Ye v.*

*Zemin*, 383 F.3d 620, 625 (7th Cir. 2004) (noting that "the pre-1976 practice of courts reflexively

deferring to the Executive Branch's immunity determinations has been eliminated" by the FSIA).

In *Princz*, the plaintiff argued that the activity of the sovereign defendant in that case fell

into three statutory exemptions permitting adjudication, including the so-called commercial

activity exception to the FSIA, 28 U.S.C. § 1605(a)(2); the waiver exception under 28 U.S.C. §

1605(a)(1); and the treaty exception under 28 U.S.C. § 1604.  *See id.* at 1171, 1173, 1175.  The

D.C. Circuit rejected all three bases for the exercise of jurisdiction, finding that the enslavement

of the plaintiff by the Nazis did not cause the requisite "direct effect" on the United States to

trigger the commercial activity exception, *id.* at 1173; the violation of *jus cogens*[14] did not imply

a waiver of sovereign immunity, *id.* at 1174; and no international agreement conflicted with the

FSIA's grant of sovereign immunity so as to trigger the treaty exception, *id.* at 1175.  Thus,

under the FSIA, Germany was immune from suit in United States courts even when that

country's Nazi-era government committed atrocities against a person, who was a United States

citizen at the time that country was perpetrating the Holocaust.  *Id.* at 1175.

The *Princz* court foreshadowed the further development of principles of international

comity under the FSIA, in the context of genocide allegations, in its response to a vigorous

dissent.  *See id.* at 1174 n.1.  The *Princz* dissent would have allowed the suit to go forward under

an implied waiver of foreign sovereign immunity based on the Nazi-era German state's

"engaging in the barbaric conduct alleged in this case."  *Id.* at 1179 (Wald, J. dissenting).[15]  The

majority cautioned, however, that without a clear expression of Congressional intent, United

---

[14] *Jus cogens* are "norms so universally accepted that all states are deemed bound by them under international law . . . ."  *Belhas v. Ya'alon*, 515 F.3d 1279, 1291–92 (D.C. Cir. 2008) (Williams, J. concurring) (citing *Comm. of U.S. Citizens Living in Nicar. v. Reagan*, 859 F.2d 929, 939–42 (D.C. Cir. 1988)).

[15] The plaintiffs in this matter are not raising this waiver theory and are proceeding solely under the FSIA's expropriation exception.  *See* Pls.' Mem. Opp'n Hungary Defs.' Mot. Dismiss FAC ("Pls.' Hungary Opp'n") at 7, ECF No. 24 (arguing that this Court has jurisdiction over Hungary Defendants under 28 U.S.C. § 1605(a)(3) and not relying on any other exceptions).

States courts could not "assume jurisdiction over the countless human rights cases that might well be brought by the victims of all the ruthless military juntas, presidents-for-life, and murderous dictators of the world, from Idi Amin to Mao Zedong." *Id.* at 1174 n.1. Such a reading "would likely place an enormous strain not only upon our courts but, more to the immediate point, upon our country's diplomatic relations with any number of foreign nations. In many if not most cases the outlaw regime would no longer even be in power and our Government could have normal relations with the government of the day—unless disrupted by our courts, that is."[16] *Id.* While acknowledging that a U.S. court might be the plaintiff's "last hope of reparation[,]" the court nonetheless held that it could not "responsibly make the inferential leap that would be required in order to provide him with the federal forum he seeks." *Id.*

Eight years later, in *Republic of Austria v. Altmann*, 541 U.S. 677, 681, 690 (2004), the Supreme Court took up a question left open in *Princz*: namely, whether the FSIA applied retroactively to events that occurred before its enactment and before the State Department's 1952 policy statement—the so-called "Tate letter"[17]—confirmed the restrictive theory of sovereign immunity as the policy of the United States. In *Altmann*, an art collector's heir sued the Republic of Austria and its National Gallery, an instrumentality of the Austrian state, for the return of several paintings expropriated by the Nazis. *Id.* at 680–81. The Supreme Court

---

[16] This policy consideration regarding successor regimes figured prominently in a later FSIA decision by the Supreme Court. In *Republic of Iraq v. Beaty*, 556 U.S. 848, 864 (2009), the Supreme Court noted that it was not "perplexing" for Congress to authorize the President to restore sovereign immunity to Iraq, despite the FSIA's state sponsors of terrorism exception, since Congress was "confronted [with] the prospect that a friendly successor government would, in its infancy, be vulnerable under Section 1605(a)(7) to crushing liability for the actions of its renounced predecessor." (quoting *Acree v. Republic of Iraq*, 370 F.3d 41, 61 (D.C. Cir. 2004)). The Supreme Court noted that "[t]he [U.S.] Government was at the time spending considerable sums of money to rebuild Iraq" and did not want such a reconstruction plan to be converted "into a compensation scheme for a few of Saddam's victims." *Beaty*, 556 U.S. at 864.

[17] The Tate letter was a policy letter from Jack B. Tate, Acting Legal Adviser, Department of State, to Acting Attorney General Philip B. Perlman, dated May 19, 1952, that served as the State Department's announcement of the official "adoption of the 'restrictive' theory of sovereign immunity." *See Samantar v. Yousef*, 560 U.S. 305, 312 (2010) (citing Tate letter, reprinted in 26 Dept. State Bull. 984–985 (1952)).

concluded that the FSIA applied to acts occurring prior to its enactment.  *See id.* at 700.  In reviewing the history of sovereign immunity, the Court noted that from nearly the beginning of the Republic, it was clear that "the jurisdiction of the United States over persons and property within its territory 'is susceptible of no limitation not imposed by itself,' and thus foreign sovereigns have no right to immunity in our courts."  *Id.*at 688 (quoting *Schooner Exchange v. McFaddon*, 7 Cranch 116, 136 (1812)).  Nevertheless, concomitant with this principle was the idea "that as a matter of comity, members of the international community had implicitly agreed to waive the exercise of jurisdiction over other sovereigns in certain classes of cases, such as those involving foreign ministers or the person of the sovereign."  *Id.*

The *Altmann* Court reviewed the history leading to enactment of the FSIA, just as the D.C. Circuit had in *Princz,* noting that before the FSIA's enactment, "the Executive Branch followed a policy of requesting immunity in all actions against friendly sovereigns."  *Id.* at 689.  In 1952, this case-by-case policy changed in favor of the policy reflected in the Tate letter, declaring a governing principle whereby the United States would follow the "restrictive theory" of sovereign immunity, which requires immunity for sovereigns "with regard to sovereign or public acts (*jure imperii*) . . . but not with respect to private acts (*jure gestionis*)."  *Id.* at 690 (citation omitted).  The FSIA, passed in 1976, "codifies, as a matter of federal law, the restrictive theory of sovereign immunity, and transfers primary responsibility for immunity determinations from the Executive to the Judicial Branch."  *Id.* at 691 (internal citations and quotation marks omitted).  In finding that the FSIA was the most recent statement of intent as to sovereign immunity put forth by the United States government, the Supreme Court found that it applied to acts taken by sovereigns that occurred both before and after the FSIA's enactment.  *See id.* at 696.

Nevertheless, the Supreme Court observed that "immunity reflects current political realities and relationships, and aims to give foreign states and their instrumentalities some *present* 'protection from the inconvenience of a suit as a gesture of comity.'"  *Id.* (quoting *Dole Food Co. v. Patrickson*, 538 U.S. 468, 479 (2003)) (emphasis in original).  Of particular importance to the Supreme Court was the notion that suits against foreign sovereigns are "*sui generis*," requiring a different set of considerations—generally more deferential to the "political branches"—than suits that do not involve the conduct of a foreign sovereign.  *Id.*  This notion signaled a growing recognition of the circumscribed nature of United States courts' jurisdiction over foreign entities, particularly foreign sovereigns.

Just a few weeks after the decision in *Altmann*, the Supreme Court decided *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004), which, in the context of the ATS, further elucidated the limited scope of federal courts' jurisdiction to adjudicate claims arising outside U.S. borders between parties who were not U.S. nationals.  At issue in *Sosa* was whether a foreign national could sue another foreign national in U.S. courts based on an alleged abduction that occurred in Mexico at the behest of the U.S. Drug Enforcement Administration.  *See Sosa*, 542 U.S. at 697–98.  The Supreme Court found no private right of action for the violation of the law of nations under the ATS except "in a very limited category [of claims] defined by the law of nations and recognized at common law."  *See id.* at 712.

The *Sosa* court discussed three distinct elements of international law: (1) "the general norms governing the behavior of national states with each other"; (2) "[t]he law merchant" that arose out of "the customary practices of international traders and admiralty [that] required its own transnational regulation[]"; and a third, highly circumscribed category of offenses, which "overlapped with the norms of state relationships[]" and encompassed "violation of safe

conducts, infringement of the rights of ambassadors, and piracy." *See id.* at 714–15 (citations omitted). In discussing the historical context of the ATS, the Supreme Court concluded that the ATS was applicable at the time of the Framers and that "Congress intended the ATS to furnish jurisdiction for a relatively modest set of actions alleging violations of the law of nations[,]" specifically the three aforementioned crimes. *See id.* at 719–20. In general, the *Sosa* court concurred with Blackstone's view that "'offences [sic] against this law [of nations] are principally incident to whole states or nations,' and not individuals seeking relief in court." *Id.* at 720 (quoting 4 WILLIAM BLACKSTONE, COMMENTARIES *68) (second brackets in original).

Moreover, the *Sosa* court cautioned against the overstepping of judicial boundaries in recognizing causes of action, especially because "the potential implications for the foreign relations of the United States of recognizing such causes should make courts particularly wary of impinging on the discretion of the Legislative and Executive Branches in managing foreign affairs." *Id.* at 727. The Court elaborated on its warning, stating "[i]t is one thing for American courts to enforce constitutional limits on our own State and Federal Governments' power, but quite another to consider suits under rules that would go so far as to claim a limit on the power of foreign governments over their own citizens, and to hold that a foreign government or its agent has transgressed those limits." *Id.*

*Sosa* and *Altmann* interpret two statutes authorizing the exercise of jurisdiction over a sovereign or foreign person —the FSIA and the ATS, respectively—but evince a common directive: the power of the federal courts to vindicate private rights based on wrongs that occurred overseas, particularly when those acts are perpetrated by foreign sovereigns, is highly constrained. In 2008, in the context of an interpleader action, the Supreme Court again highlighted the importance of comity in cases involving foreign sovereign defendants. *See*

*Republic of Philippines v. Pimentel*, 553 U.S. 851, 865–66 (2008).  In *Pimentel*, the Supreme

Court held that where one party to an action is immune from suit under the FSIA, and the

immune party is a "necessary" party within the meaning of Federal Rule of Civil Procedure 19,

the entire case must be dismissed so as to avoid the "potential for injury to the interests of the

absent sovereign."  *Id.* at 867.

At issue in *Pimentel* was whether the Republic of the Philippines had a right to the

proceeds in a U.S. brokerage account that once belonged to deposed dictator Ferdinand Marcos.

*See id.* at 857–60.  The Supreme Court reversed the holding of the district and appellate courts

that an interpleader action could go forward, even though the sovereign defendant—the Republic

of the Philippines—was immune from suit in the United States, for "fail[ing] to give full effect to

sovereign immunity."  *Id*. at 865.  The Supreme Court noted that where "claims . . . arise from

events of historical and political significance. . . . [t]here is a comity interest in allowing a

foreign state to use its own courts for a dispute if it has a right to do so."  *Id.* at 866.  Of

particular concern to the *Pimentel* court was the fact that the sovereign defendants in that case

had "a unique interest in resolving the ownership of or claims to the [challenged] assets and in

determining if, and how, the assets should be used to compensate those persons who suffered

grievous injury under Marcos."  *Id.*

Similarly to the D.C. Circuit in *Princz*, the *Pimentel* court saw grave problems in

subjecting a sovereign to suit in U.S. courts, particularly where the claims involve a contentious

issue of "historical and political significance" to the sovereign.  *See id.* ("The dignity of a foreign

state is not enhanced if other nations bypass its courts without right or good cause.").  Although

no FSIA exception applied to the Republic of the Philippines in *Pimentel*, *see id.* at 865 (stating

the FSIA exceptions "are inapplicable here, or at least the parties do not invoke them"), the

concern for allowing a class of victims of a foreign dictator to attempt to seize assets that could rightfully belong to a foreign sovereign is entirely in line with the cautious tone raised by *Altmann* and *Sosa*, *see id.*at 866.

More recently, in *Kiobel v. Royal Dutch Petroleum Co.*,[18] 133 S. Ct. 1659, 1663 (2013), the Supreme Court expanded on the line of reasoning laid out in *Sosa* pertaining to the ATS.  At issue in *Kiobel* were the claims of foreign nationals against foreign companies for alleged conduct that occurred on foreign soil.  *See id*. at 1662–63.  Among the atrocities alleged in *Kiobel* were aiding and abetting the state sponsored "beating, raping, killing, and arresting residents and destroying or looting property." *Id.* at 1662.  The *Kiobel* Court noted that, although the ATS is "strictly jurisdictional," the presumption against extraterritorial application of U.S. law—and, consequently, the jurisdiction of United States courts—is rooted in the need to "protect against unintended clashes between our laws and those of other nations which could result in international discord."  *Id.* at 1664 (quoting *EEOC v. Arabian Am. Oil Co.* (*Aramco*), 499 U.S. 244, 248 (1991)) (internal quotation marks omitted).  The Supreme Court held that "the danger of unwarranted judicial interference in the conduct of foreign policy is magnified in the context of the ATS, because the question is not what *Congress has done* but instead what *courts may do*." *Id.* (emphasis added).  The *Kiobel* Court cautioned that the foreign policy concerns, "which are implicated in any case arising under the ATS, are all the more pressing when the question is whether a cause of action under the ATS reaches conduct within the territory of another sovereign."  *Id.* at 1665.

---

[18] Although *Kiobel* was decided after the motions to dismiss were filed in this case, the Court gave the parties the opportunity to provide supplemental briefing regarding the impact of *Kiobel* on the instant matter, *see* Minute Order (Apr. 18, 2013), and subsequently submitted their analysis.  *See* Def. RCH Suppl. Mem. Concerning The Effect Of *Kiobel*, ECF No. 87; Hungary Defs.' Suppl. Mem. Regarding The Impact Of The Supreme Court's *Kiobel* Decision On This Case, ECF No. 88; Pls.' *Kiobel* Mem.; Def. RCH Reply Mem. Concerning The Effect Of *Kiobel* On This Action, ECF No. 91; Pls.' Mem. Reply Def. RCH's Reply On The Effect Of *Kiobel* On This Action, ECF No. 94.

The practical consequences that could flow from throwing open U.S. courthouse doors to vindicate harms caused by egregious conduct perpetrated by foreigners overseas were of particular concern to the *Kiobel* Court, which stated that "accepting petitioners' view would imply that other nations, also applying the law of nations, could hale our citizens into their courts for alleged violations of the law of nations occurring in the United States, or anywhere else in the world." *Id.* at 1669.  Thus, the Court found, "[t]he presumption against extraterritoriality guards against our courts triggering serious foreign policy consequences, and instead defers such decisions, quite appropriately, to the political branches." *Id.*; *see also Doe v. Exxon Mobil Corp.*, 654 F.3d 11, 77–78 (D.C. Cir. 2011) (Kavanaugh, J. dissenting in part) (listing ongoing protests by foreign governments to extraterritorial application of ATS for "improperly interfere[ing] with their rights to regulate their citizens and conduct in their own territory"), *vacated and remanded by* 527 F. App'x 7 (D.C. Cir. 2013).

Similarly to the ATS, the FSIA is a jurisdictional statute because it "take[s] away no substantive right but simply changes the tribunal to hear the case." *Princz*, 26 F.3d 1166, 1170 (alteration in original, quotation marks and citation omitted).  Yet, as the exclusive method under which litigants may hale foreign sovereigns into courts in the United States, *see id.*, the FSIA implicates the same policy considerations about which the Supreme Court advised caution in *Kiobel*, 133 S. Ct. at 1669.  If anything, the policy concerns raised in *Kiobel*, where jurisdiction was sought over a foreign corporation, *see Kiobel*, 133 S. Ct. at 1663, apply *a fortiori* in the FSIA context, where jurisdiction is sought over a foreign sovereign.

Most recently, in *Daimler AG v. Baumann* (*Daimler*), 134 S. Ct. 746, 763 (2014), the Supreme Court discussed the need to honor international comity, this time in the context of a suit against a German company, under the ATS and Torture Victim Protection Act, for alleged

human rights violations that took place outside of U.S. territory during Argentina's "dirty war," *id.* at 751. The Supreme Court found that a federal court in California could not exercise general jurisdiction over the German corporation for its alleged collaboration "with Argentinian state security forces to kidnap, detain, torture, and kill plaintiffs and their relatives during" Argentina's military dictatorship, when no part of the alleged collaboration giving rise to the plaintiffs' claims occurred in United States territory and the corporate defendant had insufficient connection to the forum. *Id.* at 751. In doing so, the *Daimler* Court criticized the lower court for paying "little heed to the risks to international comity" engendered by "its expansive view of general jurisdiction." *Id.* at 763. Of particular concern was that "foreign governments' objections to some domestic courts' expansive views of general jurisdiction have in the past impeded negotiations of international agreements on the reciprocal recognition and enforcement of judgments." *Id.* (citation omitted). The Supreme Court therefore found that "[c]onsiderations of international rapport thus reinforce our determination that subjecting [the foreign defendant] to the general jurisdiction of courts in California would not accord with the fair play and substantial justice due process demands." *Id.* (internal quotation marks omitted).

\*     \*     \*

The plaintiffs seek to hale a foreign sovereign, Defendant Hungary, its instrumentality, Defendant MÁV, and a foreign private corporation, Defendant RCH, into a U.S. court to answer for the crimes the entities' predecessors committed seven decades ago. As the previous discussion makes clear, cases involving the FSIA and the ATS nearly always raise substantial comity concerns, which are not diminished by the fact that the claims pertain to the Holocaust during World War II. *See Abelesz v. Magyar Nemzeti Bank*, 692 F.3d 661, 667 (7th Cir. 2012).

31

These concerns are heightened with respect to the Hungary Defendants. The FSIA

governs the ultimate resolution of this matter as to the Hungary Defendants and the plaintiffs'

claims against these two defendants must be dismissed unless those claims fall within one of the

FSIA's exceptions. *See* 28 U.S.C. § 1604 ("a foreign state shall be immune from the jurisdiction

of the courts of the United States and of the States" subject to certain enumerated exceptions).[19]

Beginning with *Princz* and proceeding through to *Daimler*, this Circuit and the Supreme Court

have expressed grave reservations about the use of federal courts to adjudicate claims against

foreign entities, under the ATS and the FSIA, for actions that took place on foreign soil,

particularly when those claims may be better addressed on a sovereign-to-sovereign level.[20] The

---

[19] The FSIA does not apply to Defendant RCH, which does not argue that it is an "instrumentality" of the Austrian state subject to the FSIA. *See generally* Def. RCH's Mem. The plaintiffs assert an ATS claim against this defendant, *see* FAC ¶¶ 208–12, and application of the ATS to Defendant RCH is discussed at Part III.C.4, *infra*.
[20] Indeed, the defendants have urged the Court to decline to adjudicate this matter under the prudential "political question doctrine." *See* Hungary Defs.' Mem. at 12–24; Pls.' Hungary Opp'n at 19–32; Def. RCH's Mem. at 15 n.12 (adopting Hungary Defs.' political question briefing). The Supreme Court's repeated cautions about "[c]onsiderations of international rapport," *see Daimler*, 134 S. Ct. at 762, highlight the justiciability question of whether the plaintiffs' claims for damages resulting from the systematic, government-sponsored pillaging and murder of hundreds of thousands of Hungarian Jews are within the province of the Federal Judiciary to address. Evaluating the merits of these allegations regarding the widespread official acts of a sovereign and its instrumentalities to commit genocide, as well as the sufficiency of the sovereign's efforts to adhere to a treaty requiring it to make restitution and to atone for the terrible wrongs of a past regime, is a tempting task. *See* FAC ¶ 132 (detailing Hungarian laws designed to "provid[e] compensation" to human rights violations victims); *id.* ¶ 140 ("The Jewish victims of the Hungarian Holocaust seek only what is due them – compensation and restitution for the atrocities they suffered at the hands of the Defendants, and a final accounting based on the contents of the Hungarian archives that have yet to be released."). Yet, when a sovereign is a party, courts must be mindful of the potential adverse impact undertaking such a task could have on relations of the United States with that sovereign such that the task is better committed to representatives of the American people, on a sovereign-to-sovereign level. *See, e.g.*, *Princz*, 26 F.3d at 1174 n.1. Due to this fundamental concern, other courts have dismissed claims by Holocaust victims against the sovereign nations that engaged in reprehensible genocidal acts before and during WWII as raising non-justiciable political questions. *See, e.g.*, *Whiteman v. Dorotheum GmbH & Co. KG*, 431 F.3d 57, 73 (2d Cir. 2005) (dismissing sovereign defendants from Nazi-era theft case on political question grounds); *Alperin v. Vatican Bank*, 410 F.3d 532, 561–62 (9th Cir. 2005) (holding adjudication of Holocaust era slave labor claims was non-justiciable political question); *In re Nazi Era Cases Against German Defendants Litigation*, 196 F. App'x 93, 101 (3d Cir. 2006) (holding claims by victim of Nazi-era medical experiments against German sovereign defendants non-justiciable political question ). More recently, the Seventh Circuit, in *Abelesz*, recognized the serious comity issue raised by adjudicating the merits of whether Hungarian efforts to provide restitution to the victims of the Hungarian Holocaust were sufficient, noting that "[i]f U.S. courts are ready to exercise jurisdiction to right wrongs all over the world, including those of past generations, we should not complain if other countries' courts decide to do the same." 692 F.3d at 682. Indeed, the "slippery slope" nature of the concern expressed by the *Abelesz* court leads inevitably to a question of whether broadening the reach of U.S. courts in the manner requested by the plaintiffs could lead to plaintiffs suing in foreign courts to obtain redress for the horrors of slavery inflicted upon millions of African-Americans during the eighteenth and nineteenth centuries in the United States, or for the

claims before this Court, to use Blackstone's international law elements summarized in *Sosa*, are more akin to "'offences [sic] against' the law of nations [that] are 'principally incident to whole states or nations'" than to "mercantile questions, such as bills of exchange and the like . . . ." *Sosa*, 542 U.S. at 714–15 (quoting 4 WILLIAM BLACKSTONE, COMMENTARIES *67–68).   The claims here are predicated on the execution of Holocaust-related policies in Hungary, even if they include ostensibly commercial torts such as conversion and unjust enrichment.   *See* FAC ¶¶ 164–225.   Violence and expropriation, conducted as an expression of government policy and perpetrated on a vast scale, simply cannot be addressed in the same way as a bailment claim, *see de Csepel v. Republic of Hung.*, 714 F.3d 591, 599 (D.C. Cir. 2013), or a suit seeking damages for falling off a train platform, *see Sachs v. Republic of Austria*, 737 F.3d 584, 588 (9th Cir. 2013), where Circuit courts have found the FSIA's exceptions overcome a foreign sovereign's immunity.   The Supreme Court's interpretation of the FSIA and the federal courts' proper role in adjudicating disputes arising overseas is clear: where principles of international comity are at issue, the appropriate branch to address grievances is the Executive, not the Judiciary.

For this fundamental reason, over the past twenty years, numerous circuit courts called upon by Holocaust survivors to obtain redress from the modern-day governments of the nations which, in the 1930s and 1940s, committed heinous crimes against Jewish members of their civilian populations, have dismissed the suits.   With the exception of cases involving specifically identifiable expropriated art objects, *see de Csepel*, 714 F.3d at 594 (denying motion to dismiss for Holocaust survivor's heirs' claim alleging breach of post-war bailment agreement); *Altmann v. Republic of Austria*, 317 F.3d 954, 958 (9th Cir. 2002) (denying motion to dismiss for heir's claims seeking return of expropriated art), those courts have found, as this Court finds today, that

---

destruction of property resulting from overseas armed conflicts involving American soldiers since the dawn of the Republic.   Although the Court does not reach this issue since the pending motions are resolved on different grounds, the concerns the defendants elucidate regarding the political nature of the legal issues posed are significant.

recompense for the victims of the Holocaust is unavailable from the Federal Judiciary. *See, e.g.,* *Princz*, 26 F.3d at 1176 (dismissing Holocaust survivor's claims for lack of subject matter jurisdiction under FSIA); *Garb v. Republic of Pol.*, 440 F.3d 579, 582 (2d Cir. 2006) (dismissing Holocaust survivors' claims based on expropriation on sovereign immunity grounds); *Whiteman*, 431 F.3d at 74 (dismissing Holocaust survivors' claims under political question doctrine); *Alperin v. Vatican Bank*, 410 F.3d 532, 561–562 (9th Cir. 2005) (same); *Abrams v. Societe Nationale Des Charmins De Fer Francais*, 389 F.3d 61, 64–65 (2d Cir. 2004) (per curiam) (dismissing Holocaust survivors' claims for lack of subject matter jurisdiction under FSIA); *Deutsch v. Turner Corp.*, 324 F.3d 692, 703 (9th Cir. 2003) (dismissing Holocaust survivors' claims California law claims under after invalidating law on Constitutional foreign affairs doctrine); *Sampson v. Fed. Republic of Ger.*, 250 F.3d 1145, 1146 (7th Cir. 2001) (dismissing Holocaust survivor's claims for lack of subject matter jurisdiction and lack of standing); *Wolf v. Fed. Republic of Ger.*, 95 F.3d 536, 544 (7th Cir. 1996) (same); *Haven v. Rzeczpospolita Polska*, 68 F. Supp. 2d 947, 958 (N.D. Ill. 1999) (dismissing Holocaust victim's claims against sovereign defendants on sovereign immunity grounds under FSIA); *Hirsh v. State of Israel*, 962 F. Supp. 377, 379 (S.D.N.Y. 1997) (same) *aff'd*, 133 F.3d 907 (2d Cir. 1997); *see also Museum of Fine Arts, Bos. v. Seger-Thomshitz*, 623 F.3d 1, 3 (1st Cir. 2010) (dismissing Holocaust victim's heir's claims to Nazi expropriated painting on statute of limitation grounds); *Orkin v. Taylor*, 487 F.3d 734, 738 (9th Cir. 2007) (dismissing for failure to state claim Holocaust victim's heirs' claims for ownership of art expropriated by Nazis).

Set against these general principles regarding the appropriate exercise of this Court's jurisdiction over claims such as those at bar, the Court now turns to an analysis of the defendants' jurisdictional grounds for dismissal.

### B.      The Hungary Defendants

The parties do not dispute that the Hungary Defendants are, in the case of Defendant

Hungary, a sovereign nation and, in the case of Defendant MÁV, an agency or instrumentality of

Defendant Hungary.  *See* FAC ¶ 82 ("Defendant Republic of Hungary is a sovereign nation");

*id.* ¶ 85 ("Defendant MÁV is an agency or instrumentality of the Republic of Hungary for

purposes of the Foreign Sovereign Immunities Act").  The "sole basis for obtaining jurisdiction

over a foreign state [or its instrumentalities] in our courts" is the FSIA.  *Argentine Republic v.*

*Amerada Hess Shipping Corp.* (*Amerada Hess*), 488 U.S. 428, 434 (1989).  Thus, the plaintiffs

must prove with respect to the Hungary Defendants that their claims for damages stemming from

the expropriation of their property during World War II fit within one of the FSIA's exceptions

to the general rule of sovereign immunity.  *See Verlinden*, 461 U.S. at 493 ("The [FSIA] must be

applied by the District Courts in every action against a foreign sovereign, since subject matter

jurisdiction in any such action depends upon the existence of one of the specified exceptions to

foreign sovereign immunity.").

The specified exceptions to the FSIA, found in 28 U.S.C. §§ 1605–07, only apply,

however, if allowing a suit against a sovereign to proceed, pursuant to one of those exceptions,

does not conflict with "existing international agreements to which the United States [was] a party

at the time of the enactment of" the FSIA.  *See Amerada Hess*, 488 U.S. at 434 (quoting 28

U.S.C. § 1604) (alterations in original).  The parties devoted their initial briefing on the FSIA to

whether the so-called "expropriation exception" to foreign sovereign immunity, under 28 U.S.C.

§ 1605(a)(3), applies to the claims at issue.  *See* Hungary Defs.' Mem. at 79; Pls.' Hungary

Opp'n at 7–19; Hungary Defs.' Reply Mem. Supp. Mot. Dismiss FAC ("Hungary Defs.' Reply")

at 3–11, ECF No. 27; Pls.' Hungary Sur-Reply Mem. at 1–9, ECF No. 30.  Despite

acknowledging the execution before enactment of the FSIA of the 1947 Treaty related to "the

restoration of confiscated property" to Jewish people during World War II, *see* FAC ¶ 127, the

parties did not initially address the "treaty exception," which provides that a treaty may trump

both a sovereign nation's immunity and any otherwise applicable FSIA exception, 28 U.S.C. §

1604.  The Court invited additional briefing on this issue, *see* Minute Order (Jan. 10, 2014), to

which the Hungary Defendants and the plaintiffs responded.  *See* Pls.' Response Re.

Applicability of "Treaty Exception," 28 U.S.C. §1604 Of The FSIA, To This Case ("Pls.' Treaty

Mem.") at 1, ECF No. 107; Hungary Defs.' Suppl. Mem. Re. Applicability of 28 U.S.C. § 1604

To The Claims Raised In Pls.' FAC ("Hungary Defs.' Treaty Mem.") at 1, ECF No. 108.  After

considering these submissions and the applicable law, the Court finds that the 1947 Treaty is an

"existing international agreement[] to which the United States [was] a party at the time of the

enactment" of the FSIA, 28 U.S.C. § 1604, and triggers the FSIA's treaty exception to deprive

this Court of subject matter jurisdiction over the plaintiffs' claims.[21]

---

[21]    This matter is ultimately decided on the basis of the FSIA's treaty exception.  Nevertheless, were the treaty exception not to apply, the plaintiffs' attempt to fit their claims against the Hungary Defendants into the expropriation exception to the FSIA suffers from significant defects.  The factual basis for application of the expropriation exception is the plaintiffs' allegation that the Hungary Defendants "maintain[] property in[] the United States[] that has been exchanged for the property [they] stole from the plaintiffs."  FAC ¶ 83; *see also id.* ¶ 85 (stating that Defendant "MÁV owns and/or operates property and property exchanged for property that it stole from Hungarian Jewish deportees.").  Specifically, the plaintiffs allege that the Hungary Defendants liquidated the assets they expropriated, co-mingled the resulting funds with their general revenues, and that this co-mingling has tainted all property owned by the Hungary Defendants, including any such property present in the United States.  *See, e.g.,* FAC ¶ 98 ("The monies thus confiscated were remitted to Defendant Hungary's national treasury and commingled with general governmental revenues."); *id.* ¶ 99 ("The proceeds [from expropriated property] were transferred to the Hungarian government treasury and co-mingled with other Hungarian government revenues."); *id.* ¶ 100 ("Defendant railways' funds and operations are in part derived from the funds they realized from liquidating the possessions they stole from Plaintiffs."); *id.* ¶ 105 ("These extortionate charges [for water during the deportations] were also commingled with MÁV's legitimate revenues.").
         This expropriation theory presents three problems.  First, contrary to the plaintiffs' allegations—and not mentioned in any of the parties' briefing—the 1947 Treaty, the terms of which Defendant Hungary declared itself in full compliance, *see* Decl. of Lázló Nagy, Partner, Weil, Gotshal & Manges LLP – Budapest ("Nagy Decl.") ¶ 30, ECF No. 22-2, contains a clause requiring any unclaimed expropriated property to be deposited in funds for relief for persecuted communities, *see* 1947 Treaty art. 27(2).  Pursuant to the terms of this treaty, the Hungarian Jewish Heritage Public Foundation was established with real property, art, and annuities valued at over $27 million and apparently continues to be funded by the Hungarian government with subsidies in excess of $4.5 million per year.  *See* Nagy Decl. ¶¶ 28–29.  Both Article 27 of the 1947 Treaty and the evidence submitted regarding this Treaty's implementation raise a significant issue with the plaintiffs' contention that the Hungarian state or its instrumentalities continue to retain property or property exchanged for property expropriated by the Nazi-era Hungarian state.

### 1.   *The Treaty Exception To The FSIA*

The treaty exception is embodied in the opening clause of 28 U.S.C. § 1604, which reads, in full:

> Subject to existing international agreements to which the United States is a party at the time of enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter.

If applicable, the treaty exception provides the contours of the immunity to which a sovereign state is entitled under the FSIA.  *See* H.R. Rep. 94-1487 (1976) ("H.R.") at 12; S.R. Rep. 94-1310 (1976) ("S.R.") at 11 (stating the FSIA "is intended to preempt any other State or Federal law (*excluding applicable international agreements*) for according immunity to foreign sovereigns, their political subdivisions, their agencies, and their instrumentalities.") (emphasis added).  The text of section 1604 makes plain that the FSIA was not intended to upset or interfere with the pre-existing scope of sovereign immunity embodied in international agreements.  *See* 28 U.S.C. § 1604.  Instead, the FSIA was designed to provide predictability

---

Second, the plaintiffs' contention that the co-mingling of funds taints all property maintained by the Hungary Defendants is highly attenuated and therefore weak support for application of the expropriation exception. The expropriation exception has been applied when certain property is identifiable and in the possession of the defendant sovereign.  *See Agudas Chasidei Chabad of the U.S. v. Russian Fed'n* (*Chabad*), 528 F.3d 934, 938 (D.C. Cir. 2008).  The theory advanced by the plaintiffs here has been rejected by other courts, since the diffuse nature of any remaining proceeds would tend to defeat any effort at proving the presence of "property exchanged for [expropriated] property."  *See Freund v. Republic of France*, 592 F. Supp. 2d 540, 559–61 (S.D.N.Y. 2008) (rejecting inference that fact of expropriation and subsequent liquidation was sufficient to show current possession), *aff'd sub nom. Freund v. Societe Nationale des Chemins de fer Francais*, 391 F. App'x 939, 942 (2d Cir. 2010); *cf. Abelesz*, 692 F.3d at 688–89 (observing, in *dicta*, that motion to dismiss could be denied based on claims that foreign sovereign "retains ownership of real property" expropriated from Holocaust victims in addition to liquidated assets).  At the same time, the Court notes that the Hungary Defendants have utterly failed to provide any affidavits or other proof refuting the bare-bones allegations in the plaintiffs' FAC regarding the Hungary Defendants' contacts with the United States, *see* FAC ¶¶ 83, 85, 98–100, such as was submitted by Defendant MÁV in *Abelesz*, *see* 692 F.3d at 694 (citing declaration from chief executive officer of Defendant MÁV).

Finally, there remains an open question whether the expropriation exception is available absent a showing that the plaintiffs have exhausted any domestic remedy in the country alleged to have expropriated the subject property.  *Compare Abelesz*, 692 F.3d at 682 (requiring exhaustion of domestic remedies in Hungary before allowing Hungarian Holocaust survivors to proceed in action in U.S. court) *with Cassirer v. Kingdom of Spain*, 616 F.3d 1019, 1022 (9th Cir. 2010) (noting FSIA "does not mandate that the plaintiff exhaust local remedies for jurisdiction to lie[]" but declining to consider "prudential exhaustion" on limited appeal).  Since the Court finds that the 1947 Treaty provides the exclusive mechanism to address the instant expropriation claims, it need not determine whether these factual and legal obstacles to the application of the expropriation exception to the plaintiffs' claims are insurmountable.

where such agreements and extant law did not.  *See* H.R. at 7; S.R. at 8 (stating one of major

rationales for FSIA's passage was the need "to provide firm standards as to when a foreign state

may validly assert the defense of sovereign immunity").  The negotiated agreements between the

United States and other sovereigns in existence when the FSIA took effect on October 21, 1976,

referred to herein as "pre-existing agreements," remain unaffected by the FSIA.  *See* 28 U.S.C. §

1604.

Since the FSIA applies to actions taken by a foreign sovereign prior to the FSIA's

enactment, *see Altmann*, 541 U.S. at 700, the treaty exception takes on added importance, *see*

H.R. at 10; S.R. at 6 ("the reference to existing international agreements [in the FSIA] is

essential to make it clear that [the FSIA] would not supersede the special procedures provided in

existing international agreements, such as the North Atlantic Treaty—Status of Forces

Agreement.").  Absent a pre-existing agreement with the United States affecting the scope of

sovereign immunity, the FSIA applies, meaning the foreign sovereign is generally immune,

unless one of the enumerated exceptions applies.  *See* 28 U.S.C. § 1604; *see also* H.R. at 17; S.R.

at 16 (stating that the FSIA "starts from a premise of immunity and then creates exceptions to the

general principle.").  If a pre-existing agreement addresses the scope of a foreign sovereign's

immunity with respect to particular claims, the agreement controls.  *See id.*  Determining

whether the pre-existing agreement actually concerns the scope of the sovereign's immunity has

been the key legal issue in cases addressing application of the treaty exception.

A pre-existing agreement may be invoked in litigation against a foreign sovereign in two

ways: plaintiffs may use it offensively in order to overcome a sovereign's immunity by showing

the agreement effectively amounts to a waiver, at least in part, of that immunity, *see generally*

*Amerada Hess*, 488 U.S. at 428, or defendant sovereigns may use it defensively to protect

sovereign immunity even when a FSIA exception would otherwise subject the sovereign to suit, *see generally Moore v. United Kingdom*, 384 F.3d 1079 (9th Cir. 2004).  Offensive use of a pre-existing agreement is generally disfavored for at least three reasons.  First, predicating suit on a pre-existing agreement essentially requires a finding of a limited waiver of the sovereign immunity that otherwise applies under the FSIA.  Yet, resting such a limited waiver on the treaty exception effectively bypasses the FSIA exception that already governs both express and implied waiver by a sovereign state, *see* 28 U.S.C. 1605(a)(1) ("A foreign state shall not be immune from the jurisdiction of courts of the United States . . . in any case . . . in which the foreign state has waived its immunity either explicitly or by implication . . . ."), and, thereby, undermines the "comprehensive jurisdictional scheme" set out in the FSIA to provide predictability and consistency in actions against a foreign sovereign, *see Altmann*, 541 U.S. at 699.  Second, employing the treaty exception to assert subject matter jurisdiction over a sovereign, where no FSIA exception—including the exception governing immunity waivers—applies, abrogates the defendant sovereign's immunity and directly implicates "[c]onsiderations of international rapport," *Daimler*, 134 S. Ct. at 762, and comity among sovereign nations, complicating the Executive Branch's responsibility for diplomatic relations.  Finally, offensive use of a pre-existing agreement to assert claims in U.S. courts against a sovereign state may run counter to the "long recognized . . . presumption against finding treaty-based causes of action, because the decision to create a private right of action is one better left to legislative judgment in the great majority of cases." *McKesson Corp. v. Islamic Republic of Iran*, 672 F.3d 1066, 1080 (D.C. Cir. 2012) (citing *Medellin v. Texas*, 552 U.S. 491, 506 n.3 (2004) and *Sosa*, 542 U.S. at 727) (internal quotation marks omitted).

Defensive use of a pre-existing agreement, on the other hand, does not implicate the same concerns.  A sovereign state's invocation of a pre-existing treaty to bar a suit is protective of sovereign immunity, except to the extent reflected in the agreement's terms, and compliance with such terms therefore does not disturb international comity and relations. *Accord Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 428 (1964) (recognizing that treaty "or other unambiguous agreement regarding controlling legal principles" would provide exception to act of state doctrine since compliance with treaty reduces conflict with "political branches of the Government on matters bearing upon foreign relations"); *Ramirez de Arellano v. Weinber*ger, 745 F.2d 1500, 1540–1541 (D.C. Cir. 1984) (en banc) (finding act of state doctrine unavailable "when an applicable bilateral treaty governs the legal merits of the controversy,"explaining that "[w]hen . . . the political branches have specified the controlling legal principles in a treaty with the foreign sovereign . . . concerning the foreign act, the danger of improper judicial interference with the Executive's responsibilities for foreign affairs is greatly reduced."), *vacated on other grounds*, 471 U.S. 1113, 1113 (1985); *Kalamazoo Spice Extraction Co. v. Provisional Military Gov't of Socialist Eth.*, 729 F.2d 422, 425, 427–428 (6th Cir. 1984) (finding that "the Supreme Court's concern in *Sabbatino* for judicial interference with foreign policy activity by the Executive Branch is not a consideration" in adjudication of expropriation claim pursuant to American-Ethiopian treaty providing for "prompt payment of just and effective compensation" for expropriated property and, consequently, as urged by Executive Branch, act of state doctrine was inapplicable).  These principles are apparent when reviewing the case law interpreting the FSIA's treaty exception.

The Supreme Court confirmed in *Amerada Hess* that the treaty "exception applies when international agreements 'expressly conflict[t]' with the immunity provisions of the FSIA . . . ."

*Amareda Hess*, 488 U.S. at 442 (citing H.R. at 17; S.R. at 17; U.S. Code Cong. & Admin. News 1976 at 6616) (brackets in original).  The Court did not define what constituted an "express conflict" warranting abrogation of immunity and "carv[ing] out an exception to the FSIA."  *Id.* at 443.  The Court observed that certain international agreements containing "substantive rules of conduct . . . stat[ing] that compensation shall be paid for certain wrongs[]" were not such conflicts, noting that "[t]hey do not create private rights of action for foreign corporations to recover compensation from foreign states in United States courts."  *Id.* at 442.  Moreover, the Court expressed reluctance to find a waiver of sovereign immunity under 28 U.S.C. § 1605(a)(1), the FSIA's waiver exception, when a foreign sovereign "sign[s] an international agreement that contains no mention of a waiver of immunity to suit in United States courts or even the availability of a cause of action in the United States."  *Id.* at 442–43.  Although not characterized as such by the Supreme Court, the plaintiffs in *Amerada Hess* were attempting to use the treaty exception *offensively*, by relying on the terms of treaty as a basis for extending subject matter jurisdiction over claims against a sovereign and to supersede the FSIA's sovereign immunity grant, where no FSIA exception otherwise applied.  *See id.* at 441–42 (dismissing plaintiffs' claim that "certain international agreements entered into by [the defendant sovereign state] and by the United States *create an exception to the FSIA here*.") (emphasis added).

This denial of the offensive use of the treaty exception is entirely consistent with the purposes of the FSIA, as outlined by the Supreme Court in *Amareda Hess*.  The overarching purpose of the FSIA, as set out in section 1604, was to "bar[] federal and state courts from exercising jurisdiction when a foreign state *is* entitled to immunity."  *Id.* at 434 (emphasis in original).  Congress' intent, according to the Court, was "that the FSIA be the sole basis for

obtaining jurisdiction over a foreign state in our courts." *Id.*[22]  The Court further stated that

section 1604 provided immunity to foreign sovereigns from suit in U.S. courts, even for "those

cases . . . alleg[ing] violations of international law" if such violations "do not come within one of

the FSIA's exceptions."  *Id.* at 436.  Thus, the Supreme Court rejected the offensive use of the

treaty exception to expand the grounds under which a foreign sovereign could be subjected to

suit in U.S. courts.  *See id.* at 442–43.

   The D.C. Circuit considered another offensive use of the treaty exception in *Foremost-*

*McKesson, Inc. v. Islamic Republic of Iran* (*Foresmost-McKesson*), 905 F.2d 438, 451–52 (D.C.

Cir. 1990), and similarly denied the plaintiff's attempt to use the treaty exception and the terms

of a pre-existing treaty as the basis for suit under U.S. law against a sovereign state, though it did

find the FSIA's commercial exception conferred jurisdiction.  Specifically, in that case, the

plaintiff argued that it had been illegally divested of its investment in an Iranian dairy and that a

treaty between the United States and Iran in effect prior to the FSIA acted as a waiver of

sovereign immunity.  *See Foremost-McKesson*, 905 F.2d at 440–41, 451–52.  The D.C. Circuit

rejected that argument, finding that the treaty in question, at most, "sets forth such substantive

provisions" that were found not to trigger the FSIA in *Amareda Hess* and, consequently, could

not act as a waiver of sovereign immunity against Iran.[23]  *See id.* at 452; *see also Frolova v.*

*U.S.S.R.*, 761 F.2d 370, 374–75 (7th Cir. 1985) (rejecting attempted offensive use of treaty

exception based on United Nations Charter that did not confer private right of action and finding

that allowing suit would raise "serious foreign policy implications which courts are ill-equipped

---

[22] In a similar vein, the Seventh Circuit surmised that the comprehensiveness and exclusiveness of the FSIA
indicated that "Congress was cautious about the development and source of future exceptions to the immunity it
granted[]" in the FSIA.  *Sampson*, 250 F.3d at 1153.
[23] In subsequent litigation in the same matter, the D.C. Circuit made clear that subject matter jurisdiction in that case
was predicated on the FSIA's commercial activities exception and that, while the treaty at issue provided no right of
action under U.S. law, the treaty did provide a private right of action against Iran under Iranian law, a point
conceded by Iran.  *McKesson Corp. v. Islamic Republic of Iran*, 672 F.3d 1066, 1073, 1078 (D.C. Cir. 2012).

to anticipate or handle"); *Thai Lao Lignite (Thailand) Co., Ltd. v. Gov't of Lao People's Democratic Republic*, No. 10 Civ. 5256, 2013 WL 1703873, at *5 (S.D.N.Y. Apr. 19, 2013) (rejecting attempted use of New York Convention on enforcement of foreign arbitral awards to supersede FSIA in case where FSIA barred suit); *Chen v. China Cent. Television*, No 06 Civ. 414, 2007 WL 2298360, at *4 (S.D.N.Y. Aug. 9, 2007) (rejecting attempted use of Genocide Convention and the Convention Against Torture to create treaty exception allowing suit against otherwise immune sovereign); *Smith v. Socialist People's Libyan Arab Jamahiriya*, 886 F. Supp. 306, 311–12 (E.D.N.Y. 1995) (rejecting attempted offensive use of treaty exception based on United Nations Charter and Security Council Resolutions condemning Libyan bombing of Pan Am 103 to confer subject matter jurisdiction despite prohibition by FSIA); *Von Dardel v. U.S.S.R.*, 736 F. Supp. 1, 5–6 (D.D.C. 1990) (rejecting attempted offensive use of treaty exception to obtain jurisdiction over U.S.S.R. based on pre-existing international agreements where agreements' language did not confer private right of action).

In 1992, the Ninth Circuit addressed the treaty exception in the context of a suit brought against the Republic of Argentina for the alleged torture of one plaintiff and expropriation of the other plaintiffs' property. *See Siderman de Blake v. Republic of Arg.*, 965 F.2d 699, 702 (9th Cir. 1992). The Ninth Circuit interpreted the Supreme Court's ruling in *Amareda Hess* as "erect[ing] a serious obstacle to claims that, by subscribing to a treaty or other international agreement, a defendant state loses its immunity under the FSIA." *Id.* at 719. Faced with an offensive use of the treaty exception, similarly to *Amareda Hess* and *Foremost-McKesson*, the Ninth Circuit found that legally binding treaties, such as the United Nations Charter, do not serve to abrogate a foreign sovereign's presumed immunity to suit unless the agreement contained language "regarding individual remedies or compensation for violations of its substantive rules

of conduct." *Id.* at 720. Consequently, the Ninth Circuit rejected the offensive use of the treaty

exception to support subject matter jurisdiction over a cause of action if that claim were

otherwise barred by the FSIA. *Id.*[24]

By contrast to cases in which the offensive use of the treaty exception has been denied,

thereby protecting the sovereign immunity of the defendant sovereign under FSIA's section

1604, the defensive use of the treaty exception by a sovereign to supersede application of a FSIA

exception has been more successful. Recognizing that the language of the treaty exception and

"its meaning is not entirely transparent," the Ninth Circuit undertook a more detailed analysis in

*Moore v. United Kingdom*, 384 F.3d 1079, 1084 (9th Cir. 2004). In that case, the plaintiff

claimed to have been injured by a number of British soldiers in a bar fight in Tacoma,

Washington. *Id.* at 1081. The plaintiff sued the soldiers and the "government of the United

Kingdom" in District Court in Washington, seeking damages for his injuries. *Id.* "[N]one of the

defendants appeared in the district court," but "the United States filed an application for leave to

appear as amicus curiae, along with a 'Suggestion of Lack of Subject Matter Jurisdiction[]'"

based on an international agreement called the North Atlantic Treaty Organization Status of

Forces Agreement ("NATO-SOFA"), *id.* at 1081–82, which, *inter alia*, pertains to litigation

against NATO service members "who are within the United States," *id.* at 1083.

The operative section of the NATO-SOFA in *Moore* provided that foreign service

members on active duty in the United States were " 'assimilated' into the United States military"

for the purposes of claims raised against them. *Id.* at 1086 (quoting *Daberkow v. United States*,

581 F.2d 785, 789 (9th Cir. 1978)). In essence, the NATO-SOFA provided that the British

---

[24] The Ninth Circuit ultimately found that the foreign sovereign in that case had "implicitly waived it sovereign immunity with respect to [the plaintiffs'] claims for torture[]" and, on the limited record before it, that the FSIA's expropriation and/or commercial activity exceptions applied to the taking of the plaintiffs' property. *Siderman de Blake*, 965 F.2d at 712, 722.

soldier defendants were to be treated as U.S. service members for the purposes of litigation, effectively immunizing the United Kingdom from suit. *See id.* Thus, the Ninth Circuit considered whether the treaty exception to the FSIA "can only permit suits against foreign states where the FSIA would not[,]"—in other words, offensive use of the treaty exception—or whether pre-existing "agreements can preclude suit where the FSIA would otherwise allow it[,]"—in other words, defensive use of the exception. *See id.* at 1084.

The Ninth Circuit's answer to this question was that the treaty exception may apply in both circumstances; in other words, a pre-existing agreement may be used defensively to protect immunity or offensively to abrogate immunity. *Id.* at 108485 ("[P]reexisting international agreements could either expand or contract a foreign nation's amenability to suit as compared to that under the FSIA"). Relying on *Amerada Hess* and the legislative history of the FSIA, the *Moore* court held that "any conflict with the FSIA immunity provisions, whether toward more or less immunity, is within the treaty exception." *Id.* at 1084. The Ninth Circuit went on to note that such a reading was "the only sensible one" since "[t]o read § 1604 otherwise, as permitting pre-existing international agreements only to expand a foreign state's exposure to suit but not to limit it, would allow the FSIA to implicitly trump treaties precluding certain kinds of suits against foreign nations." *Id.* at 1084–85. The court found that the pre-existing agreement embodied in NATO-SOFA applied to the situation in *Moore*, with the result that the suit had to be dismissed, even though, absent that agreement, the FSIA would have allowed the plaintiff to proceed against the United Kingdom. *Id.* at 1088 ("As the NATO-SOFA controls, there is no jurisdiction under the FSIA over [the plaintiff's] suit against the United Kingdom.").[25] *See also*

---

[25] Specifically, under the NATO-SOFA, a suit against NATO service members on active duty in the United States was construed as if the service members were part of the U.S. military, thereby requiring substitution of the United States, against which the plaintiff's suit for an intentional tort was barred by the Federal Tort Claims Act, for the United Kingdom. *See Moore*, 384 F.3d at 1088.

*Gutch v. Federal Republic of Germany*, 444 F. Supp. 2d 1, 8 (D.D.C. 2006) (declining to find NATO-SOFA restricted otherwise applicable sovereign immunity when plaintiff attempted offensive use of treaty exception) *disagreed with on other grounds by Nemariam v. Fed. Democratic Republic of Eth.*, 491 F.3d 470, 476 (D.C. Cir. 2007); *Greenpeace, Inc. (U.S.A.) v. State of France*, 946 F. Supp. 773, 788 (C.D. Cal. 1996) (upholding defensive use of treaty exception and finding NATO-SOFA barred claim against French soldiers).  Thus, *Moore* confirmed the principle that the treaty exception may be used defensively by a sovereign, which is a party to an existing international agreement providing broader immunity than otherwise available under the FSIA's exceptions.  *See id*; *see also 767 Third Ave. Assocs. v. Permanent Mission of Republic of Zaire to United Nations*, 988 F.2d 295, 297 (2d Cir. 1993) (holding preexisting agreement granting diplomatic and consular immunities barred application of FSIA); *Mashayekhi v. Iran*, 515 F. Supp. 41, 43 (D.D.C. 1981) (holding that immunity provisions in Treaty of Amity between United States and Iran prohibited suit to which FSIA exception likely would have applied); *Ewald v. Royal Norwegian Embassy*, No. 11-cv-2116, 2013 WL 6094600, at *5 (D. Minn. Nov. 20, 2013) (holding that preexisting agreement declaring foreign missions "inviolable" superseded application of FSIA exception); *Johnson v. U.K. Government*, 608 F. Supp. 2d 291, 296–97 (D. Conn. 2009) (holding preexisting agreement shielded consular official without deciding whether FSIA would have allowed suit).

In cases—such as *Moore* and the one at bar—involving the defensive use of the treaty exception by a sovereign, courts have closely examined the structure and text of the underlying international agreement relied upon by the sovereign to ascertain whether the agreement failed to address or protect the sovereign's immunity on the subject matter of the claims at issue.  When courts have found no "express[] conflict," *Amerada Hess*, 488 U.S. at 442, between the pre-

existing agreement and application of the FSIA's exceptions under sections 1605 through 1607,

subject matter jurisdiction has been exercised.  For example, in an unpublished opinion, the D.C.

Circuit rejected a foreign sovereign's attempt to use the treaty exception to avoid application of

FSIA's state-sponsored terrorism exception, 28 U.S.C. § 1605(a)(7), which strips sovereign

immunity from countries that, "*inter alia*, 'provi[ded] material support or resources' for an act of

'hostage taking,' if the state was designated as a state sponsor of terrorism 'at the time the act

occurred' or was 'later so designated as a result of' the act taken."  *Wyatt v. Syrian Arab

Republic*, 266 F. App'x 1, 2 (2008) (quoting 28 U.S.C. § 1605(a)(7)) (alteration in original).  The

defendant sovereign in that case argued that the United Nations Charter, to which both Syria and

the United States were parties, prohibited the unequal treatment of member states.  *See id.*  The

D.C. Circuit found that the state-sponsored terrorism exception treated all U.N. member states

equally, since any of them could be placed on the state-sponsors of terror list by the U.S.

Secretary of State.  *Id.*  Thus, the *Wyatt* court found no conflict between the international

agreement and the FSIA and, consequently, that the treaty exception did not bar application of

the FSIA exceptions.  *Id.*

Likewise, in *World Holdings, LLC v. Federal Republic of Germany* (*World Holdings*),

613 F.3d 1310, 1317 (11th Cir. 2010), the Eleventh Circuit denied a sovereign's defensive use of

the FSIA's treaty exception based on a pre-existing international agreement pertaining to bonds

issued by Germany in the early twentieth century.[26]  In that case, the pre-existing agreement

provided that no bond "shall be enforceable unless and until it shall be validated" by a "Board

---

[26] The Eleventh Circuit reserved decision regarding the general availability of the treaty exception as a defense to a suit but merely assumed this construction of the FSIA, explaining that "[w]e need not decide whether the 'subject to' language applies only to abrogate immunity where it may otherwise exist under the FSIA, or whether an existing international agreement may alternatively preserve a foreign sovereign's immunity from the jurisdiction of United States courts where the foreign sovereign's conduct otherwise falls under an exception to immunity in the FSIA." *World Holdings*, 613 F.3d at 1315 n.8.

for the Validation of German Bonds in the United States established by the Agreement on

Validation Procedures, or by the authorities competent for that purpose in" the sovereign

defendant.  *Id.* at 1315 (quoting the Agreement Between the Government of the United States of

America and the Government of the Federal Republic of Germany Regarding the Validation of

Dollar Bonds of German Issue, U.S.-Ger., Feb. 27, 1953, 4 U.S.T. 797).[27]  The plaintiff brought

suit in U.S. District Court to enforce its bonds without first complying with the validation

procedures set out by the agreement between the United States and Germany.  *See id.* at 1314.

Although the parties had stipulated that FSIA's commercial activity applied, *id.* at 1315,

Germany nonetheless argued that the court lacked subject matter jurisdiction because its

agreement with the United States "precluded an enforcement action in United States courts on

bonds that have not been validated," *id*. at 1314.  The Eleventh Circuit concluded that, although

the treaty set out mechanisms for validation of the bonds as a prerequisite for enforcement, the

issue of immunity from suit for purposes of subject matter jurisdiction was a separate and

distinct issue from the merits question of the enforceability of the bonds.  *See id.* at 1316–17.

With respect to the former jurisdictional issue, the court found that the treaty "is silent on the

question of immunity[]" and, consequently, similarly to the treaty considered in *Amerada Hess*,

"the treat[y] at issue did not expressly conflict with the FSIA because they did not speak to the

issue of sovereign immunity."  *Id*. at 1316.  With respect to the latter merits issue, the court

expressly "advise[d] that this is *not* a decision as to whether World Holdings' bonds are, in fact,

enforceable[,]" but merely "that the district court has the authority to decide that issue."  *Id.* at

---

[27] The lengthy procedural history of *World Holdings* need not be recounted here.  The dispute centered on whether certain bonds were among those stolen by Soviet forces during World War II after the bonds had been retired.  *See World Holdings*, 613 F.3d at 1313.  The agreement entered into between Germany and the United States was intended to protect the interests of legitimate American bond holders, who were at risk of losing out to "holders of the looted bonds" in competition for Germany's limited foreign currency reserves.  *See id.* (quoting *Abrey v. Reusch*, 153 F. Supp. 337, 339 (S.D.N.Y. 1957)).

1317 (emphasis in original); *see also Mortimer Off Shore Servs. v. Fed. Republic of Ger.*, 615

F.3d 97, 108, 117 (2d Cir. 2010) (affirming dismissal of claims to enforce German bonds under

same treaty at issue in *World Holdings*, upon finding FSIA's commercial activity exception

applied providing subject matter jurisdiction as to bonds issued by West Germany, but, on

merits, bonds not validated per terms of treaty so not enforceable); *Bleiser v. Bundesrepublik*

*Deutschland*, No. 08 C 6254, 2010 U.S. Dist. LEXIS 107174, at *18–19 (N.D. Ill. Oct. 7, 2010)

(concluding that same treaty at issue in *World Holdings* did not preclude subject matter

jurisdiction but that "this decision does not preclude a finding that the bonds are unenforceable

for failure to comply with the validation requirement" under the treaty), *aff'd sub nom on other*

*grounds*, *Korber v. Bundesrepublik Deutschland*, 739 F.3d 1009, 1011 (7th Cir. 2014).

Set against this case law regarding the defensive use of the FSIA's treaty exception, the

Court now turns to its application in the instant matter.

### 2.      *The 1947 Peace Treaty*

The Hungary Defendants assert that the 1947 Treaty "provides an exclusive mechanism

and forum for the resolution of individuals' claims against Hungary for expropriation of property

during World War II."  Hungary Defs.' Treaty Mem. at 1.  Citing the FSIA's treaty exception,

these defendants argue that the terms of the 1947 Treaty preclude the exercise of subject matter

jurisdiction over the instant claims.  *See id.*  Based on an examination of the 1947 Treaty, the

Court agrees. *See Medellin*, 552 U.S. at 506 ("The interpretation of a treaty, like the

interpretation of a statute, begins with its text.").

Two articles in the 1947 Treaty are relevant to the plaintiffs' claims: Article 27 and

Article 40.  Article 27 reads, in full:

> 1. Hungary undertakes that in all cases where the property, legal rights or
> interests in Hungary of persons under Hungarian jurisdiction have, since
> September 1, 1939, been the subject of measures of sequestration, confiscation or

49

control on account of the racial origin or religion of such persons, the *said property, legal rights and interests shall be restored together with their accessories or, if restoration is impossible, that fair compensation shall be made therefor*.

2. All property, rights and interests in Hungary of persons, organisations or communities which, individually or as members of groups, were the object of racial, religious or other Fascist measures of persecution, and *remaining heirless or unclaimed for six months after the coming into force of the present Treaty, shall be transferred by the Hungarian Government to organisations in Hungary representative of such persons, organisations or communities.* The property transferred shall be used by such organisations for purposes of relief and rehabilitation of surviving members of such groups, organisations and communities in Hungary. *Such transfer shall be effected within twelve months from the coming into force of the Treaty, and shall include property, rights and interests required to be restored under paragraph 1 of this Article*.

1947 Treaty art. 27 (emphasis supplied).

As the text of this article makes plain, this treaty between the Allied Nations and Defendant Hungary addressed reparations for the victims of the Hungarian Holocaust. *See* 1947 Treaty art. 27. Defendant Hungary agreed to "restore[] together with their accessories, or, if restoration is impossible, [make] fair compensation" to all people who were the victims of "sequestration, confiscation or control on account of racial origin or religion of such persons[.]" *Id.* art. 27(1). In addition, the 1947 Treaty contemplated that those victimized by the Hungarian government during the war would be compensated quickly. *See id.* art. 27(2). Under Article 27, confiscated property retained by Defendant Hungary was to be "transferred . . . to organisations [sic] in Hungary representative of [Holocaust victims], organisations [sic], or communities" within twelve months if such property went "unclaimed" for six months after the 1947 Treaty came into force. *Id.* Thus, the operation of the 1947 Treaty envisioned, perhaps unrealistically given the trauma the Hungarian Holocaust victims had suffered, that individual victims would make claims for their wartime losses within six months of the treaty coming into force. *See id.* If the victims were unable to do so, the 1947 Treaty provided that confiscated property—or

"compensation therefor"—would be delivered to relief organizations to benefit the victims of the

Holocaust. *See id.*

The other relevant article in the 1947 Treaty is Article 40, which reads in full:

> 1. Except where another procedure is specifically provided under any Article of the present Treaty, *any dispute concerning the interpretation or execution of the Treaty*, which is not settled by direct diplomatic negotiations, shall be referred to the Three Heads of Mission acting under Article 39, except that in this case the Heads of Mission will not be restricted by the time limit provided in that Article. Any such dispute not resolved by them within a period of two months shall, unless the parties to the dispute mutually agree upon another means of settlement, be referred at the request of either party to the dispute to a Commission composed of one representative of each party and a third member selected by mutual agreement of the two parties from nationals of a third country. Should the two parties fail to agree within a period of one month upon the appointment of the third member, the Secretary-General of the United Nations may be requested by either party to make the appointment.
>
> 2. The decision of the majority of the members of the Commission shall be the decision of the Commission, and shall be accepted by the parties as definitive and binding.

1947 Treaty art. 40 (emphasis supplied). This article establishes a three-tiered review procedure

for disputed claims arising under the 1947 Treaty, namely: (1) resolution through direct

diplomatic negotiations, *id.* art. 40(1); (2) followed by referral to a board of the "Three Heads of

Mission" of the Soviet Union, the United Kingdom, and the United States, *see id.* art. 39

(defining "Three Heads of Mission"); *id.* art. 40(1); and (3) final resolution by a "Commission"

made up of representative selected by the parties to a dispute, *id.* art. 40(1). This procedure *must*

be used "[e]xcept where another procedure is specifically provided under any Article of the

[1947] Treaty." *Id.* This article required that "any dispute concerning the interpretation or

execution of the treaty" was subject to resolution exclusively through the mechanisms described

in the Treaty. The 1947 Treaty goes on to state that the "decision of the majority of the members

of the Commission shall be the decision of the Commission, and shall be accepted by the parties

as definitive and binding." *Id.* art. 40(2).

Taken together, Article 27 and Article 40 provide an explicit agreement by Defendant

Hungary to provide reparations to the Hungarian government's wartime victims, *id.* art. 27(1); a

time period, albeit short, in which claims had to be made, *id.* art. 27 (2); a three-step review

process for resolution of any disputes over the execution of these reparations, *id.* art 40(1); and a

clear end to any disputes when a Commission issues a final ruling, *id.* art.40(2).  The question

disputed by the parties is whether this treaty constitutes an "existing international agreement," 28

U.S.C. § 1604, that is in conflict with the FSIA such that the treaty exception applies.

### 3.  *The 1947 Treaty Conflicts With The FSIA*

By providing an exclusive mechanism for dispute resolution arising from the

"interpretation or execution of the Treaty," Defendant Hungary agreed to a limited, conditional

waiver of sovereign immunity regarding the subjects covered by the 1947 Treaty.  Although the

plaintiffs contend that the 1947 Treaty "is not at all like" the NATO-SOFA at issue in *Moore*, *see*

Pls.' Treaty Mem. at 3 n.3, the two agreements share material similarities.  The NATO-SOFA at

issue in *Moore* required one sovereign to shift the legal regime applicable to its own service

members by "assimilat[ing]" those service members into the service of an ally and subjecting

them to another sovereign's legal system.  *See Moore*, 384 F.3d at 1086.  Under the 1947 Treaty,

Defendant Hungary relinquishes its sovereign immunity to the limited extent necessary to

recognize rights to restitution and to submit itself to a *sui generis* legal regime designed to

address the issues covered by the 1947 Treaty.  *See* 1947 Treaty art. 40.  As in *Moore*, the pre-

existing agreement between the foreign sovereign and the United States specified the forum

where certain disputes were to be resolved and, in doing so, altered the contours of each nation's

sovereign immunity.  Far from being "not at all like" the NATO-SOFA, Pls.' Treaty Mem. at 3

n.3, which the Ninth Circuit found superseded the FSIA under the treaty exception, *see Moore*,

384 F.3d at 1088, the 1947 Treaty shares a key feature of delineating a specific and exclusive regime to resolve certain types of claims.

There is no dispute that the claims in the instant matter stem from the discriminatory expropriation of rights and property from Hungarian Jews by the Hungarian state during World War II and that the subject matter of such claims was addressed in the 1947 Treaty.  The gravamen of the plaintiffs' FAC is that the Hungary Defendants' efforts to comply with the 1947 Treaty were "paltry and wholly inadequate."  FAC ¶ 132.  Where the parties differ is whether the 1947 Treaty "expressly conflicts" with the provisions of the FSIA, *see Amerada Hess*, 488 U.S. at 442, such that the 1947 Treaty controls and precludes jurisdiction in this Court.

The plaintiffs rely heavily on the Seventh Circuit's decision in *Abelesz*.  *See* Pls.' Treaty Mem. at 4–5.  There, the court rejected the application of the treaty exception when asserted by Defendant MÁV in a case brought by Jewish victims of the Hungarian Holocaust, finding that the 1947 Treaty did not "expressly conflict" with the FSIA, citing Articles 27 and 40.  *See Abelesz*, 692 F.3d at 695–96.  In response, the Hungary Defendants state that "the Seventh Circuit erred in this part of its decision."  Hungary Defs.' Treaty Mem. at 9.  The *Abelesz* decision is not binding on this Court, nor is its reasoning on this issue ultimately persuasive.

The *Abelesz* court's finding is predicated on two critical interpretations of the 1947 Treaty.  First, it states that "Article 27 spoke exclusively to Hungary's obligations.  It said nothing about the rights and responsibilities of the people from whom Hungary expropriated property."  *Id.* at 695.  Yet, Article 27 expressly provides that "the people from whom Hungary expropriated property," *id.*, are to have restored the "property, legal rights and interests" that were "the subject of measures of sequestration, confiscation or control on account of the racial origin or religion of such persons," implicitly establishing a "right" to restitution for victims

53

from whom property was expropriated, 1947 Treaty art. 27(1).  Additionally, Article 27 provides

a six month time period for victims to claim their property, after which "unclaimed" property

would be transferred to aid organizations for the victims of the Hungarian Holocaust, thus

implicitly suggesting that the claimants had a responsibility—perhaps unrealistic—to assert

claims within that timeframe.[28]  *See id.* art. 27(2).  Thus, while not granting a private right of

action to enforce the restitution obligations undertaken by Hungary, as the Seventh Circuit

pointed out, *see Abelesz*, 692 F.2d at 695, Article 27 nonetheless *does* establish individual

"rights" explicitly, and individual "responsibilities," at least implicitly, to assert claims in a

timely manner—or see the expropriated property turned over to relief agencies, *see* 1947 Treaty

art. 27.

The Seventh Circuit's second critical interpretation of the 1947 Treaty concerns Article

40.  The *Abelesz* court acknowledged that the "1947 Treaty did establish an exclusively

executive branch mechanism [for resolution of disputes]—but only for disputes concerning the

interpretation or execution of the Treaty, not for disputes concerning restitution for expropriated

property."  692 F.3d at 695–96.  It then found, without further explanation, that this "exclusive

executive branch mechanism" did not "expressly conflict" with the FSIA.  *See id.*  This

---

[28] As previously noted, *see supra* note 21, Defendant Hungary's obligation under Article 27 to transfer "[a]ll property, rights and interests" that it expropriated "to organisations [sic] in Hungary representative of such persons, organisations [sic] or communities" from whom the property was expropriated undermines the plaintiffs' assertion in the FAC that the Hungary Defendants remain in possession of property or property exchanged for property expropriated from them.  *See* FAC ¶¶ 83, 85.  Moreover, although the Hungarian Constitutional Court initially ruled in the 1990s that Hungary was not in compliance with the 1947 Treaty, the Hungarian government revisited this issue and determined that the country had come into compliance by 2007, *see* Hungary Defs.' Mem. at 26 n.25 (citing Hungary Government Decision 1091/2007).  Thus, even if the FSIA were not superseded in this matter by the pre-existing 1947 Treaty, the plaintiffs would have to overcome significant hurdles to establish that their claims against the Hungary Defendants fall within the FSIA's expropriation exception, which requires a foreign sovereign to retain possession of expropriated property or property exchanged for such expropriated property.  *See* 28 U.S.C. § 1605(a)(3).  Since the treaty exception applies to the instant motion, however, the Court need not decide the effect, if any, on the application of the expropriation exception of the Hungarian government's 2007 decision finding that Defendant Hungary was in full compliance with the requirements set out in Article 27(2) of the 1947 Treaty, implying that all unclaimed confiscated property or interests were transferred to refugee organizations.

interpretation turns on an unduly restrictive reading of the meaning of "any dispute concerning the interpretation or execution of the Treaty." *See* 1947 Treaty art. 40(1).

A contextual examination of Article 40, in conjunction with Article 26, which provides rights for foreign nationals from whom property was expropriated, and Article 27, which provides rights for people under Hungarian jurisdiction from whom property was expropriated, as well as other portions of the 1947 Treaty, illustrates why the FSIA's treaty exception applies to the instant plaintiffs' claims. While primarily a peace treaty, the 1947 Treaty contains numerous provisions relating to the rights and responsibilities of the Allied Nations, the Hungary Defendants, and the people and armies under their control. For example, the 1947 Treaty also describes obligations on the part of Hungary pertaining to navigation on the Danube River, *see* 1947 Treaty art. 38; international rail travel and the rates charged for such travel, *see id.* art. 34; treatment of corporations from the Allied Nations within Hungary, *see id.* art. 33(1)(c); resolution of claims on behalf of Hungary and its nationals against other nations, *see id.* art. 32; and reparations to the Soviet Union, Czechoslovakia, and Yugoslavia for losses caused by military action, *see id.* art. 23. All of these provisions are subject to the three-tier resolution process set forth in Article 40. *See* 1947 Treaty art. 40. Absent the 1947 Treaty, however, Defendant Hungary would have sovereign immunity from suits concerning virtually all of the aforementioned claims.

When viewed through this lens, the "express conflict" with the FSIA comes into focus. In signing the 1947 Treaty, Defendant Hungary waived its sovereign immunity to a limited extent in agreeing to make expropriation victims whole. *See generally* 1947 Treaty. Article 40 is the codification of the condition to this limited waiver to which the Hungary Defendants

agreed.  Although the words "sovereign immunity" do not appear in Article 40, the conditional

waiver agreed to by the Hungary Defendants is implicit throughout the article.

A critical condition is set out in Article 40, whereby Defendant Hungary subjected itself

to an "exclusive[] executive branch mechanism," *Abelesz*, 692 F.3d at 695, for resolution of any

"dispute concerning the interpretation or execution of the Treaty," 1947 Treaty art. 40(1).  The

Seventh Circuit's narrow reading of this provision in *Abelesz* is difficult to reconcile with the

language in Article 27.  The plaintiffs do not dispute that Defendant Hungary has a

responsibility, under Article 27, to make those from whom it expropriated property whole.

Indeed, neither do the defendants.  The plaintiffs instead argue that the Hungary Defendants'

attempts to comply with Article 27 and to make Hungarian Holocaust victims whole were "paltry

and wholly inadequate."  FAC ¶ 132.  Whether the plaintiffs are correct is immaterial to the

application of the treaty exception.  Since the 1947 Treaty provides a right to be made whole for

the victims of the Hungarian Holocaust, any dispute over the adequacy of those efforts is, by

definition, a dispute over the interpretation or execution of the 1947 Treaty such that Article 40

applies.  In such a case, Article 40 creates an exclusive, extrajudicial remedy premised on

diplomacy.

The House and Senate Reports accompanying the FSIA bolster this conclusion.

Congress expressly intended that the "immunity provisions [in the FSIA] are made subject to

'existing' treaties and other international agreements to which the United States is a party."  H.R.

at 17; S.R. at 17.  As examples, the House Report stated that the FSIA would not "alter the

provisions of commercial contracts or agreements to which the United States is a party, calling

for *exclusive nonjudicial remedies through arbitration or other procedures for the settlement of*

*disputes*."  *Id.* (emphasis added).  The "exclusive[] executive branch mechanism" provided for in

Article 40 to settle disputes arising from claims within the scope of the 1947 Treaty is just such a "nonjudicial remed[y]" for which Congress designed the treaty exception.[29]

Consequently, the Court holds that the plaintiffs' claims are entirely based on the expropriation of their property by the Hungarian government and its instrumentalities during World War II and, consequently, fall squarely within the scope of Article 27 of the 1947 Treaty. The plaintiffs' claims are, in essence, over the adequacy of the Hungary Defendants compliance with their responsibilities under Article 27. Such an inquiry requires an interpretation of the 1947 Treaty's terms and the Hungary Defendants' efforts to execute it. Consequently, Article 40, which provides for an exclusive, extrajudicial mechanism to resolve such disputes, "expressly conflicts" with the 1947 Treaty. The 1947 Treaty is an "existing agreement" within the meaning of 28 U.S.C. § 1604, such that the exceptions to the FSIA do not apply and the 1947 Treaty controls. Therefore, the plaintiffs' requests for relief are properly directed to the Executive Branch, which may resolve such disputes diplomatically, rather than the Judicial

---

[29] The Supreme Court in *Amerada Hess* relied on language in the House and Senate Reports stating "[i]n the event that an international agreement *expressly conflicts* with this bill, the international agreement would control," to create the "express conflicts" test, which has been applied thereafter. *See* 488 U.S. at 442 (quoting H.R. at 17; S.R. at 17) (emphasis supplied). Yet, the same reports contain a further elucidation of this principle, noting that "[m]any provisions in [international] agreements are consistent with, but do not go as far as, the current bill. To the extent such international agreements are silent on a question of immunity, the bill would control; the international agreement would control only where a conflict was manifest." H.R. at 18; S.R. at 17. While somewhat ambiguous, this report language is generally in keeping with the FSIA's "premise of immunity" from which certain "exceptions to the general principle" were created. *See* H.R. at 17; S.R. at 17. It is possible to read this language as a "magic words" requirement that demands use of the word "immunity" in a pre-existing agreement before such an agreement can be found to conflict with the FSIA by not "go[ing] as far as" the statute's exceptions in restricting immunity. *See id.* Such a reading, dependent on an explicit mention of sovereign immunity, is too narrow of a reading of Congressional intent, especially considering that United States policy prior to 1952 was one of "virtual absolute immunity" for foreign states. *See Princz*, 26 F.3d at 1169. Moreover, requiring explicit discussion of immunity in a pre-existing agreement as a predicate for finding an "express conflict" with the FSIA would essentially conflate the treaty exception in section 1604 with the explicit waiver exception in section 1605(a)(1). The better reading of this influential passage in the Congressional reports is that some international agreements—particularly those entered into before the 1952 Tate letter against the backdrop of absolute sovereign immunity—"do not go as far as" the FSIA exceptions in restricting immunity and must be given effect, i.e., defensive use of the treaty exception, when any abrogation of immunity reflected in the agreement is expressly conditioned. Such conditions may "manifest" a conflict with the FSIA's exceptions even when the "magic words" of sovereign immunity are absent.

Branch, which is constrained by the FSIA to recognize the Hungary Defendants' sovereign immunity, consistent with the conditional waiver embodied in the 1947 Treaty.

The plaintiffs contend that the D.C. Circuit's decision in *de Csepel* does not "suggest that this Circuit would reach a different outcome on the inapplicability of the treaty exception than the Seventh Circuit[]" in *Abelesz*. Pls.' Treaty Mem. at 6. The D.C. Circuit analyzed the 1947 Treaty at some length in *de Csepel*, *see* 714 F.3d at 601–03, and, albeit in *dicta*, clarified the types of claims that would fall within the treaty exception under the 1947 Treaty, *see id*. at 602. Contrary to the plaintiffs' contention, the D.C. Circuit's discussion is pertinent to the instant matter and bolsters the conclusion that the plaintiffs' claims are barred by the treaty exception.

At issue in *de Csepel* were the efforts of the heirs of a major Hungarian Jewish art collector to reacquire art objects that were "loaned" to the Hungarian state immediately after World War II. 714 F.3d at 595–96. The heirs alleged that the arrangement constituted a bailment "whereby Hungary assumed 'a duty of care to protect the property and to return it to" the plaintiff's family. *Id.* at 596. The lawsuit centered on the heirs' claims that Hungary breached the bailment agreement by refusing to return the artwork in 2008. *Id.* The D.C. Circuit rejected Hungary's argument that the 1947 Treaty and the 1973 Executive Agreement between the United States and Hungary prevented the District Court from exercising subject matter jurisdiction.[30] *See id.* at 602–03. In doing so, the Court accepted Hungary's description that Articles 27 and 40 of the 1947 Treaty "[t]aken together . . . establish an exclusive treaty-based mechanism for resolving all claims seeking restitution of property discriminatorily expropriated during World War II from individuals subject to Hungarian jurisdiction." *Id.* at 602. Nonetheless, the Court found that the "Peace Treaty presents no conflict with Hungary's

---

[30] This Court need not reach the question of whether the 1973 Agreement, which was intended to resolve all outstanding claims of U.S. nationals, bars the claims of the U.S. nationals who are members of the purported class, since the instant claims may be resolved by reliance on the 1947 Treaty.

amenability to suit under the FSIA[]" in that case "for the simple reason that the [heirs'] claims fall outside the Treaty's scope." *Id.* Specifically, the Court explained that the "family's claims rest not on war-time expropriation but rather on breaches of bailment agreements formed and repudiated after the war's end." *Id.* at 602 (citation omitted). Thus, the D.C. Circuit had no reason to address whether the 1947 Treaty's exclusive mechanism for addressing claims based on expropriated property were in conflict with the FSIA. *See id.*

The D.C. Circuit's treatment—without disputing Hungary's view—of the scope of the 1947 Treaty bolsters this Court's conclusion that the 1947 Treaty was intended to resolve claims such as those brought by the plaintiffs in the instant matter for restitution arising from property confiscated by the Hungarian defendants during the war.

The D.C. Circuit's interpretation of the 1973 Executive Agreement makes this conclusion clearer. In *de Csepel*, Hungary argued that the "1973 Agreement . . . effectuated a 'full and final settlement and . . . discharge' of certain specified claims against Hungary by 'nationals and the Government of the United States,' including, as relevant here, claims for 'property, rights and interests affected by Hungarian measures of nationalization, compulsory liquidation, expropriation, or other taking on or before the date of this Agreement' and claims for 'obligations of the Hungarian People's Republic under Articles 26 and 27 of the [Peace Treaty]." *Id.* at 602 (quoting the 1947 Treaty and the Agreement Between the Government of the United States of America and the Government of the Hungarian People's Republic Regarding the Settlement of Claims, U.S.-Hungary, Mar. 6, 1973, 24 U.S.T. 522 ("the 1973 Agreement")). The D.C. Circuit found that the 1973 Agreement, which, by its terms, incorporated claims under Articles 26 and 27 of the 1947 Treaty, "settles claims for property expropriated by Hungary prior to the date of the [1973] Agreement[.]" *Id.* at 603.

This finding by the D.C. Circuit supports two conclusions.  First, the 1973 Agreement, which resolved outstanding claims under Articles 26[31] and 27 of the 1947 Treaty, comported with the requirements of Article 40, since Article 40 envisioned the resolution of such claims through diplomatic negotiation.  *See* 1947 Treaty Art. 40(1) (establishing dispute resolution procedure for "any dispute concerning the interpretation or execution of the Treaty, *which is not settled by direct diplomatic negotiations*" (emphasis added)).  The resolution of outstanding claims through state-to-state negotiation is in keeping with U.S. practice involving the claims of its citizens against foreign sovereigns.  *See infra*.

Second, the fact that the D.C. Circuit held that the 1973 Agreement resolved claims of U.S. nationals against Defendant Hungary for property expropriated during the war indicates that those claims were properly addressed through the 1947 Treaty's provisions.  *See de Csepel*, 714 F.3d at 602 ("the 1973 Agreement settles claims for property expropriated by Hungary prior to the date of the [1973] Agreement").  This interpretation of the 1973 Agreement was important in *de Csepel* to distinguish the heirs' claims, which were predicated on a bailment agreement that became ripe in 2008, rather than expropriation claims covered by either the 1947 Treaty or the 1973 Agreement.  *See id.*  In contrast to the claims at issue in *de Csepel*, the plaintiffs in the instant matter are pressing claims entirely related to expropriation of property during the war. *See* FAC ¶¶ 143 (noting the purported class "consists of (a) all surviving Jewish victims of the Holocaust . . . who were stripped of personal property by any of the defendants . . . and (b) the heirs . . . of the deceased Jewish victims of the Holocaust who at any time between September 1, 1939, and May 8, 1945, were stripped of personal property by any of the defendants"); 145(F) (noting question of law or fact common to the purported class as "[w]hether the defendants, as a

---

[31] Article 26 addressed Hungary's responsibility to restore property and rights expropriated during the war to nationals of the Allied Nations.  *See* 1947 Treaty art. 26.

matter of course, confiscated the property and possessions of the Hungarian Jews contemporaneous with their deportation, and *failed to return that stolen property to its rightful owners or provide adequate compensation therefor*[,]" mirroring the language of the 1947 Treaty); 164–225 (describing all claims as stemming from expropriation of property and heinous acts associated with such deportation).  In detailing the types of acts that were settled in the 1973 Agreement on behalf of U.S. nationals—which were also covered by the 1947 Treaty—the D.C. Circuit in *de Csepel* strongly indicated that, contrary to the plaintiffs' assertion, *see* Pls.' Treaty Mem. at 6, the D.C. Circuit would find the instant claims covered by that treaty and subject to the FSIA's treaty exception.

The plaintiffs' allegations that the Hungary Defendants have failed to fulfill their obligations under the 1947 Treaty, or the subsequent 1973 Agreement, are of little relevance in determining the effect of the treaty exception.  Indeed, while generating controversy, diplomatic settlement of private claims is not unusual when it concerns debts or claims owed by a foreign sovereign with whom the United States had engaged in conflict.  For instance, in *Dames & Moore v. Regan*, 453 U.S. 654, 686 (1981), the Supreme Court held that it was not an undue extension of executive power when, following the 1979 Iranian Hostage Crisis, the President, acting under the powers provided to him by Congressional legislation and his foreign affairs power provided by the Constitution in Article II, used an executive order to suspend all claims against Iran and require all outstanding claims to be resolved through an alternative process, namely, the Iran-United States Claims Tribunal, *id.* at 665.  In upholding the President's actions, the Supreme Court noted that "[n]ot infrequently in affairs between nations, outstanding claims by nationals of one country against the government of another country are 'sources of friction' between the two sovereigns . . . . [and t]o resolve these difficulties, nations have often entered

into agreements settling the claims of their respective nationals." *Id.* at 679 (citation omitted).

Indeed, the Supreme Court cited the 1973 Agreement with Hungary, 24 U.S.T. 522, mentioned

in *Abelesz* and *de Csepel*, as an example of a "binding settlement[] with [a] foreign nation." *Id.*

at 680 & n.9.  The Court noted that "it is . . . undisputed that the 'United States has sometimes

disposed of claims of its citizens without their consent, or even without consultation with them,

usually without exclusive regard for their interests, as distinguished from those of the nation as a

whole.'" *Id.* at 679–80 (quoting L. Henkin, *Foreign Affairs and the Constitution* 262–63

(1972)); *see also City of New York v. Permanent Mission of India*, 618 F.3d 172, 194 n. 15 (2d

Cir. 2010) ("The President's authority to enter Executive Agreements to settle civil claims

between American citizens and foreign governments or foreign nationals is . . . treated as a gloss

on Executive Power.") (internal quotation marks and citation omitted).

It stands to reason that if the United States government, through a treaty or an executive

agreement with a foreign nation, may make a binding settlement upon all the claims of its

citizens, the Hungarian government, through a negotiated treaty of peace with the Allied Nations

at the end of World War II, had the same power to negotiate and provide for settlement of its

claims on behalf of its citizens "without exclusive regard for their interests, as distinguished from

those of the nation as a whole." *Dames & Moore*, 453 U.S. at 680.  Although the plaintiffs'

description of the Hungary Defendants' restitution efforts as "paltry and wholly inadequate,"

FAC ¶ 132, may be entirely accurate, they were pledged as part of a diplomatic process that the

Supreme Court has noted is practiced by the United States and "implicitly approved" by

Congress, *Dames & Moore*, 453 U.S. at 680.  *See also Kiaie v. Islamic Republic of Iran*, No. 01-

1501, 2006 WL 3833946, at *2 (D.D.C. Dec. 29, 2006) (holding international claims settlement

agreement precluded judicial review of claims against Iran ruled on by commission).

The Seventh Circuit noted recently that "[d]iplomacy requires compromise. . . . [and] diplomatic dispositions of private financial claims against other sovereigns, designed to facilitate the establishment of peaceful relations among nations, have occurred throughout American history." *Korber*, 739 F.3d at 1012.  In *Korber*, the Seventh Circuit was presented with the same agreement regarding German bonds as that addressed by the *World Holdings* court.  *See id.* at 1010–11.  The plaintiffs in *Korber* "maintain[ed] that Germany has not carried out all its obligations under the 1953 Treaty."  *Id.* at 1012.  The Seventh Circuit held that such a "contention should be made to the Department of State rather than to a district judge."  *Id.*  Even when "private parties [are] the intended beneficiaries of treaties," the Seventh Circuit held, in the absence of a private right of action provided for in the treaty, "diplomatic rather than judicial channels are the appropriate ones for consideration of plaintiffs' grievances."  *Id.*[32]

\*       \*       \*

In sum, the 1947 Treaty provided a process to administer the class of claims now raised by the plaintiffs.  All expropriated property was to have been returned or "compensation . . . made therefor" under Article 27(1) of the 1947 Treaty.  Any "unclaimed" property was to have been turned over to relief organizations six months from the execution of the 1947 Treaty.  1947 Treaty art. 40(2).  All of the plaintiffs' claims against the Hungary Defendants pertain to property or rights expropriated during World War II.  *See* FAC ¶¶ 164–225.  An exclusive mechanism for resolution of disputes regarding "the interpretation or execution" of the 1947 Treaty was provided in Article 40.  Consequently, the 1947 Treaty constitutes an "existing agreement" to which the United States was a party prior to the enactment of the FSIA that "expressly conflicts" with the FSIA, meaning the 1947 Treaty controls.  *See Amerada Hess*, 488

---

[32] Additionally, the Seventh Circuit held in *Korber* that a judicial order under the Alien Tort Statute "did not survive *Kiobel*," and that "how Germany administers the [process provided for in the treaty at issue] is for diplomats or German courts to consider."  *Korber*, 739 F.3d at 1012.

U.S. at 442; H.R. at 18; S.R. at 17. The Hungary Defendants are entitled to sovereign immunity

except as modified by the 1947 Treaty and, consequently, the plaintiffs' claims must be

dismissed for lack of subject matter jurisdiction.[33]

### C.    Defendant RCH

Defendant RCH asserts four principal grounds in support of its motion to dismiss the

plaintiffs' claims: (1) the lack of personal jurisdiction over it; (2) the claims are "non-justiciable,

under the political question doctrine[;]" (3) the plaintiffs' claims are time barred; and (4) venue

in this District is improper "under the doctrine of *forum non conveniens*." *See* Def. RCH's Mem.

at 1–2. The Court agrees, for the reasons discussed below, that the plaintiffs have not established

sufficient minimum contacts of Defendant RCH with the United States to support the exercise of

personal jurisdiction over it. This conclusion obviates the need to address Defendant RCH's

alternative arguments for dismissal of the claims against it.

The plaintiffs contend that Defendant RCH may be haled into court in the United States

based upon Federal Rule of Civil Procedure 4(k)(2). This rule provides that "[f]or a claim that

---

[33] The plaintiffs have requested "limited discovery to elucidate further the jurisdictional facts giving rise to exemptions under FSIA," if this Court were inclined to grant the Hungary Defendants' motion to dismiss. Pls.' Hungary Opp'n at 49 n.50. Presumably, such discovery would entail access to the "official documentation maintained by Defendants Hungary and MÁV evidencing their depradations [sic,]" to which the Hungary Defendants have allegedly refused access to Hungarian Holocaust victims. FAC ¶ 158. It is conceivable that access to this "trove of documents," which are purported to contain "cargo manifests, bills of lading, invoices, inter-agency memoranda and the like . . . that specified the details of each shipment of [Hungarian Jewish] deportees," could provide the plaintiffs with information regarding the eventual disbursement of their liquidated property. FAC ¶ 104; *see also* ¶¶ 137–39 (alleging Hungary Defendants "created and maintained documentation . . . evidencing and relating to the acts and events" of the Hungarian Holocaust, "including the isolation, ghettoization, enslavement, plundering and deportation to the death camps of Hungarian Jewry[]" and that the Hungary Defendants "intend[] to destroy all or part of this historical documentation."). According to the plaintiffs, the continued withholding and potential destruction of these documents "constitutes a continuing offense and violation of the Plaintiffs' fundamental rights as human beings and as Jews." FAC ¶ 137. By contrast to Defendant Hungary's alleged handling of such documentation, the Court notes that the United States, through the Nazi War Crimes Disclosure Act, Pub. L. 105-246, 112 Stat. 1859 (1998), has gone so far as to require declassification and disclosure of any documents pertaining to the Holocaust and the crimes against humanity committed during World War II. The Hungary Defendants' continued refusal to disclose these documents, if true, nearly seventy years after the end of the war, is difficult to understand. Nevertheless, the plaintiffs' claims are covered by the 1947 Treaty and, consequently, neither the FSIA nor any of its exceptions apply. Accordingly, the Court denies the plaintiffs' request for jurisdictional discovery since such discovery would be futile.

arises under federal law, serving a summons . . . establishes personal jurisdiction over a defendant if: (A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and (B) exercising jurisdiction is consistent with the United States Constitution and laws." FED. R. CIV. P. 4(k)(2); *see* FAC ¶ 86 ("While [Defendant RCH] is not subject to jurisdiction in any state's courts of general jurisdiction, the exercise of federal jurisdiction is consistent with the United States [C]onstitution and laws in that the claim arises under federal law, and [Defendant RCH] has substantial contacts with the United States as a whole.").  In essence, Rule 4(k)(2) operates as a federal long-arm statute, requiring the plaintiffs to meet a four-pronged test: (1) the claim against the defendant arises under federal law; (2) "a summons has been served;" (3) the defendant is not subject to personal jurisdiction in any state court of general jurisdiction; and (4) the exercise of personal jurisdiction by this federal court comports with due process. *Mwani*, 417 F.3d at 10.

The parties do not dispute that the first three prongs of this test are met but contest whether Defendant RCH has the requisite contacts with the United States to allow the exercise of jurisdiction "consistent with the United States Constitution and laws." *See* FED. R. CIV. P. 4(k)(2).[34]  The Court first reviews the evolving legal principles governing the exercise of

---

[34] The parties do not address the prerequisite for the application of Rule 4(k)(2), namely, whether the claims raised "arise[] under federal law[.]" FED. R. CIV. P. 4(k)(2).  Of the plaintiffs' nineteen claims, only two, could be construed as "aris[ing] under federal law": Counts XVI and XVII, which allege violations of "International Law" and the ATS, respectively. *See* FAC ¶¶ 205–212.  As explained *infra*, the Supreme Court's ruling in *Kiobel* precludes jurisdiction under the ATS, as alleged in Count XVII, leaving only Count XVI as a claim potentially "aris[ing] under federal law."  The D.C. Circuit, interpreting the Supreme Court's ruling in *Sosa*, stated in *McKesson Corp. v. Islamic Republic of Iran*, 672 F.3d 1066, 1077 (D.C. Cir. 2012), that "the language and history of the FSIA . . . do not support the creation of a private right of action for expropriation based on customary international law."  Thus, it would appear that the plaintiffs have failed to plead any claims "aris[ing] under federal law" such that jurisdiction is available under Rule 4(k)(2) and the plaintiffs' claims against Defendant RCH should be dismissed for failure to meet this predicate requirement.  The plaintiffs also affirmatively plead that Defendant RCH "is not subject to jurisdiction in any state's courts of general jurisdiction," FAC ¶ 86, thus precluding exercise of personal jurisdiction under the District of Columbia's long-arm statute, D.C. Code § 13-423.  In any event, under either Rule 4(k)(2) or the D.C. long-arm statute, personal jurisdiction must comport with the Fifth and Fourteenth Amendments' Due Process guarantee. *See Helmer v. Doletskaya*, 393 F.3d 201, 205 (D.C. Cir. 2004) (noting D.C. long-arm statute is interpreted as "coextensive with the due process clause" (quoting *Mouzavires v. Baxter*, 434 A.2d 988, 992

personal jurisdiction under the Due Process Clauses of the Fourteenth and Fifth Amendments before examining, as required under Rule 4(k)(2), "whether [this] defendant has sufficient contacts with the United States as a whole to justify the exercise of personal jurisdiction under the Due Process Clause of the Fifth Amendment." *Mwani*, 417 F.3d. at 11. In making that examination, the Court must heed the caution that "'great care and reserve should be exercised when extending our notions of personal jurisdiction into the international field.'" FED. R. CIV. P. 4(k) advisory committee's note (1993) (quoting *Asahi Metal Indus. v. Super. Ct. of Cal., Solano Cnty*, 480 U.S. 102, 115 (1987) (internal quotation marks omitted).

### 1.    *Personal Jurisdiction Principles*

In cases involving foreign corporations, such as Defendant RCH, "United States courts may not exercise personal jurisdiction over a foreign corporation unless the corporation has 'minimum contacts' with the relevant forum." *GSS Grp. Ltd. v. Nat'l Port Auth.*, 680 F.3d 805, 817 (D.C. Cir. 2012) (citing *Goodyear Dunlop Tires Ops., S.A. v. Brown* (*Goodyear*), 131 S. Ct. 2846, 2853 (2011)). "Minimum contacts" are the touchstone of personal jurisdiction, of which there are two types: specific and general. *See Goodyear*, 131 S. Ct. at 2851. Specific jurisdiction is present when the court "exercises personal jurisdiction over a defendant in a suit arising out of or related to the defendant's contacts with the forum." *Helicopteros Nacionales de Colombia, S.A. v. Hall* (*Helicopteros*), 466 U.S. 408, 414 n.8 (1984); *see also J. McIntyre Mach., Ltd. v. Nicastro*, 131 S. Ct. 2780, 2787–88 (2011) ("Where a defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws, it submits to the judicial power of an otherwise foreign sovereign to the extent that power is exercised in connection with the defendant's activities touching on the

---

(D.C. 1981)) (internal quotation marks omitted)). Since exercising personal jurisdiction over Defendant RCH in this matter does not comport with due process, the claims against Defendant RCH must be dismissed even were jurisdiction available under Rule 4(k)(2) or the D.C. long-arm statute.

State.") (internal quotation marks and citation omitted); *United States ex rel. Miller v. Bill Harbert Int'l Const., Inc.*, 608 F.3d 871, 887–88 (D.C. Cir. 2010) (finding, in *qui tam* action stemming from U.S. government contracts, that foreign company's "contacts with the United States were sufficient to give the district court personal jurisdiction over it" where, despite the absence of any "office, bank account, real property, or employees in the United States," the foreign company "was created by American citizens, acting as agents for . . . American corporations, for the specific purpose of providing services to companies that were bidding on projects that were going to be funded by agencies of the United States," and "fully 50%" of the foreign company's work was performed on these projects and "funded by payments from the United States Government via bank accounts in the United States"); *Mwani*, 417 F.3d at 12 (for specific jurisdiction, out-of-state defendant must have "purposefully directed his activities at residents of the forum and the litigation results from alleged injuries that arise out of or relate to those activities") (internal quotation marks and citations omitted).  The plaintiffs concede that no specific jurisdiction over Defendant RCH is present and, thus, rely on the exercise of general jurisdiction.  *See* Pls.' Opp'n Def. RCH's Mot. Dismiss ("Pls.' RCH Opp'n") at 3, ECF No. 73 (admitting that jurisdiction asserted under Rule 4(k) requires that "defendant is not subject to the jurisdiction of any single state court").

General or all-purpose jurisdiction is only available "over foreign (sister-state or foreign-country) corporations to hear any and all claims against them when their affiliations with the State are so continuous and systematic as to render them essentially at home in the forum State." *Goodyear*, 131 S. Ct. at 2851 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 317 (1945)) (internal quotation marks omitted).[35]  At issue in *Goodyear* was an injury to the plaintiffs that

---

[35] In the 66 years between the "canonical opinion" in *International Shoe* and *Goodyear*, the Supreme Court addressed general jurisdiction only twice: in *Perkins v. Benguet Consolidated Mining Co.*, 342 U.S. 437 (1952), and

occurred abroad as a result of a product manufactured and sold abroad by foreign subsidiaries of a United States corporation.  *Id.* at 2852.  The Court held that the Fourteenth Amendment's Due Process clause prohibited the exercise of general jurisdiction over the foreign subsidiaries, which had "no place of business, employees, or bank accounts," business registration or business solicitations in the forum, even though a small percentage of the subsidiaries' products placed in the "stream of commerce" were distributed in the forum, North Carolina.  *Id.* at 2852, 2855–56. Thus, *Goodyear* reaffirmed the limited nature of general jurisdiction, stating that "[a] corporation's 'continuous activity of some sorts within a state . . . is not enough to support the demand that the corporation be amenable to suits unrelated to that activity.'"  *Id.* at 2856 (citing *Intl Shoe Co.*, 326 U.S. at 318).

Most recently, in *Daimler*, as noted, the Supreme Court held that a federal court in California did not have the authority to hear a case involving a foreign corporation's alleged complicity in Argentina's so-called "dirty war."  *Daimler*, 134 S. Ct. at 760–62.  In overturning the Ninth Circuit's finding of general jurisdiction in California over the foreign corporation based on the contacts of the corporation's U.S. subsidiary imputed to the foreign corporation, the Supreme Court found that "multiple California-based facilities, including a regional office . . . a Vehicle Preparation Center . . . and a Classic Center" as well as substantial sales in the forum were insufficient to render the foreign corporation "at home" in California for the purposes of general jurisdiction.  *Id.* at 752–54.  Consequently, the Supreme Court found that haling the

---

*Helicopteros*, 466 U.S. 408.  *Goodyear*, 131 S. Ct. at 2854.  The Supreme Court held, in *Perkins*, that general jurisdiction was properly exercised over a Philippine corporation, which was sued in the forum, where the company's president managed the company's operations during World War II, essentially making the forum "the corporation's principal, if temporary, place of business."  *Id.* (citing *Perkins*, 342 U.S. at 447–48; *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 779–80 n.11 (1984)).  By contrast, in *Helicopteros,* the court found the exercise of general jurisdiction over a foreign corporation inappropriate where the company's ties to the selected forum were limited to purchases and "purchase-linked activity."  *Id.* (citing *Helicopteros*, 466 U.S. at 408).

foreign corporation into court in California based on actions that occurred entirely outside the forum violated the U.S. Constitution's due process clause.  *Id.*

*Daimler* gave clear instructions regarding the inquiry a court must undertake in determining whether general jurisdiction is appropriate: the test is "not whether a foreign corporation's in-forum contacts can be said to be in some sense 'continuous and systematic,' it is whether that corporation's 'affiliations with the State are so 'continuous and systematic' as to render [it] essentially at home in the forum State.'"  *Id.* at 761 (quoting *Goodyear*, 131 S. Ct. at 2851) (alteration in original).  Under this test, the plaintiffs' claims fail to meet the requisite threshold for the Court to exercise general jurisdiction over Defendant RCH.

### 2.    *Defendant RCH Is Not "At Home" In The United States*

The *Daimler* court stated that "*Goodyear* made clear that only a limited set of affiliations with a forum will render a defendant amenable to all-purpose jurisdiction there."  *Daimler*, 134 S. Ct. at 760.  These affiliations include "the place of incorporation and principal place of business."  *Id.*  Defendant RCH is "incorporated in Hungary and headquartered in Budapest, Hungary."  Decl. of Amber Wessels, Alston & Bird, LLP ("Wessels Decl.") Ex. A (Statement of Christian Prosl, Austrian Ambassador to the United States ("Prosl Statement")) at 2, ECF No. 70-4.  "[I]t is an almost 100% subsidiary of Rail Cargo Austria AG ("RCA"), which is incorporated in Austria and headquartered in Vienna, Austria."  *Id.*  Thus, it is indisputable that Defendant RCH is not incorporated in the United States.

Furthermore, a corporation's "principal place of business" is "the place where the corporation's high level officers direct, control, and coordinate the corporation's activities." *Hertz Corp. v. Friend*, 559 U.S. 77, 80 (2010).  Defendant RCH's declarant states that "at no time has RCH . . . had any directors, officers, employees or agents anywhere in the United States," nor has it even "been licensed to do business anywhere in the United States."  Decl. of

Attila Czöndör, Project Manager, Defendant RCH ("Czöndör Decl.") at ¶¶ 2(a), 2(g), ECF No. 70-5; *see also id.* ¶ 1 (stating Defendant RCH is "a Hungarian corporation whose principal place of business is in Budapest, Hungary"). Consequently, Defendant RCH's principal place of business is not in the United States.

Although *Daimler* states that "*Goodyear* did not hold that a corporation may be subject to general jurisdiction *only* in a forum where it is incorporated or has its principal place of business," *Daimler*, 134 S. Ct. at 760 (emphasis in original), the Court cautioned that it would be "unacceptably grasping" to exercise general jurisdiction even where a corporation "engages in a substantial, continuous, and systematic course of business," *id* at 761. Set against the Supreme Court's clear guidance regarding the limited circumstances under which general jurisdiction may be properly exercised, the plaintiffs' allegations that Defendant RCH maintains a generally accessible, interactive website, and may have certain physical contact with the United States, fall woefully short. *See* Pls.' RCH Opp'n at 5–9.

The plaintiffs rely on a number of cases decided before *Daimler* to argue that Defendant RCH's website is used for "advertising its business, soliciting for business, explaining the advantages of doing business with RCH via its website, and enabling customers to conduct their business with RCH via its website," thus conferring general jurisdiction in this Court. *Id.* at 6–7. In addition, the plaintiffs allege that discovery could reveal: that Defendant RCH has shareholders in the United States, *id.* at 10; an affiliated company that could be considered the agent of Defendant RCH, thus conferring jurisdiction, *id.*; or an affiliated company that "exercise[s] a greater than normal amount of control over" Defendant RCH such that exercise of general jurisdiction is proper, *id.* These arguments are unavailing.

a)      *Defendant RCH's Website Does Not Suffice To Confer General Jurisdiction*

The FAC alleges that Defendant RCH "maintains a robust presence in the United States through its Website, which solicits intermodal freight shipping business originating or terminating in the United States."  FAC ¶ 86; *see also* Pls.' RCH Opp'n at 4–9 (arguing that Defendant RCH's website is "interactive" and justifies jurisdiction in the United States).  In response, Defendant RCH contends that the mere maintenance by a foreign company of a website accessible in the United States is insufficient, by itself, to satisfy the Due Process clause.  *See* Def. RCH's Reply Pls.' Opp'n Def. RCH's Mot. Dismiss ("Def. RCH's Reply") at 1–6.  Defendant RCH is correct.

Even under pre-*Daimler* precedent from this Circuit, the plaintiffs' description of Defendant RCH's website would be insufficient to support general jurisdiction.  For example, in *GTE New Media Servs., Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1350 (D.C. Cir. 2000), the D.C. Circuit flatly rejected the proposition that the "mere accessibility" of a defendant's website in a forum is sufficient to establish the necessary minimum contacts for the exercise of personal jurisdiction, commenting that "[t]his theory simply cannot hold water," *id.*  Under that theory, "personal jurisdiction in Internet-related cases would almost always be found in any forum in the country."  *Id.*  The Court explained in vivid language that this result would "vitiate long-held and inviolate principles of federal court jurisdiction" and "would shred . . . out of practical existence" the constitutional assurances of the Due Process clause "to give 'a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some

minimum assurance as to where that conduct will and will not render them liable to suit.'" *Id.*

(quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).[36]

Consequently, "a foreign corporation's maintenance of a website that is accessible in the [forum] can satisfy general jurisdiction requirements" only by meeting "[t]wo additional criteria." *FC Inv. Grp. LC v. IFX Mkts., Ltd.*, 529 F.3d 1087, 1092 (D.C. Cir. 2008). First, "the website must be interactive" and have more functionality than "[a]n essentially passive website through which customers merely access information," and, second, forum "residents must use the website in a continuous and systematic way." *Id.* at 1092 (quoting *Gorman v. Ameritrade Holding Corp.*, 293 F.3d 506, 512 (D.C. Cir. 2002)) (internal quotation marks omitted); *see also Rundquist v. Vapiano SE*, 798 F. Supp. 2d 102, 116 (D.D.C. 2011) ("Courts look to the level and quality of the commercial activity that an entity conducts over the Internet, and focus particularly on the level of interactivity of the websites at issue" when evaluating whether a website provides the sufficient contacts necessary to support personal jurisdiction).

With respect to the first criteria, the plaintiffs contend that, in addition to being accessible in the United States, Defendant RCH's website is "interactive" because it advertises its business and "enabl[es] customers to conduct their business with RCH via its website." Pls.' RCH Opp'n at 6–7. The plaintiffs support this contention by relying on one of their counsel's declarations describing Defendant RCH's website and "screenshots" from the website. *See id.*; *see also* Decl. of Liesel J. Schopler, Pls.' Counsel, ("Schopler Decl.") ¶ 2 and Exs. A–C, ECF No. 73-1. Specifically, the Schopler Declaration notes that Defendant RCH's website "provides electronic

---

[36] The plaintiffs attempt to distinguish *GTE*, arguing that the *GTE* court focused on the passive nature of the website in that case to find that no general jurisdiction was available and, by contrast here, Defendant RCH's website is interactive. *See* Pls.' RCH Opp'n at 8–9. The plaintiffs ignore, however, that the general statements in *GTE* regarding the level of interactivity necessary to obtain general jurisdiction are incorporated in the *FC Investment Group* test, under which websites are evaluated for general jurisdiction purposes in this Circuit. *See FC Inv. Grp. LC*, 529 F.3d at 1092 (quoting *GTE* in establishing two part test). The plaintiffs have not made the requisite showing of interactivity sufficient to establish general jurisdiction under this pre-*Daimler* test. *See infra.*

services to its customers via its E-Freight system," which provides access for Defendant RCH's clients to various account, freight, and consignment documents.  *See* Schopler Decl. ¶ 2a, b.

Defendant RCH disputes the plaintiffs' characterization of its website, clarifying that the E-Freight system "can be used only by existing customers of RCH who have already signed an agreement with RCH" and that it "can only be used for the transport of freight by rail within Europe."  Reply Decl. of Attila Czöndör, Project Manager, Def. RCH ("Czöndör Reply Decl.") ¶ 6, ECF No. 76-1.  Furthermore, no "E-Freight customer has an address in the United States."  *Id.* As for the alleged advertisement and solicitation of business, Defendant RCH's declarant notes that "[s]ince there are no rail connections between Europe and the United States, [Defendant] RCH does not transport freight between Europe and the U.S." nor does it derive any "revenue from any transatlantic portion of the transport of freight between the United States and Europe." *Id.* ¶¶ 2–3.  Indeed, because of Defendant RCH's limited role as a freight forwarder operating only within the borders of Hungary and its immediately neighboring countries, it

> would not typically know whether the freight it transports either originates in or is destined for the United States, because [Defendant] RCH simply receives an order to transport containers (a) within Hungary, (b) from a destination in Hungary to (or just across) the border of Hungary, or (c) from the border of Hungary to a destination within Hungary.

*Id.* ¶ 4.  Defendant RCH avers that it "does not have any business relationships with any U.S. freight forwarding companies" and that it "does not solicit, either through its website or otherwise, intermodal freight shipping business originating or terminating in the United States." *Id.* ¶¶ 5, 7.[37]  Indeed, it appears that such solicitation would be useless, since Defendant RCH has

---

[37] The plaintiffs allege in their opposition that a United States internet marketing firm publicizes Defendant RCH's website. Pls.' RCH Opp'n at 9; Schopler Decl. ¶¶ 3–4.  The Schopler Declaration does not, however, support this contention.  *See* Schopler Decl. ¶¶ 3–4.  Based upon the screen shots submitted with the Schopler Decl., *see* Schopler Decl. Ex. G at 29–33, ECF No. 73-1, the firm at issue, markosweb.com, appears to be an internet analytics firm that "lets you explore the best of the web's history and monitor the performance and progress of your site, as well as your competitors [sic] sites via detailed analytics and our various SEO widgets," *id.* Ex. H at 35, ECF No. 73-1.  Neither the screenshots provided nor the Schopler Declaration suggests any direct or contractual connection

no independent way of moving freight from a United States customer to Hungary, due to its limited operations only within Hungary.

The level of interactivity of Defendant RCH's website in this matter is even less than the level of interactivity in a post-*Daimler* case where another Judge on this Court concluded that the defendant's website, on its own, was insufficient to establish a connection on which to exercise personal jurisdiction.  *See Alkanani v. Aegis Defense Servs., LLC*, No. 09-1607, 2014 WL 1234901, at *10–11 (D.D.C. Mar. 26, 2014).  In *Alkanani*, the website at issue advertised a physical presence in Washington, D.C., a "round-the-clock tailored threat assessment system," and multiple "restricted online secure services." *Id.* at *10 (internal quotation marks and citation omitted).  The plaintiff, however, "failed to adduce any evidence that [forum] residents actually used [the defendant's] website, let alone in a continuous and systematic way," leading to the conclusion that "the website cannot give rise to jurisdiction." *Id.* at 11.

While Defendant RCH's website does, theoretically, give existing customers access to freight information "around-the-clock," the website offers no indication that Defendant RCH has any presence in this forum or, indeed, in the United States at all.  *See* Schopler Decl. Exs. A–F (screenshots of Defendant RCH's website) at 9–29.  Nothing in the record suggests that United States' residents have used the website to become a customer for Defendant RCH's services.  To the contrary, Defendant RCH's declarant makes clear that the "E-Freight" module on which the plaintiffs stake their jurisdictional argument "can be used only by existing customers of RCH who have already signed an agreement with RCH[,]" and no such customer has a U.S. address.  Czöndör Reply Decl. ¶ 6.

---

between markosweb.com and Defendant RCH, and Defendant RCH's declarant confirms that Defendant RCH "has no contractual or other relationship with Markosweb, and is not affiliated with Markosweb in any way."  Czöndör Reply Decl. ¶ 8.

Thus, even if the functionality of Defendant RCH's website were properly characterized as "interactive," that factor alone does not establish the requisite minimum contacts to support personal jurisdiction over this foreign company.  Rather, the plaintiffs must further meet the second criterion from *FC Investment Group* and establish that United States' residents "use the website in a continuous and systematic way."  529 F.3d at 1092.  The plaintiffs wholly fail to meet this criterion.  Similarly to the plaintiff in *Alkanani*, the plaintiffs here do not even allege that U.S. residents are *able* to engage in commercial transactions through Defendant RCH's website, let alone do so in such a "continuous and systematic" way so as to confer general jurisdiction.  *See* Schopler Decl. Exs. A–F at 9–29 (showing website pages with information about Defendant RCH's corporate structure, history, and the E-Freight module but reflecting no links or ability to conduct business through website).  Instead, Defendant RCH has submitted unrefuted declarations stating that it does not solicit business in the United States and that its customers are "European freight forwarding companies," Czöndör Decl. ¶ 7, "another European rail transport company or . . . the European owner of the transported freight, such as a mining company or an industrial plant," Czöndör Reply Decl. ¶ 4; *see also*  Czöndör Decl. ¶¶ 2, 7 (stating, *inter alia*, that Defendant RCH is not licensed to do business in the United States, has not conducted business in the United States, has no registered agent for service of process in the United States, owns no property in the United States, has no bank accounts in the United States, nor has it "engaged in any other continuous and systematic activity of any kind anywhere in the United States"); Czöndör Reply Decl. ¶¶ 5, 7 (stating Defendant RCH has no business relationships with any freight forwarding companies in the United States and does not solicit intermodal business "originating or terminating in the United States.").

Even under this pre-*Daimler* precedent, the D.C. Circuit decision in *FC Investment Group LC* is dispositive on this point against the plaintiffs.  There**,** the American plaintiffs sued a British currency broker for fraud after losing several million dollars in an alleged fraudulent investment scheme initiated by the defendant when the defendant's employee contacted the plaintiffs via telephone in Washington, D.C.  529 F.3d at 1090–92.  The plaintiffs asserted personal jurisdiction over the foreign defendant based upon the defendant's "maintenance of an interactive website accessible—and used—in the District," and the defendant's employee's "'regular' telephone calls to [plaintiff] at [plaintiff]'s District office."  *Id*. at 1091.  The D.C. Circuit affirmed the district court's dismissal of the suit for lack of personal jurisdiction, explaining that the defendant had only a single customer from this jurisdiction and "[t]his limited contact with a single District customer—unrelated to the plaintiffs or their claims—does not support the district court's exercise of general jurisdiction."  *Id*. at 1093.[38]  Just as in *FC Investment Group LC*, the lack of any evidence that Defendant RCH has customers in the United States, let alone any sustained business activities in this country facilitated by its website, defeats the plaintiffs' assertion of personal jurisdiction over this foreign company.

The cases involving websites that are relied upon by the plaintiffs to support the exercise of personal jurisdiction over Defendant RCH do not alter this conclusion.  For example, the plaintiffs cite this Court's decision in *Rundquist*, 789 F. Supp. 2d 116, but the holding in that case makes plain that a generally accessible website *does not*, without more, establish general jurisdiction over the foreign corporation, even if that website is highly interactive, *id.* at 115–16.  Specifically, the foreign defendant's website at issue in *Rundquist*, provided "direct and guided access" to a United States-based website, which, in turn, allowed United States customers in

---

[38] The *FC Investment Group LC* court also found that regular telephone calls into the District from elsewhere "do not suffice" under the cited provisions of the D.C. long-arm statute to support the exercise of personal jurisdiction. *Id*. at 1095–96 & n.9.

certain domestic locations, including the District of Columbia, to place orders for carry-out food service.  *Id*.  Nonetheless, this Court concluded that the website was "insufficient to show . . .[the foreign company's] direct transaction of business in the District."  *Id*.  Indeed, this Court concluded that the evidence presented was insufficient for the exercise of personal jurisdiction where, in addition to the foreign defendant's website being accessible in the United States, the plaintiff alleged  that: (1) the defendant was closely linked with a U.S.-affiliate, *id*. at 114–15; (2) the defendant's website provided access to press releases touting its affiliated business in the United States, *id*. at 116–17; (3) its executives traveled to the United States and the defendant's president and founder "lives and works in the District [of Columbia] area," *id*. at 118; and (4) the defendant potentially received revenue from franchise operations in the United States, *id*. at 119.

Likewise, contrary to the plaintiffs' characterization, *Gorman v. Ameritrade Holding Corp.*, 293 F.3d 506, did not hold that a "sufficiently 'interactive'" website "support[ed] general jurisdiction in D.C. because the website allowed District residents to," *inter alia*, open "brokerage accounts online;" from which they could "transmit funds . . . electronically" and "use those accounts to buy and sell securities."  Pls.' RCH Opp'n at 5 (quoting *Gorman*, 293 F.3d at 512).  Rather, the *Gorman* court held that "it is quite possible that, through its website, [the defendant] is doing business in the District of Columbia," *Gorman*, 293 F.3d at 513, but expressly *declined* to find personal jurisdiction because the necessary facts to support such general jurisdiction were "unavailable."  *Id*.  The *Gorman* court ultimately affirmed the dismissal of the case for insufficient service but opined that, absent that ground for dismissal, it would have permitted jurisdictional discovery to determine "whether [the defendant] is actually 'doing business' in the District" through "an examination of the frequency and volume of the firm's transactions with District residents."  *Id*. at 513.  Such discovery would have been warranted

based upon other indicia of the defendant's activities in the District, including that the

defendant's website "allows it to engage in real-time transactions with District of Columbia

residents while they sit at their home or office computers 'in the District of Columbia.'"   *Id*.

Thus, it was the contractual contacts and transactions within the forum that could have

potentially given rise to general jurisdiction in *Gorman*, not the mere accessibility of the

defendant's website.  *See id.*  No such contractual contacts are alleged to be present in the instant

case.

The plaintiffs' reliance on *Blumenthal v. Drudge*, 992 F. Supp. 44, 56 (D.D.C. 1998), is

similarly misplaced.  First, the jurisdiction addressed in *Blumenthal* was specific, not general,

since the specific injuries alleged by the libel plaintiffs occurred in the forum as a direct result of

the defendant's Internet postings.  *See id.* at 53.  The court in that case noted that "there must

also be some other non-Internet related contacts between the defendant and the forum state in

order for the court to exercise personal jurisdiction."  *Id.*  In *Blumenthal*, those additional

contacts consisted of "specifically target[ing] readers in the District of Columbia by virtue of the

subjects [the website] covers and even solicits gossip from District residents and government

officials who work" in the District.  *Id.* at 57.  The defendant in *Blumenthal* also "traveled to the

District of Columbia" for a television interview, contacted "District of Columbia residents via

telephone and the U.S. mail" and "solicited contributions from District residents via the

[defendant's website's] homepage."  *Id.*  In addition, the plaintiffs resided in the District of

Columbia and the effects of the libel were felt in the District of Columbia.  *Id.* at 53.  The

*Blumenthal* court found this *combination* of factors, not the mere accessibility of the website in

the forum, to convey personal jurisdiction under the District of Columbia long-arm statute.  By

contrast, here, the plaintiffs have not pleaded any non-website related contacts by Defendant

RCH with the forum, except for a conclusory allegation, generally contradicted by Defendant RCH's declarations, that Defendant RCH has "customers in the United States."  *See* FAC ¶ 86. Moreover, the "primary and most devastating effects of the [defendant's actions were] felt" in Hungary, not, as in *Blumenthal*, in the United States.  *See Blumenthal*, 992 F. Supp. at 57. Consequently, on its facts, *Blumenthal* counsels against the exercise of personal jurisdiction in this matter.[39]

\*      \*      \*

In sum, a foreign company's operation of a generally accessible website, standing alone, does not confer general jurisdiction over that company in the United States.  Nonetheless, this is the key allegation underlying the plaintiffs' assertion of general jurisdiction over Defendant RCH.  In light of the unrefuted declarations submitted by Defendant RCH, this foreign company's website simply does not provide sufficient "continuous and systematic contacts" to render this defendant "essentially at home" in the United States and subject to general jurisdiction here.  The Court now turns to the plaintiffs' alternative position that jurisdictional discovery could reveal sufficient additional contacts between Defendant RCH and the United States for the exercise of general jurisdiction.

---

[39] The plaintiffs also rely on two cases from the Southern District of New York, *Citigroup Inc. v. City Holding Co.*, 97 F. Supp. 2d 549(S.D.N.Y. 2000) and *Obabueki v. IBM*, Nos. 99-11262, 99-12486, 2001 WL 921172 (S.D.N.Y. Aug. 14, 2001), both of which addressed specific jurisdiction, not general jurisdiction, since in both cases the "cause of action [arose] from this transaction of business" over the Internet.  *Citigroup Inc.*, 97 F. Supp. 2d at 566; *Obabueki*, 2001 WL 921172, at *4 (holding that the "plaintiff's claims do relate to the business activities which [the defendant] conducts on the Internet).  In any event, the reasoning in *Obabueki* has been rejected by at least one other Judge in this District in a decision affirmed by the D.C. Circuit.  *See FC Inv. Grp. LC*, 479 F. Supp. 2d at 37 (rejecting *Obabueki*'s finding that a "website with downloadable application [was] sufficient to establish contacts" and finding that "the mere fact that defendant's website may, after a complicated offline registration process, be used for certain active online transactions does not necessarily provide the Court with general jurisdiction.").

> b)   *Defendant RCH's Other Potential Contacts Cannot Suffice To*
> *Confer General Jurisdiction*

In addition to the primary contention that jurisdiction over Defendant RCH is proper

based on its website alone, the plaintiffs assert two additional grounds on which it contends

discovery could reveal sufficiently continuous and systematic contacts to hale Defendant RCH

into court in the United States.  Specifically, the plaintiffs argue that (1) shareholders in

Defendant RCH might be present in the United States; and (2) the contacts of affiliated

companies may be imputed to Defendant RCH for general jurisdiction purposes.  Pls.' RCH

Opp'n at 10.  Even if the plaintiffs were able to support their allegations with further discovery,

neither shareholder presence nor affiliated company contacts in the United States would help

establish general jurisdiction over Defendant RCH. On the contrary, the Supreme Court's recent

guidance regarding the non-virtual activities of a foreign company necessary for the assertion of

general jurisdiction make plain that neither of these factors, even if established through

discovery, would provide sufficiently continuous and systematic contacts for proper exercise of

such  jurisdiction.

In *Daimler*, the Supreme Court found that a physical presence consisting of multiple

offices and substantial sales in the selected forum was insufficient to support general jurisdiction.

*Daimler*, 134 S. Ct. at 761.  Those contacts included a subsidiary that was assumed to be "at

home" in the selected forum, *id.* at 758–60; a "regional office" in the forum, *id.* at 752; a

"Vehicle Preparation Center" in the forum, *id.*; a "Classic Center" in the forum, *id.*; sales figures

making the subsidiary "the largest supplier of luxury vehicles to the [forum] market, *id.*; and

"over 10% of all sales of new vehicles in the United States" from the parent company took place

in the forum, *id.*  Even imputing all of these contacts to the foreign parent company, the Supreme

Court found that the exercise of general jurisdiction was inappropriate.  *Id.* at 760.  Instead, the

Supreme Court cautioned that if those

> activities sufficed to allow adjudication of this [foreign]-rooted case in California, the same global reach would presumably be available in every other state in which [the defendant's subsidiary's] sales are sizable.  Such exorbitant exercises of all-purpose jurisdiction would scarcely permit out-of-state defendants "to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit."

*Id.* at 761–62 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985).  The Supreme

Court stated that it did "not foreclose the possibility that in an exceptional case, *see, e.g.*,

*Perkins*, . . . a corporation's operations in a forum other than its formal place of incorporation or

principal place of business may be so substantial and of such a nature as to render the

corporation at home in that State."  *Id.* at 761 n.19 (citation omitted).  Nevertheless, the Court

found that the substantial physical presence and level of sales in California were not the

"exceptional case" that would warrant exercise of general jurisdiction.  *Id.*  The plaintiffs'

additional asserted grounds for general jurisdiction over Defendant RCH must be examined in

the context of this recent guidance from the Supreme Court.

### (1)  Stockholder Presence Does Not Confer General Jurisdiction

First, in a bare three sentences, the plaintiffs assert that "one factor pertinent to a finding

of general jurisdiction is '[w]hether the corporate defendant is . . . present in that shareholders

reside in [the forum]."  Pls.' RCH Opp'n at 10 (quoting *Soma Med. Int'l v. Standard Chartered*

*Bank* ("*Soma*"), 196 F.3d 1292, 1296 (10th Cir. 1999)).  This factor, the plaintiffs allege,

supports general jurisdiction in the instant case because "Austria and Hungary, which are

shareholders in RCH, have a presence, in the United States."  Pls.' RCH Opp'n at 10   Thus,

according to the plaintiffs "[p]ersonal jurisdiction over RCH may be based on such presence

depending on the extent thereof."  *Id.*

The only authority the plaintiffs offer for this contention is the Tenth Circuit's decision in *Soma*, *see* Pls.' RCH Opp'n at 10, but that case is not helpful to the plaintiffs and wholly inapposite.  First, notably, the Tenth Circuit granted the foreign company defendant's motion to dismiss for lack of personal jurisdiction.  *Soma*, 196 F.3d at 1294.  Indeed, the Tenth Circuit found the foreign defendant's website, which offered "information concerning [the defendant's] services and soliciting business from all over the planet . . . allow[ing] access from anywhere, including Utah," an insufficient ground on which to assert general jurisdiction over the foreign defendant.  *Id.* at 1297.  Second, the *Soma* court was interpreting Utah law, not, as here, the limits of the Fifth Amendment's Due Process clause under Federal Rule of Civil Procedure 4(k). *See id.* at 1295.

Third, the plaintiffs rely on one factor from a list of twelve mentioned by the Tenth Circuit as "relevant to the issue of whether general personal jurisdiction exists" under Utah law over a foreign defendant, namely, whether a corporate defendant is "present in that shareholders reside in this state," to support their contention that discovery could reveal facts sufficient to assert personal jurisdiction over Defendant RCH.  Pls.' RCH Opp'n at 10 (quoting *Soma*, 196 F.3d at 1295–96, itself citing *Buddensick v. Stateline Hotel, Inc.*, 972 P.2d 928, 930–31 (Ut. Ct. App. 1998)).  *Soma* does not state, nor even imply, that any one of the twelve factors listed in that case can, standing alone, result in general jurisdiction under Utah law, let alone comport with federal due process.  *Soma*, 196 F.3d at 1296 (declining to discuss any individual factors examined by Utah courts since "[i]t is undisputed that [the defendant] does none of those things" found to be relevant to the exercise of general jurisdiction).  Indeed, the case from which the Tenth Circuit drew these twelve factors, *Buddensick*, found general jurisdiction proper because the defendant in that case conducts "extensive advertising and promotional activities in Utah";

"leases and possesses at least five parcels of real property in Utah"; "contracts for goods and services with Utah corporations, including food, linens, advertisements, and professional services"; and "maintains two phone numbers, at least two post office boxes, and six fax numbers in Utah." *Buddensick*, 972 P.2d at 931. The issue of whether the "shareholders reside in [the forum]" was not dispositive or even present in *Buddensick*, and that case found a combination of factors, not a single factor, to be sufficient to support general jurisdiction. Thus, the plaintiffs' argument, even if borne out by discovery—that Austria and Hungary are shareholders in Defendant RCH and that both are "present" in the United States[40]—is insufficient to show that this Court has general jurisdiction over Defendant RCH in the instant matter.

### (2)    Affiliated Company Contacts Do Not Support General Jurisdiction Over Defendant RCH

The second ground on which the plaintiffs contend that general jurisdiction over Defendant RCH in the United States might be possible is based on the purported contacts of its "affiliated compan[ies]" within the United States. Pls.' RCH Opp'n at 10.[41] Specifically, the plaintiffs point to the "contacts" of Defendant RCH's "indirect parent, Rail Cargo Austria, which may do business in the United States . . . ." *Id.*[42] The plaintiffs' argument is unpersuasive.

---

[40] Defendant RCH contests the fact that Hungary is one of its shareholders, *see* Def. RCH's Reply at 7, but that factual dispute is immaterial to the Court's resolution of the pending motions.

[41] This argument appears for the first time in the plaintiffs' opposition to Defendant RCH's motion to dismiss and is not alleged in the FAC, which alleges personal jurisdiction over all three defendants only under 28 U.S.C. § 1330(b) ("Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction" over a foreign state being sued under an exception to the FSIA); 28 U.S.C. §1605(a) (the FSIA); and Federal Rule of Civil Procedure 4(k)(2). *See* FAC ¶ 88. Since 28 U.S.C. §§ 1330(b) and 1605(a) apply only to foreign states and their instrumentalities, the plaintiffs appear to allege personal jurisdiction against Defendant RCH only under Rule 4(k)(2). *See* FAC ¶ 88; Pls.' RCH Opp'n at 2–3 (claiming personal jurisdiction present over Defendant RCH under Rule 4(k)(2)).

[42] The plaintiffs also state that general jurisdiction may be possible based on a link between Defendant MÁV and Defendant RCH. Pls.' RCH Opp'n at 10–11. While the plaintiffs do not appear to contend that Defendant MÁV is, today, related to Defendant RCH, they present two sources for a purported link between these two defendants. The first is that "recent articles [state] that [Defendant RCH's second-level corporate parent] may sell back a significant amount of shares in RCH to the Hungarian state." Pls.' RCH Opp'n at 18. The plaintiffs offer no support for the

The Supreme Court assumed, without deciding, that it was possible for "a foreign corporation [to] be subjected to a court's general jurisdiction based on the contact of its in-state subsidiary." *Daimler*, 134 S. Ct. at 759.[43] Here, the plaintiffs are attempting the converse: to impute to a subsidiary the jurisdictional contacts of its parent. *See* Pls.' RCH Opp'n at 10 & n.8. Assuming, *arguendo*, that "the same legal principles apply" when asserting personal jurisdiction over a subsidiary based on the contacts of the parent, *see Walker v. Newgent*, 583 F.2d 163, 167 (5th Cir. 1978), the plaintiffs have made no showing that Rail Cargo Austria ("RCA"), Defendant RCH's corporate parent and itself a foreign corporation, has sufficient systematic and continuous contacts with the United States to support general jurisdiction. The plaintiffs assert that RCA is "a 'public railway company,'" and thus "an instrumentality of Austria itself." *Id.* at 17. Assuming this to be true, and assuming that the plaintiffs are correct that RCA's contacts

---

conclusion that a potential future sale to a foreign sovereign could result in the exercise of general jurisdiction over a foreign entity. As such, these potential future sales are not relevant to the instant matter. In any event, even if the sales were consummated and the link between Defendant MÁV and Defendant RCH confirmed, it is highly doubtful that this would make Defendant RCH any more "at home" in the United States than it is now. Second, the plaintiffs advance, again without any authority, the novel theory that because Defendant RCH and Defendant MÁV "were recently fined for jointly operating a price-fixing cartel," there may be "a possible nexus between the two companies sufficient to impute MÁV's contacts with the United States to RCH for the purposes of personal jurisdiction." Pls.' RCH Opp'n at 19. Although the "conspiracy theory" of personal jurisdiction has been recognized by the D.C. Circuit, *see Second Amendment Foundation v. U.S. Conference of Mayors*, 274 F.3d 521, 523 (D.C. Cir. 2001), the theory is recognized in reference to specific jurisdiction, where the civil conspiracy involves allegations of "specific acts connecting [the] defendant with the forum[.]" *Id.* at 524 (quoting *First Chicago Int'l v. United Exch. Co.*, 836 F.2d 1375, 1378) (alterations in original). Moreover, the D.C. Circuit held that a plaintiff must allege a prima facie showing of civil conspiracy in order to assert this theory, something the plaintiffs have failed to do here. As such, even if the plaintiffs' conspiracy theory of jurisdiction could apply in a general jurisdictional context, the plaintiffs have wholly failed to allege any of the elements necessary to support such a claim here. *See generally* FAC; *see also supra* note 34 (discussing lack of allegations for jurisdiction in FAC over Defendant RCH other than under Fed. R. Civ. P. 4(k)).

[43] The Ninth Circuit opinion reversed in *Daimler* relied on a finding that the foreign corporation's U.S. subsidiary in that case was an agent of the parent company. *See Daimler*, 134 S. Ct. 758–59. The Supreme Court cast doubt on the viability of this theory, noting that "[t]he Ninth Circuit's agency theory thus appears to subject foreign corporations to general jurisdiction whenever they have an in-state subsidiary or affiliate, an outcome that would sweep beyond even the 'sprawling view of general jurisdiction' [the Supreme Court] rejected in *Goodyear*." *Id.* at 759–60 (citation omitted). Nevertheless, for the purposes of its decision, the Supreme Court "assume[d] that [the domestic subsidiary] is at home in [the forum], and further assume[d] [the subsidiary's] contacts are imputable to [the foreign parent]" and found that "there would still be no basis to subject [the foreign parent] to general jurisdiction in [the forum], for [the foreign parent's] slim contacts with the State hardly render it at home here." *Id.* at 760.

with the United States could be imputed to Defendant RCH, the assertion of general jurisdiction over RCA would appear to be even more difficult than over Defendant RCH.

RCA "is incorporated in Austria and headquartered in Vienna, Austria."  Prosl Statement at 2.  Thus, under *Daimler* and *Hertz Corp.*, the principal place of business and site of incorporation for RCA is Austria, not the United States.  *See Daimler*, 134 S. Ct. at 760.  The plaintiffs aver that RCA has an "interactive proprietary website, accessible to customers in the United States" and that its parent, the ÖBB Group, itself another foreign corporation, "entered into a multi-year contract with a Massachusetts-based company for network technology."  Pls.' RCH Opp'n at 16.  As stated previously, particularly under *Daimler*, even an interactive website does not, standing alone, render a corporation effectively "at home" in a foreign forum.  *See Daimler*, 134 S. Ct. at 761 n.18.  Moreover, a single contract in Massachusetts pales in comparison to the contacts the defendant's subsidiary had in *Daimler*, where the foreign company maintained multiple physical locations and a wholly owned U.S. subsidiary, for which all of the contacts were assumed to be imputable to the parent, and were still found insufficient for a court to assert general jurisdiction over a foreign corporation.  *See id.* at 761–62.  Consequently, even assuming that all of RCA's contacts with the United States are imputable to Defendant RCH, the plaintiffs have failed to clear the high bar for general jurisdiction set by *Daimler*.

### 3. *Jurisdictional Discovery As To Defendant RCH Is Unnecessary*

The plaintiffs request jurisdictional discovery if the Court finds that the plaintiffs have not established the requisite prima facie case for personal jurisdiction over Defendant RCH.  *See* Pls.' RCH Opp'n at 15–19.  The "Federal Rules of Civil Procedure generally provide for liberal discovery to establish jurisdictional facts" but nonetheless "the scope of discovery lies within the district court's discretion."  *Goodman Holdings v. Rafidain Bank*, 26 F.3d 1143, 1147 (D.C. Cir.

1994).  The D.C. Circuit recently provided guidance to district courts when addressing requests

for jurisdictional discovery, explaining that such discovery is appropriate "if it could produce

facts that would affect [the court's] jurisdictional analysis," but, conversely, should be denied "in

the absence of some specific indication regarding what facts additional discovery could produce

that would affect the court's jurisdictional analysis."  *Al Maqaleh v. Hagel*, 738 F.3d 312, 325–

326 (D.C. Cir. 2013) (internal quotations, brackets, ellipses and citations omitted); *see also*

*Cheyenne Arapaho Tribes of Okla. v. United States*, 558 F.3d 592, 596–597 (D.C. Cir. 2009)

(finding that the "district court did not abuse its discretion in denying jurisdictional discovery

given the absence of any specific indication from the [plaintiffs] regarding 'what facts additional

discovery could produce that would affect [the court's] jurisdictional analysis'") (quoting

*Mwani*, 417 F.3d at 17 (quoting *Goodman Holdings v. Rafidain Bank*, 26 F.3d 1143, 1147 (D.C.

Cir. 1994)).

     Thus, simply requesting discovery to sustain jurisdictional allegations is not enough.

Instead, the plaintiff must demonstrate with plausible factual support amounting to more than

speculation or conclusory statements that discovery will uncover sufficient evidence to

demonstrate the defendant's ties to the forum.  *See El-Fadl v. Cent. Bank of Jordan*, 75 F.3d 668,

671 (D.C. Cir. 1996) (holding that plaintiff was permitted jurisdictional discovery to establish

jurisdiction over foreign bank based upon evidence of several specific transactions by defendant

bank within forum, including several loan and other financial agreements and assertion of

counter-claim in other litigation within forum) *abrogated on other grounds by Samantar v.*

*Yousuf*, 560 U.S. 305 (2010).  The plaintiffs have failed to make this showing here, relying only

on conclusory statements to bolster their barebones jurisdictional allegation that Defendant RCH

has a proprietary website accessible in the United States and its second-level parent company has

entered into a "multi-year contract with a Massachusetts-based company for network technology." Pls.' RCH Opp'n at 17.[44]  This is not sufficient to warrant jurisdictional discovery. *See Bancoult v. McNamara*, 214 F.R.D. 5, 13 (D.D.C. 2003) (denying jurisdictional discovery to show ties between forum and defendant since plaintiff's allegations "are tenuous at best, particularly in light of [defendant's] affidavits and the significant hurdle posed by the minimum-contacts requirement").

In support of its argument, the plaintiffs rely upon two decisions by this Court, *Rundquist* and *Delta Sigma Theta Sorority, Inc. v. LaMith Designs, Inc.* (*DST Sorority*), 275 F.R.D. 20, 30 (D.D.C. 2011), but in each of those cases the plaintiffs set forth the requisite "specific indication," *Cheyenne Arapaho Tribes of Okla.*, 558 F.3d at 596, or specific factual allegations, *see El-Fadl*, 75 F.3d at 671, to which the defendants in those cases interposed only relatively weak responses, that the defendant had sufficient contacts with this forum, thereby warranting additional discovery to confirm or defeat the exercise of personal jurisdiction. Those circumstances are simply not present here.

For example, in *Rundquist*, a copyright infringement case, this Court allowed jurisdictional discovery of a foreign company's ties to this forum because the plaintiff had presented sufficient indicia of the foreign company's affiliation with two defendant domestic companies, which concededly transacted business in the District of Columbia, to permit the plaintiff "to test" whether the foreign company was an alter ego of the domestic defendants such

---

[44] The Court had previously noted in its Memorandum and Order regarding the plaintiffs' request for jurisdictional discovery that "the plaintiffs need to assert a good faith belief that discovery will produce additional evidence that RCH engages in business in the United States either through its website or shipping operations." Mem. & Order at 15, ECF No. 67.  The plaintiffs have attempted to comply with the Court's instructions, but have still been unable to show that Defendant RCH engages in any business in the United States, let alone with any U.S. customers.  *See generally* Pls.' RCH Opp'n.  The plaintiffs have bolstered their pleading with screenshots from Defendant RCH's website and an unrelated internet analytics firm, but such proof is insufficient to establish the requisite good faith belief that additional discovery would support personal jurisdiction over Defendant RCH.  *See generally* Schopler Decl.

that the latters' contacts could be attributed to the foreign company for jurisdictional purposes. *Rundquist*, 798 F. Supp. 2d at 120.  Specifically, the plaintiff provided exhibits showing "unmistakabl[e]" visual evidence that "a consistent design and theme," incorporating the allegedly infringed photographs, were used on the websites and in the physical restaurants of both the foreign and domestic companies, which evidence significantly undermined the foreign company's "averment that it does not direct or require display of plaintiff's Protected Photographs."  *Id.* at 120–21.  This evidence was supplemented by further demonstration of a cross-over of senior management between the domestic companies and the foreign company.[45]

*Id.* at 121.  The factual scenario in *Rundquist* stands in stark contrast to the instant matter where the plaintiffs have provided no evidence at all, aside from conclusory allegations in the FAC, that Defendant RCH has any United States customers and has presented no supplemental information to refute any part of the sworn declaration submitted by Defendant RCH that it does not carry on, solicit or otherwise engage in business in the United States.  Even if Defendant RCH does have customers in the United States, as the plaintiffs claim, *see* Pls.' RCH Opp'n at 15–17, *Daimler* makes clear that "engag[ing] in a substantial, continuous, and systematic course of business" is insufficient for the purposes of general jurisdiction, 134 S. Ct. at 761.  Consequently, *Rundquist* does not support the plaintiffs' request for jurisdictional discovery, since the plaintiffs have not provided the requisite likelihood that they would uncover evidence sufficient to allow this Court to exercise general jurisdiction.

Likewise, *DST Sorority* is inapposite.  Unlike the instant case, the issue in *DST Sorority*

---

[45] The plaintiffs have offered evidence that Defendant RCH has overlapping directors with its foreign parent company, RCA, but this evidence is not helpful.  *See* Pls.' RCH Opp'n at 18.  Unlike in *Rundquist*, where the directorships in question overlapped with a United States corporation that was subject to personal jurisdiction in the United States, there is no indication that RCA, a foreign company, is sufficiently at home in the United States such that general jurisdiction over it and its subsidiaries is appropriate.  *See* Part III.C.2 *supra*.  Thus, even if proven, the mere fact that Defendant RCH and RCA have overlapping directors would not give rise to general jurisdiction.

was whether personal jurisdiction was properly exercised over a domestic company, which

indisputably advertised for sale, via its catalog and website, the plaintiff's trademarked goods.

*See DST Sorority*, 275 F.R.D. at 22–23.  In the context of accusations that the defendant engaged

in the "destruction of evidence related to Defendant's websites [that] will likely compromise

plaintiff's ability to litigate its claims," *id*. at 27 (brackets in original omitted), the New York

defendant merely averred that it could "[]not recall" ever conducting a business transaction or

conducting business of any kind involving the plaintiff's protected trademarks within

Washington, D.C. and, consequently, was not subject to the District of Columbia's long-arm

statute.  *Id.* at 30.  Noting that "[t]he nature of the defendant's business operations, however,

includes selling merchandise via websites and catalogues and may consequently reach customers

outside the local area in New York, New York, where the defendant's business is physically

located," the Court permitted the plaintiff jurisdictional discovery "to test" the defendant's

owner's lack of "present recollection of reaching customers in this jurisdiction" in transactions

involving the plaintiff's trademarks.  *Id.*

     *DST Sorority* is readily distinguishable from the case at bar in at least two significant

respects.  First, the nature of the business activity at issue in *DST Sorority* made the plaintiff's

allegations regarding the transaction of business in this jurisdiction far more plausible.  To

sustain specific personal jurisdiction in that case, the plaintiff trademark owner needed to

establish unauthorized sales by the defendant of the plaintiff's trademarked goods in this

jurisdiction, which, in light of the defendant's business operations was highly plausible.  *See*

*DST Sorority*, 275 F.R.D. at 29–30.  By contrast, in the instant case, Defendant RCH is a foreign

freight forwarding company that moves freight within the Republic of Hungary and immediately

surrounding areas.  *See* Czöndör Decl. ¶ 2.  Far from being a domestic corporation that sells

goods over the Internet, as was the defendant in *DST Sorority*, Defendant RCH only provides services overseas. *See id.*  Notably, this Court in *DST* did not consider the mere accessibility of a website from within the boundaries of the District of Columbia to convey general jurisdiction over the defendant; the jurisdictional discovery was granted to give the plaintiff the opportunity to prove contacts involving the unauthorized use of its trademarks within the forum. *See DST Sorority*, 275 F.R.D. at 30.

Second, the clarity of the defendant's response to the allegation of conducting business within the forum differs dramatically between *DST Sorority* and the instant case.  Specifically, the defendant's declaration in *DST Sorority* did not firmly deny any forum transactions but instead the defendant's owner claimed merely no recollection of requisite contacts, a quasi-denial rendered somewhat suspect after the defendant took actions, which in the plaintiff's view, amounted to spoliation of business records. *See id* at 29.  By contrast, here Defendant RCH has unequivocally stated that the company transacts no business in the United States, wholly consistent with the nature of its operations which are based solely in overseas in Hungary. *See* Czöndör Decl. ¶ 2 (stating, *inter alia*, that RCH has not "been licensed to do business in the United States"; "conducted or transacted business anywhere in the United States"; "owned or lease any office space or other facility of any kind anywhere in the United States"; "had a bank or brokerage account anywhere in the United States"; or "shipped freight to any customer located anywhere in the United States").  In short, *DST Sorority* is inapposite to the instant matter.

Even under the liberal standard for allowing jurisdictional discovery in this Circuit, the party seeking such discovery still must have "at least a good faith belief that such discovery will enable it to show that the court has personal jurisdiction over the defendant." *Caribbean Broadcasting System, Ltd. v. Cable & Wireless P.L.C.*, 148 F.3d 1080, 1090 (D.C. Cir. 1998).

The foregoing discussion of the plaintiffs' allegations and the relevant case law belies any such good faith belief, especially in light of the Supreme Court's holding that, in order to assert general jurisdiction over a foreign corporation, that corporation must have connections that are "so continuous and systematic as to render [the foreign corporation] essentially at home in the forum State." *Daimler*, 134 S. Ct. at 761 (internal quotation marks, brackets, and citation omitted). The plaintiffs have alleged only that Defendant RCH and its corporate parents have a website accessible in the United States and that one of the corporate parents has a contract with a United States company. *See* Pls.' RCH Opp'n at 17. Although the plaintiffs challenge Defendant RCH's assertion that it has no U.S. customers, *see id.* at 15–17, unlike the plaintiffs in *Rundquist* or *DST Sorority*, the plaintiffs have provided no evidence to discredit Defendant RCH's declaration so as to provide the requisite "good faith basis" that general personal jurisdiction is present in this forum. In the absence of such a basis, jurisdictional discovery is unwarranted. Consequently, the plaintiffs' request for jurisdictional discovery as to Defendant RCH is denied.

### 4.     *Alien Tort Statute Jurisdiction*

In addition to Federal Rule of Civil Procedure 4(k)(2), the plaintiffs assert one remaining basis for the exercise of jurisdiction over Defendant RCH: namely, the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350.[46] *See* 28 U.S.C. § 1350 ("The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."). The plaintiffs concede that only the claim in Count XVII "sounds under the ATS," *See* Pls.' Suppl. Mem. Law on the Effect of *Kiobel* in on this

---

[46] The plaintiffs aver that they are relying exclusively on the FSIA, not the ATS, for jurisdiction over the Hungary Defendants. *See* Pls.' Suppl. Mem. Law on the Effect of *Kiobel* in on this Action ("Pls.' *Kiobel* Mem.") at 1, ECF No. 89 ("*Kiobel* has no effect on Plaintiffs' claims against [the Hungary Defendants], which rely solely on the [FSIA] for jurisdiction."). Thus, the discussion of the ATS applies only to Defendant RCH.

Action ("Pls.' Kiobel Mem.") at 14 n.6, and, consequently, given the lack of general jurisdiction

over Defendant RCH, *see* Part III.C.2 *supra*, only this count would survive if jurisdiction over

Defendant RCH is proper under the ATS.  The Supreme Court's decision in *Kiobel v. Royal*

*Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013), however, forecloses even that claim for which the

underlying factual allegations occurred entirely on foreign soil and did not touch or concern the

United States.[47]

The abhorrent treatment meted out to the plaintiffs in Hungary during World War II

occurred entirely in the territory of another sovereign.  *See* Pls.' *Kiobel* Mem. at 18, ECF No. 89

("There are cases in which the assertion of ATS jurisdiction over acts committed outside of the

United States remain viable.  The present case is just such an example.").  Nevertheless, the

plaintiffs contend that the claims "affect key interests of the United States and therefore touch

and concern the territory of this country" because these claims involve "genocide and mass

expropriation on the basis of race and religion."  *Id.* at 13.  Even the "extraordinar[iness]," *id.*, of

the plaintiffs' claims does not, however, work to expand the scope of the ATS, as interpreted by

*Kiobel*.

*Kiobel*'s language was clear: in order for the ATS to apply to actions taking place outside

the United States, the "claims [must] touch and concern the territory of the United States . . . with

sufficient force to displace the presumption against extraterritorial application."  *Kiobel*, 133 S.

Ct. at 1669.  The Supreme Court noted that "there is no indication that the ATS was passed to

make the United States a uniquely hospitable forum for the enforcement of international norms."

*Id.* at 1668.  The Court found further that allowing such claims to go forward, "would imply that

other nations also applying the law of nations, could hale our citizens into their courts for alleged

---

[47] Although Count XVII is apparently brought on behalf of all the plaintiffs, nationals of the United States may not
bring this claim. The plain language of the ATS limits its cause of action to "alien[s]."  *See* 28 U.S.C. § 1350 ("The
district courts shall have original jurisdiction of any civil action *by an alien* for a tort only . . . .") (emphasis added).

violations of the law of nations occurring in the United States, or anywhere else in the world. The presumption against extraterritoriality guards against our courts triggering such serious foreign policy consequences, and instead defers such decisions, quite appropriately, to the political branches." *Id.* at 1669.

The plaintiffs acknowledge this language, but rely upon the statements in two concurrences, neither one of which drew the support of a majority of the Supreme Court, to argue that their claims "touch and concern the territory of the United States . . . with sufficient force to displace the presumption against extraterritorial application." Pls.' *Kiobel* Mem. at 2; *see id.* at 13–18; Pls.' Resp. Def. RCH's Reply On The Effect of *Kiobel* On This Action at 2–4, ECF No. 94.

The plaintiffs rely upon Justice Kennedy's concurrence, but this is too thin a reed on which to rest the plaintiffs' case. This concurrence suggested that "[o]ther cases may arise with allegations of serious violations of international law principles protecting persons, cases covered neither by the [Torture Victims Protection Act] nor by the reasoning and holding of today's case; and in those disputes the proper implementation of the presumption against extraterritorial application may require some further elaboration." *Kiobel*, 133 S. Ct. at 1669 (Kennedy, J. concurring); *see* Pls.' *Kiobel* Mem. at 13–14. The plaintiffs do not argue, nor does Justice Kennedy's concurrence provide, any rationale as to how this Court can determine whether the plaintiffs' claims or, indeed, any plaintiff's claim, fall within the class of cases Justice Kennedy believes could "require some further elaboration" of the "proper implementation of the presumption against extraterritorial application" of the ATS. *See id.* Without clear guidance from the Supreme Court or the D.C. Circuit, this Court cannot determine with confidence whether the plaintiffs' claims are the type of claims to which Justice Kennedy was referring.

The plaintiffs rest the remainder of their argument on Justice Breyer's concurrence, joined by Justices Ginsberg, Sotomayor, and Kagan.  *See* Pls.' *Kiobel* Mem. at 14–18; Pls.' *Kiobel* Reply at 2–4.  This reliance is unavailing.  First, as noted, the Breyer concurrence did not garner a majority of votes on the Supreme Court and, therefore, cannot overcome the clear direction of the majority opinion.  Second, the Breyer concurrence, while rejecting the majority's approach of applying the presumption against extraterritoriality to the ATS, *see Kiobel*, 133 S. Ct. at 1671 (Breyer, J. concurring), sets forth an alternative test, which the plaintiffs also cannot pass.

Justice Breyer would "find jurisdiction under [the ATS] where (1) the alleged tort occurs on American soil, (2) the defendant is an American national, or (3) the defendant's conduct substantially and adversely affects an important American national interest, and that includes a distinct interest in preventing the United States from becoming a safe harbor (free of civil as well as criminal liability) for a torturer or other common enemy of mankind."  *Id.*  The plaintiffs do not allege that the torts at issue here occurred on American soil or that Defendant RCH is an American national, which leaves only the third prong to evaluate.

Justice Breyer elaborated on the meaning of the third prong—whether a "defendant's conduct substantially and adversely affects an important American national interest"—in light of two specific cases: *Filartiga v. Pena-Irala*, 630 F.2d 876 (2d Cir. 1980) and *In re Estate of Marcos, Human Rights Litigation* ("*Marcos*"), 25 F.3d 1467 (9th Cir. 1994).  *See Kiobel*, 133 S. Ct. at 1675.  In *Filartiga*, the "defendant . . . 'had . . . resided in the United States for more than ninth [sic] months' before being sued, having overstayed his visitor's visa."  *Id.* (quoting *Filartiga*, 630 F.2d at 878–79) (alteration in original).  In *Marcos*, "the defendant, 'his family, . . . and others loyal to [him] fled to Hawaii,' where the ATS case was heard."  *Id.* (quoting *Marcos*,

25 F.3d at 1469) (alteration in original).  Justice Breyer explained that jurisdiction under the ATS

was appropriately found in those cases because "[n]ations have long been obliged not to provide

safe harbors for their own nationals who commit . . . serious crimes abroad." *Id.* at 1675.  The

Justice also cited a number of U.S. treaties requiring the United States to "find and punish

foreign perpetrators of serious crimes committed against foreign persons abroad." *Id.* at 1676.

Under his test, Justice Breyer found that the "defendants are two foreign corporations" whose

"only presence in the United States consists of an office in New York City[;]" that "[t]he conduct

at issue took place abroad[;]" and that "the plaintiffs allege, not that the defendants directly

engaged in acts of torture, genocide, or the equivalent, but that they helped others (who are not

American nationals) to do so." *Id.* at 1677–78.  "Under these circumstances, even if the New

York office were a sufficient basis for asserting general jurisdiction, but see *Goodyear* . . . it

would be farfetched to believe, based solely upon the defendants' minimal and indirect American

presence, that this legal action helps to vindicate a distinct American interest, such as in not

providing a safe harbor for an 'enemy of all mankind.'" *Id*. at 1678.  Justice Breyer was

therefore most concerned with preventing the United States from becoming a "safe harbor" for

the "enemies of all mankind," not with extending the long-arm of American justice to adjudicate

disputes with and claims against those enemies, wherever they may be.

The plaintiffs argue that the United States' interests related to the Holocaust are

demonstrated by the fact that "the American Government lead [sic] the way in establishing the

Nuremberg war crimes tribunals and prosecuting the perpetrators of the Holocaust for

violation[s] of international law."  Pls.' *Kiobel* Mem. at 16.  Even set against these historical

facts, however, the plaintiffs do not and cannot show how subjecting to a civil suit Defendant

RCH—which, unlike the defendants in *Kiobel*, does not have any office in the United States or

conduct in business in the United States—furthers the United States' interest in not "providing a safe harbor for an 'enemy of all mankind.'" *See Kiobel*, 133 S. Ct. at 1678.  Thus, even under the test articulated by Justice Breyer, it is doubtful that the plaintiffs' claims would trigger jurisdiction under the ATS.[48]  No one disputes that the "United States not only has an important interest in preventing and stopping acts of genocide, but also in bringing some measure of justice to the victims and survivors of these acts." Pls.' *Kiobel* Mem. at 17.  Yet, as the Supreme Court framed the issue in *Kiobel*, the question is "what courts may do," 133 S. Ct. at 1664, to address genocide, when "the presumption against extraterritoriality" constrains "courts exercising their power under the ATS," 133 S. Ct. at 1665.  The majority of the Supreme Court concluded that adjudication in federal court was not the appropriate mechanism to address such atrocities as genocide committed overseas by foreign actors, but rather concluded that the "presumption against extraterritoriality guards against our courts triggering [] serious foreign policy consequences, and instead defers such decisions, quite appropriately, to the political branches." *Id*. at 1669.

Accordingly, this Court does not have personal jurisdiction over Defendant RCH for any of the claims raised by the plaintiffs and, because the plaintiffs are not entitled to jurisdictional discovery, Defendant RCH's Motion to Dismiss for lack of personal jurisdiction is granted.

## IV.   CONCLUSION

The atrocities committed by the Nazis and their collaborators during World War II will continue to reverberate through history for decades to come, as they should, so the world may

---

[48] The plaintiffs also argue that a Ninth Circuit case, *Sarei v. Rio Tinto, PLC*, 671 F.3d 736 (9th Cir. 2011) (en banc), that was vacated by the Supreme Court after *Kiobel* was decided, shows that *Kiobel* should not apply "categorically" to all torts that occurred entirely on foreign soil.  *See* Pls.' *Kiobel* Mem. at 15.  The plaintiffs assert that if such a categorical approach were required, the Supreme Court would have summarily reversed the Ninth Circuit in *Sarei*, which involved claims of genocide that occurred in Papua New Guinea.  *See id.* at 15–16.  On remand, in a four sentence en banc order, the Ninth Circuit affirmed the District Court's dismissal of the case in light of the Supreme Court's opinion in *Kiobel*.  *Sarei v. Rio Tinto, PLC*, 722 F.3d 1109, 1110 (2013).

learn not to repeat the mistakes of the past.  There is no doubt that the plaintiffs were wronged, atrociously so, and that they believe Defendant Hungary, assisted by its railway, has not atoned adequately for its genocidal actions.  Nevertheless, there are limits to the reach of the United States courts to provide redress where the Constitution and relevant laws and treaties say otherwise.  For the foregoing reasons, the Hungary Defendants' Motion to Dismiss and Defendant RCH's Motion to dismiss are granted.

An appropriate Order accompanies this Memorandum Opinion.

**Date:** May 9, 2014

_____
BERYL A. HOWELL
United States District Judge