# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

ROSALIE SIMON, *et al.*,
*Individually, for themselves and for all others similarly situated*

        Plaintiffs,

        v.

REPUBLIC OF HUNGARY, *et al.*,

        Defendants.

Civil Action No. 10-1770 (BAH)

Judge Beryl A. Howell

## MEMORANDUM OPINION

The named plaintiffs in this proposed class action, Rosalie Simon, Helen Herman, Charlotte Weiss, Helena Weksberg, Rose Miller, Tzvi Zelikovitch, Magda Kopolovich Bar-Or, Zehava (Olga) Friedman, Yitzhak Pressburger, Alexander Speiser, Ze-ev Tibi Ram, Vera Deutsch Danos, Ella Feuerstein Schlanger, and Moshe Perel (collectively, "the plaintiffs"), are fourteen of the approximately 825,000 Hungarian Jews who were subjected to the atrocities and horrors of the Holocaust at the hands of the Hungarian government between 1941 and 1945. Second Am. Compl. ("SAC") ¶¶ 5–9, 14, 22, 28, 39, 41, 49, 65, 73, 81, 131, ECF No. 118. The plaintiffs instituted this suit against the Republic of Hungary ("Hungary") and the Hungarian national railway, Magyar Államvasutak Zrt. ("MÁV"), (collectively, "the Defendants") seeking restitution for the property seized from them as part of Hungary's broader effort to eradicate the Jewish people. SAC ¶¶ 173–215.[1]

---

[1] The plaintiffs' initial complaint named a third defendant, Rail Cargo Hungaria Zrt. ("RCH"), which is a freight rail company that is the successor-in-interest to MÁV Cargo Árufuvarozási Zrt., f/k/a MÁV Cargo Zrt., a former division of MÁV. RCH was dismissed for lack of personal jurisdiction, *see Simon v. Republic of Hungary* ("*Simon I*"), 37 F. Supp. 3d 381, 444 (D.D.C. 2014), a ruling not appealed by the plaintiffs.

In 2014, this Court dismissed the plaintiffs' case, holding that in light of a treaty between the United States and Hungary, the defendants were entitled to sovereign immunity under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1605–07. *Simon v. Republic of Hungary* ("*Simon I*"), 37 F. Supp. 3d 381, 424 (D.D.C. 2014). The case now returns on remand from the D.C. Circuit, which rejected the application of the treaty exception under the FSIA, and held that the FSIA "expropriation exception" may provide a waiver of the defendants' sovereign immunity. *Simon v. Republic of Hungary* ("*Simon II*"), 812 F.3d 127, 149 (D.C. Cir. 2016). The D.C. Circuit further held "that the plaintiffs' claims do not constitute non-justiciable political questions falling outside of the Judiciary's cognizance," *id*. at 132; *id*. at 151, but left unresolved the applicability of other prudential doctrines. Instead, "whether, as a matter of international comity, the plaintiffs must first exhaust available remedies in Hungary before proceeding with their claims in United States courts," *id*. at 132-33, as well as "any other arguments" previously raised by the defendants "that [the Court] has yet to reach . . . such as the defendants' *forum non conveniens* arguments," *id.* at 151, were expressly left to this Court to consider on remand.

The defendants now seek to dismiss the plaintiffs' Second Amended Complaint, which was filed after remand. Defs.' Mot. Dismiss SAC ("Defs.' Mot."), ECF No. 120. For the reasons explained below, the plaintiffs are required to exhaust their Hungarian remedies before bringing suit in the United States under the prudential exhaustion doctrine and, since they have not done so, the defendants' motion to dismiss is granted, without prejudice, on that ground as well as under the *forum non conveniens* doctrine. [2]

---

[2]    Given the ample papers and accompanying exhibits submitted by the parties, the defendants' request for an oral hearing is denied. Defs.' Mot. at 1, ECF No. 120; *see* LCvR. 7(f) (granting request for oral hearing "shall be within the discretion of the Court").

## I.  BACKGROUND

The factual background of this case has been extensively reviewed in prior decisions of this Court and the D.C. Circuit, *see generally Simon I*, 37 F. Supp. 3d at 385–95; *see also Simon II*, 812 F.3d at 132–34, and, consequently, that background, as set out in the Second Amended Complaint, will only be briefly summarized below, followed by review of the relevant procedural history.

### A.  Factual Background

In 1944, "the Nazis and Hungary, knowing they had lost [the war], raced to complete their eradication of the Jews before the Axis surrendered."  SAC ¶ 3.  As part of their greater plan to eradicate the Jewish people, the defendants stripped Hungarian Jews of their possessions, including cash, jewelry, heirlooms, art, valuable collectibles, and gold and silver, loaded them onto trains, and transported them in squalid conditions to concentration camps where they were either murdered or forced to work as slave laborers.  *Id.* ¶¶ 17, 20, 23–26, 32–34, 44–48, 52, 57, 69–71, 76, 81.  "In less than two months . . . over 430,000 Hungarian Jews were deported, mostly to Auschwitz, in 147 trains," *id.* ¶ 120; *id.*, Exhibit B (list of deportation trains in 1944, along with "DATES, ORIGIN OF TRANSPORTS AND NUMBER OF DEPORTEES"), and the "vast majority" of the Hungarian Jews sent "to the killing fields and death camps of Nazi Germany-occupied Poland and the Ukraine" died, *id.* ¶ 3.  "The overall loss of Hungarian Jewry during the Second World War, excluding those who fled abroad, was 564,507."  *Id.* ¶ 131.

After the armistice agreement ended the hostilities of World War II, *id.* ¶ 137, Hungary signed the "Paris Peace Treaty of February 10, 1947" ("1947 Treaty") that incorporated "a number of provisions relating to the restoration of confiscated property," with promises to undertake the restoration of, and fair compensation for, property, legal rights or interests confiscated from persons "'on account of the racial origin or religion of such persons,'" *id.* ¶ 138

(quoting 1947 Treaty, 61 Stat. 2065, 41 U.N.T.S. 135, art. 27, para. 1). Article 27 and related provisions "were not self-executing (they needed appropriate municipal legislation and enforcement to prevail); and they did not provide for sanction in case of non-compliance, other than the implied possible litigation before an international tribunal." *Id.* (quoting 2 RANDOLPH L. BRAHAM, THE POLITICS OF GENOCIDE: THE HOLOCAUST IN HUNGARY, 1308–09 (rev. ed. 1994)). The plaintiffs acknowledge that the Hungarian government "implement[ed] an array of legislative enactments and remedial statutes," but Hungarian Jews "saw no tangible results with respect to restitution and indemnification" for their seized property. *Id.* Moreover, "[w]ith the communist party in power in Hungary" after World War II, "'the issue of compensation or restitution was squashed,'" and to the extent the Hungarian government had set aside funds for victims of the Holocaust, "the funds were rarely used for their intended purpose and they were frequently raided by the Communists for financing their own political projects." *Id.* ¶¶ 141–42 (quoting 2 BRAHAM at 1309). In 1992, two years after "the downfall of the Communist regime" in Hungary, the Hungarian government adopted at least two laws to provide remedies to Hungarian Jews victimized in the Holocaust: one of these laws "provid[ed] compensation for material losses incurred between May 1, 1939 and June 8, 1949," and the other "provid[ed] compensation for those who, for political reasons, were illegally deprived of their lives or liberty between March 11, 1939 and October 23, 1989," but plaintiffs claim that the remedies provided under those programs are "paltry and wholly inadequate." *Id.* ¶ 143.

In sum, the plaintiffs have never been properly compensated for the personal property seized from them by the defendants as the plaintiffs were about to be deported. *Id.* ¶¶ 83–84. The plaintiffs believe that the defendants "liquidated [this] stolen property, mixed the resulting funds with their general revenues, and devoted the proceeds to funding various governmental and

commercial operations." *Id.* ¶ 97.  Thus, the plaintiffs claim that the "stolen property or property exchanged for such stolen property is owned and operated by Hungary and MÁV," some of which property "is present in the United States in connection with commercial activity carried on in the United States by Hungary," *id.* ¶ 98, including, for example, "fees and payments, offices, furniture, furnishings, bank accounts, artwork, stock and bond certificates, securities held in 'street name' and airplanes," *id.* ¶ 101.

Sixty-five years after the end of World War II and twenty years after the fall of the Hungarian communist regime, the plaintiffs filed the instant action against Hungary and MÁV, seeking, *inter alia*, restitution for the possessions seized from them and their families during the Holocaust, and to certify a class "consist[ing] of [1] all surviving Jewish victims of the Holocaust" who were residents of Hungary between September 1, 1939 and May 8, 1945, and "[2] the heirs (whether American citizens or aliens) and open estates . . . of the deceased Jewish victims of the Holocaust, whether presently American citizens or aliens," who were residents of Hungary between September 1, 1939 and May 8, 1945.  *Id.* ¶ 153.  According to the plaintiffs, this class would consist of at least "5,000 survivors" and "countless heirs and estates" of the "approximately 825,000 Jews in Hungary" who were victims of the atrocities committed by the defendants.  *Id.* ¶¶ 131, 154.

The plaintiffs' Second Amended Complaint asserts, in ten counts, claims for conversion (Count I), unjust enrichment (Count II), breach of fiduciary and special duties imposed on common carriers (Count III), recklessness and negligence (Counts IV, V), civil conspiracy with Nazi Germany to commit tortious acts (Count VI), aiding and abetting (Count VII), restitution (Count VIII), accounting (Count IX), a demand for a declaratory judgment that plaintiffs and class members are entitled to inspect and copy certain documents, and for injunctive relief

enjoining the defendants from tampering or destroying such documents (Count X; Prayer For Relief, ¶¶ 5, 6). *See* SAC. The plaintiffs also assert that subject matter jurisdiction may properly be exercised over their claims, and that the defendants are not immune from suit, pursuant to the FSIA's expropriation exception, 28 U.S.C. § 1605(a)(3), SAC ¶¶ 86–92, which exception permits suit against a foreign sovereign or its agencies or instrumentalities in the courts of the United States to vindicate "rights in property taken in violation of international law" when an adequate commercial nexus is present between the United States and the defendant, 28 U.S.C. § 1605(a)(3).

### B. Procedural History

As noted, the defendants' first motion to dismiss on the grounds of sovereign immunity was granted because the exceptions to such immunity set out in the FSIA, 28 U.S.C. §§ 1605–07, only apply "if allowing a suit against a sovereign to proceed, pursuant to one of those exceptions, does not conflict with 'existing international agreements to which the United States [was] a party at the time of the enactment of' the FSIA." *Simon I*, 37 F. Supp. 3d at 406. Finding "that the 1947 Treaty is an 'existing international agreement[] to which the United States [was] a party at the time of the enactment' of the FSIA, 28 U.S.C. § 1604," the Court held that the 1947 Treaty "trigger[ed] the FSIA's treaty exception to deprive this Court of subject matter jurisdiction over the plaintiffs' claims." *Id.* at 407. In particular, the 1947 Treaty addressed Hungary's disposition of "all property" taken from Holocaust victims, directed how Hungary was to distribute all expropriated property at the end of the war, and provided that "any dispute concerning the interpretation or execution of the treaty" was subject to resolution exclusively through the mechanisms described in the Treaty. *Id.* at 415–16 (quoting 1947 Treaty, art. 40(1)). Based on those treaty provisions, which this Court viewed as defining the contours of Hungary's waiver of its sovereign immunity for claims for property seized during the Holocaust and

delineating the exclusive legal regime set up to resolve the plaintiffs' property claims against Hungary, the Court held that the Treaty precluded review of those claims under a FSIA exception and declined to reach the parties' other arguments concerning the application of the FSIA's "expropriation exception" or prudential reasons to dismiss the case, such as *forum non conveniens*. *Id.* at 397, 418 n.28.

On appeal, the D.C. Circuit affirmed in part and reversed in part. In particular, the Circuit rejected application of the treaty exception, *Simon II*, 812 F.3d at 135, finding that the 1947 Treaty set out only a non-exclusive mechanism for the plaintiffs to obtain compensation, *id.* at 137, and, thus, did not conflict with the FSIA such that "the FSIA's treaty exception does not foreclose jurisdiction over the plaintiffs' claims," *id.* at 140 ("we hold that Article 27 secures one means by which Hungarian victims can seek recovery against Hungary for their wartime property losses, but not to the exclusion of other available remedies."). The Circuit then considered whether the expropriation exception provides a basis for waiver of the defendants' sovereign immunity. *Id.*

The Circuit affirmed the dismissal of the "plaintiffs' non-property claims because they do not come within the FSIA's expropriation exception," and no other FSIA exception provided jurisdiction over the claims. *Id.* at 151. By contrast, the plaintiffs' claims that "directly implicate[d]" their property rights were "claims 'in which rights in property taken in violation of international law'" remained at issue. *Id*. at 140 (quoting 28 U.S.C. § 1605(a)(3)).[3] The Circuit acknowledged that a sovereign's expropriation of its own nationals' property was not a violation of international law under the "so-called 'domestic takings rule,'" but construed the plaintiffs'

---

[3] The D.C. Circuit specifically held that the plaintiffs' "conversion claim," "[t]heir unjust enrichment claim," and their "restitution claim . . . place 'rights in property . . . in issue' within the meaning of the FSIA's expropriation exception," and left to this Court to determine which, if any, of the plaintiffs' other claims involved "rights in property." *Id.* at 142.

claims as not asserting a "basic expropriation claim" subject to the domestic takings rule.  *Id.* at

140–41, 144.  Reasoning that "[e]xpropriations undertaken for the purpose of bringing about a

protected group's physical destruction qualify as genocide," *id.* at 143, the Circuit saw "the

expropriations as *themselves genocide*" committed "'in violation of international law,'" *id.* at

142–43 (emphasis in original), in reliance on "[t]he legal definition of genocide" set out in the

Convention on the Prevention and Punishment of the Crime of Genocide (Genocide

Convention), art. 2, Dec. 9, 1948, 78 U.N.T.S. 277, and other international treaties.  *See also id.*

at 144 ("[T]he complaint describes takings of property that are *themselves* genocide within the

legal definition of the term.").[4]

      The Circuit then turned to the "commercial-activity nexus requirement" of the

expropriation exception, which, on a "general level . . . require[s]: (i) that the defendants possess

the expropriated property or proceeds thereof; and (ii) that the defendants participate in some

kind of commercial activity in the United States."  *Id.* at 146.  The plaintiffs' allegations "that the

Hungarian defendants liquidated the stolen property, mixed the resulting funds with their general

---

[4]      The D.C. Circuit's articulation of when a sovereign nation's expropriation of property from its own nationals qualify as a violation of international law, has garnered critical comment.  *See, e.g.*, RESTATEMENT (FOURTH) OF FOREIGN RELATIONS LAW § 455 rep. note 7 (AM. LAW INST., Tentative Draft No. 2, 2016) (noting that "[b]y eliminating the 'domestic takings' rule and permitting claims to proceed on the basis of allegations that the takings occurred in the context of egregious violations of international law, [*Simon II*] appears to expand the scope of [the expropriation exception] significantly, potentially opening courts in the U.S. to a wide range of property-related claims arising out of foreign internal (as well as international) conflicts characterized by widespread human rights violations."); Vivian Grosswald Curran, HARMONIZING MULTINATIONAL PARENT COMPANY LIABILITY FOR FOREIGN SUBSIDIARY HUMAN RIGHTS VIOLATIONS, 17 CHI. J. INT'L L. 403, 430 (2017) ("[I]n *Simon* [*II*] . . .the D.C. Circuit seemed to take yet an additional step beyond both [the Seventh] and [Ninth Circuits], by *equating* Hungary's expropriation of its Jewish population *with* genocide . . . Thus, the FSIA expropriations exception for takings in violation of international law has become a form of universal jurisdiction for the gravest human rights violations under the FSIA.") (emphasis in original); *id.* at 428 ("[I]nstead of applying the domestic takings rule in the manner of established case law, [*Simon II*] created a novel exception to the FSIA, nowhere to be found in the statute's language, that is based on the context of genocide and perhaps other grave violations of human rights.").  Notably, the Supreme Court has expressed the view, consistent with *Simon II*, that "there are fair arguments to be made that a sovereign's taking of its own nationals' property sometimes amounts to an expropriation that violates international law, and the expropriation exception provides that the general principle of immunity for these otherwise public acts should give way."  *Bolivarian Republic of Venez. v. Helmerich & Payne Int'l Drilling Co*., 137 S. Ct. 1312, 1321 (2017).

revenues, and devoted the proceeds to funding various governmental and commercial operations" were found to "raise a 'plausible inference' that the defendants retain the [plaintiffs'] property or proceeds thereof," and, thus, the defendants' argument that such allegations were insufficient as a matter of law was rejected. *Id.* at 147. Nevertheless, the Circuit cautioned that the plaintiffs ultimately "may or may not be able to prove the point," and emphasized the limitation of its holding to whether the plaintiffs' allegations were sufficient as a matter of law. *Id.* The Circuit further noted that "[u]pon any factual challenge by the [] defendants—e.g., concerning whether the defendants in fact still possess the property or proceeds thereof—the plaintiffs will bear the burden of production, and the defendants will bear the burden of persuasion to establish the absence of the factual basis by a preponderance of the evidence." *Id.* (internal quotation omitted). Based on the then-record regarding the commercial activity nexus requirement, the Circuit held that "[b]ecause defendants make no attempt to argue that the rail company fails to 'engage[] in a commercial activity in the United States,' the nexus requirement is satisfied as to MÁV," *id.* at 147–48, but that "the complaint's allegations about Hungary's commercial activity fail to demonstrate satisfaction of §1605(a)(3)'s nexus requirement" because the plaintiffs "put forward only [] bare, conclusory assertion[s]" to support their claim, consequently affirming the dismissal of the claims against Hungary, *id.* at 148.

The Circuit concluded by leaving to this Court to consider on remand any remaining issues raised by defendants' invocation of sovereign immunity "should the defendants assert" them, such as "whether, as a matter of international comity, the court should decline to exercise jurisdiction unless and until the plaintiffs exhaust available Hungarian remedies," *id*. at 149, and

"any other arguments that [this Court] has yet to reach and that are unaddressed [by the Circuit], such as the defendants' *forum non conveniens* arguments," *id.* at 151.[5]

## C. Second Amended Complaint

On remand, the plaintiffs were permitted to file the operative Second Amended Complaint, s*ee* Scheduling Order, dated April 13, 2016; J. Stip. Regarding Sched. Order, ECF No. 117, which supplements the allegations regarding the defendants' commercial nexus to the U.S., and alleges for the first time, consistent with the D.C. Circuit's holding, that the takings at issue were "themselves genocide," SAC ¶¶ 92–94. The defendants then filed their second Motion to Dismiss, arguing that the Second Amended Complaint should be dismissed, *inter alia*, for plaintiffs' failure to exhaust Hungarian remedies, Defs.' Mem. Supp. Second Mot. Dismiss ("Defs.' Mem.") at 21–24, ECF No. 120-1, and under *forum non conveniens, id.* at 24–35.[6] The defendants' second motion to dismiss is now ripe for review. For the reasons explained below, the defendants' motion is granted on prudential exhaustion and *forum non conveniens* grounds.

---

[5] The D.C. Circuit made clear that "the FSIA itself imposes no exhaustion requirement," *id*. at 148, and rejected the defendants' argument that the plaintiffs cannot show a "violation of international law," as a prerequisite for invoking the expropriation exception, "without exhausting domestic remedies in the defendant state (or showing the absence of any need to do so)," *id*. When the expropriation at issue involves genocidal takings, any statutory exhaustion requirement to show the international law violation is obviated because "[t]he violation is the genocide itself, which occurs at the moment of the taking, whether or not a victim subsequently attempts to obtain relief through the violating sovereign's domestic laws." *Id*. at 149.

[6] Defendants have also sought dismissal on grounds of sovereign immunity, but since the motion is resolved on alternative grounds, those arguments need not be considered. *See Sinochem Intern. Co. Ltd. V. Malaysia Intern. Shipping Corp.*, 549 U.S. 422, 425 (2007) ("a district court has discretion to respond at once to a defendant's *forum non conveniens* plea, and need not take up first any other threshold objection. In particular, a court need not resolve whether it has authority to adjudicate the cause (subject-matter jurisdiction) or personal jurisdiction over the defendant if it determines that, in any event, a foreign tribunal is plainly the more suitable arbiter of the merits of the case."); *In re Papandreou*, 139 F.3d 247, 255 (D.C. Cir. 1998) ("[A]lthough subject-matter jurisdiction is special for many purposes . . . a court [may instead] dismiss [] on other non-merits grounds such as forum non conveniens"); *Pub. Citizen v. U.S. Dist. Court for D.C.*, 486 F.3d 1342, 1347 (D.C. Cir. 2007) ("Any remaining doubt as to whether a federal court may, in appropriate circumstances, dismiss a case on prudential grounds prior to establishing its jurisdiction was put to rest in *Sinochem*.").

## II. LEGAL STANDARD

Both *forum non conveniens* and exhaustion are prudential doctrines that fall outside the "standard procedural devices trial courts around the country use every day in service of [Federal Rule of Civil Procedure] Rule 1's paramount command: the just, speedy, and inexpensive resolution of disputes." *Dietz v. Bouldin*, 136 S. Ct. 1885, 1891 (2016). Nevertheless, in considering dismissal of a case on prudential grounds, the norm in reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b) is followed and the Court "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth v. Seldin*, 422 U.S. 490, 501 (1975); *see also Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (noting that in evaluating dismissal under Rule 12(b)(1), court should "assume the truth of all material factual allegations in the complaint and 'construe the complaint liberally, granting [the] plaintiff the benefit of all inferences that can be derived from the facts alleged'" (quoting *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005))). At the same time, inferences drawn by the plaintiff that are unsupported by facts alleged in the complaint or amount merely to legal conclusions need not be accepted. *See Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). Similarly to evaluating the jurisdictional sufficiency of a complaint, the Court may also consider "materials outside the pleadings." *Jerome Stevens Pharm., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005); *Belhas v. Ya'Alon*, 515 F.3d 1279, 1281 (D.C. Cir. 2008) (examining materials outside the pleadings in ruling on a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction); *Coal. for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003) (noting that courts may consider materials outside the pleadings in ruling on a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction).

**III. DISCUSSION**

The defendants have moved to dismiss the SAC on three independent grounds, which are, unsurprisingly, the grounds highlighted by the D.C. Circuit as left unresolved on appeal: first, the defendants dispute the factual bases on which application of the FSIA's expropriation exception to the plaintiffs' claims depends, Defs.' Mem. at 8–20; second, the defendants argue that, as a matter of international comity, the Court should as, a prudential matter, decline to hear the case until the plaintiffs have exhausted their claims before a court in Hungary, *id.* at 21–24; and third, the defendants reassert, as they did in their first motion to dismiss, that regardless of whether jurisdiction may properly be exercised over the plaintiffs' claims, the Court should decline to hear the case under the doctrine of *forum non conveniens*, *id.* at 24–34. The plaintiffs counter that the facts support the exercise of subject matter jurisdiction under the FSIA's expropriation exception, Pls.' Mem. Opp'n Defs.' Mot. Dismiss ("Pls.' Opp'n") at 2–22, ECF No. 122; that they are not required to exhaust their claims in Hungary, stressing that such efforts would be futile, *id.* at 22–27; and that *forum non conveniens* is unavailable because Hungary is not an adequate alternative forum and other relevant factors do not overcome the plaintiffs' choice of forum, *id.* at 27–44.

As explained below, plaintiffs have not shown that pursuing their claims in Hungary would be futile or that Hungary is an inadequate alternative forum. Thus, the prudential exhaustion and *forum non conveniens* doctrines both provide a compelling basis for "declin[ing] to exercise jurisdiction," *Simon II*, 812 F.3d at 149, and dismissing the plaintiffs' claims.

**A. Prudential Exhaustion**

**1.    *Applicable Legal Principles***

The prudential exhaustion doctrine for FSIA expropriation claims was articulated by the Seventh Circuit first in *Abelesz v. Magyar Nemzeti Bank*, 692 F.3d 661 (7th Cir. 2012), and later

refined by *Fischer v. Magyar Államvasutak Zrt,* 777 F.3d 847 (7th Cir. 2015). As summarized in *Fischer*, the exhaustion inquiry must answer two questions: (1) whether plaintiffs have alleged a taking in violation of international law where "international law favors giving a state accused of taking property in violation of international law an opportunity to 'redress it by its own means, within the framework of its own legal system' before the same alleged taking may be aired in foreign courts," *Fischer*, 777 F.3d at 855 (quoting *Abelesz*, 672 F.3d at 680); and (2) whether the plaintiffs have exhausted domestic remedies in the country where the taking occurred or, if not, whether plaintiffs can "show convincingly that such remedies are clearly a sham or inadequate or that their application is unreasonably prolonged," *Abelesz*, 672 F.3d at 681, such that "it could not be worthwhile to bring suit" there, *Fischer*, 777 F.3d at 857. In such cases, "principles of international comity make clear that these plaintiffs must attempt to exhaust domestic remedies," *id.* at 852, except where those remedies are "futile or imaginary," *id.* at 858. Those two factors – comity and futility – are now considered in turn.

### a. Comity

In *Abelesz*, the Seventh Circuit reversed the denial of motions to dismiss claims from two related cases brought by "Holocaust survivors and heirs of other Holocaust victims" against the Hungarian national bank and against MÁV, also a defendant in the instant case, for allegedly "participat[ing] in expropriating property from Hungarian Jews who were victims of the Holocaust." 692 F.3d at 665.[7] The *Abelesz* court affirmed the district court's rejection of the FSIA treaty exception, *id.* at 695, and found that the expropriation exception may provide a waiver of sovereign immunity, despite the general principle that plaintiffs may not bring an FSIA suit for uncompensated takings without exhausting domestic remedies, *id.* at 677, because the

---

[7] The *Abelesz* plaintiffs apparently did not sue Hungary. *See Abelesz,* 692 F.3d at 664–65.

relevant "violation of international law" was not an uncompensated taking, but expropriation of property "to deprive Hungarian Jews of their wealth and to fund genocide, a long-recognized violation of international law." *Id.* at 677. Nevertheless, the court reversed the denial of the motions to dismiss, holding that the plaintiffs "must exhaust domestic remedies to assert a claim for expropriation in violation of international law," even if the alleged violation was not an uncompensated taking. *Id.* at 679–82.

The *Abelesz* court explained that "the requirement that domestic remedies for expropriation be exhausted before international proceedings may be instituted is 'a well-established rule of customary international law,'" *Abelesz*, 692 F.3d at 679 (quoting Interhandel (Switz v. U.S.), Preliminary Objections, 1959 I.C.J. 6, 26–27 (Mar. 21)), and emphasized the "sovereignty and comity concerns underlying the domestic exhaustion rule," *id.* at 680. Noting that the United States itself had invoked this rule in a case before the International Court of Justice, *id.* at 679 (citing Interhandel (Switz. v. U.S.)), the *Abelesz* court expressed concern that the United States invoking the exhaustion doctrine in foreign courts but failing to require exhaustion in domestic courts would conflict with "the comity and reciprocity between sovereign nations that dominate international law." *Id.* at 682. Importantly, the exhaustion requirement is not required by the FSIA, but is "made clear" from the statute's "reliance on international law norms," such as exhaustion. *Fischer*, 777 F.3d at 854–55. "[E]xhaustion of domestic remedies is preferred in international law as a matter of comity," and a plaintiff seeking to overcome that consideration must show that they have exhausted the foreign sovereign's own domestic remedies, or that to do so would be futile. *Id.* at 859.

### b. Futility

Several factors are considered when determining whether "'Hungarian courts would be so obviously incapable of providing a fair and impartial hearing' that a United States court

should step in." *Id.* at 859–60 (quoting *Abelesz*, 692 F.3d at 684). These are: (1) whether Hungarian law provided sufficiently congruent judicial remedies, *id.* at 860–61; (2) the existence of "procedural obstacles" to those remedies, *id.* at 861, such that "the remedy provided by the alternative forum is so clearly inadequate or unsatisfactory that it is no remedy at all," *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 254 (1981), a high bar borrowed from "the related context of *forum non conveniens*," *Fischer*, 777 F.3d at 861; and (3) the "adequacy of Hungarian courts" in light of recent "limits on judicial independence," *id.* at 862.

### 2. Analysis

As noted *supra*, the D.C. Circuit left unresolved whether this Court "should decline to exercise jurisdiction" over the plaintiffs' expropriation claims "as a matter of international comity unless the plaintiffs first exhaust domestic remedies." *Simon II*, 812 F.3d at 149 (citing *Fischer,* 777 F.3d at 857). The D.C. Circuit's approving reference to *Fischer's* application of the prudential exhaustion doctrine "to parallel claims arising from the Hungarian Holocaust," *id*. at 146, and "in closely similar circumstances," *id*. at 149, makes plain that application of this doctrine to the facts of this case, at a minimum, warrants consideration.

The same considerations that the Seventh Circuit held counseled dismissal for failure to exhaust Hungarian remedies in *Abelesz/Fischer* apply to the instant case, and point to the same result. Here, the plaintiffs argue both that the prudential exhaustion doctrine does not apply to their claims and, more generally, that the prudential exhaustion doctrine should not be adopted at all. As the plaintiffs point out, this doctrine is neither reflected in the text of the FSIA, which displaced "pre-existing common law," Pls.' Opp'n at 26, nor a direct application of recognized international law principles, *id.* at 23–24. Neither of these arguments, however, address the prudential concerns animating the Seventh Circuit's formulation of this doctrine.

As the Seventh Circuit explained, an exhaustion requirement "could serve two distinct roles": either as a necessary part of the violation of international law itself, or imposed as a matter of "customary international law." *Fischer,* 777 F.3d at 857. Since the *Abelesz* "plaintiffs had alleged violations of international law due to the genocidal nature of the expropriations," not because of an uncompensated taking, *Abelesz* did not invoke the "domestic takings" doctrine, but instead "invoked the second form of exhaustion," the "prudential exhaustion" requirement. *Id.* at 857–59. The plaintiffs here do not articulate any reason *not* to adopt the prudential exhaustion doctrine. That Congress did not include an exhaustion requirement in the expropriation exception is certainly relevant, Pls.' Opp'n at 23–24, but the similarity between the prudential exhaustion doctrine and the *forum non conveniens* doctrine, which "remains fully applicable in FSIA cases" despite lacking a statutory basis, *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 100 (D.C. Cir. 2002), indicates that the FSIA is not a bar to adopting prudential exhaustion in this case.

That said, the plaintiffs are likely correct that exhaustion is only *required* as a matter of course where a plaintiff seeks to bring a domestic dispute before an international tribunal, rather than to the domestic courts of a different sovereign, which may apply its own domestic laws. Pls.' Opp'n at 23–25 (citing William S. Dodge, INTERNATIONAL COMITY IN AMERICAN LAW, 116 COLUM. L. REV. 2071, 2110–11 n.243 (2015) ("[C]ustomary international law requires the exhaustion of local remedies in domestic courts only before a claim is brought in an international tribunal. . . . There is no international law rule requiring the exhaustion of local remedies before a claim is brought in another domestic court.")). The Seventh Circuit's decisions in *Abelesz* and *Fischer*, however, were not based solely on applying existing international law, but on applying the principles that motivated international law norms. The doctrine adopted by the Seventh

Circuit is not a direct translation of the exhaustion requirement for international courts, and does not require plaintiffs to exhaust domestic remedies *any* time they seek to sue in a foreign forum.

This is not to say that the prudential exhaustion doctrine avoids all comity problems. The *Fischer* court stressed that dismissal of a lawsuit on prudential exhaustion grounds would be without prejudice and, thus, "[i]f plaintiffs attempt to bring suit in Hungary and are blocked arbitrarily or unreasonably, United States courts could once again be open to these claims," 777 F.3d at 865-866; *id.* at 852 ("while the doors of United States courts are closed to these claims for now, they are not locked forever. All dismissals are without prejudice. If plaintiffs find that future attempts to pursue remedies in Hungary are frustrated unreasonably or arbitrarily, a United States court could once again hear these claims."). By requiring that plaintiffs exhaust domestic remedies in Hungary, but permitting them to re-file suit in the United States afterward, United States courts may be called upon to decide not only the previously dismissed legal issues, but also to evaluate the fairness and adequacy of the foreign proceeding, effectively placing domestic United States courts in the position of reviewing the sufficiency of another sovereign's judicial or legal regime and, on review of any revived claims, disagree with the outcome in the foreign court.

Nevertheless, despite these drawbacks, the factors counseling application of the prudential exhaustion doctrine here outweigh those against. Perfect judicial procedures for resolving seventy-year-old claims of genocide against a foreign sovereign are elusive. The prudential exhaustion doctrine recognizes the risks of unnecessarily infringing on the sovereignty of a foreign nation while also guaranteeing that the plaintiffs are afforded an adequate forum for their claims. Accordingly, the Court finds that the prudential exhaustion doctrine applies here. The two-pronged inquiry outlined by the *Fischer* Court is addressed next.

### a. International Comity Considerations Require Plaintiffs to Exhaust Hungarian Remedies

The Seventh Circuit focused its comity inquiry on principles that the Supreme Court has articulated in recent years, particularly in *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108 (2013), where, in addressing the extraterritorial application of the Alien Tort Statute, the Supreme Court highlighted concerns that "other nations, also applying the law of nations, could hale our citizens into their courts for alleged violations of the law of nations occurring in the United States, or anywhere else in the world," *id.* at 124. Such concerns are heightened when foreign sovereigns, rather than just foreign citizens, are potential defendants. The *Fischer* court also drew on Justice Breyer's concurrence, which noted that "limiting principles" such as comity "help to minimize international friction." *Fischer*, 777 F.3d at 859 (quoting *Kiobel*, 569 U.S. at 133 (Breyer, J., concurring)). Moreover, where "claims . . . arise from events of historical and political significance . . . [t]here is a comity interest in allowing a foreign state to use its own courts for a dispute if it has a right to do so." *Philippines v. Pimentel,* 553 U.S. 851, 866 (2008).[8] The comity considerations that led the *Fischer* court to dismiss that suit against MÁV, the Hungarian national railway, apply also to the instant suit against MÁV, and with greater strength to defendant Hungary – itself a foreign sovereign.

---

[8] The plaintiffs argue on this point that several cases relied on by the defendants are not relevant because they concerned suits against private foreign entities or did not arise under the *forum non conveniens* doctrine. *See* Pls.' Opp'n at 41–43 nn. 31–34. It is true that some of the cases cited by the defendants concern private business disputes, *see VIP Eng'g & Mktg. Ltd. V. Standard Chartered Bank*, 969 F. Supp. 2d 391 (S.D.N.Y. 2013); *MBI Group v. Credit Foncier du Cameroun*, 558 F. Supp. 2d 21 (D.D.C. 2008), or involve "maritime torts," *Cook v. Champion Tankers AS*, No. 12-cv-01965-JST, 2013 U.S. Dist. LEXIS 54018 (N.D. Cal. Apr. 16, 2013). The Supreme Court has not limited its concerns about the interference of U.S. courts in foreign affairs to a single type of case, however, and concerns about federal courts "triggering serious foreign policy consequences," *Kiobel*, 569 U.S. at 124, apply *a fortiori* when plaintiffs ask the court to exercise jurisdiction over a foreign-sovereign defendant.

### b. Hungarian Remedies Would Not Be Futile

After finding that comity considerations counsel in favor of dismissal, the second inquiry is whether "there is a legally compelling reason for plaintiffs' failure to exhaust Hungarian remedies." *Abelesz*, 692 F.3d at 682. As the plaintiffs are required to exhaust their claims, they also bear the burden of demonstrating that attempting to exhaust any of their claims would be futile. *Fischer*, 777 F.3d at 867 ("In the exhaustion analysis, it was up to plaintiffs to point to a legally compelling reason that the remedies might be inadequate."); *see also Tesoro Refining & Marketing Co. v. FERC*, 552 F.3d 868, 874 (D.C. Cir. 2009) ("The futility exception is quite restricted . . . [e]ven if one were to concede that an unfavorable decision . . . was *highly likely*, that does not satisfy our strict futility standard requiring a *certainty* of an adverse decision." (emphasis in original) (internal quotations and citations omitted)); *Rann v. Chao*, 154 F. Supp. 2d 61, 65 (D.D.C. 2001), *aff'd as modified*, 346 F.3d 192 (D.C. Cir. 2003) ("[A] plaintiff bears a heavy burden to establish that the futility exception applies to his or her case."). The parties vigorously dispute whether Hungarian courts would provide an adequate alternative forum for the plaintiffs' claims or if bringing the claims in Hungary would be futile. Given the significant overlap in facts between *Abelesz/Fischer* and the instant case, the Seventh Circuit's opinions are highly persuasive.

A foreign forum will "ordinarily" be found adequate so long as "the defendant is amenable to process in [that] jurisdiction." *Piper Aircraft*, 454 U.S. at 254 n.22 (internal quotation marks omitted). "[A]s long as the alternative forum provides some potential avenue for redress, that forum generally will be considered adequate." 17 James Wm. Moore et al., Moore's Federal Practice–Civil § 111.74 (2017) (internal quotation marks omitted). "In rare circumstances . . . where the remedy offered by the other forum is clearly unsatisfactory, the other forum may not be an adequate alternative." *Piper Aircraft*, 454 U.S. at 254 n.22. A

foreign forum "is not inadequate merely because it has less favorable substantive law," *El-Fadl v. Central Bank of Jordan*, 75 F.3d 668, 678 (D.C. Cir. 1996), *abrogated on other grounds by Samantar v. Yousuf*, 560 U.S. 305 (2010); *see also* 17 MOORE'S FEDERAL PRACTICE–CIVIL § 111.74 ("The possibility that the foreign tribunal will apply law that is less favorable to the plaintiff or that the damages award may be smaller does not render the forum inadequate."), nor because it employs different adjudicative procedures, *El-Fadl,* 75 F.3d at 678, or because of general allegations of corruption in the judicial system, *see BFI Grp. Divino Corp. v. JSC Russian Aluminum*, 298 Fed. App'x. 87, 91 (2d Cir. 2008) (noting that courts "are reluctant to agree" that a "foreign judicial process is biased or corrupt"); *Leon v. Millon Air, Inc*., 251 F.3d 1305, 1311–12 (11th Cir. 2001) ("[T]he argument that the alternative forum is too corrupt to be adequate does not enjoy a particularly impressive track record.") (internal quotation marks omitted).

The defendants summarize a number of features of the Hungarian court system to highlight the remedies available to the plaintiffs in Hungary. The defendants note that the Hungarian constitution, called the Hungarian Basic Law, explicitly requires that parties be treated fairly and equally in court, prohibits discrimination on the basis of, among other things, race or religion, and creates rights of appeal to various appellate courts. Defs.' Mem. at 25–26 (citing *id.*, Attach. 25, Decl. of Dr. Pál Sonnevend, Head of the Department of International Law, ELTE Law School Budapest ("Sonnevend Decl."), ¶¶ 7, 9, 39, 48, ECF No. 120-25); *see also* Sonnevend Decl. ¶¶ 39–53 (describing the extensive safeguards in place to ensure the independence of the Hungarian judiciary). The defendants further stress that Hungary "recognizes and enforces international law," Defs.' Mem. at 25 (citing Sonnevend Decl. ¶¶ 32–34, 95), and that Hungarian courts "recognize[] and provide[] damages for the types of loss of

20

property claims alleged in [the] complaint," *id.* at 25–26 (citing Sonnevend Decl. ¶¶ 92–94).

These features of the Hungarian legal system strongly support the conclusion that Hungary is an

adequate alternative forum for the plaintiffs' claims.[9]

The plaintiffs bolster their position that they meet the futility requirement with a variety

of arguments, ranging from the procedural hurdles and insufficient remedies in Hungary, to the

anti-Semitism extant in that country. None is persuasive.

First, as to the procedural hurdles, the plaintiffs claim that their property-based claims

have been time-barred since March 1994 under Hungarian law. Pls.' Opp'n at 26 (citing Ex. A,

Decl. of András Hanák, Hungarian attorney ("Hanák Decl.") ¶¶ 14, 21, ECF No. 122-1)). The

plaintiffs' expert explains that the Hungarian "Second Compensation Act" created an

administrative procedure in Hungary through which Holocaust victims could receive money as

compensation for property and tort claims, but that the time to file a claim under the act has long

since passed. Hanák Decl. ¶¶ 20–21. In addition, the remedy was only "symbolic

compensation" to victims and not full compensation, an outcome that the Hungarian

Constitutional Court found constitutional. *Id.* ¶ 19. The plaintiffs misleadingly overstate the

---

[9] The defendants also point to a number of cases in which lawsuits have been dismissed on the related ground of *forum non conveniens* predicated on finding that Hungary provides an adequate forum for the resolution of different types of claims, including claims brought by Hungarian holocaust survivors. *See* Defs.' Mem. at 26 (citing *Fischer*, 777 F.3d at 860 (finding Hungary adequate to hear claims from Hungarian Holocaust victims)); *see also de Csepel v. Republic of Hungary*, 808 F. Supp. 2d 113, 138 (D.D.C. 2011) (assuming, based on the strong evidence provided, that Hungary provided an adequate alternative forum for claims brought by Hungarian Jews against Hungary); *Moscovits v. Magyar Cukor Rt.*, No. 00 Civ. 0031 (VM), 2001 U.S. Dist. LEXIS 9252, at *14 (S.D.N.Y. July 9, 2001) (concluding that Hungary offered an adequate alternative forum for business dispute), *aff'd by Moscovits v. Magyar Cukor Rt*, 34 F. App'x 24, 26 (2d Cir. 2002) (same)); *Dorfman v. Marriott Int'l Hotels, Inc.*, No. 99 Civ. 10496 (CSH), 2001 U.S. Dist. LEXIS 642, at *22–23 (S.D.N.Y. Jan. 26, 2001) (same). These cases, while not dispositive on the issue, *see* Pls.' Opp'n at 29 ("In each case, a fact-specific inquiry must be made"), bolster the conclusion that Hungary is an adequate forum. The plaintiffs briefly note that a suit by a Hungarian holocaust survivor, who is not a plaintiff in this case, was recently dismissed by the Hungarian courts, Pls.' Opp'n at 32, but do not dispute the defendants' account of that case, namely, that the "Plaintiff did not make any motions asking the Metropolitan Court of Budapest to collect or hear evidence to support her claims," and "did not appeal" the decision against her, as was her right, Defs.' Reply Attach. 1, Reply Decl. of László Nanyitsa ¶¶ 4–5, ECF No. 124-1. On this record, a single plaintiff's unsuccessful suit in Hungary is wholly insufficient to find that the plaintiffs' exhaustion of their claims in Hungary would be futile.

opinion expressed by this expert by indicating that "under Hungarian law, all property-based claims have been time-barred since March 1994," Pls.' Opp'n at 26 (citing Hanák Decl. ¶ 14), when the expert instead states only that "claims under the Compensation Acts are time-barred," Hanák Decl. ¶ 14. In fact, the plaintiffs' expert concedes that the Compensation Acts do not bar civil litigation by the plaintiffs, although the plaintiffs may ultimately lose on "substantive" grounds. *Id.* ¶ 20. The mere fact that the plaintiffs *may* not be successful on the merits of their claims falls far short of showing futility. In the expert's own words, the receptivity of Hungarian courts to international claims "seemingly offer[s] to [the] plaintiffs" at least one path by which they could bring their claims in Hungarian court. *Id.*

Notably, the defendants have agreed to waive, and Hungary has waived by constitutional amendment, any statute of limitations for claims related to "crimes visited upon the Hungarian people during World War II." Defs.' Reply Supp. Mot. Dismiss ("Defs.' Reply") at 15, ECF No. 124 (quoting *Abelesz*, 692 F.3d at 682 n. 11); *see also id.* (citing *Fischer*, 777 F.3d at 862 (recognizing that Hungary has waived by constitutional amendment the statute of limitations on such claims)). Other plaintiffs who have recently brought claims in Hungary seeking recovery of property taken by the Hungarian government during the Holocaust have been successful in their cases. Defs.' Reply at 20 (discussing return of property expropriated by Hungary from Hungarian Jews "in four separate litigations in Hungary").

Second, the plaintiffs contend that "[t]he lack of meaningful remedies" available in Hungary "eviscerates Defendants' exhaustion claim." Pls.' Opp'n at 27. Yet, the plaintiffs' expert acknowledges that damages would likely be recoverable in Hungarian courts, though they may be limited to pecuniary damages and "relatively modest" non-pecuniary damages. *Id.* at 31 (quoting First Decl. of András Hanák, Hungarian attorney ("First Hanák Decl.") ¶ 11, ECF No.

24-2).  That the plaintiffs' recovery in Hungary may be less than they could recover in the United States does not make Hungary an inadequate forum.  As the Seventh Circuit noted, "domestic Hungarian remedies need not be perfectly congruent with those available in the United States to be deemed adequate." *Abelesz*, 692 F.3d at 685.  *See also Saqui v. Pride Cent. America, LLC*, 595 F.3d 206, 212 (5th Cir. 2010) (affirming that "the mere fact that the amount of damages would be more limited under Mexican as opposed to American law, does not provide the basis for finding Mexican courts an inadequate alternative forum." (internal quotation marks omitted)); 17 MOORE'S FEDERAL PRACTICE–CIVIL § 111.74 ("If the plaintiff will not be deprived of all remedies in the foreign forum, the court may dismiss on *forum non conveniens* grounds even though the foreign forum does not provide the same array of remedies, or the same magnitude of potential recovery available in the [U.S.] forum.").

Third, the plaintiffs complain about the procedural differences between American and Hungarian courts because there is "no right to pre-trial discovery" in Hungary; "Hungary does not allow class actions"; and, unlike the United States, the losing party usually pays the opposing party's attorney's fees in Hungary.  Pls.' Opp'n at 31–33.  These concerns are unavailing. Though Hungarian courts do not employ the same discovery methods as United States courts, the defendants point out that "the parties can ask [a Hungarian] court to gather evidence" on their behalf, and the court "can order a party or third party to submit relevant documents in its possession to the court, summon witnesses with relevant knowledge to testify, or require witnesses to produce documents in their possession that the parties wish to rely on for evidence." Defs.' Reply at 22 (citing Sonnevend Decl. ¶¶ 61–62).  Though these procedures may not permit the plaintiffs to control the course of discovery as in the United States, they would nonetheless be allowed to seek, via the court, access to relevant information held by the defendants.  Indeed,

the Hungarian court may have jurisdiction to compel evidence and testimony in Hungary that is lacking in this Court.

Moreover, while Hungarian courts do not permit class actions in the same manner as American courts, under Hungarian law, plaintiffs may join their lawsuits together if the claims "involve the same cause of action and legal basis." Defs.' Reply at 21 n. 17 (citing Sonnevend Decl. ¶ 57); Pls.' Opp'n at 31 n.18. The lack of availability of "American-style class actions," which "remain uncommon" throughout the rest of the world, *Fischer*, 777 F.3d at 861, also would not deprive the plaintiffs of the ability to bring their claims in Hungary. Indeed, as the *Fischer* court noted in expressly rejecting this same argument, the lack of an "American-style class action" mechanism does not mean "no remedy at all" is provided. *Id.*

Similarly, the American rule that each party presumptively bears its own costs in litigation is, like the "American-style class action," relatively uncommon, and the possibility that the plaintiffs would be required to pay the opposing parties' fees if they are unsuccessful in court is not only speculative, but is simply insufficient to show that a foreign forum is inadequate or that proceeding there would be futile. *See Piper Aircraft*, 454 U.S. at 252 n. 18 (noting that in "most foreign jurisdictions," courts "tax losing parties with their opponents' attorneys' fees"); *Borden, Inc. v. Meiji Milk Products Co., Ltd.*, 919 F.2d 822, 829 (2d Cir. 1990) ("some inconvenience or the unavailability of beneficial litigation procedures similar to those available in the federal district courts does not render an alternative forum inadequate." (internal quotation marks omitted)).[10]

---

[10] The plaintiffs also briefly speculate that Hungary might refuse to pay any damages awarded to them by Hungarian courts, Pls.' Opp'n at 33, but have provided no specific evidence that the government would ignore a lawful order of its judiciary.

Fourth, the plaintiffs argue that they would face "manifest religious and ethnic prejudice" in the Hungarian courts, and that despite the "aspirational language" of the Basic Law prohibiting such discrimination, the "toxic anti-Semitic environment in Hungary" makes such prohibitions no more than "wishful thinking." Pls.' Opp'n at 30 (citing First Hanák Decl. ¶¶ 20–21 ("It is well-established . . . that anti-Semitism is on the increase in Hungary.")). The rise of anti-Semitism in Hungary and elsewhere, even close to home, is enormously disturbing. Nonetheless, such concern is insufficient to conclude that bringing the plaintiffs' claims before Hungary's judicial system would be futile. In rejecting the same argument, the Seventh Circuit acknowledged that "anti-Semitism unfortunately has been on the rise throughout Europe and is also present in the United States," but ultimately found the argument of possible bias unpersuasive because, "hold[ing] otherwise would imply that United States courts should presume that the courts of other nations cannot fairly hear claims brought by historically persecuted groups." *Fischer*, 777 F.3d at 865. The Seventh Circuit went on to explain that "[o]ne could easily imagine that Thurgood Marshall and the NAACP Legal Defense and Educational Fund had similar concerns about many United States courts' ability to hear claims by African Americans in 1950 and later. Yet our courts by and large rose to the challenge in the following decades." *Id.* Indeed, the Hungarian judiciary has already demonstrated a willingness to consider fairly the plaintiffs' claims, as the Hungarian courts have assisted the plaintiffs in this case in taking a deposition of a witness located in Hungary, and when that witness was unavailable, the court offered to make transcripts of other proceedings involving the witness available to the plaintiffs for use in this litigation. *See Simon I*, 37 F. Supp. 3d at 395 (discussing plaintiffs' attempt to depose László Csatary).

Finally, the plaintiffs raise concerns about the independence of the Hungarian judiciary due to the effort by the Hungarian parliament to restrict the power of the judiciary through national legislation and the 2013 Fourth Amendment to the Basic Law, which legislative activity prompted criticism by the European community at large. Pls.' Opp'n at 30 & n.16; *see also* Hanák Decl. ¶ 9 & n.1. These legislative efforts to control the judiciary are acknowledged with concern by the defendants' own expert. *See* Sonnevend Decl. ¶¶ 19–21, 53. International organizations have also expressed concerns about these developments. The European Commission for Democracy through Law (the "Venice Commission"), for example, found that "these measures amount to a threat for constitutional justice . . . [and] may negatively affect . . . the separation of powers . . . the protection of human rights and the rule of law." Pls.' Opp'n Attach. 1, Ex. 7, Venice Commission, Opinion on the Fourth Amendment to the Fundamental Law of Hungary ¶ 145 (dated June 14–15, 2013), ECF No. 122-1; Hanák Decl. ¶ 9(b) (noting that the European Court of Human Rights held that the Chief Justice's removal violated the European Human Rights Convention).

Hungary has responded to many of these concerns by again amending the Basic Law. *See* Sonnevend Decl. ¶ 53; *see also Fischer*, 777 F.3d at 863–64 (noting that concerns about the amendments to the Basic Law have been largely addressed by both the further amendments to the Basic Law and reliance on the decisions of the European Court of Justice). These corrective actions, including to submit to the jurisdiction of international European tribunals, are significant steps indicating that Hungary is, in fact, committed to preserving the rule of law and still seeks to align itself with commonly-accepted legal and moral norms. Presented with the same argument that Hungarian courts had become too politically charged to adjudicate the plaintiffs' claims fairly, the Seventh Circuit also recognized that Hungary had reversed attempted changes to its

judiciary that concerned the plaintiffs and emphasized Hungary's willingness to quickly do so in response to criticism from other countries and international bodies. *Fischer*, 777 F.3d at 863–64.

***

International comity concerns apply here and warrant dismissal, without prejudice, of the Second Amended Complaint for failure to exhaust the remedies available in Hungary to address the plaintiffs' claims of genocidal takings during World War II, under the prudential exhaustion doctrine.

### B. Forum Non Conveniens

Having determined that this lawsuit must be dismissed, without prejudice, on the ground of prudential exhaustion, no further consideration is necessary of the alternative prudential basis for dismissal. Yet, given the similarities between the prudential exhaustion and *forum non conveniens* doctrines, both dictate the same result. Analysis of the latter basis for dismissal is set out below.

### 1. Applicable Legal Principles

Despite the "substantial presumption in favor of a plaintiff's choice of forum," *Agudas Chasidei Chabad v. Russian Federation*, 528 F.3d 934, 950 (D.C. Cir. 2008) (citing *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 509 (1947)), a court "may nonetheless dismiss a suit for *forum non conveniens* if the defendant shows [(1)] there is an alternative forum that is both available and adequate and, [(2)] upon a weighing of public and private interests," that the alternative forum is "the strongly preferred location for the litigation," *MBI Grp., Inc. v. Credit Foncier du Cameroun*, 616 F.3d 568, 571 (D.C. Cir. 2010) (citing *Chabad*, 528 F.3d 934); *see also El-Fadl*, 75 F.3d at 676–77 (noting that "the defendant bears the burden of proving" the applicability of the *forum non coveniens* doctrine).

In evaluating whether private interest factors weigh in favor of plaintiff's chosen forum or the foreign forum, a court considers: (1) the relative ease of access to sources of proof; (2) the availability of process for compelling unwilling witnesses; (3) the cost for obtaining attendance of willing witnesses; (4) the possibility of inspecting the premises, if appropriate; and (5) all other practical problems that make trial of a case easy, expeditious, and inexpensive. *Gulf Oil*, 330 U.S. at 508. The relevant public factors to be considered include: (1) "local interest in having localized controversies decided at home"; (2) "the possibility of holding the trial in a forum at home with the law that must govern the case, rather than having a court in some other forum untangle problems in conflict of laws, and in law foreign to itself"; (3) "avoiding the 'imposition of jury duty' on people of a community which has no relation to the litigation"; and (4) "other 'administrative difficulties' that flow from foreign litigation congesting local courts." *MBI*, 616 F.3d at 576 (quoting *Gulf Oil,* 330 U.S. at 508–09).

Courts do not apply "a rigid rule" to decide a motion to dismiss on the grounds of *forum non conveniens* and "[each] case turns on its facts." *Piper Aircraft*, 454 U.S. at 249–50 (internal quotation marks omitted). "If central emphasis were placed on any one factor, the *forum non conveniens* doctrine would lose much of the very flexibility that makes it so valuable." *Id.*; *see also Van Cauwenberghe v. Biard*, 486 U.S. 517, 529 (1988) ("[T]he district court is accorded substantial flexibility in evaluating a *forum non conveniens* motion, and each case turns on its facts." (internal citations and quotation marks omitted)); *Iragorri v. Int'l Elevator, Inc.*, 203 F.3d 8, 12 (1st Cir. 2000) (in reviewing a *forum non conveniens* motion, "flexibility is the watchword").

A defendant is not required to carry out an "extensive investigation" in support of its *forum non conveniens* argument, which "would defeat the purpose of [a *forum non conveniens*]

motion," but only must "provide enough information to enable the district court to balance the parties' interests." *Piper Aircraft*, 454 U.S. at 258; *see also SAS Inst., Inc. v. World Programming Ltd.*, 468 F. App'x 264, 266 (4th Cir. 2012) ("A party seeking *forum non conveniens* dismissal is not required to undertake extensive investigation in order to demonstrate that it[] . . . would be adversely impacted by the continuance of the litigation." (internal quotation marks omitted)).

### 2. *Analysis*

At the outset, the finding that the plaintiffs' pursuit of their claims in Hungary would not be futile satisfies the first prong of the test for application of the *forum non conveniens* doctrine that Hungary is both an available and adequate alternative forum. Thus, the Court proceeds to consider the remaining factors for application of the *forum non conveniens* doctrine.

#### a. *Plaintiffs' Choice of Forum*

The plaintiffs correctly note the "substantial deference" to which their choice of forum is entitled, Pls.' Opp'n at 33–35 (citing *Chabad*, 528 F.3d at 950), but the selection of this Court for the filing of the instant lawsuit is not dispositive or even controlling in the *forum non conveniens* analysis for several reasons. First, the deference given to a plaintiff's forum choice is lessened when the plaintiff's ties to the forum are attenuated. In this case, only four of the fourteen named plaintiffs reside in the United States and are U.S. citizens. SAC ¶¶ 5, 7, 9, 73; *see Pac. Mar. Ass'n v. NLRB*, 905 F. Supp. 2d 55, 60–61 (D.D.C. 2012) ("[T]he plaintiff's choice of forum is afforded great deference . . . [but] that choice is conferred less deference by the court when a plaintiff's choice of forum is not the plaintiff's home forum." (internal quotation marks omitted)). The remaining ten named plaintiffs are citizens of other countries and do not reside in this country. SAC ¶¶ 6, 8, 14, 22, 27–28, 39, 41, 49, 65, 81; *see Friends for All Children, Inc. v. Lockheed Aircraft Corp.*, 717 F.2d 602, 605 (D.C. Cir. 1983) ("The district court was mistaken

in supposing that a foreign plaintiff's choice of a United States forum is entitled to so much deference.").

Moreover, because none of the underlying facts in this case relate to the United States in any way, the plaintiffs' selection of the United States as the forum for their suit carries less force. To the extent the plaintiffs argue that requiring them to travel out of the United States is burdensome, *see* Pls.' Opp'n at 38, the majority of the named plaintiffs will be required to travel internationally regardless of whether the litigation is in the United States or Hungary. Additionally, many of the putative class members also will be required to travel regardless of the forum. Relatedly, requiring the defendants to defend themselves in the courts of another sovereign against claims brought by plaintiffs from all over the globe weighs against the plaintiffs' choice of forum.

In these circumstances, the plaintiffs' choice of forum is entitled to minimal deference. *See, e.g.*, *Fischer*, 777 F.3d at 871 (noting that plaintiff's choice of forum is given "presumption of convenience," which was "rebutted by the strength of the private and public factors" warranting dismissal); *Moscovits v. Magyar Cukor Rt*, 34 Fed. Appx. 24, 26 (2d Cir. 2002) (agreeing with the trial court that "defendants had overcome the presumption to which [plaintiff's] choice of forum was entitled" given that "'the conduct giving rise to the causes of action never left Hungary's borders'; that nearly all of the relevant evidence is located in Hungary; that all but one of the witnesses are Hungarians who are in Hungary and that many of them are nonparties who are not subject to compulsory process; that the dispute has 'minimal ties' to New York or the United States and . . . that '[i]t is highly likely that Hungarian law would apply.'").

### b. Private Factors

Where, as here, an adequate alternative forum exists, a court must next balance enumerated private interest factors to decide whether "trial in the chosen forum would be unnecessarily burdensome for the defendant or the court." *Piper Aircraft*, 454 U.S. at 255 n.23. Each of these considerations weighs in the defendants' favor.

First, regarding the relative ease of access to sources of proof, the defendants argue that "all of the relevant events alleged in the Complaint took place in Hungary," and "to the extent any records of these events exist, they are most likely archived in Hungary." Defs.' Mem. at 28; *see also id.* Ex. V, Decl. of Lázló Csösz, Chief Archivist of the Statewide Archives of the Hungarian Nat'l Archives, ¶¶ 3–6 (discussing the extensive documents in the Hungarian Archives related to "property taken from Hungarian nationals during World War II"), ECF No. 120-21; *id.* Ex. W, Decl. of Ilona Dávid, President of MÁV ¶ 7 ("As MÁV has only ever maintained and carried on business in Hungary, all documents relevant to the events that form the basis of the present litigation are located in Hungary and are overwhelmingly in the Hungarian language . . . [and] are stored as hard-copy documents."), ECF No. 120-22. Indeed, the plaintiffs themselves assert in their complaint that evidence "vital" to their claims is kept by the defendants in Hungary. SAC ¶ 208 ("Defendants have maintained in their archives, in hard-copy, facsimile and digital form, documents . . . relating to the isolation, ghettoization, enslavement and plundering of Hungarian Jewry and their deportation to the German death camps, as well as evidence of such acts and events . . . [and have] consistently denied access to these records which are vital to the proof of this case."). The plaintiffs' own expert expresses the same view that records relevant to the plaintiffs' claims are located in Hungary. *See* Hanák Decl. ¶ 39 ("I understand from scholarly works and from Hungarian scholars that there is an

abundance of records of [confiscation of the property of Hungarian Jews] in Hungarian archives.").

Furthermore, the defendants point out that these documents are likely paper records, written in Hungarian, the production of which would require the defendants to comb through the Hungarian archives to identify relevant paper documents and would then require all documents to be translated in to English before being submitted to the Court. Defs.' Mem. Ex. X, Decl. of Zsuzsanna Mikó, General Director of the National Archives of Hungary, ¶ 4 ("[T]o the extent any documents relevant to the events . . . exist in the archives, they would likely be in hard-copy in the Hungarian language."), ECF No. 120-24. "When documentary evidence is in a language other than English (and that other language is used in the alternative court), the cost of having to translate the documents (as well as trial or deposition testimony) into English if the case were retained militates in favor of dismissal." 17 MOORE'S FEDERAL PRACTICE–CIVIL § 111.74.

Second, regarding the availability of process for compelling unwilling witnesses and the cost for obtaining attendance of willing witnesses, the defendants are correct that "many witnesses with personal knowledge will be located in Hungary," that most Hungarian witnesses will likely "be elderly and may not be willing or able to travel to the United States," and that unwilling witnesses would potentially be outside the jurisdiction of this Court. Defs.' Mem. at 28–29. If the claims are brought in Hungary, however, the defendants note that Hungarian witnesses would not have to travel internationally to participate in litigation, and "unlike this Court, Hungarian courts would have the power to compel testimony and the production of documents from witnesses located in Hungary." *Id.* at 29; *see also Abelesz*, 692 F.3d at 684 (concluding, in a similar suit brought by Hungarian Jews against Hungary, that "much of the evidence and surviving witnesses are located" in Hungary). Though the parties have not

identified a comprehensive list of relevant witnesses, whether in Hungary or elsewhere, *see* Pls.'
Opp'n. at 35–37 (arguing defendants have failed to sufficiently assert the location of potential
witnesses), the plaintiffs themselves have already sought to depose at least one witness located in
Hungary who was unable to travel out of the country.

Additionally weighing in favor of the alternative forum of Hungary is the possibility that
the plaintiffs may seek to bring suit against RCH, whose dismissal from the instant case in *Simon
I* was based on the lack of personal jurisdiction.  *See Simon I*, 37 F. Supp. 3d at 444.  This
jurisdictional defect would not be present in Hungary.  *See* Defs.' Mem. at 30 n. 17 (noting that
as a company "incorporated in Hungary and headquartered in Budapest, Hungary," Hungarian
courts would have jurisdiction over RCH).

For all of these practical reasons, the private interest factors weigh strongly in favor of
dismissing this lawsuit.  The plaintiffs protest that "the emotional burden if forced to return to
Hungary" should weigh in favor of retaining the case here.  Pls.' Opp'n at 38–39; *see also id.* at
31.  These feelings about returning to Hungary are understandable, and this concern must be
weighed against the factors in the defendants' favor.  As the Seventh Circuit aptly stated, "[a]s
survivors of the effort of an earlier Hungarian government to exterminate them or their loved
ones, plaintiffs have an understandable fear and reluctance to trust a Hungarian forum to try their
claims fairly."  *Abelesz*, 692 F.3d at 684.  While acknowledging the profound nature of the
emotional weight of bringing this case in Hungary, the Court is hesitant to find that this factor
outweighs virtually every other factor weighing in favor of dismissing under *forum non
conveniens*.  While the plaintiffs' emotional distress or even trauma in returning to Hungary
should not be discounted, those difficulties are not sufficient to ignore the overwhelming weight

of applicable legal factors to hale a foreign sovereign into a U.S. court to answer for its conduct over seventy years ago.[11]

### c. Public factors

The key public interest factors, including the "'local interest in having localized controversies decided at home'" and "the possibility of holding the trial in a forum 'at home with the law that must govern the case, rather than having a court in some other forum untangle problems in conflict of laws,'" *MBI*, 616 F.3d at 576 (quoting *Gulf Oil*, 330 U.S. at 509), strongly favor dismissal of this action. Plainly, the claims at issue involve Hungarians brutally taking the property of other Hungarians in Hungary during World War II, giving, as the defendants point out, Hungary "a far stronger interest than the United States in resolving this dispute." Defs.' Mem. at 32. There simply is "no connection between the allegations of wrongdoing in the Complaint and the United States," *id.* at 31–32, although that does not mean this country has no interest in seeing justice done. In this regard, Hungary has made efforts, feeble as they may have been in the past, to provide relief to victims of the Hungarian Holocaust and continues to express strong interest in resolving disputes over its past actions. *Id.* at 33 (noting that Hungary's interests in this case are "clearly paramount").

The plaintiffs counter that "Hungary's interest, if any, is far outweighed" by the United States' "interest and involvement . . . in violations of international human rights norms and in

---

[11]     The plaintiffs' brief argument that Hungary cannot complain that the United States is an inconvenient forum because it is "is currently a plaintiff in a lawsuit filed in the U.S." misses the mark. Pls.' Opp'n at 39 n.29 (citing *European Cmty. v. RJR Nabisco, Inc*., Case. No. 1:02-cv-05771 (E.D.N.Y. filed Oct. 30, 2002)). In *European Cmty*., Hungary, along with 25 other member-states of the European Community, sued RJR Nabisco and other related defendants, all headquartered in the United States, alleging that the defendants had orchestrated violations of the Racketeer Influenced and Corrupt Organizations Act from within the United States. *See RJR Nabisco, Inc. v. European Cmty*., 136 S. Ct. 2090, 2114 (2016) ("All defendants are U.S. corporations, headquartered in the United States, charged with a pattern of racketeering activity directed and managed from the United States.") (Ginsburg, J. dissenting). No such connections exist in this case between the United States and the conduct giving rise to the plaintiffs' claims. Moreover, the factors articulated in *Piper Aircraft* and *Gulf Oil* suggest that the analysis is specific to an individual case: the fact that Hungary is a plaintiff in the United States for one particular action does not mean that it forfeits a *forum non conveniens* claim in a separate case.

Holocaust reparation matters." Pls.' Opp'n at 40–41. Given that four of the fourteen named plaintiffs are now U.S. citizens, "and because public policy favors a domestic forum for U.S. citizens to redress wrongs," the plaintiffs discount "Hungary's interest in defending against alleged international human rights violations." *Id.*

Hungary's interest in this case goes beyond merely defending against potential liability for its conduct during World War II. Hungary has an interest in every part of the litigation, and has a moral interest, if not obligation, to hear the plaintiffs' claims and provide them appropriate relief. By contrast, binding Supreme Court precedent cautions federal courts against exercising broad jurisdiction over foreign sovereigns. *See Pimentel*, 553 U.S. at 866 (noting that where "claims . . . arise from events of historical and political significance . . . [t]here is a comity interest in allowing a foreign state to use its own courts for a dispute if it has a right to do so").

Invoking another of the *Gulf Oil* public factors, the defendants next note that Hungarian law would likely apply to the plaintiffs' claims, requiring this Court to interpret and apply Hungarian law to the merits of this case. Defs.' Mem. at 30. Regardless of whether a court ultimately is required to apply the law of a foreign country, the mere issue of "untangl[ing] problems in conflict of laws," supports dismissing this case in favor of the foreign forum." *Gulf Oil*, 330 U.S. at 509; *see also Piper Aircraft*, 454 U.S. at 260 ("[T]he need to apply foreign law point[s] toward dismissal."). At least one court, considering similar claims, held that it was required "to apply Hungarian law to a host of delicate issues, especially those concerning remedies." *Fischer*, 777 F.3d at 871. Indeed, in light of the parties' disputes about the language of the Basic Law, this Court could be required not only to interpret Hungarian law governing property claims, but Hungarian constitutional law as well.

Finally, the defendants note that this case "is not a typical, garden variety lawsuit—it raises significant substantive and procedural issues and challenges that could prove to be a substantial drain on the Court's resources."  Defs.' Mem. at 33 (citing *MBI Grp., Inc. v. Credit Foncier du Cameroun*, 558 F. Supp. 2d 21, 34 (D.D.C. 2008) ("The administrative difficulties of trying this case in a forum thousands of miles away from the majority of witnesses and the evidence are obvious." (internal quotations and citations omitted))).  The plaintiffs counter that "[t]here is no evidence that Hungarian courts are less congested than this Court," and assert that the defendants "fail to specify why this factor weighs in their favor."  Pls.' Opp'n at 40.  Given the size of the class the plaintiffs seek to certify, the age of the claims, relevant witnesses and documents, and the location, language, and condition of much of the evidence in this case, the administrative burden posed on this Court is not insignificant.  Those burdens would be somewhat lessened on the Hungarian courts, based on Hungary's status as the location where all of the conduct giving rise to this litigation occurred, with familiarity with the language and proximity to archived documents and available witnesses.

Each of the relevant public interest factors weigh strongly in favor of Hungary as the preferred location for this litigation.

*** 

Evaluation of all of the *Gulf Oil* factors weighs uniformly and heavily in favor of Hungary as the more appropriate forum for this lawsuit. Accordingly, dismissal under the *forum non conveniens* doctrine is warranted.

### III. CONCLUSION

The D.C. Circuit authorized this Court on remand to consider the doctrines of prudential exhaustion, which the Seventh Circuit applied to a case on similar facts, along with the doctrine of *forum non conveniens*, if either or both of those grounds for dismissal were raised by the

defendants.  Both doctrines apply here and warrant dismissal of this action without prejudice.

Accordingly, the defendants' motion to dismiss is granted.

An appropriate Order accompanies this Memorandum Opinion.

**Date:** September 30, 2017

_____
BERYL A. HOWELL
Chief Judge