# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ROSALIE SIMON, *et al.*,
*Individually, for themselves and for all others*
*similarly situated*,

        Plaintiffs,

        v.

REPUBLIC OF HUNGARY, *et al.*,

        Defendants.

Civil Action No. 10-1770 (BAH)

Chief Judge Beryl A. Howell

## MEMORANDUM OPINION

The named plaintiffs in this proposed class action include four American citizens (Rosalie Simon, Charlotte Weiss, Rose Miller, and Ella Feuerstein Schlanger), two Canadian citizens (Helen Herman and Helena Weksberg), seven Israeli citizens (Tzvi Zelikovitch, Magda Kopolovich Bar-Or, Zehava (Olga) Friedman, Yitzhak Pressburger, Alexander Speiser, Ze-ev Tibi Ram, and Moshe Perel), and one Australian citizen (Vera Deutsch Danos) (collectively, "the plaintiffs"), who are fourteen of the approximately 825,000 Hungarian Jews who were subjected to the atrocities and horrors of the Holocaust at the hands of the Hungarian government between 1941 and 1945. Second Am. Compl. ("SAC") ¶¶ 5–9, 14, 22, 28, 39, 41, 49, 65, 73, 81, 131, ECF No. 118. The plaintiffs instituted this suit against the Republic of Hungary ("Hungary") and the Hungarian national railway, Magyar Államvasutak Zrt. ("MÁV"), (collectively, "the defendants") seeking restitution for property that was seized from them as part of Hungary's

broader effort to eradicate the Jewish people and then commingled in the state's public fisc. SAC ¶¶ 173–215.[1]

After the D.C. Circuit twice rejected several bases asserted by defendants for dismissal of the plaintiffs' claims, the defendants now for the third time seek dismissal of the plaintiffs' Second Amended Complaint for lack of subject matter jurisdiction, pursuant to Federal Rule of Civil Procedure 12(b)(1), on grounds of sovereign immunity not exempted under the Foreign Sovereign Immunity Act ("FSIA"), 28 U.S.C. § 1602 *et seq.  See* Defs.' Mot. to Dismiss the Second Amended Class Action Complaint Because of Their Sovereign Immunity ("Defs.' Mot."), ECF No. 138.  The plaintiffs counter that the requirements of the FSIA's expropriation exception are met, and jurisdiction therefore may be exercised.  *See* Pls.' Mem. Opp'n Defs.' Third Mot. Dismiss ("Pls.' Opp'n"), ECF No. 148.  For the reasons explained below, the plaintiffs have the better arguments under binding precedent of the D.C. Circuit, requiring denial of the defendants' motion to dismiss.

## I.     BACKGROUND

The factual background of this case has been extensively reviewed in prior decisions of this Court and the D.C. Circuit.  *See generally Simon v. Republic of Hungary*, 37 F. Supp. 3d 381, 385–95 (D.D.C. 2014), *aff'd in part, rev'd in part*, 812 F.3d 127 (D.C. Cir. 2016); *see also Simon v. Republic of Hungary* ("*Simon I*"), 812 F.3d 127, 132–34 (D.C. Cir. 2016); *Simon v. Republic of Hungary* ("*Simon II*"), 911 F.3d 1172, 1175–76 (D.C. Cir. 2018).  Consequently, that background, as supplemented in the Second Amended Complaint, will only be briefly summarized below, followed by review of the relevant procedural history.

---

[1]     The plaintiffs' initial complaint named a third defendant, Rail Cargo Hungaria Zrt. ("RCH"), which is a freight rail company that is the successor-in-interest to MÁV Cargo Árufuvarozási Zrt., f/k/a MÁV Cargo Zrt., a former division of MÁV.  RCH was dismissed for lack of personal jurisdiction, *see Simon v. Republic of Hungary*, 37 F. Supp. 3d 381, 444 (D.D.C. 2014), a ruling not appealed by the plaintiffs.

## A.  Factual Background

In 1944, "the Nazis and Hungary, knowing they had lost [the war], raced to complete their eradication of the Jews before the Axis surrendered."  SAC ¶ 3.  As part of their greater plan to eradicate the Jewish people, the defendants stripped Hungarian Jews of their possessions, including cash, jewelry, heirlooms, art, valuable collectibles, and gold and silver, loaded them onto trains, and transported them in squalid conditions to concentration camps where they were either murdered or forced to work as slave laborers.  *Id.* ¶¶ 17, 20, 23–26, 32–34, 44–48, 52, 57, 69–71, 76, 81.  "In less than two months . . . over 430,000 Hungarian Jews were deported, mostly to Auschwitz, in 147 trains."  *Id.* ¶ 120; *id*., Ex. B (list of deportation trains in 1944, along with "DATES, ORIGIN OF TRANSPORTS AND NUMBER OF DEPORTEES").  The "vast majority" of the Hungarian Jews sent "to the killing fields and death camps of Nazi Germany-occupied Poland and the Ukraine" died.  *Id.* ¶ 3.  "The overall loss of Hungarian Jewry during the Second World War, excluding those who fled abroad, was 564,507."  *Id.* ¶ 131.

After the armistice agreement ended the hostilities of World War II, *id.* ¶ 137, Hungary signed the "Paris Peace Treaty of February 10, 1947" ("1947 Treaty") that incorporated "a number of provisions relating to the restoration of confiscated property," with promises to undertake the restoration of, and fair compensation for, property, legal rights or interests confiscated from persons "on account of the racial origin or religion of such persons," *id.* ¶ 138 (quoting 1947 Treaty, 61 Stat. 2065, 41 U.N.T.S. 135, art. 27, para. 1).  Article 27 and related provisions "were not self-executing (they needed appropriate municipal legislation and enforcement to prevail); and they did not provide for sanction in case of non-compliance, other than the implied possible litigation before an international tribunal."  *Id*. (quoting 2 RANDOLPH L. BRAHAM, THE POLITICS OF GENOCIDE: THE HOLOCAUST IN HUNGARY, 1308–09 (rev. ed. 1994)).

The plaintiffs acknowledge that the Hungarian government "implement[ed] an array of legislative enactments and remedial statutes," but Hungarian Jews "saw no tangible results with respect to restitution and indemnification" for their seized property. *Id.* Moreover, "[w]ith the communist party in power in Hungary" after World War II, "'the issue of compensation or restitution was squashed,'" and to the extent the Hungarian government had set aside funds for victims of the Holocaust, "the funds were rarely used for their intended purpose and they were frequently raided by the Communists for financing their own political projects." *Id.* ¶¶ 141–42 (quoting 2 BRAHAM at 1309). In 1992, two years after "the downfall of the Communist regime" in Hungary, the Hungarian government adopted at least two laws to provide remedies to Hungarian Jews victimized in the Holocaust: one of these laws "provid[ed] compensation for material losses incurred between May 1, 1939 and June 8, 1949," and the other "provid[ed] compensation for those who, for political reasons, were illegally deprived of their lives or liberty between March 11, 1939 and October 23, 1989," but plaintiffs claim that the remedies provided under those programs are "paltry and wholly inadequate." *Id.* ¶ 143.

In sum, the plaintiffs claim never to have been properly compensated for the personal property seized from them by the defendants as the plaintiffs were being deported. *Id.* ¶¶ 83–84. The plaintiffs believe that the defendants "liquidated [this] stolen property, mixed the resulting funds with their general revenues, and devoted the proceeds to funding various governmental and commercial operations." *Id.* ¶ 97. Thus, the plaintiffs claim that the "stolen property or property exchanged for such stolen property is owned and operated by Hungary and MÁV," some of which property "is present in the United States in connection with commercial activity carried on in the United States by Hungary," *id.* ¶ 98, including, for example, "fees and payments, offices,

furniture, furnishings, bank accounts, artwork, stock and bond certificates, securities held in 'street name' and airplanes," *id*. ¶ 101.

Sixty-five years after the end of World War II and twenty years after the fall of the Hungarian communist regime, the plaintiffs filed the instant action against Hungary and MÁV, seeking, *inter alia*, restitution for the possessions seized from them and their families during the Holocaust, and to certify a class "consist[ing] of [1] all surviving Jewish victims of the Holocaust" who were residents of Hungary between September 1, 1939 and May 8, 1945, and "[2] the heirs (whether American citizens or aliens) and open estates . . . of the deceased Jewish victims of the Holocaust, whether presently American citizens or aliens," who were residents of Hungary between September 1, 1939 and May 8, 1945. *Id.* ¶ 153. According to the plaintiffs, this class would consist of at least "5,000 survivors" and "countless heirs and estates" of the "approximately 825,000 Jews in Hungary" who were victims of the atrocities committed by the defendants. *Id.* ¶¶ 131, 154.

The plaintiffs' Second Amended Complaint asserts, in ten counts, claims for conversion (Count I), unjust enrichment (Count II), breach of fiduciary and special duties imposed on common carriers (Count III), recklessness and negligence (Counts IV, V), civil conspiracy with Nazi Germany to commit tortious acts (Count VI), aiding and abetting (Count VII), restitution (Count VIII), accounting (Count IX), a demand for a declaratory judgment that plaintiffs and class members are entitled to inspect and copy certain documents, and for injunctive relief enjoining the defendants from tampering with or destroying such documents (Count X; Prayer For Relief, ¶¶ 5, 6). *See* SAC ¶¶ 173–215. The plaintiffs also assert that subject matter jurisdiction may properly be exercised over their claims, and that the defendants are not immune from suit, pursuant to the FSIA's expropriation exception, 28 U.S.C. § 1605(a)(3), SAC ¶¶ 86–

92, which exception permits suit against a foreign sovereign or its agencies or instrumentalities in United States courts to vindicate "rights in property taken in violation of international law" when an adequate commercial nexus is present between the United States and the defendant, 28 U.S.C. § 1605(a)(3).

### B.    Procedural History

As noted, this is the third motion to dismiss to be resolved in this decade-long case.[2]  The defendants' first motion to dismiss argued that the defendants were entitled to sovereign immunity because neither the FSIA's expropriation exception nor commercial activity exception applied to confer jurisdiction.  *See* Defs.' Mem. Pts. Auth. Supp. Mot. Dismiss, ECF No. 22-1. In a 98-page opinion, Hungary and MÁV were found to be immune from suit under the FSIA's treaty exception, *Simon*, 37 F. Supp. 3d at 424, because the 1947 Treaty, "trigger[ed] the FSIA's treaty exception to deprive this Court of subject matter jurisdiction over the plaintiffs' claims," *id*. at 407.  In particular, the 1947 Treaty addressed Hungary's disposition of "all property" taken from Holocaust victims, directed how Hungary was to distribute all expropriated property at the end of the war, and provided that "any dispute concerning the interpretation or execution of the treaty" was subject to resolution exclusively through the mechanisms described in the Treaty.  *Id.* at 415–16 (quoting 1947 Treaty, art. 40(1)).  Based on those treaty provisions, which were viewed as defining the contours of Hungary's waiver of its sovereign immunity for claims for

---

[2]    Initially filed in 2010, this case was reassigned to the undersigned Judge on January 20, 2011.  Briefing on the defendants' first motion to dismiss was not completed until January 17, 2014, following supplementary briefing requested by the parties, including former defendant Rail Cargo Hungaria Zrt., as well as the Republic of Austria as an interested party, and the Court.  While this Court's decision granting the defendants' first motion was issued on May 9, 2014, *see* Mem. Op. (May 9, 2014), ECF No. 112, the case was then on appeal until April 1, 2016, *see* Mandate of the United States Court of Appeals, ECF No. 116. Following the first appeal, the defendant's second motion to dismiss became ripe on July 31, 2017, and was resolved on September 30, 2017.  *See* Mem. Op. (Sept. 30, 2017), ECF No. 132.  The case returned to the D.C. Circuit where it remained until March 21, 2019.  *See* Mandate of the United States Court of Appeals, ECF No. 135.  As stated, the defendants' third motion to dismiss became ripe on January 7, 2020.

property seized during the Holocaust and delineating the exclusive legal regime set up to resolve the plaintiffs' property claims against Hungary, this Court held that the Treaty precluded review of those claims under a FSIA exception and declined to reach the parties' other arguments concerning the application of the FSIA's "expropriation exception" or prudential reasons to dismiss the case, such as *forum non conveniens*.  *Id.* at 397, 418 n.28.

### 1. *Simon I*

On appeal, the D.C. Circuit affirmed in part and reversed in part.  In particular, the Circuit rejected application of the treaty exception, *Simon I*, 812 F.3d at 135, finding that the 1947 Treaty set out only a non-exclusive mechanism for the plaintiffs to obtain compensation, *id*. at 137, and, thus, did not conflict with the FSIA such that "the FSIA's treaty exception does not foreclose jurisdiction over the plaintiffs' claims," *id.* at 140 ("we hold that Article 27 secures one means by which Hungarian victims can seek recovery against Hungary for their wartime property losses, but not to the exclusion of other available remedies.").

The Circuit then considered whether the expropriation exception provides a basis for waiver of the defendants' sovereign immunity.  *Id.*  At the outset of this discussion, the Circuit explained "the standards by which to assess whether the plaintiffs' claims fall within the terms of § 1605(a)(3)," *id.*, eschewing the "exceptionally low bar of non-frivolousness," *id.* at 141 (internal citation omitted) that was applied in this circuit "[w]hen the jurisdictional and merits inquiries fully overlap," *id.*, but was subsequently rejected altogether by the Supreme Court in *Bolivarian Republic of Venezuela v. Helmerich & Payne Intern. Drilling Co.*, 137 S. Ct. 1312 (2017).  Instead, since the plaintiffs "seek recovery based on garden-variety common-law causes of action" and "the jurisdictional and merits inquiries do not overlap," the Circuit "ask[ed] for more than merely a non-frivolous argument."  *Simon I*, 812 F.3d at 141 (citing *Agudas Chasidei*

*Chabad v. Russian Fed'n*, 528 F.3d 934, 940 (2008) (instructing that plaintiff's burden, "on a challenge by the defendant," "[f]or purely factual matters under the FSIA…is only a burden of production; the burden of persuasion rests with the foreign sovereign claiming immunity, which must establish the absence of the factual basis by a preponderance of the evidence.")).

In applying the expropriation exception to the plaintiff's First Amended Complaint, the D.C. Circuit affirmed dismissal of the plaintiffs' non-property claims "because [such claims] do not come within the FSIA's expropriation exception," and no other FSIA exception provided jurisdiction over the claims. *Id.* at 151. By contrast, the plaintiffs' claims that "directly implicate[d]" their property rights were "claims 'in which rights in property taken in violation of international law'" remained at issue. *Id.* at 140 (quoting 28 U.S.C. § 1605(a)(3)). Notably for resolution of the pending motion to dismiss, the Circuit explained that "[c]ertain of the plaintiffs' claims," *id.* at 142, "place 'rights in property … in issue' within the meaning of the expropriation exception," *id.* (quoting 28 U.S.C. § 1605(a)(3)), such as the plaintiff's conversion, unjust enrichment, and restitution claims, but left "it to the district court on remand to determine precisely which of the plaintiffs' claims directly implicat[e] property interests or rights to possession" to satisfy the "rights in property … in issue" requirement of § 1605(a)(3), *id.*

The Circuit recognized that a sovereign's expropriation of its own nationals' property was not a violation of international law under the "so-called 'domestic takings rule,'" *id.* at 140–41, but nevertheless, the plaintiffs' claims were construed as not asserting a "basic expropriation claim" subject to the domestic takings rule, *id.* at 144. Reasoning that "[e]xpropriations undertaken for the purpose of bringing about a protected group's physical destruction qualify as genocide," *id.* at 143, the Circuit saw "the expropriations as *themselves genocide*" committed "'in violation of international law,'" *id.* at 142–43 (emphasis in original), in reliance on "[t]he

legal definition of genocide" set out in the Convention on the Prevention and Punishment of the

Crime of Genocide (Genocide Convention), art. 2, Dec. 9, 1948, 78 U.N.T.S. 277, and other

international treaties. *See also id.* at 144 ("[T]he complaint describes takings of property that are

*themselves* genocide within the legal definition of the term.").[3]

The Circuit then turned to the "commercial-activity nexus requirement" of the

expropriation exception, which, on a "general level . . . require[s]: (i) that the defendants possess

the expropriated property or proceeds thereof; and (ii) that the defendants participate in some

kind of commercial activity in the United States." *Id.* at 146. The plaintiffs' allegations "that the

Hungarian defendants liquidated the stolen property, mixed the resulting funds with their general

revenues, and devoted the proceeds to funding various governmental and commercial

operations" were found to "raise a 'plausible inference' that the defendants retain the [plaintiffs']

property or proceeds thereof," and, thus, the Circuit rejected the defendants' argument that such

allegations were insufficient as a matter of law. *Id.* at 147. The Circuit cautioned, however, that

the plaintiffs ultimately "may or may not be able to prove the point," *id.*, since its holding was

limited to whether the plaintiffs' allegations were sufficient as a matter of law. Emphasizing the

---

[3]     Commentators have noted that the theory of genocidal expropriation articulated in *Simon I* represents a significant expansion of the expropriation exception's scope that raises concerns. *See, e.g.*, RESTATEMENT (FOURTH) OF FOREIGN RELATIONS LAW § 455 (2018) ("By eliminating the 'domestic takings' rule and permitting claims to proceed on the basis of allegations that the takings occurred in the context of egregious violations of international law, this line of decisions appears to expand the scope of § 1605(a)(3) well beyond the original intent of the Congress, potentially opening courts in the United States to a wide range of property-related claims arising out of foreign internal (as well as international) conflicts characterized by widespread human-rights violations."); Vivian Grosswald Curran, *The Foreign Sovereign Immunities Act's Evolving Genocide Exception*, 23 UCLA J. Int'l L. & Foreign Aff. 46, 68 (2019) (citing "judicial developments of a genocide category in the context of property expropriation," as in *Simon I*, and observing "[h]owever well-intentioned the courts may have been in developing the new FSIA subcategory, which was nowhere to be found within the statute itself, it would be particularly regrettable for US courts to set a precedent that trivializes the concept of genocide, a concept and claim already fraught with politicization on the world stage."); Francoise N. Djoukeng, Comment, *Genocidal Takings and the FSIA: Jurisdictional Limitations*, 106 Geo. L.J. 1883, 1886 (2018) ("A reading of 'genocidal takings' into the expropriation exception raises red flags because it signals that U.S. courts are, essentially, international human rights courts—an interpretation that overrides congressional and presidential prerogatives and jeopardizes the United States' diplomatic relations.").

standard of review, the Circuit echoed the shifting burdens set out in *Chabad*, stating that "[u]pon any factual challenge by the [] defendants—e.g., concerning whether the defendants in fact still possess the property or proceeds thereof—the plaintiffs will bear the burden of production, and the defendants will bear the burden of persuasion to establish the absence of the factual basis by a preponderance of the evidence." *Id.* (citing *Chabad*, 528 F.3d at 940). Based on the then-record regarding the commercial activity nexus requirement, the Circuit held that "[b]ecause defendants make no attempt to argue that the rail company fails to 'engage[] in a commercial activity in the United States,' the nexus requirement is satisfied as to MÁV," *id.* at 147–48, but that "the complaint's allegations about Hungary's commercial activity fail to demonstrate satisfaction of §1605(a)(3)'s nexus requirement" because the plaintiffs "put forward only [] bare, conclusory assertion[s]" to support their claim, consequently affirming the dismissal of the claims against Hungary, *id.* at 148.

This Court was left to consider on remand any remaining issues raised by defendants' invocation of sovereign immunity "should the defendants assert" them, such as "whether, as a matter of international comity, the court should decline to exercise jurisdiction unless and until the plaintiffs exhaust available Hungarian remedies," *id.* at 149, and "any other arguments that [this Court] has yet to reach and that are unaddressed [by the Circuit], such as the defendants' *forum non conveniens* arguments," *id.* at 151. In this vein, the Circuit expressly pointed out that the Seventh Circuit had found a comity-based "prudential argument to be persuasive in closely similar circumstances." *Id.* at 149 (citing *Fischer v. Magyar Allamvasutak Zrt.*, 777 F.3d 847, 859–66 (7th Cir. 2015)).

### 2.    Remand From *Simon I*

On remand, the plaintiffs "amended their complaint to allege specific facts regarding Hungary's ongoing commercial activity in the United States, including, among other things, '[t]he promotion of Hungarian businesses through trading houses,' the promotion of Hungary as a destination for United States tourists, '[t]he promotion of American investment in Hungarian business[,]' '[t]he acquisition by Hungary of military equipment,' Hungary's use of the United States' capital and debt markets to secure financing, and Hungary's acceptance of federal grants and loans from the United States."  *Simon II*, 911 F.3d at 1179; *see also* SAC ¶ 101.

The defendants moved to dismiss the plaintiffs' Second Amended Complaint, *see* Defs.' Mot. to Dismiss the Second Amended Class Action Complaint, ECF No. 120, which motion was again granted, *see Simon v. Republic of Hungary*, 277 F. Supp. 3d 42 (D.D.C. 2017).  Without ruling on "whether the Survivors had adequately pled facts supporting application of the FSIA's expropriation exception," *Simon II*, 911 F.3d at 1179, this Court addressed the two prudential grounds highlighted by the D.C. Circuit, holding that the doctrines of prudential exhaustion and *forum non conveniens* required that the plaintiffs' claims be litigated in Hungary, *Simon*, 277 F. Supp. 3d. at 53; *see also Fischer*, 777 F.3d at 852–58.

### 3.    *Simon II*

On appeal, a divided panel of the D.C. Circuit reversed and remanded.  *Simon II*, 911 F.3d at 1190.  The Circuit held, first, that principles of international comity should not be construed in this case to undermine the jurisdiction-conferring exceptions enumerated in the FSIA, *id*. at 1180–81, and second, that the doctrine of *forum non conveniens* did not apply because the defendants had failed to meet their "heavy burden of persuasion" in establishing

Hungary as a preferred forum over that chosen by the plaintiffs, the United States, *id*. at 1183.[4]

Relying on *Philipp v. Federal Republic of Germany*, 894 F.3d 406 (D.C. Cir. 2018), which post-dated this Court's ruling on remand, the Circuit implicitly rejected the Seventh Circuit's rationale in *Fischer* and found "legal errors that materially distorted [this Court's] analysis as to amount to a clear abuse of discretion." *Simon II*, 911 F.3d at 1182; *but see id.* at 1190 (Katsas, J., dissenting) ("The district court concluded that this foreign-cubed case—involving wrongs committed by Hungarians against Hungarians in Hungary—should be litigated in Hungary. In so doing, the court permissibly applied the settled law of *forum non conveniens*.").[5]

### 4. Remand From *Simon II*

On remand once again, the defendants filed the instant motion to dismiss—their third—in May 2019. Returning to the terrain of *Simon I*, the defendants argue that they are immune from suit because the plaintiffs cannot meet the commercial nexus requirement of the FSIA's expropriation exception. *See* Defs.' Mem. Supp. Mot. Dismiss ("Defs.' Mem."), at 1, ECF No. 138-1. Following the filing of the defendants' motion, the parties agreed to a four-month period of "discovery concerning the averments in the declarations in support of" the defendants' motion to dismiss. Joint Stipulation and Proposed Scheduling Order, ECF No. 139. The briefing

---

[4]     Both the panel in *Simon I* and majority panel in *Simon II* expressed distrust of Hungary's willingness to "pay [] fair compensation" under the 1947 Treaty or through adjudication of the plaintiffs' claims in Hungarian courts, *Simon I*, 812 F.3d at 153 (Henderson, J., concurring) (stating Hungary's "intent or ability to effectuate Article 27 of the 1947 Peace Treaty" "defies reality"); *see also Simon II*, 911 F.3d at 1187 (observing "Hungary has had over seventy years to vindicate its interests in addressing its role in the Holocaust."), but without acknowledging the fact that Hungary has taken the step of waiving, by constitutional amendment, statute of limitations defenses to claims related to state crimes committed against Hungarian citizens during the Second World War, *see Simon*, 277 F. Supp. 3d at 59; *Fischer*, 777 F.3d at 862; *Abelesz v. Magyar Nemzeti Bank*, 692 F.3d 661, 682 n.11 (7th Cir. 2012).

[5]     The defendants have sought review by the Supreme Court of the D.C. Circuit's 2018 decision, which is currently under consideration along with a related *certiori* petition filed in *Philipp v. Republic of Germany*. *See* Petition for Writ of Certiorari (May 16, 2019), *Republic of Hungary, et al. v. Simon et al.*, Supreme Court Docket No. 18-1447; Petition for Writ of Certiorari (Sep. 16, 2019), *Federal Republic of Germany, et al. v. Philipp, et al.*, Supreme Court Docket No. 19-351. This Court elicited the parties' views on whether these proceedings should be stayed pending resolution of the pending petitions, *see* Min. Order (Jan. 6, 2020), and while the defendants favored a stay, the plaintiffs did not, *see* Joint Status Report, ECF No. 153; Pls.' Suppl. Status Report, ECF No. 154.

schedule proposed by the parties was adopted in a scheduling order, *see* Min. Order (June 7,

2019, and briefing on the defendants' pending motion was completed on January 7, 2020, at

which point the pending motion became ripe for review.[6]

## II.    LEGAL STANDARD

"'Federal courts are courts of limited jurisdiction,' *Gunn v. Minton*, 568 U.S. 251, 256

(2013) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)), and

"have only the power that is authorized by Article III of the Constitution and the statutes enacted

by Congress pursuant thereto," *Johnson v. Comm'n on Presidential Debates*, 869 F.3d 976, 980

(D.C. Cir. 2017) (quoting *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986)).  To

survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), the plaintiff thus

"bears the burden of invoking the court's subject matter jurisdiction." *Arpaio v. Obama*, 797

F.3d 11, 19 (D.C. Cir. 2015), *cert. denied*, 136 S. Ct. 900 (2016), (citing *Lujan v. Defenders of

Wildlife*, 504 U.S. 555, 561 (1992)).

When a jurisdictional skirmish "present[s] a dispute over the factual basis of the court's

subject matter jurisdiction … the court must go beyond the pleadings and resolve" any dispute

necessary to the disposition of the motion to dismiss.  *Feldman v. F.D.I.C.*, 879 F.3d 347, 351

(D.C. Cir. 2018) (quoting *Phoenix Consulting v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir.

2000)).  In such situations, the "court may properly consider allegations in the complaint and

evidentiary material in the record," affording the plaintiff "the benefit of all reasonable

inferences."  *Id.*; *see also Am. Freedom Law Ctr. v. Obama*, 821 F.3d 44, 49 (D.C. Cir. 2016)

---

[6]    Defendants submitted their reply brief on December 4, 2019, *see* Defs.' Reply Pls.' Opp'n Mot. to Dismiss, ECF No. 149, prompting the plaintiffs' motion to strike footnote 7 in the defendants' reply, *see* Pls.' Mot. to Strike Footnote 7 From Defs.' Reply (ECF 149) in Support of Their Third Mot. to Dismiss, ECF No. 150.  Briefing on the plaintiffs' motion to strike was completed on January 7, 2020.  *See* Pls.' Reply to Defs.' Opp'n to Mot. to Strike, ECF No. 152.  The plaintiffs' motion to strike footnote 7 from the defendants' reply is denied.  To the extent the plaintiffs believed the targeted footnote misrepresented their position, plaintiffs have sufficiently clarified it and, in any event, this challenged footnote has no bearing on resolution of the pending motion.

("In considering a motion to dismiss for lack of subject matter jurisdiction … we 'may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction.'" (quoting *Jerome Stevens Pharm., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005))). Absent "evidentiary offering[s]," *Feldman*, 879 F.3d at 351, however, courts must seek jurisdictional assurance by accepting as true all undisputed "factual allegations in the complaint and contru[ing] the complaint liberally," and again "granting plaintiff the benefit of all inferences that can be derived from the facts alleged." *Am. Nat'l Ins. Co. v. F.D.I.C.*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (internal quotation marks omitted).

The FSIA "is a 'comprehensive statute containing a set of legal standards governing claims of immunity in every civil action against a foreign state or its political subdivisions, agencies, or instrumentalities.'" *Simon II*, 911 F.3d at 1177 (quoting *Republic of Austria v. Altmann*, 541 U.S. 677, 691 (2004)). The FSIA "provides, with specified exceptions, that a 'foreign state shall be immune from the jurisdiction of the courts of the United States…" *Helmerich & Payne*, 137 S. Ct. at 1316 (quoting 28 U.S.C. § 1604). The FSIA's expropriation exception, 28 U.S.C. § 1605(a)(3), "waives foreign sovereign immunity in cases asserting that 'rights in property [were] taken in violation of international law' if 'that property or any property exchanged for such property' either (i) 'is present in the United States in connection with a commercial activity carried on in the United States by the foreign state,' or (ii) 'is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States[.]'" *Simon II*, 911 F.3d at 1177 (alterations in original) (quoting 28 U.S.C. § 1605(a)(3)); *see also Helmerich & Payne*, 137 S. Ct. at 1316.

## III. DISCUSSION

The defendants posit that this case should be dismissed because the plaintiffs' claims do not meet the requirements of the FSIA's expropriation exception (or of any of the statute's other enumerated exceptions), leaving the FSIA's general grant of immunity intact to shield them from further litigation here. *See* Defs.' Mem. at 1. The FSIA's expropriation exception contains three separate requirements: "(i) the claim must be one in which 'rights in property' are 'in issue;' (ii) the property in question must have been 'taken in violation of international law'; and (iii) one of two commercial-activity nexuses with the United States must be satisfied." *Simon I*, 812 F.3d at 140 (quoting 28 U.S.C. § 1605(a)(3)). As *Simon I* made clear, as discussed further below, "[t]he nexus requirement differs somewhat for claims against the foreign state itself (*e.g.*, Hungary) as compared with claims against an agency or instrumentality of the foreign state (*e.g.*, MÁV)." *Simon I*, 812 F.3d at 146.

*Simon I* definitively ruled that the claims in this case involve "property taken in violation of international law," meeting the second prong of the expropriation exception, since "[t]he alleged takings of property in this case amounted to the commission of genocide, and genocide violates international law." *Simon I*, 812 F.3d at 142. As to the first prong, the Circuit affirmed this Court's dismissal of the plaintiffs' non-property-based claims, including wrongful death and torture, *id.* at 141, but described several of the plaintiffs' other claims as "plac[ing] 'rights in property … in issue' within the meaning of the expropriation exception," *id.* at 142. Citing the plaintiffs' conversion, unjust enrichment, and restitution claims as examples, *see id.*, the Circuit remanded this case "to determine precisely which of the plaintiffs' claims directly implicat[e] property interests or rights to possession … thus satisfying the 'rights in property … in issue' requirement of § 1605(a)(3)." *Id.* (internal quotation marks and citation omitted).

Thus, two separate questions must be addressed: first, which of the plaintiffs' claims place rights in property in issue; and second, whether the commercial nexus requirement is met as to each defendant, Hungary and MÁV. These questions are examined in turn.

## A.    Rights in Property

"FSIA immunity determinations [are made] on a claim-by-claim basis." *Simon I*, 812 F.3d at 141. Thus, each of the ten separate claims asserted in the Second Amended Complaint, *see* SAC ¶¶ 173–215, must be examined to ensure that each places "rights in property … in issue" to satisfy the first prong of the FSIA's expropriation requirement and withstand dismissal. *Simon I*, 812 F.3d at 142. Despite the Circuit's remand for examination of each claim, no party addressed whether each claim directly implicates a property interest, which amounts to an obvious concession by the defendants. Indeed, by contrast to the plaintiffs' earlier complaints, the Second Amended Complaint alleges in each claim an injury to the plaintiffs' property interests under multiple equitable and tort claims.

Count I (conversion) asserts that the defendants unlawfully took "personal property" from the plaintiffs, SAC ¶ 174, as does Count II (unjust enrichment), *id*. ¶ 179. In Count VIII (restitution), plaintiffs similarly allege that their "personal property was taken" and that the defendants "wrongfully used and profited from that property." *Id*. ¶ 201. Count IX (accounting), meanwhile, alleges that plaintiffs' property was "forcibly taken from them, against their will and without just payment by Defendants," and demands "an accounting of [the plaintiffs'] stolen property, and the profits earned thereby by Defendants." *Id*. ¶¶ 205, 206. These counts place "rights in property … in issue" within the meaning of the expropriation exception. *See Simon I*, 812 F.3d at 142.

Likewise, the plaintiffs' claims in Counts III (breach of fiduciary and special duties imposed on common carriers), IV (recklessness), and V (negligence), are crafted to assert not

just personal injury but also a loss of property. Count III, for example, states that "MÁV, as a common carrier, owed a fiduciary duty – a special duty of care – to Plaintiffs," *id*. ¶ 183, and that "MÁV breached that duty by confiscating Plaintiffs' possessions before and during their deportations," *id*. ¶ 184. Count IV similarly asserts that the defendants' recklessness "result[ed] in the confiscation of Plaintiffs' property," *id*. ¶ 187, while Count V states that the defendants' negligence "result[ed] in the confiscation of Plaintiffs' property," *id*. ¶ 189. Thus, these claims "directly implicat[e] property interests or rights to possession," as required to confer jurisdiction under the expropriation exception. *Simon I*, 812 F.3d at 142 (internal quotation marks omitted).[7]

Count VI (civil conspiracy with Nazi Germany to commit tortious acts) similarly alleges property destruction and loss, in the course of genocidal violence. Count VI charges that the defendants took part in a conspiracy with Nazi officials after the German occupation of Hungary to deport Hungarian Jews "to serve the Nazi war machine" and as part of the "'Final Solution,' *viz.*, the mass murder and eradication of Hungarian Jewry." SAC ¶ 191. This conspiracy allegedly enabled the defendants to "steal and convert Plaintiffs' property, and unjustly enrich themselves at Plaintiffs' expense." *Id*. ¶ 194. As such, Count VI also implicates rights in property sufficient to survive dismissal.

Count VII (aiding and abetting) charges the defendants with "assist[ing] and encourag[ing]" each other to engage in "the conversion of Plaintiffs' personal property." *Id*. ¶ 198. Like Count I, then, Count VII directly implicates rights in property and is not dismissed.

---

[7]    In *Philipp v. Federal Republic of Germany*, 248 F. Supp. 3d 59, 69 (D.D.C. 2017), *aff'd*, 894 F.3d 406 (D.C. Cir. 2018), the district court dismissed analogous tort claims—fraud in the inducement, breach of the covenant of good faith and fair dealing, civil conspiracy, and tortious interference—because those claims did not "directly implicate property interests or rights to possession of property," and the D.C. Circuit affirmed. Unlike here, however, the *Philipp* defendants argued that the claims in question were not property claims, and the plaintiffs were deemed to have conceded the point. *Id*. at 69.

Finally, Count X (declaratory judgment and injunctive relief) requests injunctive relief ordering the defendants to preserve archival records purportedly documenting unlawful acts against the defendants including "inventories of stolen property." *Id.* ¶ 208. Inasmuch as this count concerns documents related to the validity of the property rights plaintiffs seek to vindicate in this case, "rights in property" are sufficiently implicated to meet the requirements of the expropriation exception.[8]

In sum, each of the plaintiffs' claims places "rights in property … in issue," as required by 28 U.S.C. § 1605(a)(3), thereby satisfying the first prong of the jurisdictional analysis.

### B. Commercial Nexus

As noted, the commercial-nexus analysis differs for Hungary and for MÁV. *See de Csepel v. Republic of Hungary*, 859 F.3d 1094, 1106–07 (D.C. Cir. 2017) (noting that *Simon I* "expressly considered and decided the question of foreign state immunity under the expropriation exception" and "explained that the nexus requirement for jurisdiction over foreign states 'differs' from that over agencies and instrumentalities"). Specifically, upon satisfaction of the requirement for a taking in violation of international law, FSIA's expropriation exception applies when "[1] that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; *or* [2] that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state *and* that agency or instrumentality is engaged in a commercial activity in the United States." 28 U.S.C. § 1605(3) (italics added). As the D.C. Circuit has explained, "claims against foreign states must satisfy the first nexus

---

[8] Count X appears to contemplate the extraordinary exercise of this Court's equitable power to manage the preservation and production of archival records in a foreign country. While this certainly gives pause, at this stage of the litigation and absent any argument from the parties focused on this particular claim, it survives assessment of the first prong of the jurisdictional analysis for FSIA's expropriation exception.

requirement, and claims against agencies and instrumentalities must satisfy the second." *De Csepel*, 859 F.3d at 1107.

Thus, for Hungary, "the question is whether the 'property [in issue] or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state.'" *Simon I*, 812 F.3d at 146 (quoting 28 U.S.C. § 1605(a)(3)); *see also de Csepel*, 859 F.3d at 1107 ("even were we not bound by *Simon [I]*, we would hold that a foreign state retains its immunity unless the first clause of the commercial-activity nexus requirement is met."). For MÁV, "the question is whether the 'property [in issue] or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States.'" *Simon I*, 812 F.3d at 146 (quoting 28 U.S.C. § 1605(a)(3)). While these requirements differ, "both kinds of claims require (i) that the defendants possess the expropriated property or proceeds thereof; and (ii) that the defendants participate in some kind of commercial activity in the United States." *Id.* Consequently, a two-part analysis is necessary for each defendant, each of which is discussed separately below.

### 1. *Hungary*

#### a. *Possession*

In *Simon I*, the D.C. Circuit provided guidance on determining whether the first prong of the commercial nexus requirement—concerning the alleged possession by a foreign country of expropriated property—is met. According to these instructions, first, "the Hungarian defendants would be entitled to dismissal for failure to establish jurisdiction only if 'no plausible inferences can be drawn from the acts alleged that, if proven,' would satisfy the expropriation exception's nexus requirements." *Simon I*, 812 F.3d at 147 (citing *Price v. Socialist People's Libyan Arab*

*Jamahiriya*, 294 F.3d 82, 93 (D.C. Cir. 2002)).  Second, upon a factual challenge by the defendants as to "whether the defendants in fact still possess the property or proceeds thereof … the plaintiffs will bear the burden of production, and the defendants will bear the burden of persuasion to 'establish the absence of the factual basis by a preponderance of the evidence.'" *Id.* (quoting *Chabad*, 528 F.3d at 940).[9]

The First Amended Complaint alleged "that the Hungarian defendants liquidated the stolen property, mixed the resulting funds with their general revenues, and devoted the proceeds to funding various governmental and commercial obligations." *Simon I*, 812 F.3d at 147.  Such allegations, the Circuit concluded, "suffice to raise a 'plausible inference[]' that the defendants retain the property or proceeds thereof, absent a sufficiently convincing indication to the contrary." *Id.*  The defendants, meanwhile, had "offered no case or fact that demonstrates conclusively that the value of the expropriated property is not traceable to their present day cash and other holdings" and "thus failed to defeat the plausibility of the plaintiffs' claims." *Id.* (internal quotation marks omitted).  In other words, following the D.C. Circuit's ruling, the

_____

[9] The defendants argue that *Helmerich & Payne* instituted a "heightened pleading standard" requiring plaintiffs to "*actually* show (and not just arguably show) that jurisdiction is proper," Defs. Mem. at 22 (italics in original; citing *Helmerich & Payne*, 137 S. Ct. at 1324), and that, under this standard, "[p]laintiffs' bald allegations that their property (or property exchanged for such property) may be present in the United States in connection with some commercial activity carried on by Hungary or by one of its instrumentalities undeniably fails this heightened burden," *id*.  This argument misapplies *Helmerich & Payne*, which held only that plaintiffs asserting jurisdiction pursuant to the FSIA's expropriation exception have to do more than advance a "nonfrivolous argument," 137 S. Ct. at 1318–19, thereby rejecting the "exceptionally low bar" applied by the D.C. Circuit when FSIA's jurisdictional question overlaps with the merits question posed by a claim, *id.* at 1318.  More to the point, *Helmerich & Payne* expressly approved the pleading standard applied in *Simon I*.  As the D.C. Circuit noted, here, the jurisdictional and merits inquiries do not overlap, since "the plaintiffs' claim on the merits is not an expropriation claim asserting a taking without just compensation in violation of international law" but rather an assertion of "garden-variety common-law causes of action such as conversion, unjust enrichment, and restitution." *Simon I*, 812 F.3d at 141.  As the Supreme Court explicitly recognized in *Helmerich & Payne*, the D.C. Circuit therefore did not apply the incorrect "nonfrivolous-argument standard" in *Simon I*.  *Helmerich & Payne*, 137 S. Ct. at 1324.  In short, while *Helmerich & Payne* overruled the "non-frivolous" pleading standard formerly applied by the D.C. Circuit in certain types of FSIA expropriation cases, that incorrect standard was never applied in this case.  Indeed, since *Helmerich & Payne*, multiple courts considering the expropriation exception have confirmed that the burden of persuasion remains with the defendant, as outlined in *Simon I*.  *See Schubarth v. Federal Republic of Germany*, 891 F.3d 392, 401 (D.C. Cir. 2018); *Rukoro v. Federal Republic of Germany*, 363 F. Supp. 3d 436, 448–49 (S.D.N.Y. 2019).

plaintiffs' allegation that the defendants sold the expropriated property, commingled the proceeds with their general funds, and now continue to use those proceeds in connection with commercial activity abroad, raises a "plausible inference."[10] To defeat that inference, the defendants must affirmatively establish, by a preponderance of the evidence, that the plaintiffs' allegation is factually incorrect.

On remand, the plaintiffs' Second Amended Complaint asserts similar allegations concerning Hungary's possession of the commingled expropriated property that *Simon I* already upheld as sufficient to meet the expropriation exception's pleading requirement and withstand a motion to dismiss. Specifically, the new operative complaint alleges that the "[d]efendants liquidated stolen property, mixed the resulting funds with their general revenues, and devoted the proceeds to funding various governmental commercial operations." SAC ¶ 97. The plaintiffs further allege that "[t]he stolen property or property exchanged for such stolen property is owned and operated by Hungary and MÁV and/or other agencies and instrumentalities of Hungary that are engaged in commercial activity in the United States." *Id*. ¶ 98. The Second Amended Complaint goes on to allege that both Hungary and MÁV engage in commercial activity in the United States, and that Hungary does so, in part, using the commingled proceeds of the expropriated property. *Id*. ¶¶ 98, 99, 101. These allegations suffice to raise a plausible inference

---

[10]     The Court is mindful that the theory advanced by the plaintiffs that expropriated property commingled in the coffers of a foreign sovereign is sufficient to show the foreign sovereign's ongoing possession, which theory was upheld in *Simon I,* arguably broadens the already expanded scope of the expropriation exception engendered by *Simon I*'s definition of genocide to encompass egregious property takings. *See, e.g.,* Brief for Amicus Curiae the United States at 23, *Simon v. Republic of Hungary*, D.C. Cir. Dkt. No. 17-7146, Document No. 1733875 ("In enacting the FSIA and creating for the first time an exception to the *in personam* immunity of a foreign state in certain expropriation cases, Congress adopted an incremental approach that paralleled those few cases in which title to property in the United States had been in issue. In contrast, deeming allegations that the Republic of Hungary seized and liquidated property abroad and commingled it with general revenues in its treasury abroad many decades ago to be sufficient to treat any state-owned property in the United States as 'exchanged' for expropriated property would expand the expropriation exception far beyond its intended limits…"). That is to say, *Simon I* broadened the scope of both the second prong of the expropriation exception—that property be taken "in violation of international law"—and the third—that such property be "present in the United States in connection with a commercial activity." 28 U.S.C. 1605(a)(3). Nonetheless, *Simon I* is binding on this Court.

that the defendants retain some portion of the expropriated property, legally sufficient to survive a motion to dismiss. *See Simon I*, 812 F.3d at 147; *see also Abelesz v. Magyar Nemzeti Bank*, 692 F.3d 661, 688 (7th Cir. 2012) (finding similar allegations, also by Hungarian Holocaust survivors, that their "expropriated property was retained and that defendants' retention of the property continues to the present" was "sufficient at the pleading stage" absent factual refutation by the defendants); *Rukoro v. Fed. Republic of Germany*, 363 F. Supp. 3d 436, 449 (S.D.N.Y. 2019) (finding that allegations of genocidal expropriation of property from Ovaherero and Nama indigenous peoples in Southwest Africa from 1885 to 1909 and that such property was commingled in Germany's treasury for use in the purchase of Germany's properties in New York were sufficient meet jurisdictional requirement that "property exchanged for such property is present in the United States").

The plaintiffs cite two additional sources to bolster the plausibility of their allegation that the expropriated property was sold and commingled with general state funds. First, the plaintiffs point to a 1993 decision by the Hungarian Constitutional Court, which found that Jewish property registered and expropriated pursuant to Decree 1600/1944 ME "ultimately ended up in the possession of the State in the National Bank under the authority of the Ministry of Finance in what amounted to a *de facto* nationalisation." Pls.' Mem. Opp'n Defs.' Mot. Dismiss Second Am. Compl., Ex. 1, Decision 16 of 1993: 12 March 1993 On The Restitution of Jewish Possessions, at 76, ECF No. 122-1. Second, the plaintiffs state that the archives of the Holocaust Museum in Washington, D.C. contain "evidence that Defendants kept careful records of the property seized from Survivors, and commingled and used the proceeds as though they were legitimate revenues of the state." Pls.' Opp'n at 28.

The defendants "do not dispute that property was, in fact, taken during the tragic events alleged in Plaintiffs' Complaint," Defs.' Mem. at 22, but contest the plausibility of the plaintiffs' allegations, mainly by relying on the depositions of three experienced scholars with knowledge of Hungarian state archival records related to the Holocaust, *see id.* at 23; Defs.' Reply at 7–10. Dr. János Botos, formerly the academic secretary of the Holocaust Documentation Center and Memorial Collection Public Foundation in Budapest and director of the Budapest Holocaust Institute, *see* Defs.' Mot., Ex. 2, Declaration of János Botos (May 6, 2019) ("Botos Decl."), at ¶ 2, ECF No. 138-3, led two state-backed research initiatives "in an attempt to trace the property and proceeds of the property taken from Hungarian nationals during World War II," *id.* Dr. Botos opines that "it is impossible for one to trace the current location or to identify who now has possession of the property identified in Plaintiffs' Second Amended Complaint as items allegedly having been taken during World War II by Hungarian state officials and MÁV employees or the proceeds thereof." *Id.* ¶ 4. Another scholar, Dr. László Csősz, the chief archivist of the Statewide Archives of the Hungarian National Archives, similarly declares, in part, that "it is impossible for one to trace the current location or to identify who now has possession of the property identified in Plaintiffs' Second Amended Complaint as items allegedly having been taken during World War II by Hungarian state officials and MÁV employees or the proceeds thereof." Defs.' Mot., Ex. 3, Declaration of László Csősz PhD (May 7, 2019) ("Csősz Decl."), at ¶5, ECF No. 138-4. Finally, Tamás Kovács, the deputy head of the Statewide Archives of the Hungarian National Archives, concurs in the views of Drs. Botos and Csősz and similarly considers it impossible to trace, using available archival records, ongoing possession of the plaintiffs' expropriated property. *See* Defs.' Mot., Ex. 4, Declaration of Tamás Kovács (May 7, 2019) ("Kovács Decl."), at ¶¶ 4–5, ECF No. 138-5.

These declarations fail to meet the defendants' burden. Specifically, the declarations do not affirmatively disprove the plausible inference drawn from the plaintiffs' complaint—that the expropriated property was liquidated, commingled, and retained. The D.C. Circuit expressly addressed the proof the defendants must offer, explaining that the defendants may defeat the plaintiffs' plausible inference by affirmatively showing that the property was otherwise disposed of and not retained. *See Simon I*, 812 F.3d at 147. If, for example, state archival records showed clearly that, after the property was confiscated from the Jews during deportation, the property was actually transferred to another country, seized by the United States or its allies, or transferred in bulk somewhere in the war's aftermath, such showings would "'demonstrate[] conclusively that the value of the expropriated property is not traceable to their present day cash and other holdings.'" *Id.* (citing *Abelesz*, 692 F.3d at 689). That is not what the defendants' declarations show, however.

Instead of demonstrating what happened to the expropriated property, the declarations merely confirm the difficulty of tracing individual paths of exchange. That conclusion hurts rather than helps the defendants, since the burden rests on the defendants to show that the expropriated property never reached Hungary's treasury or was otherwise disposed of in some other fashion. In short, the defendants have failed "to defeat the plausibility of the plaintiff's claims," because they have not "conclusively" shown that proceeds of the property are no longer retained, as the plaintiffs allege. *Id.*; *see also Abelesz*, 692 F.3d at 697; *Rukoro*, 363 F. Supp. 3d at 448–49.[11]

---

[11]     The defendants cite *Rosner v. U.S.*, 231 F. Supp. 2d 1202 (S.D. Fla. 2002), as evidence that the expropriated property in this case may not have been retained by Hungary and MÁV. The plaintiffs in *Rosner*, also Jewish victims of the Hungarian Holocaust, alleged that their expropriated property was transported on a "gold train" near the end of the war, recovered by the U.S. Army, and sold without compensation through the Army Exchange Service. 231 F. Supp. 2d at 1204–05. While a district court recited these background allegations, accepting them as fact for purposes of resolving a motion to dismiss, *see id.*, the court made no findings of fact that

### b. *Commercial Activity*

The FSIA "defines 'commercial activity' to mean: 'either a regular course of commercial conduct or a particular commercial transaction or act.  The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose."  *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 612 (1992) (quoting 28 U.S.C. § 1603(d)).  The Supreme Court has observed that the FSIA "largely codifies the so-called 'restrictive' theory of foreign sovereign immunity first endorsed by the State Department in 1952."  *Id*; *see also Saudi Arabia v. Nelson*, 507 U.S. 349, 359 (1993).  Thus, while the FSIA does not itself define the word "commercial," "[t]he meaning of 'commercial' is the meaning generally attached to that term under the restrictive theory at the time the statute was enacted."  *Weltover*, 504 U.S. at 612–13.

"Under the restrictive, as opposed to the 'absolute,' theory of foreign sovereign immunity, a state is immune from the jurisdiction of foreign courts as to its sovereign or public acts (*jure imperii*), but not as to those that are private or commercial in character (*jure gestionis*).  *Nelson*, 507 U.S. at 359–60 (citing *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S.480, 487 (1962), and *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 698 (1976) (plurality opinion)).  Thus, "when a foreign government acts, not as regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are 'commercial' within the meaning of the FSIA."  *Weltover*, 504 U.S. at 614.

The proper focus of the inquiry under the FSIA, then, is the character, not the purpose, of the alleged commercial activity.  "In deciding whether particular activity is sovereign or commercial we must ask 'not whether the foreign government is acting with a profit motive or

---

would imply, as the defendants appear to suggest, that "the United States government, and not the Hungarian government, actually came into possession of a lot of the property stolen from Plaintiffs," Defs.' Mem. at 23, n.19.

instead with the aim of fulfilling uniquely sovereign objectives' but 'whether the particular actions that the foreign state performs (whatever the motive behind them) are the *type* of actions by which a private party engages in 'trade and traffic or commerce.'" *Janini v. Kuwait Univ.*, 43 F.3d 1534, 1537 (D.C. Cir. 1995) (quoting *Weltover*, 504 U.S. at 614) (emphasis in original)); *see also de Csepel*, 714 F.3d at 599 (same).

Here, the plaintiffs allege that Hungary engages in four types of commercial activity in the United States by: (1) issuing bonds; (2) purchasing military equipment; (3) promoting trade and tourism; and (4) accepting grants from the United States federal government. *See* SAC ¶ 101(a)-(i); Pls.' Opp'n at 2–21. The defendants discount the sufficiency of these allegations on three grounds: (1) the bonds in question were issued by an independent instrumentality, not Hungary; (2) the military equipment purchases, tourism promotion, and U.S. government grant aid cited by the plaintiffs are not commercial activities within the meaning of the FSIA; and (3) the tourism and trade promotion activities did not exist at the time the plaintiffs filed their complaint. *See* Defs.' Mem. at 12–21. These arguments are unconvincing. As explained below, the plaintiffs' allegations regarding Hungary's bond offerings and military equipment purchases are sufficient to meet the commercial activity prong of the expropriation exception.[12]

### *(i)    Bonds*

The plaintiffs first allege that Hungary engaged in commercial activity in the United States within the meaning of the FSIA's expropriation exception by issuing debt securities in this country between 2005 and the present. *See* Pls.' Opp'n at 2; SAC ¶ 101(h). Specifically, Hungary has issued "more than $13 Billion of U.S. dollar debt securities," SAC ¶ 101(h),

---

[12]     Since these allegations are sufficient, the plaintiffs' remaining allegations regarding tourism, trade, and aid need not be addressed.

through bond offerings registered with the U.S. Securities and Exchange Commission ("SEC") in 2004, 2005, 2006, 2007, and 2010, *see* Pls.' Opp'n at 3.

In *Weltover*, the Supreme Court made clear that "garden-variety debt instruments," like bonds, are "commercial activity" within the meaning of the FSIA. *See Weltover*, 504 U.S. at 615. There, the Republic of Argentina issued special government bonds to prior creditors in an effort to shore up the country's "foreign exchange insurance contract program … under which Argentina effectively agreed to assume the risk of currency depreciation in cross-border transactions involving Argentine borrowers." *Id*. at 609. Even though the purpose of the bonds was to assist in the sovereign act of currency regulation, the Court ruled that the bonds were everyday commercial activity, noting: "[t]hey may be held by private parties; they are negotiable and may be traded on the international market (except in Argentina); and they promise a future stream of cash income." *Id*. at 615. The Court pointed out that "it is irrelevant *why* Argentina participated in the bond market in the manner of a private actor; it matters only that it did so." *Id*. at 617.

Under this standard, Hungary clearly "participated in the bond market in the manner of a private actor" and thus engaged in commercial activity within the meaning of the FSIA. The parties agree that Hungary filed a prospectus supplement with the SEC in 2005 "offer[ing] $1,500,000,000 of notes for sale globally of which no more than $582,000,000 was directly sold in the United States," Joint Stipulation of Facts ("Jt. Stip.") ¶ 21, ECF No. 147; that "[t]he notes issued under the 2005 Prospectus constituted direct, unconditional, unsecured and general obligations of Hungary," *id.* ¶ 25; and that "[d]ebt securities issued under the 2005 Prospectus were outstanding in the United States throughout 2009, 2010, and 2011, *id.* ¶ 27. The parties similarly agree that "Hungary issued debt securities in the United States under [a] 2010

Prospectus," *id.* ¶ 51; that these securities "were notes due January 29, 2020, bearing interest at the rate of 6.250% per year, accruing from January 29, 2010 and payable on July 29 and January 29 of each year, beginning on July 29, 2010," *id.* ¶ 52; and that "[d]ebt securities issued under the 2010 Prospectus Supplement were outstanding in the United States throughout the balance of 2010 after their issuance and throughout 2011," *id.* ¶ 54. The defendants do not dispute that these debt securities are anything but "garden-variety debt instruments," *Weltover*, 504 U.S. at 615, and nothing in the record suggests otherwise. As in *Weltover*, the bonds at issue here were offered for sale on the international market, can be "held by private parties," and "promise a future stream of cash income" in the form of both principal and interest. *Id.*

Nonetheless, the defendants argue that even if the bonds constitute "commercial activity," such activity cannot be attributed to Hungary because a juridically independent instrumentality, not the state itself, managed the relevant financial transactions. *See* Defs.' Mem. at 13–16; Defs.' Reply at 11–14. According to the defendants, "ÁKK Zrt., a separate and distinct instrumentality of Hungary, arranges the issuance of Hungary's debt securities like those alleged in Plaintiffs' Complaint." Defs.' Mem. at 16. ÁKK Zrt. "is a company limited by shares, whose sole founder and shareholder is the Minister responsible for the public finances," and "is the instrumentality authorized by [Hungarian] law to manage Hungary's state debt, including the issuance of state bonds and other securities." Defs.' Mot., Ex. 5, Declaration of Laszlo Nanyista in Support of Hungary's and Magyar Allamvasutak Zrt.'s Motion to Dismiss the Second Amended Class Action Complaint ("Nanyista Decl.") at ¶¶ 32, 30, ECF No. 138-6; *see also* Defs.' Mot. at 16. Since "government instrumentalities and agencies are presumed to be 'distinct and independent' from the sovereign state," the defendants assert that bond offerings

managed by ÁKK Zrt. cannot be attributed to Hungary.  Defs. Mem. at 13 (quoting *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba (Bancec)*, 462 U.S. 611, 627 (1983)).

This argument fails because the bonds in question were clearly offered by Hungary, not ÁKK Zrt.  The relevant registration documents filed with the SEC confirm this point.  A prospectus supplement describing an offering of $2,000,000,000 made in 2010 lists the "Republic of Hungary," not ÁKK, as the "issuer" of the bonds, and further states: "The Notes are debt securities of the Republic, which are being offered globally for sale in the United States and elsewhere where such offer and sale is permitted."  Pls.' Mem. Pts. Auth. Opp'n Defs.' Mot. Dismiss, Ex. 9, Prospectus Supplement, US $2,000,000,000 Republic of Hungary 6.250% Notes due 2020 (Jan. 26, 2010) ("2010 Prospectus Supplement) at S-26, S-1, ECF No. 122-9.  The supplement adds, "The Republic has prepared this Prospectus Supplement and the accompanying Prospectus and is responsible for their contents."  *Id*. at S-2.  After disclosing relevant information regarding *Hungary's* financial condition, including the country's annual budget, employment rate, balance of payments, foreign exchange reserves, and interest rates, *see id*. at S-2–S-8, the supplement clearly states that the securities being offered "constitute direct, unconditional, general and unsecured obligations of the Republic…"  *id.* at S-26.

The 2007 prospectus under which the 2010 Prospectus Supplement was issued similarly identified Hungary, not ÁKK, as the issuer of and entity ultimately responsible for the debt securities cited by plaintiffs as evidence of defendant Hungary's commercial activity in the United States.  The 2007 prospectus lists the "Republic of Hungary" as the issuer of "up to U.S. $2,000,000,000 of our debt securities," and explains further that such "securities will be direct, unconditional, unsecured and general obligations of the Republic of Hungary … and will be backed by the full faith and credit of the Republic of Hungary."  Pls.' Mem. Pts. Auth. Opp'n

Defs.' Mot. Dismiss, Ex. 9, Prospectus, Republic of Hungary Debt Securities (Nov. 29, 2007) ("2007 Prospectus"), ECF No. 122-9.

In addition, the parties have stipulated to numerous facts confirming that the bonds cited by the plaintiffs belonged to Hungary, even if ÁKK executed necessary financial transactions on Hungary's behalf. The parties agree, for example, that "Hungary issued debt securities in the United States under the 2010 Prospectus." Jt. Stip. ¶ 51. They similarly agree that "[d]ebt securities issued under the 2010 Prospectus Statement were outstanding in the United States throughout the balance of 2010 after their issuance and throughout 2011." *Id.* ¶ 54. The Joint Stipulation explains that ÁKK made interest payments, and that ÁKK's Chief Executive Officer signed underwriting and pricing agreements on Hungary's behalf to facilitate the bond offerings. *See id.* ¶¶ 55, 57, 59, 61. Yet these actions do not show that the debt belonged to ÁKK. Instead, they again reveal that the debt was Hungary's. Thus, "ÁKK paid interest in 2010 and 2011 to holders in the United States of debt securities that were issued under the 2010 Prospectus," not independently, but rather "[f]or Hungary's benefit and in fulfillment of Hungary's obligations." *Id.* ¶ 55. Similarly, though Ferenc Szarvas, the Chief Executive Officer of ÁKK, signed a 2010 underwriting agreement filed with the SEC, *id.* ¶¶ 56–57, that agreement "was made in the name of Hungary represented by its Minister of Finance," and Mr. Szarvas signed the agreement "as attorney for the Republic of Hungary represented by its Minister of Finance," *id.* ¶ 57; *see also* Jt. Stip., Ex. D, Republic of Hungary Debt Securities Underwriting Agreement (Jan. 26, 2010), ECF No. 147-4. Likewise, while Mr. Szarvas signed a 2010 pricing agreement "as attorney for the Republic of Hungary," such pricing agreement was "sent by Hungary represented by its Finance Minister" to "Citigroup Global Markets Inc. and Deutsche Bank Securities Inc. as underwriters of the debt securities that were issued under the 2010 Prospectus at their respective

offices in New York, New York." Jt. Stip. ¶ 59; *see also* Jt. Stip., Ex. E, Pricing Agreement (Jan. 26, 2010), ECF No. 147-5. In short, the stipulated facts in the record establish that Hungary, not ÁKK, issued the bonds in question, and disprove the defendants' argument to the contrary.[13]

### (ii) *Military Equipment Purchases*

In addition to Hungary's bond offerings, the plaintiffs allege that Hungary engaged in commercial activity in the United States by purchasing military equipment. *See* Pls.' Opp'n at 10; SAC ¶ 101(g) (citing "[t]he acquisition by Hungary of military equipment, including but not limited to airplanes, munitions, electronics and armaments from United States companies and suppliers"). The defendants counter this assertion in two ways. First, defendants assert that Hungary "does not make any purchases of military equipment from any United States company," instead making purchases only through "non-US registered distributors or European subsidiaries, or through the United States Government's Foreign Military Sales Program." Defs.' Mot. at 21. Second, they argue that participation in the Foreign Military Sales Program ("FMSP") does not constitute "commercial activity" within the meaning of the FSIA. *Id*.

Again, the plaintiffs have the better arguments. The defendants concede that, "[d]uring the period relevant to Hungary's motion to dismiss, Hungary purchased military equipment from the U.S. government under the U.S. Government's foreign military sales program." Jt. Stip. ¶ 99. The parties' joint stipulation further explains that, in making these purchases through the FMSP, "Hungary deposited (or caused to be deposited) U.S. dollars in a U.S. treasury account designated by the U.S. Government and supervised by the Defense Finance Accounting Service

---

[13]    Having found that Hungary itself engaged in commercial activity within the meaning of the FSIA by issuing debt securities, the parties' additional arguments regarding the circumstances under which the actions of an agent may be attributed to a principal, *see* Defs.' Mot. at 13–16; Pls.' Opp'n at 8–9; Defs.' Reply at 11–14, need not be addressed.

to cover the costs of such purchases." *Id.* ¶ 100. Even if Hungary also purchases U.S. military equipment through European distributors, purchasing such equipment through the FMSP—as Hungary concedes it has done—constitutes "commercial activity."

After all, in *Weltover*, the Supreme Court highlighted the purchasing of military equipment as a clear example of commercial activity, stating: "a contract to buy army boots or even bullets is a 'commercial' activity, because private companies can similarly use sales contracts to acquire goods…" *Weltover*, 504 U.S. at 614–15. That is the case since, as the Supreme Court explained, "the issue is whether the particular actions that the foreign state performs (whatever the motive behind them) are the *type* of actions by which a private party engages in 'trade and traffic or commerce'". *Id.* at 614 (italics in original) (quoting *Black's Law Dictionary* 270 (6th ed. 1990)). The defendants are thus incorrect in arguing that purchases made through the FMSP are not commercial because only states, not private parties, are eligible to participate in the program. *See* Defs.' Mot. at 21. The important issue is the "type of action[]" engaged in, which in this case is the purchasing of goods. *Weltover*, 504 U.S. at 614. Making purchases through the FMSP, as Hungary did, is merely a means of executing the purchase but does not alter the type of action, which, like a "contract to buy army boots," was commercial. *Id.*

To bolster their position, the defendants rely on *Heroth v. Kingdom of Saudi Arabia*, 565 F. Supp. 2d 59 (D.D.C. 2008), *aff'd*, 331 F. App'x 1 (D.C. Cir. 2009). The court in *Heroth* suggested in a footnote that FMSP purchases should not be considered "commercial." 565 F. Supp. 2d at 68 n.9. Yet in reaching this conclusion, which was unnecessary to the holding in the case, the court relied on inapposite authority and as a result misapplied the standard from *Weltover*. In particular, *Heroth* cited *Cicippio v. Islamic Republic of Iran*, 30 F.3d 164 (D.C. Cir.

1994), a case concerning the taking of hostages in Iran and the freezing of Iranian assets in the United States, not the FMSP. In *Cicippio*, the Circuit stated, "[w]hen two governments deal directly with each other *as governments*, even when the subject matter may relate to the commercial activities of its citizens or government entities … those dealings are not akin to that of participants in a marketplace." 30 F.3d at 168 (italics in original). This statement referred not to the purchasing of good through the FMSP or any other international program but rather to the freezing of assets, which the Circuit regarded as a "peculiarly sovereign" action. *Id*. As to *Weltover* and the meaning of "commercial activity" for purposes of the FSIA, *Cicippio* supports the plaintiffs' position rather than that of the defendants. As the Circuit explained, "we take from *Weltover* the key proposition that in determining whether a given government activity is commercial under the act, we must ask whether the activity is one in which commercial actors typically engage." *Id*. at 167. Purchasing goods, including military equipment, is the type of activity "in which commercial actors typically engage." *Id.* Thus, the defendants' reliance on *Heroth* and by implication *Cicippio* does not undermine the straightforward application of the *Weltover* standard to Hungary's purchases made through the FMSP.

### 2. *MÁV*

In *Simon I*, the D.C. Circuit found that the commercial nexus requirement had been met with respect to MÁV based on the allegation "that MÁV maintains 'an agency for selling tickets, booking reservations, and conducting similar business in the United States,'" 812 F.3d at 147 (quoting Compl. ¶ 85), "[b]ecause defendants make no attempt to argue that the rail company 'fails to engage in a commercial activity in the United States,'" *id*. (quoting 28 U.S.C. § 1605(a)(3)); *see also Simon II*, 911 F.3d at 1179 ("Looking to the complaint, this court held that the Survivors had satisfactorily pled a commercial nexus with respect to MÁV because MÁV

33

engaged in a commercial activity in the United States…").  The parties seemingly brush past the Circuit's firm finding about MÁV's commercial nexus to the United States, but this Court is bound by the law of the case.

Under the law of the case doctrine, "a court involved in later phases of a lawsuit should not re-open questions decided (i.e., established as the law of the case) by that court or a higher one in earlier phases." *Crocker v. Piedmont Aviation, Inc.*, 49 F.3d 735, 739 (D.C. Cir. 1995). "Law of the case is a prudential rule rather than a jurisdictional one," and is therefore not an "absolute" bar to review. *Crocker*, 49 F.3d at 739–40.  In this circuit, however, "the law-of-the-case may be revisited only if there is an intervening change in the law or if the previous decision was 'clearly erroneous and would work a manifest injustice.'" *Kimberlin v. Quinlan*, 199 F.3d 496, 500 (D.C. Cir. 1999) (quoting *LaShawn A. v. Barry*, 87 F.3d 1389, 1393 (D.C. Cir. 1996) (en banc)); *see also Sherley v. Sebelius*, 689 F.3d 776, 780–81 (D.C. Cir. 2012) (same).  Other circuits similarly set aside the law of the case only in narrow circumstances involving an intervening change in the law, clear error, or manifest injustice.  *See, e.g.*, *United States v. Trent*, 884 F.3d 985, 995 (10th Cir. 2018) ("Courts have recognized exceptions to the law of the case doctrine in three exceptionally narrow circumstances: (1) when the evidence in a subsequent trial is substantially different; (2) when controlling authority has subsequently made a contrary decision of the law applicable to such issues; or (3) when the decision was clearly erroneous and would work a manifest injustice.") (internal quotation marks and citation omitted)).

The defendants argue that the law of the case doctrine "only applies to final judgments," Defs.' Reply at 22, and "does not apply to determinations of subject-matter jurisdiction," *id*. at 23, and therefore should not apply in this case.  Neither argument is correct.  The first argument relies on a misreading of *Keepseagle v. Perdue*, 856 F.3d 1039 (D.C. Cir. 2017), which held that

a district court is not bound by its own prior interlocutory order, but certainly did not suggest, more broadly, that the doctrine applies only to final judgments. 856 F.3d at 1048. The second argument is simply incorrect, at least with regard to subject matter jurisdiction under the FSIA. The law of the case doctrine applies to jurisdictional rulings under the FSIA. *See McKesson Corp. v. Islamic Republic of Iran*, 52 F.3d 346, 350 (D.C. Cir. 1995) ("In order for us to rule for the second time on Iran's contentions regarding the direct effects portion of § 1605(a)(2) [the FSIA's commercial activity exception], we would have to find some reason for not adhering to the law of the case doctrine.").

The defendants can succeed in refuting the commercial activity nexus as to MÁV only if one of the limited exceptions to the law of the case doctrine is met. No intervening change in law has occurred. Thus, the D.C. Circuit's determination should be set aside only if that determination is "clearly erroneous and would work a manifest injustice," *Kimberlin*, 199 F.3d at 500, in light of any new factual allegations or record now before the Court.

Although the defendants previously did not contest the plaintiffs' allegations, they now argue that the commercial nexus requirement cannot be met as to MÁV for two reasons. First, the defendants claim that MÁV does not still possess the plaintiffs' expropriated property or any proceeds from such property. Defs.' Mem. at 11–12. Second, the defendants assert that MÁV does not engage in commercial activity in the United States. *Id.* at 9–10. For the reasons that follow, neither argument is persuasive, let alone sufficient to show that the Circuit's prior finding as to MÁV's commercial nexus should be set aside as clearly erroneous or manifestly unjust.

### a. *Possession*

As to MÁV's ongoing possession of the expropriated property—the first component of the commercial-nexus requirement, *see Simon I*, 812 F.3d at 146—the defendants argue that the

plaintiffs' "conclusory allegations" are insufficient, Defs.' Mem. at 12. For the reasons already explained regarding Hungary, *supra* Sec. III.B.1.a, however, this argument fails.

The plaintiffs' theory applied to Hungary's ongoing possession of the expropriated property also applies to MÁV. Specifically, the plaintiffs allege that MÁV "liquidated stolen property, mixed the resulting funds with their general revenues," SAC ¶ 97, and that "[t]he stolen property or property exchanged for such stolen property is owned and operated by Hungary and MÁV and/or other agencies and instrumentalities of Hungary that are engaged in commercial activity in the United States," *id*. ¶ 98. *Simon I* already found that these allegations raise a "plausible inference" that MÁV retains proceeds from some portion of the expropriated property. *Simon I*, 812 F.3d at 147. That finding, too, is law of the case here.

To undermine this inference, the defendants again cite the declarations of Dr. Botos, Dr. Csősz, and Dr. Kovács, who "have not found any data in the documents relating to MÁV's participation or involvement in taking the property of the deportees during World War II." Defs.' Mem. at 12. Such declarations do not "'demonstrate[] conclusively that the value of the expropriated property is not traceable to [MÁV's] present day cash and other holdings,'" as is required to defeat the plaintiffs' reasonable inference. *Simon I*, 812 F.3d at 147 (citing *Abelesz*, 692 F.3d at 689). As already explained, *supra* in Section III.B.1.a, the defendants have not met their burden at this stage in the litigation because they have failed to demonstrate conclusively that the plaintiffs' inference regarding possession is factually incorrect.

**b.** *Commercial Activity*

The defendants do not dispute that MÁV's activities qualify as being "commercial" within the meaning of the FSIA. Instead, the defendants argue that MÁV simply conducts no business in the United States, *see* Defs.' Mem. at 9–10, and therefore that the plaintiffs cannot

satisfy the commercial-nexus requirement, which demands "engage[ment] in a commercial activity in the United States," 28 U.S.C. § 1605(a)(3). As support for this argument, defendants state that MÁV "has been owned by the Hungarian State since 1869." Defs.' Mem. at 9. In 2007, MÁV's "public passenger rail services" were split off from its commercial freight services and "were taken over by a newly established, separate legal entity, MÁV-Start Zrt." *Id.* While the plaintiffs allege that MÁV engages in commercial activity in the United States by "selling tickets, booking reservations, and conducting similar business," both directly and "through the Eurail Group and its affiliates," SAC ¶ 99—the same allegation relied upon by the D.C. Circuit to find that the commercial nexus requirement was met as to MÁV, *see Simon I*, 812 F.3d at 147—the defendants counter that these activities involving the provision of passenger rail services are attributable only to MÁV-START Zrt. ("MÁV-START"), not MÁV, *see* Defs.' Mem. at 10; Defs.' Reply at 3–6. According to the defendants, since the plaintiffs' initial and amended complaints were all filed after 2007, when MÁV-START was created, the plaintiffs' allegations fail to establish commercial activity as to MÁV.

The plaintiffs contend that a principal-agent relationship exists between MÁV and MÁV-START and, as a result, MÁV-START's commercial activity in the United States—selling tickets for passenger rail services—can and should be attributed to MÁV. *See* Pls.' Opp'n at 33–35. To establish this relationship, the plaintiffs assert that "MÁV-START operates as an agent of MÁV;" that MÁV-START depends financially on MÁV; and that MÁV-START's financial records and public statements demonstrate a "close interrelationship with MÁV." *Id.* at 34. In addition, the Eurail Group "directly and through subagents markets and sells rail passes for transportation on MÁV and MÁV-START's rail lines worldwide," and Eurail Group's commercial activity on behalf of MÁV-START can also be attributed to MÁV. *Id.* at 33.

The Supreme Court has held that "government instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such." *First Nat. City Bank v. Banco Para El Comercio Exterior de Cuba (Bancec)*, 462 U.S. 611, 626–27 (1983); *see also Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 822 (2018) (restating this rule while recognizing *Bancec*'s abrogation after Congress incorporated the *Bancec* factors into the FSIA, 28 U.S.C. § 1610(g), by amendment in 2008). Such instrumentalities are "presumed to have legal status separate from that of the sovereign." *Transamerica Leasing, Inc. v. La Republica de Venezuela*, 200, F.3d 843, 847 (D.C. Cir. 2000). This presumption can be overcome in two circumstances: (1) "where a corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created;" and (2) "where recognition of the instrumentality as an entity apart from the state would work fraud or injustice." *Id.* at 848 (internal quotation marks and citations omitted). While *Bancec* concerned liability of the sovereign for actions of the instrumentality, the D.C. Circuit applies the presumption of separateness "to the question of subject matter jurisdiction under the FSIA" as well. *TMR Energy Ltd. v. State Property Fund of Ukraine*, 411 F.3d 296, 301 (D.C. Cir. 2005); *Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 446–47 (D.C. Cir. 1990).

These standards apply even though here the issue is jurisdiction over Hungary's instrumentality, MÁV, based on the actions of MÁV's subsidiary, MÁV-Start. *See Arch Trading Corp. v. Republic of Ecuador*, 839 F.3d 193, 201–02 (2d Cir. 2016) (applying presumption of separation to subsidies controlled by a government instrumentality under the FSIA). No fixed formula determines whether an agency relationship exists; instead, this inquiry is "inherently fact-specific." *Transamerica Leasing*, 200 F.3d at 849. Mere ownership of the subsidiary's stock is insufficient. *Id.* At the other end of the spectrum, however, "complete

dominion" is not required either, such that it is not necessary for the parent to exercise complete control to the point of eliminating all legal distinctions for the actions of a subsidiary to be attributable to the parent corporation. *Id.* Crucially, "[t]he relationship of principal and agent depends … upon the principal having 'the right to control the conduct of the agent with respect to matters entrusted to [the agent].'" *Id.* (citing RESTATEMENT (SECOND) OF AGENCY § 14 (1958) (alterations in original)).

In *McKesson Corp. v. Islamic Republic of Iran*, the D.C. Circuit found a principal-agent relationship between Iran and several independent instrumentalities that controlled an Iranian dairy set up and partly owned by an American corporation. 52 F.3d at 351–52. Such a relationship, the Circuit explained, "was manifested generally through Iran's control over the management of the co-defendants and through a pattern of conduct and policy statements that caused 'the agent[s] to believe that the principal desire[d] [them] so to act on the principal's account." *Id.* at 352 (citing RESTATEMENT (SECOND) OF AGENCY § 26 (1957) (alterations in original). In addition, the Circuit emphasized that Iran, the principal, influenced the agents' "[r]outine business decisions," and altered and controlled their "commercial mission." *Id.* at 351. In the FSIA context, the Second Circuit considers similar factors in determining whether the presumption of separateness is overcome: in its view, the "touchstone inquiry" is "whether the sovereign state [or state instrumentality] exercises significant and repeated control over the instrumentality's [or subsidiary's] day-to-day operations." *Arch Trading Corp.*, 839 F.3d at 202 (citing *EM Ltd. v. Banco Central de la Republica Argentina*, 800 F.3d 78, 91 (2d Cir. 2015).

MÁV-START is a separate legal entity entitled to a presumption of separateness from MÁV. Róbert Homolya, the President and Chief Executive Officer of MÁV, attests that in 2007, "the provision of passenger rail services including public passenger rail services formerly

conducted by MÁV was taken over by a newly established, separate company called MÁV-START Zrt.," and that since then, "MÁV-START has been competent for and assumed all financial, and legal risks and obligations associated with providing public passenger transportation services in Hungary, previously performed by MÁV." Defs.' Mot., Ex. 1, Declaration of Róbert Homolya ("Homolya Decl."), ¶ 4, ECF No. 138-2. Since "[t]he management of all tasks related to the operation of passenger trains in Hungary is now handled by MÁV-START," he further states, "MÁV itself does not sell tickets, take reservations, or offer any other similar business for public passenger rail services," and "MÁV does not have a relationship with the EURAIL GROUP or its affiliates with respect to ticket sales, reservations, or any other similar business…" *Id.* ¶ 18. The plaintiffs attempt to discredit Homolya's declaration, stating that his "limited personal knowledge is legally inadequate" since he only became MÁV's president and CEO in 2018. Pls.' Opp'n at 32. Yet, as the Seventh Circuit recognized in *Abelesz*, where plaintiffs' counsel made the same assertion, *see Abelesz*, 692 F.3d at 694, Homolya's declaration is adequately based upon "personal knowledge" as well as "historical facts and [] review of MÁV's relevant records," to which Homolya, as President and CEO, has access, Homolya Decl. ¶ 1.[14]

Despite the defendants' efforts to show otherwise, however, the record demonstrates that a principal-agent relationship exists between MÁV and MÁV-START, which is a wholly owned subsidiary of MÁV. Homolya Decl. ¶ 5 ("MÁV owns 100% of the shares of MÁV-START."). Plaintiffs' allegations and exhibits indicate that MÁV-START is in essence a division of MÁV and is incapable of operating independently. To begin with, MÁV's website describes MÁV and MÁV-START as closely related parts of a broader umbrella, the MÁV Group. *See* Pls.' Opp'n,

---

[14] Thus, plaintiffs' suggestion that Homolya's declaration should be disregarded, under Federal Rule of Evidence 602, for lack of personal knowledge is rejected. Pls.' Opp'n at 32 (citing FED. R. EVID. 602).

Ex. 14, Declaration of Liesel J. Schopler, Ex. 13 ("Schopler Decl., Ex. 13"), ECF No. 148-14.

The website states that "[t]he Group carries out its activities in a coordinated manner," and

describes "MÁV Group," not simply MÁV-START, as being "at the service of our passengers

and our customers." *Id.* Instead of having its own website, MÁV-START's webpages appear on

the MÁV Group's unified site. *See* https://www.mavcsoport.hu/en/mav-

group/introduction/introduction (accessed February 26, 2020). Indeed, searchable timetables for

passenger rail services, with links facilitating ticket purchases, appear on the landing page of

MÁV's website. *See* Pls.' Opp'n, Ex. 12, Declaration of Liesel J. Schopler, Ex. 11 ("Schopler

Decl., Ex. 11"), ECF No. 148-12. MÁV Group is prominently identified in the right-hand corner

of the page, along with customer-service contact information, provided through another division

of the company, MÁVDIREKT. *Id.*

In addition, MÁV-START is financially dependent on MÁV. An independent auditor's

report from 2015 concluded that MÁV-START's "future financial position and the results of its

operations greatly depend on the MÁV Group's financial position." Pls.'s Opp'n, Ex. 17,

Pricewaterhouse Coopers Independent Auditor's Report (April 29, 2015) ("PWC Report"), ECF

No. 148-17. The report further found that MÁV-START's financial stability depended on

funding from the Hungarian state, since, pursuant to a "public passenger transport service

agreement … with the Ministry for National Development," the company is "entitled to

reimbursement of reasonable expenses incurred in connection with the supply of public services

that are not covered by revenues." *Id.*

Not only does MÁV-START rely on MÁV financially, it also depends on MÁV's

infrastructure to carry out its "mission and future vision." MÁV-Start "About Us," available at

https://www.mavcsoport.hu/en/mav-start/introduction/our-mission-and-future-vision (accessed

Feb. 26, 2020); Pls.' Opp'n, Ex. 18, Declaration of Liesel J. Schopler, Ex. 17 ("Schopler Decl., Ex. 17"), ECF No. 148-18. To "increase the competitiveness of the railway and stop the decrease in the number of passengers," MÁV-START seeks "service development" and "infrastructure modernisation" among its goals. *Id.* Such modernization must be undertaken in coordination with MÁV, since MÁV, not MÁV-START, has authority over the railways' physical infrastructure, as defendants have stated. *See* Defs.' Mem. at 9. Indeed, MÁV-START's business goals require coordinated efforts among the MÁV Group's various subsidiaries. As MÁV-START publicly represents on its website, its "next step will be to modernise [its] passenger information system through better cooperation within the MÁV Group." Schopler Decl., Ex. 17.

Finally, the plaintiffs have brought forward evidence suggesting cooperation and control within the corporate structure. In 2012, Ilona David, a member of MÁV's board of directors, was appointed general director of MÁV for the purpose of overseeing and carrying out a proposed merger between MÁV-START and two, previously separate divisions, MÁV-Trakció and MÁV-Gépészeti. *See* Pls.' Opp'n, Ex. 15, *International Railway Journal* (May 23, 2012), ECF No. 148-15. That such restructuring required the appointment of a new general director of MÁV, not MÁV-START, appears to suggest that control over the company's corporate policy ultimately rests with MÁV, an inference the defendants have not rebutted. For these reasons taken together, MÁV-START is properly viewed as a closely integrated division of the MÁV Group, financially dependent on and substantially controlled by MÁV. As such, MÁV's commercial activity in the United States may be attributed to MÁV.[15] Consequently, the D.C.

---

[15] Since an agency relationship exists between MÁV and MÁV-START, and the commercial nexus requirement is met as to MÁV on the basis of that relationship, the plaintiffs' additional arguments regarding whether commercial activity occurring before the filing of the initial complaint in 2010 can be taken into consideration for jurisdictional purposes, *see* Pls.' Opp'n at 29–30, need not be addressed.

Circuit's prior finding as to MÁV's commercial activity was neither clearly erroneous nor manifestly unjust and thus no reason has been persuasively presented to avoid application of the law of the case doctrine here.

## IV.     CONCLUSION

The plaintiffs' Second Amended Complaint sufficiently alleges, in claims asserting genocidal takings of property from Hungarian Jews between 1941 and 1945, that each defendant, Hungary and MÁV, commingled that expropriated property in the country's treasury and thereby continue to possess such property to sustain their commercial activities, including Hungary's debt offerings and military purchases in the United States, and MÁV's agent's commercial activities in the United States.  These allegations suffice to satisfy the FSIA's expropriation exception and overcome the default grant of sovereign immunity to the defendants. Accordingly, the plaintiffs' claims may go forward against the defendants.

For these reasons, the defendants' motion to dismiss is denied.  An Order consistent with this Memorandum Opinion will be entered contemporaneously.

Date: March 11, 2020

_____
BERYL A. HOWELL
Chief Judge