**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| ROSALIE SIMON, *et al.*, *individually, for themselves and for all others similarly situated*,<br><br>           Plaintiffs,<br><br>v.<br><br>REPUBLIC OF HUNGARY, *et al.*,<br><br>           Defendants. | Civil Action No. 10-cv-1770 (BAH)<br><br>Chief Judge Beryl A. Howell |

## <u>MEMORANDUM OPINION</u>

The fourteen named plaintiffs in this proposed class action—Rosalie Simon, Helen Herman, Charlotte Weiss, Helena Weksberg, Rose Miller, Tzvi Zelikovitch, Magda Kopolovich Bar-Or, Zehava (Olga) Friedman, Yitzhak Pressburger, Alexander Speiser, Ze'ev Tibi Ram, Vera Deutsch Danos, Ella Feuerstein Schlanger, and Moshe Perel (collectively, "plaintiffs")— are but a few survivors among the approximately 825,000 Hungarian Jews who were subjected to the atrocities and horrors of the Holocaust at the hands of the Hungarian government between 1941 and 1945. Second Am. Compl. ("SAC") ¶¶ 5–9, 14, 22, 28, 39, 41, 49, 65, 73, 81, 131, ECF No. 118.[1] The plaintiffs maintain this suit against the Republic of Hungary ("Hungary") and the Hungarian national railway, Magyar Államvasutak Zrt. ("MÁV"), (collectively, "defendants"), in search of long-overdue restitution for property that was seized from them as part of Hungary's broader effort to eradicate the Jewish people. *See* SAC ¶¶ 173–215.

---

[1]     Mr. Zelikovitch passed away in 2012, after this action was filed, and his three children—Esther Zelikovitch, Asher Yogev, and Yosef Yogev—were substituted in his place as "his sole Heirs at Law." SAC at 3 n.1. He remains described and discussed as a "named plaintiff" for ease of reference.

After a decade-long tour of the federal court system, bouncing up and down the tiers of appellate review, this case is back in this Court for consideration of defendants' fourth motion to dismiss—like the three before it, for lack of subject matter jurisdiction, pursuant to Federal Rule of Civil Procedure 12(b)(1), on grounds of sovereign immunity not exempted under the Foreign Sovereign Immunity Act ("FSIA"), 28 U.S.C. § 1602 *et seq.*.  The D.C. Circuit twice rejected several bases on which to grant dismissal (both with and without prejudice), but since that time, the Supreme Court has expressly rejected a central pillar of the Circuit's first *Simon* opinion while vacating the judgment associated with the second *Simon* opinion.  Meanwhile, the paper trail in this case grew further still when this Court last year ruled on defendants' third motion to dismiss, appellate review of which opinion was cut short by the Supreme Court's direction to remand everything back here.  The task before this Court is first to sort out what the state of the law in this case *is*, given its complex procedural history with intervening changes in case law. Only then can the parties' arguments be examined in the context of the already-crowded slate on which the Court now writes.

The motion to dismiss is granted in part and denied in part.  For the reasons explained below, the outcome of this motion varies by plaintiff.  Four plaintiffs must be dismissed with prejudice for an uncurable lack of subject matter jurisdiction due to sovereign immunity, nine plaintiffs may proceed past this motion to dismiss but may still face jurisdictional hurdles down the line, and one remaining plaintiff is the subject of jurisdictional allegations so ambiguous as to warrant dismissal, though without prejudice to a new attempt.

## I.   BACKGROUND

The grim factual background of this eleven-year-old case has been recounted in several prior decisions of this Court and the D.C. Circuit.  *See generally Simon v. Republic of Hungary*

("*Simon-2014*"), 37 F. Supp. 3d 381, 385–95 (D.D.C. 2014), *aff'd in part, rev'd in part*, 812 F.3d

127 (D.C. Cir. 2016); *Simon v. Republic of Hungary* ("*Simon I*"), 812 F.3d 127, 132–34 (D.C.

Cir. 2016), *abrogated in part by Federal Republic of Germany v. Philipp*, 141 S. Ct. 703 (2021);

*Simon v. Republic of Hungary* ("*Simon-2017*"), 277 F. Supp. 3d 42, 47–49 (D.D.C. 2017), *rev'd*,

911 F.3d 1172 (D.C. Cir. 2018); *Simon v. Republic of Hungary* ("*Simon II*"), 911 F.3d 1172,

1175–76 (D.C. Cir. 2018), *vacated per curiam*, 141 S. Ct. 691 (2021); *Simon v. Republic of*

*Hungary* ("*Simon-2020*"), 443 F. Supp. 3d 88, 92–94 (D.D.C. 2020).  That background is briefly

summarized below, followed by review of the lengthy relevant procedural history.

### A.    Factual Background

In 1944, "the Nazis and Hungary, knowing that they had lost [the war], raced to complete

their eradication of the Jews before the Axis surrendered."  SAC ¶ 3.  As part of their broader

plan to eradicate the Jewish people, defendants stripped Hungarian Jews of their possessions,

including cash, jewelry, heirlooms, art, valuable collectibles, and gold and silver, loaded them

onto trains, and transported them in squalid conditions to concentration camps where they were

either murdered or forced to work as slave laborers.  *Id.* ¶¶ 12, 17, 20, 23–26, 32–34, 44–48, 52–

58, 69–71, 75–76, 81.  "In less than two months, . . . over 430,000 Hungarian Jews were

deported, mostly to Auschwitz, in 147 trains."  *Id.* ¶ 120; *id.*, Ex. B, ECF No. 118-2 (listing

deportation trains in 1944, along with "DATES, ORIGIN OF TRANSPORTS AND NUMBER OF

DEPORTEES").  The "vast majority" of the Hungarian Jews sent "to the killing fields and death

camps of Nazi Germany-occupied Poland and the Ukraine" died.  SAC ¶ 3.  "The overall loss of

Hungarian Jewry during the Second World War, excluding those who fled abroad, was 564,507."

*Id.* ¶ 131.  Hungary "does not dispute that the treatment of Hungarian Jews during the Holocaust

was reprehensible."  Hungary's & MÁV Magyar Államvasutak Zrt.'s Mem. Supp. Mot. Dismiss

Second Am. Class Action Compl. ("Defs.' Mem.") at 19, ECF No. 165-1.

After the armistice agreement ended the hostilities of World War II, SAC ¶ 137, Hungary signed the "Paris Peace Treaty of February 10, 1947" ("1947 Treaty") that incorporated "a number of provisions relating to the restoration of confiscated property," with promises to undertake the restoration of, and make fair compensation for, property, legal rights, or interests confiscated from persons "'on account of the racial origin or religion of such persons,'" *id.* ¶ 138 (citation omitted) (quoting 1947 Treaty art. 27, ¶ 1, 61 Stat. 2065, 2124, 41 U.N.T.S. 135). Article 27 of the 1947 Treaty and related provisions "were not self-executing (they needed appropriate municipal legislation and enforcement to prevail); and they did not provide for sanction in case of non-compliance, other than the implied possible litigation before an international tribunal." *Id.* (quoting 2 RANDOLPH L. BRAHAM, THE POLITICS OF GENOCIDE: THE HOLOCAUST IN HUNGARY 1308–09 (rev. ed. 1994)).

Plaintiffs acknowledge that the Hungarian government "implement[ed] an array of legislative enactments and remedial statutes," but Hungarian Jews "saw no tangible results with respect to restitution and indemnification" for their seized property.  SAC ¶ 138.  Moreover, "[w]ith the Communist party in power in Hungary" after World War II, "'the issue of compensation or restitution was squashed,'" and to the extent the Hungarian government had set aside funds for victims of the Holocaust, "the funds were rarely used for their intended purpose and they were frequently raided by the Communists for financing their own political projects." *Id.* ¶¶ 141–42 (quoting 2 BRAHAM, *supra*, at 1309).  In 1992, "two years after the downfall of the Communist regime" in Hungary, the Hungarian government adopted at least two laws to provide remedies to Hungarian Jews victimized in the Holocaust: one of these laws "provid[ed] compensation for material losses incurred between May 1, 1939 and June 8, 1949," and the other "provid[ed] compensation for those who, for political reasons, were illegally deprived of their

4

lives or liberty between March 11, 1939 and October 23, 1989," but, in plaintiffs' view, the remedies provided under those programs were "paltry and wholly inadequate."  *Id.* ¶ 143.

In sum, plaintiffs claim never to have been properly compensated for the personal property seized from them by defendants as plaintiffs were being deported.  SAC ¶¶ 83–84. Further, plaintiffs allege that defendants "liquidated [this] stolen property, mixed the resulting funds with their general revenues, and devoted the proceeds to funding various governmental and commercial operations."  *Id.* ¶ 97.  Thus, plaintiffs claim that the "stolen property or property exchanged for such stolen property is owned and operated by Hungary and MÁV," some of which property "is present in the United States in connection with commercial activity carried on in the United States by Hungary," *id.* ¶ 98, including, for example, "fees and payments, offices, furniture, furnishings, bank accounts, artwork, stock and bond certificates, securities held in 'street name' and airplanes," *id.* ¶ 101.

In 2010, sixty-five years after the end of World War II and twenty years after the fall of the Hungarian communist regime, plaintiffs filed the instant action against Hungary and MÁV, seeking, *inter alia*, restitution for the possessions seized from them and their families during the Holocaust, and to certify a class consisting of "all surviving Jewish victims of the Holocaust" and "the heirs . . . and open estates . . . of the deceased Jewish victims of the Holocaust," where such victims were residents of Hungary at any point between September 1, 1939 and May 8, 1945 and "were stripped of personal property by" defendants.  *Id.* ¶ 153; Class Action Compl. ("Compl.") ¶ 132, ECF No. 1.  According to plaintiffs, the putative class consists of at least "5,000 survivors" and "countless heirs and estates" of many of the "approximately 825,000 Jews in Hungary" who were victims of the atrocities committed by defendants.  SAC ¶¶ 131, 154.[2]

---

[2]     The parties offer no estimates of potential total damages specific to this case, but as defendants point out, *see* Defs.' Mem. at 40 n.24, cases of this type have the potential to yield awards so large as to be economically

Plaintiffs' Second Amended Complaint asserts, in ten counts, common law claims for conversion (Count I), unjust enrichment (Count II), breach of fiduciary and special duties imposed on common carriers (Count III), recklessness and negligence (Counts IV and V), civil conspiracy with Nazi Germany to commit tortious acts (Count VI), aiding and abetting (Count VII), restitution (Count VIII), accounting (Count IX), as well as a demand for a declaratory judgment that plaintiffs and class members are entitled to inspect and copy certain documents in Hungary, and for injunctive relief enjoining defendants from tampering with or destroying such documents (Count X; Prayer For Relief ¶¶ 5–6). *See* SAC ¶¶ 173–215. To satisfy their burden of establishing the requisite subject matter jurisdiction of this Court to hear these claims, plaintiffs contend that defendants are not immune from suit because of the FSIA's expropriation exception, 28 U.S.C. § 1605(a)(3), SAC ¶¶ 86–92, which exception permits suit in United States courts against a foreign sovereign or its agencies or instrumentalities to vindicate "rights in property taken in violation of international law" when an adequate commercial nexus is present between the United States and a defendant, 28 U.S.C. § 1605(a)(3).

### B.   Procedural Background

This is the fourth motion to dismiss presented by defendants over the last decade in this case, with the first two motions granted and the third motion denied by this Court, the latter under controlling precedent established in the D.C. Circuit's reversal of this Court's grants of the first two motions. As summarized below, the D.C. Circuit has effectively rebuffed every ground previously found to warrant dismissal of this lawsuit, but the Supreme Court's recent vacatur of

---

destabilizing. In a suit by Holocaust victims against a Hungarian national bank and MÁV—both instrumentalities of the state—the Seventh Circuit observed, in the course of contemplating dismissal on the grounds of international comity, that "[t]he sum of damages sought by plaintiffs would amount to nearly 40 percent of Hungary's annual gross domestic product in 2011." *Abelesz v. Magyar Nemzeti Bank*, 692 F.3d 661, 665, 682, 697 (7th Cir. 2012).

*Simon II* and rejection of a central holding in *Simon I* appropriately prompt yet another examination.

### 1.    Simon-2014

Defendants' first motion to dismiss for lack of subject matter jurisdiction due to sovereign immunity was granted on the basis of the "treaty exception" to the FSIA, under which the FSIA's general grant of immunity and the limitations thereto—including the expropriation exception—are all "[s]ubject to existing international agreements to which the United States [was] a party at the time of enactment of" the FSIA, 28 U.S.C. § 1604. *See Simon-2014*, 37 F. Supp. 3d at 424. In other words, a pre-existing international agreement among sovereign countries supersedes the FSIA's default provisions to the extent the two are in conflict. *See id.* at 408–09. This Court found that the 1947 Treaty was such an agreement and "trigger[ed] the FSIA's treaty exception to deprive this Court of subject matter jurisdiction over the plaintiffs' claims." *Id.* at 407. In particular, the 1947 Treaty addressed Hungary's disposition of "all property" taken from Holocaust victims, *id.* at 415 (quoting 1947 Treaty art. 27(1)), directed how Hungary was to distribute all expropriated property at the end of the war, and provided that "any dispute concerning the interpretation or execution of the treaty" was subject to resolution exclusively through the mechanisms described in the Treaty. *Id.* at 415–16 (quoting 1947 Treaty art. 40(1)). Viewing those treaty provisions as delineating the exclusive legal regime set up to resolve plaintiffs' property claims against Hungary, and thus defining the contours of Hungary's waiver of its sovereign immunity for claims for property seized during the Holocaust, this Court held that the 1947 Treaty precluded review of plaintiffs' property claims under any FSIA exception. *Id.* at 397, 424, 444.

Other arguments advanced by the parties concerning the parameters of the FSIA's "expropriation exception" or prudential reasons to dismiss the case, such as international comity

considerations or the *forum non conveniens* doctrine, were not then necessary to address.  *See Simon-2014*, 37 F. Supp. 3d at 407 n.21, 418 n.28.[3]  Nevertheless, though not essential to its disposition in *Simon-2014*, this Court highlighted the "serious comity issue," also identified by the Seventh Circuit in *Abelesz v. Magyar Nemzeti Bank*, 692 F.3d 661 (7th Cir. 2012), "raised by adjudicating the merits of whether Hungarian efforts to provide restitution to the victims of the Hungarian Holocaust were sufficient."  *Simon-2014*, 37 F. Supp. 3d at 404–05 n.20.  Specifically, "[i]f U.S. courts are ready to exercise jurisdiction to right wrongs all over the world, including those of past generations, we should not complain if other countries' courts decide to do the same."  *Id.* at 405 n.20 (quoting *Abelesz*, 692 F.3d at 682).  This Court pointedly raised the specter of "plaintiffs suing in foreign courts to obtain redress for the horrors of slavery inflicted upon millions of African-Americans during the eighteenth and nineteenth centuries in the United States, or for the destruction of property resulting from overseas armed conflicts involving American soldiers since the dawn of the Republic."  *Id.*

### 2.   Simon I

On appeal, the D.C. Circuit affirmed in part and reversed in part.  First, though calling *Simon-2014* "a comprehensive and thoughtful decision," *Simon I*, 812 F.3d at 137, the Circuit rejected application of the treaty exception, *id.* at 135, finding that the 1947 Treaty set out only a non-exclusive mechanism for plaintiffs and other Hungarian Holocaust victims to obtain

---

[3]        *Simon-2014* also dismissed all claims against a third defendant, Rail Cargo Hungaria Zrt. ("RCH"), for want of personal jurisdiction, finding that RCH, now an Austrian company, lacked sufficient alleged minimum contacts with the United States.  37 F. Supp. 3d at 385, 394, 425.  Plaintiffs conceded that specific jurisdiction over RCH was unavailable, *id.* at 426, and this Court rejected plaintiffs' attempts to characterize RCH as sufficiently "at home" in the United States so as to confer general jurisdiction based on RCH's maintenance of a website and the possibility that RCH could have shareholders or affiliates in or with sufficient contacts to the United States, *id.* at 427–29.  Separately, the United States had filed a Statement of Interest advocating dismissal of the claims against RCH because of the U.S. government's "strong support for international agreements with Austria involving Holocaust claims against Austrian companies," Statement of Interest of U.S. at 1, ECF No. 42, but expressing no position as to the claims against Hungary and MÁV.  Plaintiffs did not challenge RCH's dismissal on appeal, *Simon I*, 812 F.3d at 134, and RCH is not named as a defendant in the currently operative complaint, SAC ¶¶ 83–85.

compensation, *id.* at 137.  Thus, "the FSIA's treaty exception does not foreclose jurisdiction over the plaintiffs' claims," *id.* at 140 ("Article 27 secures one means by which Hungarian victims can seek recovery . . . , but not to the exclusion of other available remedies.").

The Circuit then considered—in the first instance—whether the expropriation exception provides a basis for waiver of the sovereign immunity otherwise enjoyed by defendants under "the FSIA's default rule." *Simon I*, 812 F.3d at 140.[4]  In applying the expropriation exception for the benefit of plaintiffs' then-operative First Amended Complaint, the D.C. Circuit affirmed dismissal of plaintiffs' non-property claims, albeit without enumerating precisely which claims it so characterized, "because [such claims] do not come within the FSIA's expropriation exception," and no other FSIA exception provided jurisdiction over the claims.  *Id.* at 151.  By contrast, plaintiffs' claims that "directly implicate[d]" their property rights were "claims 'in which rights in property taken in violation of international law'" remained at issue.  *Id.* at 140 (quoting 28 U.S.C. § 1605(a)(3)).

Despite recognizing that a sovereign's expropriation of its own nationals' property is ordinarily not a violation of international law under the "so-called 'domestic takings rule,'" *Simon I*, 812 F.3d at 144, the Circuit construed plaintiffs' claims as not asserting a "basic international-law expropriation claim" to which the domestic takings rule would apply, *id.* at 145.  In novel reasoning not presented to this Court for consideration in *Simon-2014*, the Circuit found that "[e]xpropriations undertaken for the purpose of bringing about a protected group's physical destruction qualify as genocide." *Id.* at 143.[5]  In other words, the Circuit saw "the

---

[4]    The D.C. Circuit explained its interest in opining on issues not resolved by this Court as follows: "While we ordinarily do not decide an issue unaddressed by the district court, the parties have thoroughly briefed and presented the applicability of the expropriation exception and asked us to decide it.  We think it appropriate in the circumstances to take up the parties' invitation and resolve that issue in the first instance." *Simon I*, 812 F.3d at 140.

[5]    Plaintiffs' briefing before the D.C. Circuit scarcely addressed this reasoning either.  While plaintiffs in their *Simon I* reply brief suggested that the domestic takings rule did not apply to the takings at issue here "because such

expropriations *as themselves genocide*," *id.* at 142 (emphasis in original), based on "[t]he legal definition of genocide" set out in the Convention on the Prevention and Punishment of the Crime of Genocide (Genocide Convention) art. 2, Dec. 9, 1948, 78 U.N.T.S. 277, and other international treaties, *Simon I*, 812 F.3d at 143.  *See also id.* at 144 ("[T]he complaint describes takings of property that are *themselves* genocide within the legal definition of the term." (emphasis in original)).[6]  The relevant international law violated by defendants' actions was therefore, in the Circuit's view, not that of expropriations of property but rather that of *genocide*—where "[t]he domestic takings rule has no application."  *Id.*  "Genocidal expropriations of the property of a sovereign's own nationals thus are 'tak[ings] in violation of international law' for purposes of the FSIA's expropriation exception."  *Id.* at 145 (alteration in original) (quoting 28 U.S.C. § 1605(a)(3)).

The Circuit then turned—again in the first instance—to the "commercial-activity nexus requirement[]" of the expropriation exception, which, on a "general level, . . . require[s]: (i) that the defendants possess the expropriated property or proceeds thereof; and (ii) that the defendants participate in some kind of commercial activity in the United States."  *Simon I*, 812 F.3d at 146. Plaintiffs' allegations that Hungary and MÁV "liquidated the stolen property, mixed the resulting funds with their general revenues, and devoted the proceeds to funding various governmental and commercial operations" were found to "raise a 'plausible inference[]' that the

_____

policies were racially discriminatory," Reply Br. Appellants ("*Simon I* Pls.' Reply") at 9, *Simon I*, 812 F.3d 137 (No. 14-7082), and observed in a footnote that "[s]tarting with the Nuremberg Tribunal judgments after World War II, the nationality exception has been held to be unavailable where the subject conduct constitutes a crime against humanity, including genocide and discrimination against a group on racial, ethnic or religious grounds," *id.* at 9 n.6, they did not argue that the expropriations *themselves* amounted to genocide.

[6]      Commentators have expressed concerns that the theory of genocidal expropriation articulated in *Simon I* represents a problematic expansion of the expropriation exception's scope.  *See Simon-2020*, 443 F. Supp. 3d at 96 n.3 (collecting academic perspectives).  Notably, even plaintiffs themselves described the takings at issue as "in furtherance of a comprehensive program of genocide" rather than as genocide in and of themselves.  Br. Appellants ("*Simon I* Pls.' Br.") at 28, *Simon I*, 812 F.3d 127 (D.C. Cir. 2016) (No. 14-7082).

defendants retain the [plaintiffs'] property or proceeds thereof" and were found to be sufficient, as a matter of law, to show the requisite commercial-activity nexus and defeat the motion to dismiss. *Id.* at 147 (first alteration in original). While cautioning that plaintiffs ultimately "may or may not be able to prove the point" outside the posture of a motion to dismiss, *id.* (citation omitted), at this procedural juncture, the Circuit held that "[b]ecause defendants make no attempt to argue that the rail company fails to 'engage[] in a commercial activity in the United States,' the nexus requirement is satisfied as to MÁV," *id.* at 147–48 (second alteration in original) (quoting 28 U.S.C. § 1605(a)(3)). With respect to *Hungary*, however, "the complaint's allegations about Hungary's commercial activity fail to demonstrate satisfaction of § 1605(a)(3)'s nexus requirement" because plaintiffs "put forward only [] bare, conclusory assertion[s]" to support their claim, causing the Circuit to affirm this Court's judgment of dismissal of the claims against Hungary in *Simon-2014, id.* at 148, albeit on different grounds.

Although rejecting the use of the treaty exception and holding that plaintiffs' "property-based claims" could be brought under the expropriation exception, the Circuit affirmed this Court's dismissal in *Simon-2014* of "plaintiffs' non-property claims" but for a different reason: "they do not come within the FSIA's expropriation exception." *Simon I*, 812 F.3d at 151.[7] Noting that courts "make FSIA immunity determinations on a claim-by-claim basis," the Circuit stated that the exception "applies only to claims implicating 'rights *in property*.'" *Id.* at 141 (emphasis in original) (quoting 28 U.S.C. § 1605(a)(3)). "The exception therefore affords no avenue by which to 'bring claims for personal injury or death'—or any other non-property-based

---

[7] In *Simon-2014*, this Court had no occasion to address explicitly the "non-property claims" because of its decision that the treaty exception, as triggered by the 1947 Treaty, preserved sovereign immunity against Hungary and MÁV with respect to all claims. As such, *Simon I*'s partial affirmance is best read as concurring in the judgment of dismissal as to certain claims because, although the treaty exception did not foreclose them, the FSIA's general grant of immunity as to those claims was not overcome by the expropriation exception, which does not cover "non-property claims."

11

claims." *Id.* (quoting *Abelesz*, 692 F.3d at 697).  It thus "affirm[ed] the district court's determination that it lacked jurisdiction over those claims," *id.*, but left for this Court on remand to "determine precisely which of the plaintiffs' claims" those were, *id.* at 142.[8]

Finally, despite reversing *Simon-2014*, the Circuit did not foreclose the possibility that dismissal of the property-based claims in the suit was the appropriate result and expressly "le[ft] it to the district court to consider on remand" such questions as "whether, as a matter of international comity, the court should decline to exercise jurisdiction unless and until the plaintiffs exhaust available Hungarian remedies," *Simon I*, 812 F.3d at 149, and "any other arguments that [the district court] has yet to reach and that are unaddressed [by the Circuit], such as the defendants' *forum non conveniens* arguments," *id.* at 151.  The question of an exhaustion requirement predicated on international comity was not before the Circuit in *Simon I*, but the Circuit *sua sponte* introduced this potential defense to plaintiffs' claims as a hypothetical argument defendants "could"—but did not—assert.  *Id.* at 149.  In introducing that possible ground for dismissal for the district court to consider "should the defendants assert it," the Circuit highlighted that the Seventh Circuit had found a comity-based "prudential argument to be persuasive in closely similar circumstances."  *Id.* (citing *Fischer v. Magyar Államvasutak Zrt.*, 777 F.3d 847, 859–66 (7th Cir. 2015)).[9]

### 3.    Simon-2017

On remand, plaintiffs addressed the Circuit's critique of the complaint's spare, if any, allegations of Hungary's commercial activity nexus to the United States and, with defendants'

---

[8]    The question of which claims were property-related claims was next visited in *Simon-2020*.  By that time, the Second Amended Complaint had winnowed down the set of claims somewhat, such that this Court could readily conclude that the then-pressed claims all unambiguously implicated property rights.  *See Simon-2020*, 443 F. Supp. 3d at 100–01.

[9]    Neither the United States nor any other amici participated in *Simon I*.

consent, *see* Joint Stipulation & Proposed Scheduling Order, ECF No. 117, "amended their complaint to allege specific facts regarding Hungary's ongoing commercial activity in the United States, including, among other things, . . . '[t]he acquisition by Hungary of military equipment,' Hungary's use of the United States' capital and debt markets to secure financing, and Hungary's acceptance of federal grants and loans from the United States." *Simon II*, 911 F.3d at 1179 (alteration in original) (quoting SAC ¶ 101). Defendants then moved to dismiss the Second Amended Complaint, which motion this Court granted as to both defendants, Hungary and MÁV. *See Simon-2017*, 277 F. Supp. 3d 42. As expressly invited by the Circuit in *Simon I*, 812 F.3d at 149, 151, this Court examined the motion through the lens of international comity considerations and the *forum non conveniens* doctrine, concluding that "the prudential exhaustion and *forum non conveniens* doctrines both provide a compelling basis for 'declin[ing] to exercise jurisdiction.'" *Simon-2017*, 277 F. Supp. 3d at 53 (alteration in original) (quoting *Simon I*, 812 F.3d at 149).[10]

    With respect to prudential exhaustion, this Court endorsed the principle, articulated by the Seventh Circuit in *Abelesz v. Magyar Nemzeti Bank*, 692 F.3d 661 (7th Cir. 2012)—a case the D.C. Circuit had cited with approval in *Simon I* at various points in its analysis—and *Fischer v. Magyar Államvasutak Zrt*, 777 F.3d 847 (7th Cir. 2015), that when plaintiffs allege "a taking in violation of international law where international law favors giving a state accused of taking property in violation of international law an opportunity to redress it by its own means, within the framework of its own legal system," *Simon-2017*, 277 F. Supp. 3d at 53 (quotation marks and citation omitted), "'principles of international comity make clear that these plaintiffs must

---

[10]    The grant of dismissal in *Simon-2017* was solely prudential in character and expressly was *not* predicated on sovereign immunity. 277 F. Supp. 3d at 52 n.6.

attempt to exhaust domestic remedies,' except where those remedies are 'futile or imaginary,'"
*id.* at 54 (quoting *Fischer*, 777 F.3d at 852, 858).  "The prudential exhaustion doctrine recognizes
the risks of unnecessarily infringing on the sovereignty of a foreign nation while also
guaranteeing that the plaintiffs are afforded an adequate forum for their claims," this Court
wrote, because dismissal on international comity grounds would be without prejudice and United
States courts could revisit the matter "'[i]f plaintiffs find that future attempts to pursue remedies
in Hungary are frustrated unreasonably or arbitrarily.'"  *Id.* at 56 (quoting *Fischer*, 777 F.3d at
852).

Applying the *Fischer* inquiry to this case, this Court found that international comity
considerations here militated in favor of requiring plaintiffs to exhaust Hungarian remedies,
Hungarian fora offered an adequate alternative, and plaintiffs' pursuit of their claims in Hungary
would not be futile.  *Simon-2017*, 277 F. Supp. 3d at 53–62.  Accordingly, following the same
steps taken by the Seventh Circuit in *Fischer*, which also had Hungarian agency defendants, this
Court concluded that "this lawsuit must be dismissed, without prejudice, on the ground of
prudential exhaustion."  *Id.* at 62.

The related *forum non conveniens* analysis also provided an "alternative prudential basis
for dismissal."  *Simon-2017*, 277 F. Supp. 3d at 62.  As a threshold matter, the finding that
pursuing claims in a Hungarian forum would not be futile "satisfie[d] the first prong of the test
for application of the *forum non conveniens* doctrine," namely "that Hungary is both an available
and adequate alternative forum."  *Id.* at 63.  The Court then proceeded through the analysis of the
well-established factors governing *forum non conveniens* decisions.

First, while recognizing that plaintiffs' choice of forum is due "substantial deference," the
Court reminded that the deference to be accorded that choice "is lessened when the plaintiff's

ties to the forum are attenuated." *Simon-2017*, 277 F. Supp. 3d at 63 (citing *Friends for All Children, Inc. v. Lockheed Aircraft Corp.*, 717 F.2d 602, 605 (D.C. Cir. 1983)).  Observing that only a minority of the named plaintiffs reside in, and are citizens of, the United States; that "none of the underlying facts in [the] case relate to the United States"; that international travel would be required for plaintiffs regardless of venue; and that it is disfavored to require sovereign defendants "to defend themselves in the courts of another sovereign against claims brought by plaintiffs from all over the globe," the Court concluded that "[i]n these circumstances, the plaintiffs' choice of forum is entitled to minimal deference."  *Id.* at 63-64 (citing other cases where similar circumstances had "overcome the presumption" attached to plaintiffs' choice of forum: *Fischer*, 777 F.3d at 871, and *Moscovits v. Magyar Cukor Rt.*, 34 F. App'x 24, 26 (2d Cir. 2002)).

With respect to the private interest factors, the likely location of relevant records, the Hungarian language thereof, the location of witnesses, and the availability of jurisdiction over dismissed defendant RCH all "weigh strongly in favor of dismissing this lawsuit." *Simon-2017*, 277 F. Supp. 3d at 64–65.  As to the public interest factors, Hungary "has an interest in every part of the litigation, and has a moral interest, if not obligation, to hear the plaintiffs' claims and provide them appropriate relief." *Id.* at 66.  Furthermore, Hungarian law would likely apply. *Id.* at 66–67.  Finally, the Court recognized the substantial administrative burden that would be borne by any court hearing this case, which "is not a typical, garden variety lawsuit," but observed that "[t]hose burdens would be somewhat lessened on the Hungarian courts, based on Hungary's status as the location where all of the conduct giving rise to this litigation occurred, with familiarity with the language and proximity to archived documents and available witnesses." *Id.* at 67 (citation omitted).  In sum, the public and private interest factors

"weigh[ed] uniformly and heavily in favor of Hungary as the more appropriate forum for this lawsuit," warranting dismissal under the *forum non conveniens* doctrine.  *Id.*

### 4.   Simon II

Over a year later, a divided panel of the D.C. Circuit reversed and remanded *Simon-2017*. *Simon II*, 911 F.3d at 1190.[11]

Before issuing its decision and immediately after oral argument in *Simon II*, the Circuit invited the United States to opine on the prudential bases for dismissal implicated in the case. *See* Order, *Simon II*, No. 17-7146 (Apr. 20, 2018) (per curiam).  In response, the government posited that both the international comity and *forum non conveniens* doctrines "can properly be applied in appropriate circumstances to dismiss claims brought under the expropriation exception to immunity in the [FSIA]," but declined to "take a position on the specific application of those doctrines to the facts of this case."  Br. Amicus Curiae U.S. ("*Simon II* U.S. Br.") at 1, *Simon II*, 911 F.3d 1172 (No. 17-7146).[12]  The government rejected the notion that federal courts have an obligation to hear cases "in circumstances where, for example, such litigation would be at odds with the foreign policy interests of the United States and the sovereign interests of a foreign

---

[11]    The Circuit rejected, however, plaintiffs' request to reassign the case on remand, noting that the standard for reassignment had "not remotely been met" and that there was "no evidence that" the undersigned "acted with anything but impartiality in this case."  *Simon II*, 911 F.3d at 1190.

[12]    The government critiqued this Court's invocation of prudential exhaustion grounds for dismissal in *Simon-2017* not because it believed that analysis to be erroneous, but rather because in its view "significant questions as to the court's subject matter jurisdiction" worthy of resolution were presented—even after *Simon I*—before turning to prudential bases for dismissal.  *Simon II* U.S. Br. at 13–14.  Echoing concerns from the academy, *see supra* note 6, the government took issue with *Simon I*'s holding that plaintiffs' allegations "that the Hungarian defendants liquidated the stolen property, mixed the resulting funds with their general revenues, and devoted the proceeds to funding various governmental and commercial operations . . . suffice to raise a 'plausible inference[]' that the defendants retain the property or proceeds thereof," 812 F.3d at 147 (alteration in original), and expressed reservations about satisfaction of the commercial nexus requirement for the expropriation exception, noting that "deeming allegations that the Republic of Hungary seized and liquidated property abroad and commingled it with general revenues in its treasury abroad many decades ago to be sufficient to treat any state-owned property in the United States as 'exchanged' for expropriated property would expand the expropriation exception far beyond its intended limits."  *Simon II* U.S. Br. at 23.

16

government." *Id.* at 12; *see also id.* at 18 ("[T]he fact a district court has jurisdiction under the FSIA's expropriation exception does not foreclose dismissal on the grounds of international comity. . . . Nothing in the text or history of the FSIA suggests that it was intended to foreclose application of [that] doctrine[], or to require a court to exercise jurisdiction in every case.").

Plainly not persuaded by the government's position, the *Simon II* panel flatly rejected the prudential exhaustion approach adopted by the Seventh Circuit and highlighted positively by a different D.C. Circuit panel in *Simon I. See Simon I*, 812 F.3d at 149 (citing *Fischer*, 777 F.3d at 859–66).[13]  *Simon II* held that principles of international comity, as contemplated by the "prudential exhaustion" analysis in *Simon-2017*, should not afford an "extra-textual, case-by-case judicial reinstatement of immunity that Congress expressly withdrew" through the FSIA's "'comprehensive' standards governing 'every civil action.'"  *Simon II*, 911 F.3d at 1180–81 (quoting *Philipp v. Federal Republic of Germany*, 894 F.3d 406, 415 (D.C. Cir. 2018), *vacated*, 141 S. Ct. 703 (2021)).  The Circuit observed that the "prudential exhaustion" theory differed from "exhaustion" in the traditional sense because "the Survivors' right to subsequent judicial review here of the Hungarian forum's decision" could be jeopardized "by operation of *res judicata*" and, as such, use of the theory "in actuality amount[s] to a judicial grant of immunity from jurisdiction in United States courts."  *Id.* at 1180.  Leaning on its then-recent holding in *Philipp v. Federal Republic of Germany*—which post-dated this Court's opinion in *Simon-2017* but has since been vacated by the Supreme Court—that "nothing in the FSIA or federal law empowers the courts to grant a foreign sovereign an immunity from suit that Congress, in the FSIA, has withheld," *id.* at 1180 (citing *Philipp*, 894 F.3d at 414–15), the Circuit held, "courts

---

[13]     The composition of the D.C. Circuit panels deciding *Simon I* (Judges Henderson, Srinivasan, and Wilkins) and *Simon II* (Judges Millett, Pillard, and, dissenting, Katsas) did not overlap.

are duty bound to enforce the standards outlined in the [FSIA]'s text" and may not decline to exercise jurisdiction on prudential exhaustion or international comity grounds, *id.* at 1181.

The Circuit also held that while "the ancient doctrine of *forum non conveniens* is not displaced by the FSIA," *Simon II*, 911 F.3d at 1181, the doctrine did not warrant dismissal here because defendants had failed to meet their "heavy burden of persuasion" in establishing Hungary as a preferred forum over the United States forum chosen by plaintiffs, *id.* at 1183. Citing "a number of legal errors" in *Simon-2017* that, in its view, "so materially distorted [*Simon-2017*'s] analysis as to amount to a clear abuse of discretion," *Simon II*, 911 F.3d at 1182, the majority panel found that: (1) *Simon-2017* "set the scales wrong from the outset" by "affording the Survivors' choice of forum only 'minimal deference,'" *id.* at 1183 (quoting *Simon-2017*, 277 F. Supp. 3d at 63); (2) *Simon-2017*'s determination of the adequacy of the Hungarian forum, borrowed from the prudential exhaustion analysis, improperly shifted the burden of proof from defendants to plaintiffs and thus "never analyzed the critical question of the availability and adequacy of the Hungarian forum," *id.* at 1184–85; and (3) "[t]he consequences of the district court's burden-allocation errors snowballed" in the balancing of the public and private interests across the two forum options such that the factors did not "*strongly* favor[] dismissal," *id.* at 1185 (emphasis and alteration in original) (quoting *Agudas Chasidei Chabad of U.S. v. Russian Federation*, 528 F.3d 934, 950 (D.C. Cir. 2008)), "mak[ing] this among 'the rare case[s]' in which a district court's balancing of factors amounts to an abuse of discretion," *id.* (second alteration in original) (quoting *Morley v. CIA*, 894 F.3d 389, 391 (D.C. Cir. 2018) (per curiam)).

Writing in a clear-eyed dissent, Judge Katsas dissected the "mistaken argument" by the panel majority underlying its finding of a purported "snowball" of errors, *Simon II*, 911 F.3d at

18

1193 (Katsas, J., dissenting), to conclude that *Simon-2017*'s *forum non conveniens* determination

that this case "should be litigated in Hungary" was appropriate in "this foreign-cubed case—

involving wrongs committed by Hungarians against Hungarians in Hungary," *id.* at 1190.

*Simon-2017*, according to Judge Katsas, "correctly stated the governing law and reasonably

weighed the competing considerations in this case." *Id.* at 1195.  First, the *Simon-2017*

description of plaintiff's choice of an American forum as deserving "'minimal deference'" was

best read as a "considered conclusion that the 'defendants had overcome the presumption'" of

such deference, *id.* at 1191 (quoting *Simon-2017*, 277 F. Supp. 3d at 63, 64), rather than as a

"threshold legal error of 'set[ting] the scales wrong from the outset,'" *id.* (quoting *Simon II*, 911

F.3d at 1183 (majority opinion) (alteration in original)).  Second, *Simon-2017* did not improperly

shift the burden of demonstrating adequacy of the Hungarian forum to plaintiffs because *Simon-

2017* "assessed futility as a matter of law, based on undisputed assertions in both [parties']

affidavits."  *Simon II*, 911 F.3d at 1192 (Katsas, J., dissenting).  Finally, Judge Katsas found this

Court's assessment of the private and public interest factors to be reasonable at every step.  *See

id.* at 1193–95.  Notably, in discussing the interest of the United States in ensuring compensation

to Holocaust victims, Judge Katsas highlighted the government's position that this interest is best

advanced "by encouraging parties 'to resolve matters of Holocaust-era restitution and

compensation through dialogue, negotiation, and cooperation,' not by sweeping foreign-centered

cases into United States courts."  *Id.* at 1195 (quoting *Simon II* U.S. Br. at 10).

### 5.   Simon-2020

On remand again from the Circuit, defendants filed a third motion to dismiss, which this

Court denied on March 11, 2020.  *Simon-2020*, 443 F. Supp. 3d 88.  With multiple overarching

grounds for dismissal having been rejected by the Circuit in *Simon I* and *Simon II*, which also

created binding law of the case, *Simon-2020* addressed two comparatively narrow questions

relating to the requirements for invoking the expropriation exception to the FSIA: first, "which of the plaintiffs' claims place rights in property in issue"; and second, whether "one of two commercial-activity nexuses with the United States [are] satisfied" as to each of the two defendants. 443 F. Supp. 3d at 99–100 (citation omitted). With respect to the first question, "no party addressed whether each claim directly implicates a property interest, which amounts to an obvious concession by the defendants," *id.* at 100, and, in any event, each of the claims in the Second Amended Complaint expressly invoked references to property, *id.* at 100–01. As to the second question, *Simon-2020* noted that "the commercial-nexus analysis differs for Hungary and for MÁV," *id.* at 101 (citing *de Csepel v. Republic of Hungary*, 859 F.3d 1094, 1106–07 (D.C. Cir. 2017)), and as such proceeded to evaluate each defendant separately, *id.* at 102.[14]

With respect to Hungary, the Court first found that the Second Amended Complaint presented allegations of Hungary's possession and use of commingled proceeds from the sale of expropriated property, sufficient to "raise a plausible inference that" Hungary possesses such property, and that Hungary failed to defeat that inference. *Simon-2020*, 443 F. Supp. 3d at 103–05.[15] The Court then credited the sufficiency of plaintiffs' allegations that Hungary engages in commercial activity in the United States by, *inter alia*, issuing certain SEC-regulated bonds and purchasing military equipment. *Id.* at 106–11.

---

[14]    The FSIA expropriation exception may apply to a foreign state defendant only when the property in issue "or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state." 28 U.S.C. § 1605(a)(3). In contrast, for an "agency or instrumentality of [a] foreign state," the exception requires that the property in issue "or any property exchanged for such property is owned or operated by [the] agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States." *Id.*

[15]    According to the D.C. Circuit in *Simon I*, to defeat the inference of possession by way of commingled proceeds of liquidation, a defendant bears the burden of "affirmatively showing that the property was otherwise disposed of and not retained," *Simon-2020*, 443 F. Supp. 3d at 105 (citing *Simon I*, 812 F.3d at 147), which as a practical matter becomes all the more onerous a burden given the passage of decades, compounded by regime and records management changes in Hungary.

As to MÁV, *Simon-2020* invoked the D.C. Circuit's "firm finding" in *Simon I* that MÁV satisfied the commercial nexus requirement "based on the allegation that MÁV maintains an agency for selling tickets, booking reservations, and conducting similar business in the United States." *Simon-2020*, 443 F. Supp. 3d at 111 (quoting *Simon I*, 812 F.3d at 147) (internal quotation marks omitted).  Under the law of the case doctrine, in the D.C. Circuit, this prior holding "may be revisited only if there is an intervening change in the law or if the previous decision was 'clearly erroneous and would work a manifest injustice.'" *Id.* (quoting *Kimberlin v. Quinlan*, 199 F.3d 496, 500 (D.C. Cir. 1999)).  No relevant intervening change in law had taken place in the time between *Simon I* and *Simon-2020*. *Id.* at 112.  In a detailed exposition examining the relationship between MÁV and its subsidiary MÁV-START, the latter of which engaged in commercial activity by selling passenger rail tickets in the United States, the Court concluded that no new facts or arguments were "persuasive, let alone sufficient to show that the Circuit's prior finding as to MÁV's commercial nexus should be set aside as clearly erroneous or manifestly unjust." *Id.* at 112–16.

Finding that all elements of the FSIA's expropriation exception were satisfied as to both Hungary and MÁV, this Court denied defendants' motion to dismiss.  *See Simon-2020*, 443 F. Supp. 3d at 116.  Defendants appealed to the D.C. Circuit, but without appellate consideration of the merits of that appeal, the case was remanded to this Court, without further direction, in light of subsequent Supreme Court developments, discussed next.  *See* Order, *Simon v. Republic of Hungary*, No. 20-7025 (D.C. Cir. Apr. 28, 2021) (per curiam).

### 6.    *Defendants' Petition for Certiorari*

With briefing underway on defendants' third motion to dismiss before this Court (ultimately resolving in *Simon-2020*), on May 16, 2019, defendants petitioned the Supreme Court for review of *Simon II* as to: (1) whether a district court may abstain from hearing an FSIA

case for international comity reasons, and (2) the degree of deference due plaintiffs' choice of

forum and comity considerations when a court performs a *forum non conveniens* analysis.  Pet.

Cert. at i, *Republic of Hungary v. Simon*, 141 S. Ct. 691 (2021) (No. 18-1447).[16]

In a separate but similar case involving the allegedly forced sale of a "collection of

medieval reliquaries" by German Jews to a Nazi-controlled state entity, defendants including the

Federal Republic of Germany ("Germany") petitioned for review of a D.C. Circuit decision

affirming the denial of the defendants' motion to dismiss under the FSIA.  Germany presented

two questions: (1) whether the domestic takings rule applies to the FSIA expropriation exception

when plaintiffs allege that the foreign sovereign "violated international human-rights law when

taking property from its own national[s] within its own borders"; and (2) whether or not the

doctrine of international comity applies in FSIA cases.  *See* Pet. Cert. at i, 6–7, *Federal Republic

of Germany v. Philipp*, 141 S. Ct. 703 (2021) (No. 19-351).

Responding to calls by the Supreme Court for the views of the Solicitor General, the

United States argued that the international comity question, presented in both cases, warranted

review because, in its view, the D.C. Circuit's erroneous opinions in *Simon II* and *Philipp*

created a split between circuits and jeopardized the United States' "important foreign-policy

interests," which "may be particularly sensitive where the claims allege serious human rights

abuses on the part of a foreign state."  U.S. Cert. Br. at 19–22, *Philipp*, 141 S. Ct. 703 (No. 19-

351).  Further, the government urged review of the domestic takings rule question raised in

*Philipp*, arguing that the rule created by the D.C. Circuit in *Simon I*—in which the government

---

[16]    In response to an inquiry from this Court, *see* Min. Order (Jan. 6, 2020), the parties disagreed as to whether proceedings in the district court—specifically, the resolution of the third motion to dismiss—should be stayed on account of the pending petition for certiorari, *see* Joint Status Report, ECF No. 153; Suppl. Joint Status Report, ECF No. 154, and this Court therefore proceeded to issue *Simon-2020*.  *See Simon-2020*, 443 F. Supp. 3d at 98 n.5.

did not participate—was "flawed" and also has "significant foreign policy implications."  *See id.*
at 7–8, 14.

On July 2, 2020, the Supreme Court granted certiorari to review *Simon II* with respect to
only the first question presented—international comity-based abstention.  *Republic of Hungary v.
Simon*, 141 S. Ct. 187 (2020).  On the same day, the Court granted certiorari without limitation in
*Philipp*, 141 S. Ct. 185 (2020), as to both the international comity question and the domestic
takings rule question.  The latter question directly implicated the D.C. Circuit's holding in
*Simon I*—on which defendants had not sought certiorari—that the domestic takings rule does not
limit the reach of the FSIA's expropriation exception when the takings at issue are "*themselves*
genocide," 812 F.3d at 144 (emphasis in original).

In merits briefing, the United States continued to argue against the D.C. Circuit's
decisions in *Simon II* and *Philipp*.  *See generally* U.S. Br. ("*Philipp* Sup. Ct. U.S. Br."), *Philipp*,
141 S. Ct. 703 (No. 19-351); U.S. Br. ("*Simon* Sup. Ct. U.S. Br."), *Simon*, 141 S. Ct. 691 (No.
18-1447).  In addition to pressing its doctrinal arguments, as relevant here, the government
suggested two policy reasons militating in favor of allowing courts to abstain from hearing cases
on the basis of international comity.  First, "comity-based abstention aids in the United States'
efforts to persuade foreign partners to establish appropriate redress and compensation
mechanisms for human-rights violations, including for the horrendous human-rights violations
perpetrated during the Holocaust."  *Simon* Sup. Ct. U.S. Br. at 26.  Second, the government
argued that the D.C. Circuit's expansive view of the expropriation exception (as articulated in
*Simon I* and again in *Philipp*) endangers the government's "reciprocal self-interest."  *Philipp*
Sup. Ct. U.S. Br. at 29.  "Because 'some foreign states base their sovereign immunity decisions
on reciprocity,' it is generally in the United States' interest to avoid adopting broad exceptions to

foreign sovereign immunity that are inconsistent with the immunity protections that would be afforded under principles of international law generally accepted by other nations." *Id.* (citations omitted).

>    7.    ***Supreme Court's Decision in* Federal Republic of Germany v. Philipp**

The Supreme Court issued its opinion in *Federal Republic of Germany v. Philipp* on February 3, 2021.  141 S. Ct. 703.  The bulk of the Court's opinion was devoted to the first question presented in the *Philipp* petition, namely, "whether a country's alleged taking of property from its own nationals falls within" the FSIA expropriation exception.  *Id.* at 707–08. In *Philipp*, plaintiffs asserted that Hitler deputy Hermann Goering "employed a combination of political persecution and physical threats to coerce" German Jewish art dealers to sell a collection of relics to Prussia, of which Goering was Prime Minister, well under their actual value.  *Id.* at 708.  Echoing the D.C. Circuit's novel conclusion in *Simon I*, the plaintiffs argued to the Supreme Court that this purchase was *itself* an act of genocide.  *Id.* at 709.  Indeed, citing *Simon I*, the Circuit panel in *Philipp* had determined that "the [expropriation] exception for property taken in violation of international law was satisfied because 'genocide perpetrated by a state even against its own nationals is a violation of international law.'"  *Philipp*, 141 S. Ct. at 709 (quoting *Philipp*, 894 F.3d at 410–11 (quoting *Simon I*, 812 F.3d at 145)).  In other words, plaintiffs contended that the domestic takings rule did not apply to such a genocidal taking of property.

A unanimous Supreme Court disagreed.  The Court first traced the historical origins of the domestic takings rule, starting with the premise that "a sovereign's taking of a foreigner's property, like any injury of a foreign national, implicate[s] the international legal system because it 'constituted an injury to the state of the alien's nationality.'"  *Philipp*, 141 S. Ct. at 710 (citation omitted).  "The domestic takings rule endured even as international law increasingly

came to be seen as constraining how states interacted not just with other states but also with individuals, including their own citizens." *Id.* The result was a judicial "consensus that the expropriation exception's reference to 'violation of international law' does not cover expropriations of property belonging to a country's own nationals." *Id.* at 711 (quoting *Republic of Austria v. Altmann*, 541 U.S. 677, 713 (2004) (Breyer, J., concurring)) (quotation marks omitted).

While acknowledging plaintiffs' argument that "the forced sale of their ancestors' art constituted an act of genocide because the confiscation of property was one of the conditions the Third Reich inflicted on the Jewish population to bring about their destruction," the Court found it unnecessary to "decide whether the sale of the [German Jews'] property was an act of genocide, because the expropriation exception is best read as referencing the international law of expropriation rather than of human rights." *Philipp*, 141 S. Ct. at 711–12. The international law of expropriation at the time of the FSIA's enactment in 1976, the Court continued, clearly "retained the domestic takings rule." *Id.* at 712. Furthermore, the text of the expropriation exception "places repeated emphasis on property and property-related rights," an odd drafting choice if the exception were meant to "provide relief for atrocities such as the Holocaust." *Id.* Viewing the FSIA as a whole, the Court observed that plaintiffs' position would upend the FSIA's carefully cabined grants of jurisdiction related to human rights violations by "transforming the expropriation exception into an all-purpose jurisdictional hook for adjudicating human rights violations." *Id.* at 713–14.

While not addressing international comity per se, the Court observed the importance of construing the FSIA "to avoid, where possible, 'producing friction in our relations with [other] nations and leading some to reciprocate by granting their courts permission to embroil the United

States in expensive and difficult litigation.'" *Philipp*, 141 S. Ct. at 714 (alteration in original) (quoting *Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct. 1312, 1322 (2017)).  Indeed, the Court raised the specter of reciprocal consequences of allowing U.S. courts to hear claims of this type, implying that a foreign state subjected to such jurisdiction may well open its own courts as a forum to "adjudicate[] claims by Americans" to large sums "because of human rights violations committed by the United States Government years ago."  *Id.*

By holding that the FSIA expropriation exception "incorporates the domestic takings rule" and vacating the Circuit's opinion accordingly, the Court did not need to reach the issue of abstention based on international comity.  *Philipp*, 141 S. Ct. at 715.[17]  The Supreme Court vacated the D.C. Circuit's judgment in *Philipp* and remanded for further proceedings.  *Id.* at 716.

### 8.      *Vacatur of* Simon II *and Remand*

Concurrently with the opinion in *Philipp*, the Supreme Court issued a brief order vacating the judgment of the D.C. Circuit in *Simon II* and "remand[ing] for further proceedings consistent with the decision in [*Philipp*]."  *Simon*, 141 S. Ct. 691.

Following the rulings in *Philipp* and *Simon*, both parties separately filed a Motion to Govern Further Proceedings in the D.C. Circuit docket for the appeal of *Simon-2020*.  Defs.' Mot. Govern Further Proceedings ("Defs.' Post-*Philipp* Mot."), *Simon v. Republic of Hungary*, No. 20-7025 (D.C. Cir. Mar. 4, 2021); Mot. Appellees Govern Further Proceedings ("Pls.' Post-*Philipp* Mot."), *Simon*, No. 20-7025 (Mar. 5, 2021).  Defendants urged the Circuit to remand to this Court with instructions to dismiss for lack of subject matter jurisdiction, in light of *Philipp*, Defs.' Post-*Philipp* Mot. at 1, and to vacate *Simon-2020* as moot, *id.* at 4.  Plaintiffs, for their

---

[17]      The *Philipp* Court also did not reach "an alternative argument" that the sale "is not subject to the domestic takings rule because the consortium members were not German nationals at the time of the transaction."  141 S. Ct. at 715.  On remand, the district court was to be directed to "consider this argument, including whether it was adequately preserved."  *Id.* at 716.

part, urged the Circuit to stay the *Simon-2020* appeal while the *Simon II* panel addressed the case on remand from the Supreme Court.  Pls.' Post-*Philipp* Mot. at 2.  In plaintiffs' view, the outstanding issue in *Simon II* was at that point whether some plaintiffs escape the umbrella of the domestic takings rule on account of not having been Hungarian nationals at the time of the takings.  *See id.* at 4–5.  Plaintiffs also responded to defendants' proposal with a cross-motion for *affirmance* of *Simon II*, arguing that *Simon II*'s international comity and *forum non conveniens* analyses were undisturbed by the Supreme Court.  Pls.' Cross-Mot. Affirmance at 3, *Simon*, No. 20-7025 (Mar. 15, 2021).

Apparently declining plaintiffs' invitation to reconfirm its holdings on international comity and *forum non conveniens*—at least at this procedural juncture—the next day the Circuit remanded the appeal of *Simon-2017* to this Court without further comment or direction beyond "further proceedings consistent with [*Philipp*]" and without discussing the extent, if any, to which its holdings in now-vacated *Simon II* remained the law of the case or this Circuit.  *Simon v. Republic of Hungary*, 839 F. App'x 570 (D.C. Cir. 2021).  Later, the Circuit also remanded the appeal of *Simon-2020* to this Court, again without further instructions.  Order, *Simon*, No. 20-7025 (Apr. 28, 2021) (per curiam).

In *Philipp*, the Supreme Court did not resolve the international comity question on which certiorari had been granted in both *Philipp* and *Simon II*.  Since *Simon II* did not itself concern the domestic takings rule issue on which *Philipp* was decided, the end result is that while the *Simon II* judgment was vacated, the apparent reason for that vacatur was not express disapproval of any determination in the *Simon II* opinion but rather the Supreme Court's holding effectively overturning *Simon I* with respect to the domestic takings rule.  As such, neither the Supreme Court nor the Circuit have provided any guidance as to the current legal effect of the panel

27

majority's opinion in *Simon II*—and, as discussed *infra* in Part III.D, the parties disagree on

whether this Court continues to be bound by *Simon II* or holdings in *Simon I* not addressed in

*Philipp*, such as the unavailability of the treaty exception.

### 9. Fourth Motion to Dismiss

Upon receipt of the mandate from the D.C. Circuit, this Court directed the parties to

propose a schedule for further proceedings. *See* Min. Order (Mar. 19, 2021). The parties

responded with, and the Court adopted, a proposed briefing schedule for a renewed motion to

dismiss. Joint Status Report, ECF No. 164; Min. Order (Apr. 1, 2021).

Defendants filed the pending motion to dismiss on April 23, 2021, *see* Hungary's &

MÁV Magyar Államvasutak Zrt.'s Mot. Dismiss Second Am. Class Action Compl. ("Defs.'

Mot."), ECF No. 165, for which the briefing was completed on June 21, 2021, when defendants

filed a sur-sur-reply in support of their motion to dismiss, *see* Hungary's & MÁV Magyar

Államvasutak Zrt.'s Sur-Sur-Reply Mem. Further Supp. Mot. Dismiss Second Am. Class Action

Compl., ECF No. 172. Additionally, plaintiffs filed a notice of supplemental authority on July

28, 2021. Pls.' Notice Suppl. Authority ("Pls.' Notice"), ECF No. 173. This fourth motion to

dismiss is now ripe for resolution.

## II. LEGAL STANDARD

"Federal courts are courts of limited jurisdiction," *Gunn v. Minton*, 568 U.S. 251, 256

(2013) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)), and

"have only the power that is authorized by Article III of the Constitution and the statutes enacted

by Congress pursuant thereto," *Johnson v. Comm'n on Presidential Debates*, 869 F.3d 976, 980

(D.C. Cir. 2017) (quoting *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986)). To

survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), the plaintiff thus

generally "bears the burden of invoking the court's subject matter jurisdiction." *Arpaio v.*

*Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).

When a jurisdictional skirmish "present[s] a dispute over the factual basis of the court's subject matter jurisdiction," the court "must go beyond the pleadings and resolve" any dispute necessary to the disposition of the motion to dismiss.  *Feldman v. FDIC*, 879 F.3d 347, 351 (D.C. Cir. 2018) (quoting *Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000)).  In such situations, the "court may properly consider allegations in the complaint and evidentiary material in the record," affording the plaintiff "the benefit of all reasonable inferences."  *Id.*; *see also Am. Freedom L. Ctr. v. Obama*, 821 F.3d 44, 49 (D.C. Cir. 2016) ("In considering a motion to dismiss for lack of subject matter jurisdiction, . . . we 'may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction.'" (quoting *Jerome Stevens Pharms., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005))).  Absent "evidentiary offering[s]," *Feldman*, 879 F.3d at 351, however, courts must seek jurisdictional assurance by accepting as true all undisputed "factual allegations in the complaint and constru[ing] the complaint liberally," and again "granting plaintiff the benefit of all inferences that can be derived from the facts alleged."  *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (internal quotation marks and citation omitted).

The FSIA is a "comprehensive statute containing a 'set of legal standards governing claims of immunity in every civil action against a foreign state or its political subdivisions, agencies, or instrumentalities.'"  *Altmann*, 541 U.S. at 691 (quoting *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 488 (1983)).  The FSIA "provides, with specified exceptions, that a 'foreign state shall be immune from the jurisdiction of the courts of the United States.'" *Helmerich & Payne*, 137 S. Ct. at 1316 (quoting 28 U.S.C. § 1604).  Under the FSIA's

expropriation exception, 28 U.S.C. § 1605(a)(3), however, "United States courts may exercise jurisdiction over a foreign sovereign in any case 'in which rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States.'" *Philipp*, 141 S. Ct. at 712 (quoting 28 U.S.C. § 1605(a)(3)); *see also Helmerich & Payne*, 137 S. Ct. at 1316.

Notwithstanding the general burden borne by any plaintiff to establish the subject matter jurisdiction of the chosen court, when a plaintiff invokes the FSIA's expropriation exception as the basis for jurisdiction, "the defendant state 'bears the burden of proving that the plaintiff's allegations do not bring its case within a statutory exception to immunity.'" *Belize Soc. Dev. Ltd. v. Gov't of Belize*, 794 F.3d 99, 102 (D.C. Cir. 2015) (quoting *Phoenix Consulting*, 216 F.3d at 40).

## III.   DISCUSSION

In ruling on the instant motion to dismiss—the fourth in this eleven-year-old case—this Court is not writing on an empty slate.  Quite to the contrary: the legal landscape of this case is littered with a partially reversed district court opinion (*Simon-2014*), a circuit court opinion squarely abrogated in part by the Supreme Court (*Simon I*), a reversed district court opinion the reversal of which was later vacated (*Simon-2017*), a circuit court opinion vacated by the Supreme Court for reasons outside the scope of that opinion (*Simon II*), a district court opinion, issued prior to a change in relevant governing law, appealed to but remanded by the Circuit with no ruling on the merits (*Simon-2020*), a Supreme Court opinion changing the law of the

expropriation exception (*Philipp*), and a pair of terse remands of *Simon-2017* and *Simon-2020* from the Circuit providing little clarifying guidance.  Suffice it to say that figuring out what the law of this case *is* presents a challenge but is a determination that affects which of the parties' myriad arguments raised in briefing has any purchase.

Defendants' motion presses as many as six reasons this case should be dismissed at this juncture: (1) the Supreme Court's opinion in *Philipp* forecloses the use of the FSIA's expropriation exception by plaintiffs who were Hungarian nationals at the time of the takings at issue, *see* Defs.' Mem. at 17–18, including any once-Hungarian-national plaintiffs ostensibly rendered stateless by Hungary's concededly egregious conduct, *see id.* at 18–23; (2) plaintiffs are barred from arguing that any of the named plaintiffs were *never* Hungarian nationals at the time of the atrocities carried out by the Hungarian government, *see id.* at 23–30; (3) if this Court nevertheless did entertain an argument that named plaintiffs were not Hungarian nationals at that time, *Simon I*'s analysis of the treaty exception must change, *see id.* at 26–28, 28 n.18; (4) this Court's holding in *Simon-2020* that the commercial nexus requirement has been satisfied as to both defendants must be revisited in light of *Philipp*'s redefinition of property "taken in violation of international law," *see id.* at 30–38; (5) the Supreme Court's vacatur of *Simon II* revives this Court's decision in *Simon-2017* to dismiss the case on the prudential basis of international comity, *see id.* at 38–41; and (6) depending on the composition of the group of named plaintiffs, if any, whose claims survive *Philipp*, "it may also be appropriate for this Court to revisit the doctrine of *forum non conveniens*," *id.* at 41 n.25, as set out in *Simon-2017*, which decision was reversed in a now vacated *Simon II*.

In response, plaintiffs pose at least seven counter-arguments that: (7) at least some of the named plaintiffs were not Hungarian nationals at any point and are thus unaffected by *Philipp*,

*see* Pls.' Mem. Opp'n Fourth Mot. Defs. Dismiss ("Pls.' Opp'n") at 25–28, ECF No. 167, and plaintiffs are not now barred from raising this argument, *see id.* at 8–20; (8) even if any plaintiffs were Hungarian nationals pre-Holocaust, they *de facto* ceased to be when Hungary's treatment stripped them of any indicia of citizenship, *see id.* at 21–25, thereby penetrating the shield of the domestic takings rule, *see id.* at 28–34; (9) "Hungary's collaboration with Nazi Germany precludes Hungary's reliance upon the domestic takings rule," *id.* at 34–36; (10) the 1920 Treaty of Trianon created international law imposing obligations on Hungary, and Hungary's violation thereof provides an independent basis for *all* plaintiffs regardless of nationality to invoke the expropriation exception, *see id.* at 36–39; (11) the commercial nexus findings in *Simon-2020* need not and should not be revisited, *see id.* at 39–40; (12) the *Simon I* analysis on the inapplicability of the treaty exception as to the 1947 Treaty holds true for plaintiffs who were not Hungarian nationals, *see id.* at 40–42; and (13) *Simon II*'s holdings regarding international-comity-based abstention and *forum non conveniens* survive *Philipp*, *see id.* at 44–45.

This thicket of arguments and counter-arguments may be sorted into three broad questions: whether then-Hungarian national plaintiffs may assert claims notwithstanding the domestic takings rule after *Philipp* (in the lists above, defendants' argument 1 and plaintiffs' arguments 8, 9, and 10); whether any plaintiffs may maintain this action by being characterized as not having had Hungarian nationality at the time of the takings (defendants' 2, 3, 4; plaintiffs' 7, 11, 12); and whether prudential bases for dismissal remain available due to the Supreme Court's vacatur of *Simon II* (defendants' 5, 6; plaintiffs' 13).

The analysis below addresses these three questions in turn.  First, the Court finds that certain named plaintiffs have not shown anything other than Hungarian nationality at the time of the takings, and thus their claims sit squarely within the domestic takings rule as fortified by

*Philipp*, requiring dismissal of these plaintiffs from this action with prejudice.  Second, all but one of the remaining named plaintiffs have adequately alleged facts supporting reasonable inferences of Czechoslovakian nationality and a lack of Hungarian nationality, and the history of this litigation does not preclude them from asserting as much at this juncture.  These plaintiffs may trigger the FSIA's expropriation exception and survive this fourth motion to dismiss.  Third, the jurisdictional allegations concerning one named plaintiff have a level of ambiguity such that no determination may be made as to his nationality.  That last plaintiff must be dismissed, but without prejudice to bringing an action again with more fulsome allegations.  Finally, under the D.C. Circuit's rules governing the precedential weight of its own vacated opinions, *Simon II*'s holdings on international comity and *forum non conveniens* remain the law of the Circuit.  This Court therefore cannot again entertain these prudential reasons to abstain from exercising jurisdiction.

### A.    Claims by Plaintiffs of Hungarian Nationality at the Time of the Takings Must Be Dismissed

Four named plaintiffs—Zehava Friedman ("Zehava"), Vera Deutsch Danos ("Vera"), Ella Feuerstein Schlanger ("Ella"), Tzvi Zelikovitch ("Tzvi")—must be dismissed from this case because they have not alleged facts or adduced evidence suggesting that they were not Hungarian nationals at the outset of the Holocaust.  The Supreme Court's opinion in *Philipp*, partially overruling *Simon I*, precludes reliance on the egregiousness or genocidal nature of expropriative conduct as a means to escape the limitation of the domestic takings rule.  *Philipp* is also irreconcilable with plaintiffs' argument that statelessness induced by genocidal conduct removes such conduct from the confines of the domestic takings rule.

      **1.**     ***After* Philipp, *the Domestic Takings Rule Bars Claims by Plaintiffs Then of Hungarian Nationality***

In *Philipp*, as discussed in Part I.B.7, *supra*, the Supreme Court held that "the phrase 'rights in property taken in violation of international law,' as used in the FSIA's expropriation exception, refers to violations of the international law of expropriation and thereby incorporates the domestic takings rule." 141 S. Ct. at 715. "This 'domestic takings rule' assumes that what a country does to property *belonging to its own citizens* within its own borders is not the subject of international law." *Id.* at 709 (emphasis added). At the time the FSIA was enacted in 1976—the relevant context when interpreting the FSIA—"[a] 'taking of property' could be 'wrongful under international law' only where a state deprived 'an alien' of property." *Id.* at 712 (quoting RESTATEMENT (SECOND) OF FOREIGN RELS. L. U.S. § 185 (Am. L. Inst. 1965)); *see also id.* (noting the Court's "consistent practice of interpreting the FSIA in keeping with 'international law at the time of the FSIA's enactment' and looking to the contemporary Restatement for guidance" (quoting *Permanent Mission of India to the United Nations v. City of New York*, 551 U.S. 193, 199–200 (2007))). This holding categorically rejected the D.C. Circuit's rule in *Simon I*, mirrored in the Circuit's *Philipp* opinion, "that the exception for property taken in violation of international law" is satisfied by genocidal takings "because 'genocide perpetrated by a state even against its own nationals is a violation of international law.'" *Id.* at 709 (quoting *Philipp*, 894 F.3d at 410–11 (quoting *Simon I*, 812 F.3d at 145)).

The parties do not dispute that with respect to plaintiffs who were Hungarian nationals at the time their property was expropriated by defendants, *Philipp* precludes such plaintiffs from invoking the expropriation exception as a basis to abrogate the FSIA's default grant of foreign sovereign immunity to Hungary and MÁV. *See* Defs.' Mem. at 17–18; Pls.' Opp'n at 7. As

such, plaintiffs correctly identify "the cardinal issue now before this Court" is whether the named

plaintiffs were Hungarian nationals at the relevant time.  Pls.' Opp'n at 8.

### 2.    *Once-Hungarian National Plaintiffs Arguably Rendered Stateless Cannot Circumvent the Domestic Takings Rule*

Plaintiffs vigorously argue that Hungary's conduct towards its Jewish population

rendered the named plaintiffs and others *de facto* stateless.  *See* Pls.' Opp'n at 29.  The summary

plaintiffs offer of this campaign is wrenching and deserves reprinting in full:

> [T]he "dejewification" process began as early as 1920, continuing
> through the enactment of the three Anti-Jewish Laws in 1938,
> 1939 and 1941, the issuance of confiscatory and denationalizing
> decrees from 1942 to 1943 and culminating in 1944 in the ultimate
> *de facto* abnegation of their citizenship/nationality.  That is when
> Hungary threw its Jewish inhabitants out of their homes,
> expropriated all of their movable and immovable property, forced
> them into ghettos, forcibly packed them like animals into cattle
> cars and shipped—that is, deported—them outside the borders of
> Hungary into the custody and control of another sovereign (Nazi
> Germany), knowing that these persons, whom Hungary now dares
> to call its nationals, would be transported to Auschwitz and other
> concentration and death camps outside Hungary to be gassed and
> turned into smoke and ash.

*Id.* (citing Decl. of Gavriel Bar-Shaked, Ph.D. ("Bar-Shaked Decl.") ¶ 28, ECF No. 167-2; and

Paul Abel, *Denationalization*, 6 MODERN L. REV. 57, 64-65 (1942)).  "As a matter of

international law, a state that marks, despoils, expropriates, ghettoizes, deports, and murders its

own nationals in violation of international law—in short, subjects them to genocide—breaks the

genuine connection of reciprocal rights and duties on which nationality is premised."  *Id.* at 29–

30 (citations and internal quotation marks omitted).  The egregiousness of the human rights

abuses reflected in these events is obvious and cannot be overstated but, as a legal matter, the

repercussions for the fact-specific inquiry of nationality, which after *Philipp* is now key for the

exercise of jurisdiction under the FSIA expropriation exception, is disputed by the parties and

not previously explicitly resolved in this case.

Defendants nominally dispute that Hungary's actions rendered plaintiffs stateless, but do not advance any substantive arguments for this position.  *See* Defs.' Mem. at 20 (offering only the conclusory assertion that "Hungary disputes" the "contention that [plaintiffs] were rendered stateless"); *see also* Defs.' Reply Mem. Further Supp. Mot. Dismiss Second Am. Class Action Compl. ("Defs.' Reply") at 8–9, ECF No. 168 (indicating that "Plaintiffs' Claims of Statelessness Fail As a Matter of Law" but again only arguing that this induced *de facto* statelessness, even if true, does not provide a basis for invoking the expropriation exception). Plaintiffs, for their part, misleadingly suggest that Hungary conceded this possibility, claiming that "Hungary recognizes that those Survivors who may once have been Hungarian citizens . . . may have been denationalized *de facto*."  Pls.' Opp'n at 28.  As support, plaintiffs quote a remark in defendants' opening brief that in fact merely acknowledges that "Plaintiffs argued" before the Supreme Court that they should have a chance to present a denationalization theory on remand.  *Id.* at 28–29 (purportedly quoting Defs.' Mem. at 29).[18]  In any event, this is a complicated question, requiring deep consideration of what it means to be a "citizen" or "national" of a sovereign state, and the parties' cross-talk complicates matters further, particularly in the absence of any formal official actions by Hungary revoking the label of "citizen" from its Jewish residents.  In contrast, plaintiffs point out that "Germany stripped all Jews of their citizenship in 1941," Pls.' Opp'n at 7 n.4, highlighting that Hungary's conduct may differ from Germany's for legal purposes—though as a practical matter for the numerous victims in both countries, this distinction may have meant little.

---

[18]     Such an acknowledgment by defendants of the existence of plaintiffs' procedural argument cannot reasonably be viewed as an endorsement of plaintiffs' related substantive argument.  On top of this mischaracterization, the citation is incorrect.  The cited page (p. 29) of defendants' memorandum contains no text matching plaintiffs' "quotation," which is instead on pages 18–19 of that brief.  This discrepancy would not be especially noteworthy were it not the case that this is one of several citation inconsistencies that collectively undermine the Court's ability to rely on representations made in the briefing.  *See also infra* notes 29 and 31.

Fortunately, *Philipp* provides an answer that renders unnecessary fact-specific determinations of which instances of abhorrent historical conduct are *de facto* denationalizing and which are not.  That fraught exercise is one that courts would do well to avoid, particularly in the context of a sovereign immunity determination where the jurisdictional analysis— assessing the gravity of potentially denationalizing conduct as part of a broad genocidal program—becomes outsized relative to the underlying property claims.  As Judge Katsas put it, such an endeavor "oddly matches the jurisdictional equivalent of a thermonuclear weapon (determining the scope of a genocide) to the merits equivalent of swatting a fly (determining whether there was a common-law conversion)."  *Philipp v. Federal Republic of Germany*, 925 F.3d 1349, 1352 (D.C. Cir. 2019) (Katsas, J., dissenting from the denial of rehearing en banc).[19] Plaintiffs' proposed denationalization-based bypass route around the domestic takings rule, however, demands that courts do exactly that—a result that would render *Philipp*'s central holding a rule in name only.

To be sure, the Supreme Court in *Philipp* did not categorically close the door on the argument: "Nor do we consider an alternative argument noted by the heirs: that the sale of the Welfenschatz is not subject to the domestic takings rule because the consortium members were not German nationals at the time of the transaction."  141 S. Ct. at 715.  The plaintiffs in *Philipp* made that argument only obliquely, however, *see* Br. Resp'ts at 27, *Philipp*, 141 S. Ct. 703 (No. 19-351), citing a Ninth Circuit opinion long predating *Philipp* that noted the domestic takings rule does not apply to non-nationals and relied on the district court's determination that the plaintiff "was no longer regarded by Germany as a German citizen," a matter "not challenged on

---

[19]    Defendants make a similar point: "Plaintiffs' approach would bring back one of the most vexing problems of the interpretation of the expropriation exception that the Supreme Court overturned in *Philipp*: It would require courts to determine at the outset of a case how badly a sovereign had mistreated its nationals, merely to assess whether there is jurisdiction over claims for property losses."  Defs.' Mem. at 22.

appeal," *Cassirer v. Kingdom of Spain*, 616 F.3d 1019, 1023 n.2 (9th Cir. 2010) (en banc).  In

oral argument, the clearest statement of what is meant by this residual argument on remand was

whether "German governmental treatment of German Jews in the 1930s would transgress [the]

nationality line," Arg. Tr. at 67–68, *Philipp*, 141 S. Ct. 703 (No. 19-351), a question plaintiff's

counsel acknowledged would be a case-specific question of fact that "may require the

submission of historical expertise," *id.* at 68.

Despite the murkiness of presentation of this issue to the Supreme Court, *Philipp*

provided sufficiently clear breadcrumbs of a path to conclude that expropriations conducted as

an integral part of a broad genocidal program—which the Holocaust unquestionably was—

simply cannot trigger the expropriation exception with respect to takings from individuals

regarded as citizens of the expropriating state during or just prior to the genocidal events.  Put

another way, if a loss of nationality is part and parcel of a set of genocidal acts that happen to

include expropriation, then the expropriation exception becomes the very type of "all-purpose

jurisdictional hook for adjudicating human rights violations" rejected in *Philipp*, 141 S. Ct. at

713.  Indeed, it is difficult to conceive of a hypothetical program of genocide that does *not*

deprive "member[s] of a minority group" of "full civic and political rights," Pls.' Opp'n at 21, or

treat its victims as something less than "full citizen[s]," *id.*  The logical result of plaintiffs'

argument, then, is that any program of genocidal conduct of which expropriations are a part—

because it inherently entails a loss of nationality—falls outside the domestic takings rule and can

be prosecuted using the expropriation exception.  That is precisely what *Philipp* forecloses, only

without articulating the intermediate "loss of nationality" step.  As the defendant in *Philipp*

articulates in a renewed motion to dismiss on remand, "claim[ing] some de facto statelessness

exception to the domestic-takings rule . . . do[es] little more than ask[] this Court to reinstate the

unanimously overruled *Simon [I]* decision in new words."  Def.'s Mem. Supp. Mot. Dismiss

Second Am. Compl. at 41, *Philipp v. Stiftung Preussischer Kulturbesitz*, No. 15-cv-266 (CKK)

(D.D.C. Oct. 29, 2021), ECF No. 63-1.  This Court agrees.

To be clear, none of this discussion is meant to suggest that Hungary granted plaintiffs

the rights and dignity afforded to persons Hungary unambiguously considered to be that

country's nationals.  It plainly did not.  Nor does the Court necessarily reject the proposition that

plaintiffs were rendered *de facto* stateless.  Nor is there any real question whether Hungary

committed "serious violations of international human rights law."  *Philipp*, 141 S. Ct. at 713.

The holding here is more technical in nature: genocidal expropriations, including those directly

associated with the result of denaturalization, cannot under *Philipp* trigger the expropriation

exception with respect to plaintiffs that would have been nationals of the offending state but for

the genocidal conduct.[20]

### 3.    *Four Plaintiffs Have Not Shown a Lack of Hungarian Nationality Prior to Hungary's Wartime Conduct*

After *Philipp* and due to the analysis above, to prevail in a motion to dismiss, a plaintiff

must show that he or she was *not* a Hungarian national immediately prior to defendants'

expropriation of their property or the commencement of other genocidal conduct.  Four named

plaintiffs—Zehava Friedman ("Zehava"), Vera Deutsch Danos ("Vera"), Ella Feuerstein

---

[20]    Defendants also address this question through a different lens, arguing that even if Hungary's treatment of plaintiffs rendered them stateless, plaintiffs did not thereby become nationals of any other state and as a result there was no injured foreign state (by way of injury to its nationals) and no violation of international law on account of the expropriations.  *See* Defs.' Mem. at 19–20.  Plaintiffs counter that a stateless person is an "alien" in relation to the expropriating state and therefore not covered by the domestic takings rule.  *See* Pls.' Opp'n at 31-34.  This is a question of first impression in this Circuit and appears to have been addressed by only one federal court.  In *Mezerhane v. República Bolivariana de Venezuela*, 785 F.3d 545, 551 (11th Cir. 2015), the Eleventh Circuit held, with limited analysis, that an arguably stateless individual could not invoke the expropriation exception "because his claims do not implicate multiple states."  *Mezerhane* distinguished this holding from Holocaust-related cases on the grounds that the expropriations at issue in the latter cases were part of a genocidal plan, *id.* at 551, a distinction that *Philipp* later rejected with respect to the applicability of the expropriation exception.  This Court need not decide this relatively novel issue at this juncture.

Schlanger ("Ella"), and Tzvi Zelikovitch ("Tzvi")—are unable to do so and must therefore be dismissed from this case because nothing in the record suggests a lack of Hungarian nationality at the relevant time.  If anything, the record contains modest affirmative indicia that each was reasonably *likely* to have been a Hungarian national.

Plaintiffs seeking to invoke the subject matter jurisdiction of this Court using an FSIA exception to the general grant of sovereign immunity bear the initial burden of production to show that the exception is applicable.  *See Chevron Corp. v. Republic of Ecuador*, 795 F.3d 200, 204 (D.C. Cir. 2015).  Once that burden of production is met, however, "the burden of persuasion rests with the foreign sovereign claiming immunity, which must establish the absence of the factual basis by a preponderance of the evidence."  *Id.* (quoting *Agudas Chasidei Chabad*, 528 F.3d at 940).

Plaintiffs allege that the Holocaust "began in 1933 when the Nazi Party rose to power in Germany," SAC ¶ 102, and the record lacks evidence of potentially citizenship-stripping actions by Hungary before that date.  Further, according to plaintiffs, under the Hungarian Citizenship Law of 1879, effective until 1948, "one acquired Hungarian citizenship only by descent from a citizen parent, legitimization, naturalization, or marriage," Pls.' Opp'n at 25–26.  This suggests a general citizenship rule determined by parentage rather than by place of birth, although in the absence of information about the citizenship of any plaintiff's parents, place of birth may be a useful proxy.

<em>a)</em>  <em>Zehava</em>

Zehava was born May 31, 1932, in Satoraljaujhely, Hungary, to a large family living in a "large home" on a "large lot"—sufficiently expansive so as to contain outbuildings with tenants—owned by her grandfather, a "successful wine merchant."  SAC ¶ 28.  She had brothers

serving in the Hungarian army, and a father and brothers conducting business in Budapest (the capital of Hungary) much of the year.  *Id.*  Given that Zehava's birth predated the Holocaust and none of these facts alleges or supports an inference that Zehava's parents were not Hungarian citizens, Zehava has not met her burden of production to establish jurisdiction.  If anything, her family's fairly extensive, multigenerational ties to Hungary, combined with her birthplace in Hungary, weigh in favor of the opposite conclusion.

> b)      *Vera*

Vera was born in 1926 in Verpelet, Hungary to "a wealthy wine merchant" who owned a wine business.  SAC ¶¶ 65–66.  This description says little about the nationality of Vera's parents, and, critically, does *not* provide a reason to infer they were other than Hungarian nationals.  Vera, too, has not met her burden of production.  As above, the fact that Vera was born in Hungary increases the likelihood that her parents were Hungarian nationals.

> c)      *Tzvi*

Tzvi was born in 1928 in "Uglya in Carpatorus, part of Hungarian-annexed Ruthenia (which was in the Kingdom of Austria-Hungary until formation of the Czechoslovak Republic after World War I)," and was raised there as well.  SAC ¶ 15.  Plaintiffs explicitly allege, without any caveats or qualifications, that Tzvi's parents were "both Hungarian citizens."  *Id.*  Under the general rule of acquiring citizenship through birth to Hungarian citizen parents, Tzvi, too, would have been a Hungarian citizen upon birth.  Plaintiff offers unrefuted evidence that some special considerations applied, however, with respect to inhabitants of Czechoslovakian territory annexed by Hungary in the late 1930s.  *See infra* Part III.B.2.b.  Even under those additional rules, on this record, if Tzvi were not a Hungarian citizen at birth, he became one upon annexation because (1) he and his parents lived in Ruthenia continuously for the entire window

of March 15, 1929 to March 15, 1939; (2) plaintiffs have offered no facts suggesting that his parents were not yet Hungarian citizens as of July 26, 1921; (3) at the time of annexation Tzvi was ten or eleven years old—in any event, under 24 years of age; and (4) nothing in the record indicates either of his parents or any other ancestors "acquired Czechoslovak citizenship by option based on Article 64 of the Trianon Treaty," Bar-Shaked Decl. ¶ 61; to the contrary, because of the general rule of citizenship transfer through parentage, the limited set of his ancestors living between the 1920 signing of the Treaty of Trianon and the annexation in 1939 were likely Hungarian nationals as well.

>            *d)*        *Ella*

Ella "was born in 1930 to a Hungarian family resident in Benedike, Czechoslovakia." SAC ¶ 73. That statement, without more facts, is sufficient to extinguish jurisdiction over Ella's claims because without more facts, the most reasonable inference by far is that Ella had Hungarian nationality and thus her claims fall within the domestic takings rule. Without some allegation to the contrary, Ella's family must be deemed to have had Hungarian nationality. In this instance, the allegation that the family lived in Czechoslovakia actually harms, not helps, Ella's position because it is unclear what *else* besides nationality the adjective "Hungarian" could mean when applied to a family resident in Czechoslovakia prior to annexation.[21] If Ella's parents were Hungarian nationals at the time of her birth in 1930, under plaintiffs' description of the respective states' citizenship laws, she would have likewise become a Hungarian national upon birth and would *not* have become a Czechoslovakian national. Additionally, 1930 predates the various anti-Jewish laws later enacted by Hungary, *see* Bar-Shaked Decl. ¶ 29, meaning that

---

[21]        By contrast, when used to describe a resident of Hungary, the term "Hungarian" arguably could be used more colloquially without necessarily being a statement about nationality. *See infra* note 25 and accompanying text.

plaintiffs have not identified any obstacle in Hungarian law for Ella to have held that country's citizenship.

*   *   *

As discussed more fully in Part III.B.3, *infra*, plaintiffs have plausibly established non-Hungarian nationality for nine other named plaintiffs, each of whom is alleged to have been born "in the Ruthenia or Slovakian regions of Czechoslovakia" to parents not known to be of Hungarian nationality, making them "presumptively Czechoslovak nationals when Hungary wrongfully took their property in the Holocaust." Pls.' Opp'n at 4–5, 5 n.2. Their claims survive at the motion to dismiss stage, although further factual development may show that some of these named plaintiffs are Hungarian nationals as well, ultimately requiring further dismissals.

### 4.   *Plaintiffs' Alternative Bases for Showing a Violation of International Law By Hungary Against Jewish Hungarian Nationals Fail*

In a last gasp effort to preserve the right of then-Hungarian nationals to sue Hungary for Hungarian atrocities against them as Jews, plaintiffs also briefly advance two alternative arguments for why Hungarian national plaintiffs may bring expropriation claims, neither of which is convincing.

First, plaintiffs urge that because Hungary and Nazi Germany were "joint actors, joint tortfeasors, [and] partners in crime," claims can be brought against Hungary for expropriations wrought by Germany. Pls.' Opp'n at 34–35. In other words, the Hungarian nationals are not barred by the domestic takings rule because the takings were effectuated in part by Germany. In support, plaintiffs' "leading case" is the decade-old case of *Cassirer v. Kingdom of Spain*, 616 F.3d 1019 (9th Cir. 2010) (en banc), which held that the FSIA "does not require that the foreign state against whom the claim is made by the entity which took the property in violation of international law." Pls.' Opp'n at 35 (quoting *Cassirer*, 616 F.3d at 1028). *Cassirer* involved an

art expropriation claim against Spain (the alleged current owner) for Nazi Germany's expropriation from a German in Germany.  616 F.3d at 1022–23.  The Ninth Circuit held that jurisdiction could lie against Spain, but relied on the statelessness argument, rejected as now incompatible with *Philipp* in Part III.A.2, *supra*, to prevent the German takings from being deemed "domestic."  *Id.* at 1023.  Furthermore, the D.C. Circuit did not endorse the reasoning quoted by plaintiffs from *de Csepel*, *see* Pls.' Opp'n at 35, instead affirming the denial of dismissal by determining that the claims at issue were best construed as bailment claims and not expropriation claims at all, *de Csepel v. Republic of Hungary*, 714 F.3d 591, 598 (D.C. Cir. 2013).  Finally, as defendants correctly point out, even if Hungary could be liable on a theory of complicity with Germany's expropriations from Hungarians, not one of the complaint's allegations identifies any takings of plaintiffs' property by *German* officials.  Defs.' Reply at 12. The complaint alleges ample German involvement with human rights atrocities committed against the Hungarian Jews, but none that trigger the expropriation exception.

Second, plaintiffs attempt to invoke Hungary's alleged violations of the 1920 Treaty of Trianon as an "independent and sufficient basis" for applying the expropriation exception on the premise that the Treaty created international law guaranteeing rights for "all inhabitants of Hungary," the violation of which is sufficient predicate for invoking the expropriation exception without being limited by the domestic takings rule.  *See* Pls. Opp'n at 36–39.  Regardless of what obligations Hungary undertook under this Treaty related to World War I, the problem with this argument is that *Philipp* demands that the violation of international law used to invoke the expropriation exception be a violation of "the international law of expropriation" as understood in 1976 and not draw more broadly from "all of international law."  141 S. Ct. at 712–13. Furthermore, the reliance on a pre-existing treaty to *abrogate* sovereign immunity, rather than to

expand it, strikes this Court as veering perilously close to the "generally disfavored" practice of "[o]ffensive use of a pre-existing agreement," as articulated in *Simon-2014*, 37 F. Supp. 3d at 409.

\*   \*   \*

In short, *Philipp* closes the door on then-Hungarian national plaintiffs to pierce sovereign immunity using the expropriation exception, as the Supreme Court's opinion revives and fortifies the domestic takings rule even for situations involving atrocities so grave that the expropriations could themselves be deemed genocidal in character. Furthermore, plaintiffs' theory of statelessness caused by genocidal conduct as a means of bypassing the domestic takings rule is no longer viable for Hungarian plaintiffs as it is irreconcilable with the logic of *Philipp*. As applied to this case, the four named plaintiffs discussed above must therefore be dismissed with prejudice because they fail to offer allegations suggesting a lack of Hungarian nationality, and in some cases the facts even affirmatively militate in favor of such nationality.

### B.   Foreign National Plaintiffs May Proceed

Just as the parties agree that after *Philipp*, the domestic takings rule precludes the use of the expropriation exception by plaintiffs who were Hungarian nationals at the time of the takings, they also do not dispute that the FSIA does not confer sovereign immunity against claims brought by plaintiffs who were nationals of some *other* country (and not of Hungary) at the time of the takings, so long as those claims satisfy the other requirements of the expropriation exception. *See* Pls.' Opp'n at 7; Defs.' Mem. at 1.[22] The task now before this Court, therefore,

---

[22]     Defendants invite this Court to revisit one of these "other requirements," the commercial nexus requirement, in light of *Philipp*'s constriction of the scope of "property taken in violation of international law" to include only property taken from foreign nationals. Defs.' Mem. at 30–38. As a result, defendants argue, this Court's decision in *Simon-2020* that the nexus requirements had been satisfied as to both defendants "is no longer true" because after *Philipp*, "only takings from *foreign nationals* can deprive Hungary of sovereign immunity. Other expropriations cannot be considered when applying the nexus requirement. . . . The question now, which this Court has never considered, is whether the nexus requirement can be satisfied solely by property taken from

is to ascertain which, if any, of the named plaintiffs have adequately pleaded facts or proffered evidence supporting the position that they were foreign (*i.e.*, other than Hungarian) nationals at the time of the takings at issue.[23]

### 1.    *Nationality Arguments Are Properly Before the Court*

Defendants urge the Court to reject, on procedural grounds, plaintiffs' attempts to argue that at least some named plaintiffs were not Hungarian nationals at the time of the expropriations at issue. *See* Defs.' Mem. at 23–30.[24]  All three legal doctrines invoked for this basic point—

---

foreigners." Defs.' Mem. at 30–31 (emphasis in original).  As a technical matter, defendants are likely correct that *Philipp* can affect a commercial nexus analysis.  Given that the scope of "property taken in violation of international law," 28 U.S.C. § 1605(a)(3), was reduced by *Philipp*, the nexus requirement's reference to "that property," *id.*, must likewise be so constrained.  The problem for defendants is that the commingling logic in *Simon-2020*, derived from a holding in *Simon I* not related to the domestic takings rule and thus not abrogated by *Philipp*, provided the bridge between the specific named plaintiffs' property and the modern-day presence in the United States of commingled proceeds from liquidations of all victims' property.  *See Simon-2020*, 443 F. Supp. 3d at 103–04 (citing *Simon I*, 812 F.3d at 147).  Nothing about that logic changes if one set of named plaintiffs—everyone listed on the face of the complaint—is displaced in favor of a different set of named plaintiffs—only those deemed to have been foreign nationals.  Plaintiffs are correct that "[n]othing in the Court's [*Simon-2020*] analysis depended on the Hungarian nationality *vel non* of those Jews who were deprived of their property."  Pls.' Opp'n at 40.  Accordingly, defendants' invitation is declined.

[23]    This Court need not confront the question now—but could later be faced with it—whether plaintiffs who were stateless for some exogenous reason (*i.e.*, not through the denationalization theory discussed in Part III.A.2, *supra*) may bring claims using the expropriation exception without running afoul of the domestic takings rule.  None of the named plaintiffs in the Second Amended Complaint alleges facts nor otherwise argues a condition of statelessness unrelated to the Holocaust.  If any had, the types of arguments discussed in note 20, *supra*, would likely be central to that analysis.  Likewise, the parties have not addressed whether the domestic takings rule would apply in the event of claims by plaintiffs who were nationals of *both* Hungary and another country (in this case, most likely Czechoslovakia) at the time of the expropriations.  Only one appellate opinion has directly considered such a question.  In *Comparelli v. Republica Bolivariana de Venezuela*, 891 F.3d 1311 (11th Cir.), a case involving expropriation claims against Venezuela by a dual Venezuelan-Italian national, the Eleventh Circuit declined to issue a per se rule in either direction, instead holding that "the inquiry is fact-based, considering matters such as the relationship between the national and the state which allegedly expropriated the property, how the national—through his words and conduct—characterized himself, and whether the state considered its national as one of its own or as a foreign national."  *Id.* at 1323.

[24]    While defendants' brief includes a heading titled "Any Claim By Plaintiffs That They Were Never Hungarian Nationals Has Been Forfeited *And Is Incorrect*," Defs.' Mem. at 23 (emphasis added), the associated text for this section deals exclusively with judicial admission, judicial estoppel, and waiver arguments.  In other words, defendants do not articulate why it "Is Incorrect" as a factual matter for some plaintiffs to argue that they never had Hungarian nationality.  Furthermore, to support a point that "Plaintiffs were not *actually* Czech nationals," defendants point to "*infra* Point II.B," Defs. Mem. at 26—a section that would have been interesting but does not exist in defendants' brief, perhaps not surviving revisions.  Furthermore, while asserting in another title that "Plaintiffs' Claims As To Czechoslovakian Nationality Fail As A Matter Of Law," defendants nearly concede that some named plaintiffs might in fact be able to show Czechoslovakian nationality.  Defs.' Reply at 9.  The "Fail[ure]" asserted is not that plaintiffs cannot viably claim Czechoslovakian nationality, but rather that doing so would, defendants argue, cause "their claims [to] be extinguished under the treaty exception" by falling under

judicial admission, judicial estoppel, and waiver—fail, and plaintiffs are not barred from

pursuing these arguments.

a)      *No Judicial Admission*

Defendants assert that because "[p]laintiffs have admitted numerous times that they *were*

Hungarian nationals at the time of the takings," those "statements constitute a judicial admission

that Plaintiffs were Hungarian nationals at the time of the wrongdoing" and therefore bar

plaintiffs from "now argu[ing] the opposite."  Defs.' Mem. at 24 (emphasis in original).  To be

sure, "[a] party's assertion of fact in a pleading is a judicial admission by which it normally is

bound throughout the course of the proceeding."  *El Paso Natural Gas Co. v. United States*, 750

F.3d 863, 876 (D.C. Cir. 2014) (quoting *Schott Motorcycle Supply, Inc. v. Am. Honda Motor Co.,

Inc.*, 976 F.2d 58, 61 (1st Cir. 1992)).  Scrutiny of the record reveals that plaintiffs have not

made such "admission[s]" to the extent defendants suggest.  Defendants' characterization of

plaintiffs' statements about their nationality over the course of this litigation is imprecise at best.

For example, early in their opening brief, defendants argue: "*As alleged* in the Complaint,

all of the named Plaintiffs were Hungarian nationals at the time of the takings."  Defs.' Mem. at

4 (emphasis added).  This is imprecise because the types of ties to Hungary alleged in the

complaint are not one and the same with Hungarian *nationality*.  Nowhere in the complaint do

plaintiffs expressly allege *any* nationality, Hungarian or otherwise, of any named plaintiff.  As

support for supposed implicit allegations of Hungarian nationality, defendants cite to examples

of allegations of named plaintiffs who were "raised in Hungarian-annexed" territory, who were

"raised in Hungary," or who "lived in Hungary and worked in the Hungarian annexed regions."

---

Article 26 rather than Article 27 of the 1947 Treaty.  *Id.* at 9–10.  As discussed in Part III.B.1.b, *infra*, the Court
rejects this attempt to revive the use of the treaty exception in the face of the Circuit's clear holding in *Simon I*.

47

*Id.* at 4–5 (citing SAC ¶¶ 10, 15, 22, 28, 39, 41, 49, 65, 73, 81).  As apparent in the discussion below of Hungarian and Czechoslovakian nationality rules, these factual allegations are not dispositive as to Hungarian nationality for all the plaintiffs.

Elsewhere, defendants state: "Plaintiffs represented to the D.C. Circuit [in *Simon I*] that they were all Hungarian citizens or nationals at the time Hungary took their property in both their opening and reply briefs."  Defs.' Mem. at 8 n.7; *see also id.* at 24.  On the cited page of plaintiffs' opening appellate brief in *Simon I*, plaintiffs described themselves as having "lived within today's Hungarian borders or in territory annexed by Hungary in 1938 after Czechoslovakia's dismemberment," *Simon I* Pls.' Br. at 2, but such a description falls short of a "represent[ation]" of nationality.  Defendants' citation to plaintiffs' appellate reply brief presents a closer question, given plaintiffs' argument that "Survivors were Hungarian nationals or citizens in name only, not substance, as they were systematically deprived of the most fundamental rights to which a state's nationals and citizens are entitled, including the right to exist."  *Simon I* Pls.' Reply at 11.  Taken in context, however, plaintiffs were making an argument that Hungary could not hide behind the domestic takings rule because Hungary's expropriations "were racially discriminatory," *id.* at 9, and regardless of any formal labels of nationality, Hungary's relationship with plaintiffs did not entail substantive hallmarks of citizenship—hence the expression "nationals or citizens in name only," *id.* at 10–11.  Plaintiffs' phrasing implied only that *if* Hungary applied formal labels of citizenship to plaintiffs, they were "citizens in name only."  In other words, the critical term is "in name only," not "citizens."

Similarly, defendants unconvincingly point to statements by plaintiffs that emphasize the relationship between a government and a country's own nationals.  *See* Defs.' Mem. at 24.  In briefing in *Simon I*, plaintiffs noted judicial decisions that "concluded that [Holocaust

expropriations] violate international law, notwithstanding the victims' nationality" and continued that "[t]his comports with the modern view that international law confers fundamental rights upon all people vis-à-vis their own governments." *Simon I* Pls.' Reply at 9. This framing of their argument is altogether unsurprising to avoid reliance on non-Hungarian nationality to sidestep the domestic takings rule, since such arguments are critical for success for the handful of Hungarian nationals among the named plaintiffs. Nothing about that argument is inconsistent with some of the named plaintiffs having been foreign nationals at the relevant time; it is simply an argument that is not necessary for the entire group.

With more notable merit, defendants point out several times that plaintiffs describe themselves and putative class members as "Hungarian Jews," Defs.' Mem. at 5, 18, 34, but ultimately these litigation statement also fail to constitute an "admission." Defendants are correct that plaintiffs frequently use this phrase as a descriptor. *See, e.g.*, SAC ¶ 84 ("MÁV . . . deport[ed] Hungarian Jews . . . ."); *id.* ¶ 101 ("property that Defendants stole from Hungarian Jews, including Plaintiffs"); *id.* ¶¶ 105, 107 ("First Deportations and Murder of Hungarian Jews" in 1941); *id.* ¶ 108 (expulsion of "Hungarian Jews from all public employment, academic and professional positions"); *id.* ¶ 110 ("ghettoization of the Hungarian Jews"); *id.* ¶¶ 120, 122 (deportation of "Hungarian Jews" to Auschwitz); *id.* ¶ 155(D) (posing the legal question "[w]hether Defendants, as a matter of course, confiscated the property and possessions of Hungarian Jews"); *id.* ¶ 194 (alleging conspiracy between Germany and defendants to "steal Hungarian Jews' property"). Even in the course of opposing this motion to dismiss, plaintiffs continue to use the phrase. *See, e.g.*, Pls.' Opp'n at 6 ("Hungary expropriated all of the property of nearly 500,000 Hungarian Jews . . . .").

Plaintiffs offer, in a footnote, a construction of the phrase, to which defendants offer no rejoinder: "These references [to 'Hungarian Jews'] merely describe the victims generically as Jews who were in Hungary and thus subject to Hungary's genocidal actions; they do not purport to specify nationality."  Pls.' Opp'n at 8 n.5.  To be sure, the phrase "Hungarian Jews" may be understood to imply that the Jews at issue were more than merely present in Hungary when victimized by Hungary but had a closer connection of belonging to or coming from Hungary, as would a national or citizen of that country.  Nevertheless, when considering a motion to dismiss for lack of subject matter jurisdiction, courts "construe the complaint 'liberally.'"  *Zukerman v. U.S. Postal Serv.*, 961 F.3d 431, 436 (D.C. Cir. 2020) (quoting *Barr v. Clinton*, 370 F.3d 1196, 1199 (D.C. Cir. 2004)).  In that vein, plaintiffs' explanation of the intended meaning of their own allegations is credited as being a linguistically reasonable, useful shorthand rather than a blanket statement that all affected were "Hungarian nationals."[25]

Further supporting the looser reading of the "Hungarian Jews" label, the D.C. Circuit's opinion in *Simon I* likewise uses the term when referring to persons clearly lacking Hungarian citizenship.  In its overview of the relevant history, the *Simon I* panel observed that starting around 1941, "Hungary stripped some Hungarian Jews of their Hungarian citizenship, forced others into internment camps or slave labor battalions, expelled others from public or professional employment, and pressed still others into exile."  812 F.3d at 133.  Continuing to describe this group in the aggregate, the court noted that despite this persecution, "Hungarian

---

[25]     Dictionary definitions of the term "Hungarian" also show a range of interpretive possibilities.  For example, a "Hungarian" may be "a native or inhabitant of Hungary" or "a person of Hungarian descent," *Hungarian*, MERRIAM-WEBSTER ONLINE, https://www.merriam-webster.com/dictionary/Hungarian, providing minimal insight into the extent, if any, to which the term "Hungarian" is associated with Hungarian nationality or citizenship, as opposed to birthplace, residency, or ancestry.  Ambiguity of this sort is not unique to Hungarians.  *See Demonym*, MERRIAM-WEBSTER ONLINE, https://www.merriam-webster.com/dictionary/demonym ("a word (such as *Nevadan* or *Sooner*) used to denote a person who inhabits or is native to a particular place").

Jews" had until 1944 avoided "widespread extermination." *Id.* That all changed in 1944, when in just three months "nearly half a million Hungarian Jews were murdered." *Id.* In context, the *Simon I* panel seemingly applied the term "Hungarian Jews" at various points in time to describe groups that included members lacking Hungarian citizenship because that citizenship had been "stripped." In short, "Hungarian Jews" is more a term of art than a statement of nationality and is not a judicial admission by plaintiffs of Hungarian citizenship or nationality.

b)    <i>No Judicial Estoppel</i>

Defendants next posit that plaintiffs are estopped from characterizing any named plaintiffs as having been foreign nationals because plaintiffs' argument and the D.C. Circuit's decision in *Simon I* based its analysis of the treaty exception on the expropriations at issue being covered by Article 27 of the 1947 Treaty. Defs.' Mem. at 25. According to defendants, because plaintiffs tried to invoke Article 27, "where Hungary 'undertook' to restore property of its own nationals," *id.* (quoting *Simon I* Pls.' Reply at 3), and the Circuit's determination that Article 27's remedies were non-exclusive was, itself, exclusive to Article 27, *id.* This reliance by the Circuit, defendants urge, estops plaintiffs from now arguing that they were not Hungarian nationals, as doing so would invoke Article 26 instead of Article 27. *See id.* at 25–28.

Defendants overstate the significance of the distinction between the two Articles as well as the extent of reliance by the Circuit on plaintiffs' framing on nationality. As an initial (and potentially dispositive) matter, Article 27 is *not* in fact constrained to claims by Hungarian nationals. Article 27 concerns property and interests "of persons *under Hungarian jurisdiction*" violated after September 1, 1939. 1947 Treaty art. 27, 61 Stat. at 2124 (emphasis added). It is difficult to see how persons residing in the annexed territories—regardless of their nationality— did not find themselves "under Hungarian jurisdiction" when they were ousted from their homes,

divested of their belongings, and inhumanely shipped off to concentration camps.  Furthermore,

Article 27 encompasses offenses committed "on account of the racial origin or religion of such

persons," with no apparent nationality-related criterion.  *Id.*

Even were Article 26 relevant to encompass claims by Czechoslovakian nationals for

violations experienced while living within the jurisdiction of Hungary, defendants have still not

clearly articulated why Article 26 remedies should be considered exclusive, allowing the treaty

exception rejected in *Simon I* to come back into play for claims by foreign nationals.  On the

contrary, the Circuit's first stated rationale for viewing Article 27 as providing non-exclusive

remedies is that Article 27's text "says nothing about whether those rights are exclusive of other

claims Hungarian Holocaust victims might bring, such as the causes of action asserted by the

plaintiffs here."  *Simon I*, 812 F.3d at 137.  This contrasted with "[o]ther treaties concluding

World War II hostilities," which "contain language expressly establishing a final *and exclusive*

resolution of war-related claims."  *Id.* (emphasis in original).  Furthermore, "Article 27 of the

1947 Treaty contains no comparable waiver of extra-treaty claims against Hungary.  The absence

of any such waiver language in Article 27 is all the more notable given that the 1947 Treaty itself

contains an express waiver of certain other claims . . . ."  *Id.* at 138.  Nothing about this analysis

changes if "Article 26" is substituted for "Article 27" throughout.  Article 26, too, contains no

express waivers or suggestions of exclusivity of remedies.  *See* 1947 Treaty, art. 26, 61 Stat. at

2121–24.  Defendants mention none of this.

Defendants are correct that the *Simon I* court went on to bolster its conclusions about the

non-exclusivity of Article 27 based on the context that remedies for Hungarian nationals needed

to be non-exclusive because their own government (Hungary's) would not have negotiated on

their behalf against itself.  *See Simon I*, 812 F.3d at 138–40; Defs.' Mem. at 26–28.  By failing to

52

mention the Circuit's first reason—the text—for viewing Article 27 as non-exclusive, however, defendants misleadingly suggest that this "context" issue *alone* was dispositive in *Simon I*. A better reading of the *Simon I* opinion is that the Circuit found both of these reasons to be compelling.

In the end, defendants' judicial estoppel argument fails because defendants have not clearly shown that the *Simon I* court relied on plaintiffs' representations of nationality in an outcome-determinative fashion.[26] If anything, *defendants'* framing—as the party invoking the treaty exception—pushed Hungarian nationality and had more to do with the *Simon I* court's approach. *See* Pls.' Opp'n at 10–11 (showing the Circuit's reliance on defendant's characterizations). In any event, the outcome reached in *Simon I* would be no different if analyzed under Article 26.

### c)    No Waiver

Finally, defendants insist that plaintiffs' argument that at least some named plaintiffs were foreign (non-Hungarian) nationals at the time of the expropriations has been waived, principally because of plaintiffs' failure to assert it on appeal in *Simon I*. Under the peculiar circumstances of this case, the waiver argument fails.

As an initial matter, plaintiffs raised the issue of the non-Hungarian nationality of some plaintiffs in their very first responsive filing in this case, stating: "Contrary to Defendants' assertion, not all of the Plaintiffs were considered Hungarian citizens when they were deported by Defendants." Pls.' Opp'n [First] Mot. Dismiss at 3, ECF No. 24; *see also id.* at 16 ("Finally, although many of the Plaintiffs were citizens of Hungary at the time of the takings in question, not all were."). As such, the suggestion that certain plaintiffs held other than Hungarian

---

[26] For the same reason, revisiting the use of the treaty exception now is unnecessary.

nationality is by no means a "new" argument.  Furthermore, as noted above, the corpus of

plaintiffs' representations over the course of the case have not been inconsistent with this

premise.

At the same time, however, plaintiffs did not argue the nationality point on appeal in

*Simon I*, even though defendants asserted at the Circuit that "[a]ll of [the] Plaintiffs were

Hungarian nationals at the time of the events in question," Opp'n Br. Defs.-Appellees at 32,

*Simon I*, 812 F.3d 127 (No. 14-7082), without any rebuttal by plaintiffs of that characterization.

For its part, in its *Simon I* opinion the D.C. Circuit panel stated, without analysis, that "[a]ll

fourteen [named plaintiffs] were Hungarian nationals during World War II, but have since

adopted other nationalities."  812 F.3d at 134.

To the extent the D.C. Circuit relied on this assumption about plaintiffs being Hungarian

nationals, as discussed in Part III.B.1.b, *supra*, the treaty exception analysis did not meaningfully

turn on this issue.  Indeed, Article 27 may have encompassed all plaintiffs' claims regardless of

nationality given that they all found themselves under "Hungarian jurisdiction."  Although the

Circuit again mentions that "the plaintiffs were Hungarian nationals" on the way to determining

that the "domestic takings rule has no application in the unique circumstances of this case,"

*Simon I*, 812 F.3d at 144, nothing about that conclusion is any less valid with respect to a foreign

national named plaintiff.  It is still the case that for a foreign plaintiff the domestic takings rule

does not apply, but this time for two distinct reasons: (1) the takings in question were simply not

"domestic" and (2) in any event, the domestic takings rule is null and void in this scenario.  In

short, while Hungarian nationality was surely assumed in the narrative in *Simon I*, this

assumption did not in any way affect the logic and can hardly be deemed a "holding."[27]

---

[27]     For the same reason, *Simon I*'s description of plaintiffs as having been Hungarian nationals is not "law of
the case" as defendants contend.  *See* Defs.' Mem. at 23 n.14.  "The reach of the mandate is generally limited to

Ordinarily, however, the "mandate rule" would indeed constrain plaintiffs because failing to raise all arguments on appeal triggers the general rule that unaddressed arguments are typically not available to be relitigated on remand. *See, e.g.*, *Havlish v. 650 Fifth Avenue Co.*, 934 F.3d 174, 181–82 (2d Cir. 2019) ("[W]here an issue was ripe for review at the time of an initial appeal but was nonetheless foregone, the mandate rule generally prohibits the district court from reopening the issue on remand unless the mandate can reasonably be understood as permitting it to do so." (alteration in original) (quoting *United States v. Ben Zvi*, 242 F.3d 89, 95 (2d Cir. 2001))). As a mechanism for enforcing the decree of an appellate court, however, the mandate rule in its general formulation necessarily must yield to the explicit directives of the appellate court—themselves part of the mandate.

Here, the Circuit explicitly stated that on remand from *Simon I*, "the district court [may] consider on remand whether, as a matter of international comity, it should refrain from exercising jurisdiction over those claims until the plaintiffs exhaust domestic remedies in Hungary. The district court may also elect to consider any other arguments that it has yet to reach and that are unaddressed in our opinion today, such as the defendants' *forum non conveniens* arguments." *Simon I*, 812 F.3d at 151. The question whether plaintiffs were all Hungarian nationals was not reached by this Court in *Simon-2014* and *Simon I*'s references to plaintiffs as having been Hungarian nationals reflected an *assumption* that does not meet the bar for having been "addressed" by the Circuit. Accordingly, the Circuit's directions spared this critical argument from being waived despite plaintiffs' choice not to press it in *Simon I* as an additional basis on which to reverse the *Simon-2014* grant of dismissal.

---

matters actually decided. A mere recital of matters assumed for purposes of decision and dicta are not part of the mandate." 18B WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 4478.3 (2d ed. 2021) ("Law of the Case—Mandate Rule").

The permissiveness of the *Simon I* mandate is underscored by the Circuit's express invitation for defendants to argue, and this Court to consider on remand, the idea that international comity considerations provide reason for declining to exercise jurisdiction on prudential (not statutory) grounds pending exhaustion of domestic remedies.  *See* 812 F.3d at 149, 151.  Critically, defendants had not raised that argument at all in *Simon I*; rather, the Circuit identified it as an "argument that the Hungarian defendants *could* assert in this case."  *Id.* at 149 (emphasis added).  Unsurprisingly, when defendants took the Circuit up on its invitation in *Simon-2017*, *see* Part I.B.3, *supra*, nobody argued there or in *Simon II* that defendants' "new" prudential exhaustion argument had been waived by failure to press it in *Simon-2014* or *Simon I*.  There is no reason to believe that the Circuit's parallel blanket invitation to raise on remand any issue "unaddressed" in *Simon I* should be taken any less seriously.

### 2.    *Citizenship Rules*

Plaintiffs have provided a detailed and uncontroverted declaration by Dr. Gavriel Bar-Shaked, a historian "specializing in the Hungarian Holocaust."  Bar-Shaked Decl. ¶¶ 4–19.  The Court has no reason to doubt the reliability of Dr. Bar-Shaked's testimony, and in any event, defendants offer no rebuttal or objection.  To the contrary, defendants cite to Dr. Bar-Shaked's declaration in their own briefing in support of their own arguments regarding plaintiffs' nationality.  Defs.' Reply at 1, 3–4, 4 n.4.

A number of named plaintiffs were living in the Ruthenia and Slovenia portions of Czechoslovakia that were annexed by Hungary in 1938 and 1939, Bar-Shaked Decl. ¶¶ 31 n.11, 58 & n.28, 60 & n.30, raising a question as to their nationality in the relevant period.  The relevant citizenship laws of Czechoslovakia and Hungary at the time were, to put it mildly, complicated.

a)      *Czechoslovakia*

Czechoslovakian citizenship law prior to the annexations by Hungary involved complicated criteria owing to Czechoslovakia's creation upon the 1918 collapse of the Austro-Hungarian Empire.  According to plaintiffs, Czechoslovakian citizenship was conferred on October 28, 1918, to: (1) persons who had held a "domiciliary right" in the territory that became Czechoslovakia continuously since January 1, 1910; and (2) "[f]ormer Hungarian citizens who were born on the territory of Czechoslovakia as children of Hungarian citizens with domiciliary right on the Czechoslovakian territory."  Pls.' Opp'n at 26.  After that date, "Czechoslovakian citizenship was obtained by birth if a child was born into a marriage and the father was a Czechoslovakian citizen or[,] if born out of wedlock, if the mother was a Czechoslovakian citizen."  *Id.*

As relevant to this case, plaintiffs argue that persons "born in the Ruthenia or Slovakia regions when [those regions] were part of Czechoslovakia," but then resided in Hungary at the time of the post-annexation takings, were "presumptively Czechoslovak nationals when Hungary wrongfully took their property in the Holocaust."  Pls.' Opp'n at 4–5.  That conclusion, however, does not flow from plaintiffs' explanation of Czechoslovakian citizenship law, without more.  To the contrary, under the stated rule an individual's Czechoslovakian citizenship status depended on some combination of when they were born, when they lived in the area corresponding to Czechoslovakia, and the citizenship status of one or both parents.  Those are too many conditions to make someone "presumptively" a Czechoslovakian citizen based solely on the fact of birth in Ruthenia or Slovakia between 1918 and 1938.  Furthermore, even if that "presumption" were valid, application required that the person must in fact have been born in those areas in that timeframe.

*b)*        *Hungary*

Dr. Bar-Shaked describes a detailed set of qualifications for Hungarian citizenship for those living in annexed Ruthenia: "Hungarian citizenship was granted to inhabitants of Ruthenia who had lived there continuously from March 15, 1929 to March 15, 1939 and had been Hungarian citizens on July 26, 1921.  Hungarian citizenship under these rules was granted also [to] wives and children under 24 years of age.  However, any person whose ancestor acquired Czechoslovak citizenship by option based on Article 64 of the Trianon Treaty was not entitled to Hungarian citizenship." *Id.* ¶ 61.[28]  Dr. Bar-Shaked extrapolates equivalent treatment for those in annexed Slovakia. *Id.* ¶ 61 n.31.

Finally, the Hungarian citizenship possibilities available to Jews in the annexed areas were restricted.  Hungary's Second Jewish Law, enacted in 1939, "prohibited Jews from obtaining Hungarian citizenship either by naturalization or marriage."  Bar-Shaked Decl. ¶ 31. As a result, Dr. Bar-Shaked contends, "many of the 324,000 Jews who lived in the territories acquired by Hungary from Czechoslovakia . . . between 1938 and 1941 were barred by the Second Jewish Law from becoming Hungarian citizens." *Id.* ¶ 31 & n.11.[29]  "This law also established the 'legal' basis for the Hungarian government practice of imposing extra stringent

---

[28]     Defendants also cite Dr. Bar-Shaked on this point, misleadingly, to argue that any named plaintiffs "born in regions of Czechoslovakia that had been annexed by Hungary . . . became Hungarian nationals after the annexation in 1939." Defs.' Reply at 3–4.  Even though defendants identify in a parenthetical that this citizenship-upon-annexation rule applied only to persons "who were originally Hungarian citizens," *id.* at 4 (citing Bar-Shaked Decl. ¶¶ 58, 60–61), they conveniently skip over that critical limitation and misattribute to Dr. Bar-Shaked the notion that birth in the annexed region plus residency therein at the time of annexation were, alone, enough to confer Hungarian citizenship, *see id.* at 3–4.

[29]     The citation provided as support for this statement does state that 324,026 Jews lived in the annexed region, as a distinct minority—only 6.05% of the total population in the annexed region—*see* Yehuda Don & George Magos, *The Demographic Development of Hungarian Jewry*, 45 JEWISH SOC. STUD. 189, 206 n.75 (1983), but is silent on any citizenship implications from annexation or law as to those residents.

requirements for the proof of Hungarian citizenship, which proved fatal to many Jews in occupied Ruthenia." *Id.* ¶ 31.

Without diminishing Dr. Bar-Shaked's expertise on this topic, for the purposes of subject matter jurisdiction in this litigation, this explanation raises more questions than provides answers. Was the conferral of Hungarian citizenship on a Czechoslovakian citizen (Jewish or otherwise) living in the *annexed* region a question of "naturalization" or some other annexation-related process? If the Second Jewish Law barred naturalization of Jews residing in the annexed areas without pre-existing Hungarian nationality, why were only "many of"—not "all"—such Jews "barred . . . from becoming Hungarian citizens"? If stringent documentation requirements *of Hungarian citizenship* "proved fatal to many Jews in occupied Ruthenia"—undoubtedly a very serious and real concern—does that mean that Hungarian citizenship *was* available to at least some Jewish residents of the annexed territory? If this prohibition was not universal, what determined who could obtain Hungarian citizenship and who could not? Ultimately, the Hungarian citizenship status, or not, of Jewish people—including nine of the named plaintiffs—residing in annexed regions at the time of annexation cannot be determined from the mere fact of residency in that place at that time. More plaintiff-specific information is required.

### 3.     *Named Plaintiffs*

The jurisdictional analysis that follows for each named plaintiff necessarily focuses on facts and circumstances potentially relevant to nationality, omitting the many dreadful facts about atrocities to which plaintiffs were subjected during the Holocaust, extending well beyond "mere" property confiscation. Without diminishing the gravity of the horrors experienced by each of these named plaintiffs and staggeringly many others, this technical analysis is intended, as it must be, to answer the legal question at issue.

Plaintiffs identify twelve named plaintiffs allegedly "born in the Ruthenia or Slovakian regions of Czechoslovakia." Pls.' Opp'n at 5 n.2. If this were sufficient to establish a rebuttable presumption of Czechoslovakian nationality at the relevant time, this entire discussion of nationality could end here, and those twelve plaintiffs deemed unaffected by the domestic takings rule. Two problems make that shortcut unavailable here. First, plaintiffs offer no explanation of *why* those meeting this description were "presumptively *Czechoslovak* nationals," *id.* at 4 (emphasis added), as opposed to merely *not* being Hungarian nationals. That conclusion would require either that birthright citizenship be the rule (which, as a reference point, it was not in Hungary, *see* Pls.' Opp'n at 25–26) or that those plaintiffs qualified for Czechoslovakian citizenship for some other reason *and* that the facts establish that the qualifications for that "other reason" are met. Plaintiffs offer neither the rule nor the facts to substantiate this "presumpti[on]" of Czechoslovakian nationality.

The following plaintiff-specific recitations of facts and inferences establish that nine plaintiffs have met their burden of production to support a reasonable inference of Czechoslovakian rather than Hungarian citizenship. In these vignettes drawn from the operative Second Amended Complaint, a common question emerges: if a named plaintiff was born in a yet-to-be-annexed portion of Czechoslovakia in the 1920s or 1930s, is the inference reasonable that the plaintiff's *parents* resided in that same area dating back to 1910? This matters because if that inference holds, the parents would qualify as having "held a continuous (1910-1918) domiciliary right" on eventual Czechoslovakian territory and thus would have been conferred Czechoslovakian citizenship on October 28, 1918. Pls.' Opp'n at 26. A plaintiff born to such parents would similarly have been a Czechoslovakian citizen at birth. *Id.* The Court finds that,

at the motion to dismiss stage, this inference may be reasonably drawn but any or all of these outcomes may change as the case progresses.

a)       *The Lebovics Sisters*

Named plaintiffs Rosalie Simon, Helen Herman, Charlotte Weiss, Helena Weksberg, and Rose Miller (collectively, the "Lebovics sisters") are five sisters with the original surname Lebovics, "raised in Tarackoz in Hungarian-annexed Ruthenia."  SAC ¶¶ 5–10.[30]  Hungary and MÁV each confiscated some of their possessions in the course of deporting their family to Auschwitz. *Id.* ¶¶ 11–12.  Plaintiffs have not alleged the nationality of the Lebovics sisters, when or where they were born, how long they had lived in Ruthenia prior to its annexation, or the nationality of their parents.  Although plaintiffs assert in briefing that the sisters were born in Ruthenia, Pls.' Opp'n at 5 n.2, the paragraph of the complaint cited in support does not so allege. *See* SAC ¶ 10 ("[The Lebovics sisters] were *raised* in Tarackoz in Hungarian-annexed Ruthenia." (emphasis added)).  "Born" and "raised" are distinct and need not be in the same place.  Details matter, particularly given the complex nationality law at issue, the fact that plaintiffs have already been afforded two opportunities to amend, and plaintiffs' ample opportunity to provide supplemental jurisdictional evidence.

Notwithstanding this dearth of facts, a plausible (perhaps even likely) chain of inferences can be drawn establishing the Lebovics sisters' Czechoslovakian nationality and lack of Hungarian nationality.  To be sure, on account of the spectacularly unhelpful pleading and briefing on this key issue, either ultimate inference requires a chain longer than the Court should be assembling on its own.  For example, it is entirely plausible that the Lebovics sisters were not

---

[30]       The record is not consistent as to the spelling of "Lebovics."  *Compare* SAC ¶ 10 ("Lebovics"), *with* Pls.' Opp'n at 5 n.2 ("Lebovic").  Accordingly, this opinion will refer to the Lebovics sisters using the spelling as alleged in the complaint.

only raised in later-annexed Ruthenia but also born there, given that these two locations are very often one and the same.  Furthermore, given that plaintiffs allege all five sisters were "raised" (an activity spanning some years) in Ruthenia, and the common-sense observation that the five sisters were most likely not all born on a single occasion, it stands to reason that at least some of the sisters were also born in Ruthenia.  Then, plaintiffs' description of the Lebovics family being collectively deported in 1944 supplies a plausible inference that the sisters were born after 1918 (which would have them at 26 years of age or younger at the time of deportation).  If true, the sisters' Czechoslovakian citizenship status would mirror that of their parents.

Their parents, in turn, would have been Czechoslovakian citizens if they lived in Ruthenia for the period from 1910 to 1918, which would mean that they lived there for at least 34 years (1910 to 1944); again, entirely plausible.  As for Hungarian nationality, nothing in the pleadings or briefing suggests that the Lebovics sisters were Hungarian citizens on July 26, 1921 (if they had even been born by then) nor that their parents had been.  Plaintiffs alleged facts just barely sufficient to support the inference of Czechoslovakian nationality, and defendants, for their part, offered no useful persuasion to the contrary, leaning entirely on their failed procedural arguments of waiver and estoppel, *see* Part III.B.1, *supra*.  The Lebovics sisters' claims survive insofar as they pierce defendants' asserted sovereign immunity.

### b)      *Magda*

Named plaintiff Magda Kopolovich Bar-Or ("Magda") "was born in 1928 in Korosmezo (Jasina), in Hungarian-annexed Ruthenia (formerly Austria-Hungary, then Czechoslovakia and now Ukraine)."  SAC ¶ 22.  Both defendants were involved with the expropriation of her family's property of substantial value in the course of the family's forced removal from their home.  *Id.* ¶¶ 23–24.  As with the Lebovics sisters, plaintiffs fail to allege the nationality of

Magda or her parents nor where her parents lived prior to 1928.  The complaint also does not explicitly state where Magda lived in the late 1930s at the time of Hungary's annexation of Ruthenia.  Accordingly, the complaint lacks sufficient facts to apply either the Czechoslovakian or Hungarian nationality laws as explained by plaintiffs.  Nonetheless, a plausible inference of Magda's Czechoslovakian nationality and lack of Hungarian nationality may be teased from the sparse allegations available about Magda.

The complaint alleges that when Hungarian police expelled the family from their home in 1944, police left the family in an unspecified "town cemetery under heavy guard" and later moved them "to the *Krona* theater in Korosmezo."  *See* SAC ¶ 23.  These allegations—that Magda was born in Korosmezo in 1928 and her family was ultimately relocated in 1944 to a theater in the same town—support the plausible inference that the family lived in or near Korosmezo in 1944, and further that the family lived in Korosmezo in 1938 and 1939 at the time of the annexations.  No facts alleged suggest that Magda's parents were Hungarian citizens on July 26, 1921, so although the family may have lived in Ruthenia for the ten-year period ending March 15, 1939, they would *not* have been eligible to obtain Hungarian citizenship at that time. As for Czechoslovakian nationality, given that they seemingly lived in Ruthenia from at least 1928 through 1944, they may plausibly have lived there since 1910 and therefore would have obtained Czechoslovakian citizenship in 1918.  Magda would then have been conferred Czechoslovakian citizenship at birth.

Plaintiffs' allegations concerning Magda are sufficient—again, just barely—to meet their burden of production supporting an inference of Czechoslovakian nationality, and defendants offer no evidence or specific argument to the contrary.  Accordingly, her claim may proceed past this motion to dismiss.

          *c)*       *Yitzhak*

Named plaintiff Yitzhak Pressburger ("Yitzhak") and his family went into hiding and managed to avoid being transported to a concentration camp, but still allege that MÁV confiscated a shipment of agricultural products without compensation.  SAC ¶¶ 39–40.

Analysis of Yitzhak's citizenship is confounded by inconsistent factual allegations. Plaintiffs' complaint alleges that Yitzhak "was born in Prague in 1933," SAC ¶ 39, but plaintiff's opposition brief states that he "was born in Bratislava, Czechoslovakia (Slovakia)," Pls.' Opp'n at 5 n.2 (misciting SAC ¶ 39 and failing to acknowledge the inconsistency).  The complaint may be in error, stating, in fuller context: "He was born in Prague in 1933, the son of Jeno Pressburger, a trader in agricultural products.  The family lived in Bratislava until 1934, when they moved to Prague."  SAC ¶ 39.  Although the allegation as written—that is, that Yitzhak was born in Prague, away from the family's residence in Bratislava, but returned to Bratislava for a year or so before the family relocated to Prague—could be true, the phrasing of these sentences combined with the recharacterization in plaintiffs' briefing makes the more likely intended reading that Yitzhak was in fact born in Bratislava.  Earlier iterations of this factual allegation provide little clarity.  The original complaint stated that Yitzhak "was born in Slovakia in 1928," Compl. ¶ 38, a different location and year.  The First Amended Complaint changed this to "born in Prague in 1933," First. Am. Compl. ¶ 38, ECF No. 21, which carried through to the Second Amended Complaint.[31]

---

[31]     Practical difficulties may present a challenge in tracking down biographical facts in a case with numerous named plaintiffs and events 80 or more years ago.  Nevertheless, when making a substantive legal argument in which a particular fact (here, birthplace) may be material to the legal conclusion, this Court finds troubling that counsel would submit a brief explicitly citing to the complaint allegation for "support" when the specific allegation cited provides different information entirely.

Despite the factual inconsistencies, because both Prague and Bratislava were in Czechoslovakia prior to the annexations and because no critical cutoff dates relative to nationality fall within the range of 1928 to 1933, plaintiffs adequately allege facts supporting a plausible inference of Yitzhak's Czechoslovakian nationality and lack of Hungarian nationality. Every fact mentioned for Yitzhak and his family leading up to 1939 indicates that his birthplace was in Czechoslovakia and that the family resided there. SAC ¶ 39. From that, the inference is plausible that Yitzhak's parents had resided in the territory that became Czechoslovakia since 1910. The family lived in Prague around the time of the annexations, *id.*, and therefore was *not* eligible for consideration for Hungarian nationality based on residency in an annexed area. Finally, although the family moved to Budapest, Hungary—not in an annexed territory, *see* Bar-Shaked Decl. ¶ 66 (depicting in a map that Budapest was well within pre-1938 Hungary)—there is no indication that they acquired Hungarian citizenship at any point, particularly in light of the Second Jewish Law's prohibition on Jews from gaining Hungarian citizenship by naturalization, *see* Bar-Shaked Decl. ¶ 31. Yitzhak's claim is therefore not precluded by the domestic takings rule and may proceed.

### d)      Alex

Named plaintiff Alexander Speiser ("Alex") alleges that MÁV confiscated his family's possessions while in transit to Auschwitz. SAC ¶¶ 41, 44. Alex "was born on October 12, 1928, in Ersekujvar, Czechoslovakia," on territory later annexed by Hungary. *Id.* ¶ 41. Alex's family "lived in Ersekujvar until 1930, when they moved to Cesky Tesin, Czechoslovakia," returning to Ersekujvar in "1938, when the country was dismembered." *Id.* As with several other named plaintiffs, no information is provided as to Alex's parents' nationality, but from Alex's birth in Czechoslovakia in 1928 the inference is plausible that Alex's parents lived in territory that

became Czechoslovakia from 1910 through 1918.  If true, Alex's parents would have been

conferred Czechoslovakian citizenship in 1918 and Alex would have obtained the same at birth.

As for Hungarian nationality, plaintiffs do not specify whether Cesky Tesin was in

territory annexed by Hungary.  Thus, it is unclear whether the Hungarian citizenship rule for

those living in annexed territory would have been applicable, but in any event, no facts are

alleged giving reason to believe Alex's parents were Hungarian citizens in 1921, thus making it

unlikely that anyone in the family gained Hungarian citizenship in the late 1930s.  Plaintiffs have

adequately alleged that Alex had Czechoslovakian and not Hungarian citizenship.

<em>e)</em>      <em>Moshe</em>

Named plaintiff Moshe Perel ("Moshe") alleges that defendants confiscated his family's

property in the process of transporting family members to multiple concentration camps.  SAC

¶¶ 81–82.  Moshe "was born in Ersekujvar (during the relevant time period an annexed part of

Hungary, and today part of Slovakia) on February 7, 1927."  SAC ¶ 81.  The citizenship analysis

for Moshe is equivalent to that for Alex, the previous named plaintiff discussed.  Here, again, the

pleadings are silent as to Moshe's parents' nationality, but from Moshe's birth in Czechoslovakia

in 1927, the inference is plausible that his parents lived in territory that became Czechoslovakia

from 1910 through 1918.  If true, Moshe's parents would have become citizens of

Czechoslovakia in 1918 and Moshe would have followed suit upon his birth.  Plaintiffs have

adequately alleged that Moshe had Czechoslovakian and not Hungarian citizenship.

**C.     One Plaintiff with Ambiguous Nationality Allegations Must Be Dismissed Without Prejudice**

For one named plaintiff, Ze'ev Tibi Ram ("Tibi"), the facts alleged can sustain

reasonable inferences for *either* Czechoslovakian or Hungarian nationality for Tibi.  The result is

that the sovereign immunity analysis cannot be completed on this record.

66

Tibi alleges that some of his family's belongings were seized from suitcases upon being pushed onto a train to Auschwitz in 1944, and upon arrival, they were ordered to leave their other items in the train.  SAC ¶¶ 49, 53–58.  According to the complaint, Tibi "was born on December 3, 1930, in Munkács, Hungary," *id.* ¶ 49, but plaintiffs' briefing on this motion states that the "complaint erroneously says Hungary, but [Munkács] was [in] Czechoslovakia until at least 1938," Pls.' Opp'n at 5 n.2.  Tibi's father, Bernat Herman ("Bernat"), "was a Hungarian patriot who fought in the rebellion against Czech rule during the Czechoslovakia occupation." SAC ¶ 50.

Even assuming for the sake of argument that Munkács was part of Czechoslovakia prior to annexation, the record describing Tibi is still too muddled to be able to reasonably infer from the alleged facts his citizenship status in 1944 with either country.[32]  On the one hand, plaintiffs allege that Bernat was a "*Hungarian* patriot" who fought "*against Czech* rule," earning the family "exempt[ion] from racial laws that were imposed when *Hungary* annexed the area in 1938."  SAC ¶ 50 (emphases added).  Under these facts, Bernat—and, by extension, Tibi— plausibly qualified for Hungarian citizenship in 1939 by way of having lived in Ruthenia continuously for ten years and having been a Hungarian citizen on July 26, 1921.[33]  On the other hand, it is also plausible that Tibi's parents lived in Munkács for the period from 1910 to 1918,

---

[32]    The Munkács question is further muddled by other allegations in the complaint.  On the one hand, when describing another named plaintiff, plaintiffs refer to "Benedike, Czechoslovakia, approximately 10 km from Munkács."  SAC ¶ 73.  Munkács' close proximity to a specific locality in Czechoslovakia favors, to some extent, it having been in Czechoslovakia.  On the other hand, the allegation that Tibi "studied in Hungarian public schools for eight years," SAC ¶ 49, points the other way.  Presuming that Tibi's Hungarian schooling extended no later than his deportation in 1944, *any* period of "eight years," even if not contiguous, must have begun no later than 1936.  The most straightforward conclusion from those facts is that for at least some amount of time before the annexation of Ruthenia, Tibi attended "Hungarian public schools" while living in Munkács.  That result is not irreconcilable with Munkács having been in Czechoslovakia as opposed to in Hungary, but it is, at a minimum, counterintuitive.

[33]    Presuming that "the Czechoslovakia occupation" refers to events subsequent to the fracturing of the Austro-Hungarian Empire at the end of World War I, *see* Bar-Shaked Decl. ¶ 54, a "Hungarian patriot" active in resisting Czech rule at that time could plausibly have had Hungarian nationality shortly after that, in 1921.

which would mean—again, assuming that Munkács is appropriately labeled as having been part of Czechoslovakia notwithstanding the allegation—that his parents would have been granted Czechoslovakian citizenship in 1918.

All told, on this record, Tibi's nationality at the time of defendants' expropriations of his family's property is ambiguous.  While plaintiffs have not satisfied their burden of production in support of Czechoslovakian nationality, which would place his claims outside the reach of the domestic takings rule, insufficient evidence is provided to conclude he was a Hungarian national at the time, in which case sovereign immunity would bar his suit.  Additional facts, presented with improved clarity, *might* still allow Tibi properly to allege Czechoslovakian nationality and thereby establish jurisdiction under the expropriation exception.  Accordingly, Ze'ev Tibi Ram must be dismissed from this action without prejudice.

### D.      D.C. Circuit Precedent Still Bars Dismissal on Prudential Grounds

In light of the vacatur of *Simon II*, defendants invite this Court to reassert its holdings from *Simon-2017* dismissing the case on the grounds of international comity and *forum non conveniens*.  Defs.' Mem. at 38–41.  The reasons articulated in *Simon-2017* regarding the appropriateness of dismissal on these prudential grounds as a matter of law and as a matter of policy may remain sound but, without garnering the support of a majority panel on the D.C. Circuit, are rendered irrelevant.  *See Simon II*, 911 F.3d at 1194 (Katsas, J., dissenting) ("This case is 'localized' in Hungary; it involves the taking of Hungarians' property by other Hungarians in Hungary.  In addition, claims arising out of the Hungarian Holocaust are plainly a matter of historical and political significance to Hungary."); *Philipp*, 141 S. Ct. at 714 (Roberts, C.J., writing for a unanimous Court) ("As a Nation, we would be surprised—and might even initiate reciprocal action—if a court in Germany adjudicated claims by Americans that they were entitled to hundreds of millions of dollars because of human rights violations committed by the

United States Government years ago.  There is no reason to anticipate that Germany's reaction would be any different were American courts to exercise the jurisdiction claimed in this case.").  In *Simon II*, the panel majority pointedly disagreed, and its holdings remain binding on this Court, as explained further below.[34]

The disposition of defendants' prudential arguments for dismissal in the instant motion turn entirely on the status of *Simon II*.  In particular, this prompts the question whether, notwithstanding the Supreme Court's unqualified vacatur of the *Simon II judgment*, the Circuit's holdings in its accompanying *opinion*—rejecting across the board the idea that federal courts may abstain from hearing an FSIA-controlled case based on international comity, and rejecting *forum non conveniens* dismissal under the specific facts of this case—are still binding on this Court.  If so, dismissal on prudential grounds may not be revisited.  If not, on the other hand, the holdings in *Simon-2017* may be reasserted, though application of these prudential doctrines here would still face headwinds as disfavored in this Circuit on intermediate appellate review.  Remarkably, this seemingly elemental question about the rules of decision subsequent to a Supreme Court order of vacatur yields a range of answers.

---

[34]    Defendants offer an additional formulation of their argument for reasserting *Simon-2017*: "Because this Court has already held that international comity requires dismissal of the Complaint, and the D.C. Circuit's decision reversing that holding has been vacated, this Court's comity ruling remains the law of the case."  Defs.' Mem. at 41.  This fares no better.  This argument is predicated on a misapprehension of how the D.C. Circuit treats its own holdings in decisions vacated by the Supreme Court, as discussed *infra*.  Thus, assuming for the sake of argument that *Simon-2017* is "alive" because no still-effective Circuit action reversed or vacated this decision, any attempt to declare that decision the "law of the case" runs headlong into the existence of a later "intervening change in controlling law," *DuBerry v. District of Columbia*, 924 F.3d 570, 579 (D.C. Cir. 2019).  Such a change is a "primary example[]" of the types of "extraordinary circumstances" under which a court may reconsider an earlier decision that otherwise would indeed be law of the case.  *See id.*  Indeed, this Court's *Simon-2020* opinion *itself* recognized this limitation on the force of the law of the case doctrine.  *See* 443 F. Supp. 3d at 111–12.  Yet, here, as discussed *infra*, no such change of law has occurred because the opinions in *Simon II* and *Philipp v. Federal Republic of Germany*, 894 F.3d 406 (D.C. Cir. 2018), *vacated on other grounds*, 141 S. Ct. 703 (2021), are still binding on the pertinent prudential dismissal doctrines.

At first blush the answer to the question "Is *Simon II* binding?" would seem to be a resounding "no" because *Simon II* is null and void.  Indeed, the Supreme Court has said in plain terms: "Of necessity our decision vacating the judgment of the Court of Appeals deprives that Court's opinion of precedential effect, leaving this Court's opinion and judgment as the sole law of the case."  *O'Connor v. Donaldson*, 422 U.S. 563, 577 n.12 (1975); *accord Los Angeles County v. Davis*, 440 U.S. 625, 634 n.6 (1979).  Multiple circuits seem to agree.  *See, e.g.*, *United States v. Moore*, 916 F.3d 231, 241 (2d Cir. 2019) ("To the extent anything in our vacated . . . opinion may have supported [the party's] position, it has no precedential value."); *Balfour Beatty Constr., L.L.C. v. Liberty Mut. Fire Ins. Co.*, 968 F.3d 504, 516 n.20 (5th Cir. 2020) ("[T]his court has consistently held that vacated opinions are not precedent." (alteration in original));[35] *Page v. King*, No. 20-17073, 2021 WL 4690953, at *2 n.3 (9th Cir. Oct. 7, 2021) ("Vacated opinions remain persuasive, although not binding authority." (quoting *Spears v. Stewart*, 283 F.3d 992, 1017 n.16 (9th Cir. 2002))); *McKiver v. Sec'y, Fla. Dep't of Corrs.*, 991 F.3d 1357, 1368 (11th Cir. 2021) ("[A] vacated opinion is 'officially gone' and has 'no legal effect whatever,' and '[n]one of the statements made [therein] has any remaining force.'" (second and third alterations in original) (quoting *United States v. Sigma Int'l, Inc.*, 300 F.3d 1278, 1280 (11th Cir. 2002))).  This position has much intuitive appeal, and defendants

---

[35]     The Fifth Circuit has elaborated on the distinction between the effects of vacatur and reversal on other grounds, observing—perhaps counterintuitively—that precedential weight may be preserved for an opinion associated with a reversed judgment, but not for one that has been vacated.  *See Cent. Pines Land Co. v. United States*, 274 F.3d 881, 893 n.57 (5th Cir. 2001) ("This case illustrates the important difference between our treatment of a panel opinion after *vacatur* by the Supreme Court and our treatment when a judgment is reversed on other grounds.  While our prior opinion in [an earlier case] did not bind the [later case] panel because it was *vacated*, the opinion in [the later case] binds us because only the *judgment* was reversed on other grounds." (emphasis in original)).

reasonably argue that the very definition of the word "vacate" requires this result.  *See* Defs.'
Reply at 15 n.15.[36]

The D.C. Circuit, however, takes a different tack: "When the Supreme Court vacates a
judgment of this court without addressing the merits of a particular holding in the panel opinion,
that holding 'continue[s] to have precedential weight, and in the absence of contrary authority,
we do not disturb' it."  *United States v. Adewani*, 467 F.3d 1340, 1342 (D.C. Cir. 2006) (quoting
*Action All. of Senior Citizens of Greater Phila. v. Sullivan*, 930 F.2d 77, 83 (D.C. Cir 1991)); *see
also Metro. Wash. Airports Auth. Pro. Fire Fighters Ass'n Local 3217 v. United States*, 959 F.2d
297, 304–05 (D.C. Cir. 1992) (describing the Circuit's rule that "where circuit court decision is
vacated for reconsideration, rulings on unrelated issues continue to have precedential effect");
*Edmond v. U.S. Postal Serv. Gen. Couns.*, 949 F.2d 415, 424 n.17 (D.C. Cir. 1991) ("Although
vacated because of an intervening Supreme Court decision covering immunity, the *Briggs*
opinion retains precedential weight on other issues.").[37]  To that end, citing this rule, another
judge on this Court has recently found himself not just influenced but rather *bound* by a holding
in a vacated Circuit opinion.  *See Trump v. Mazars USA LLP*, No. 19-cv-1136 (APM), 2021 WL
3602683, at *9 (D.D.C. Aug. 11, 2021) ("The parties dispute whether—in light of the Supreme
Court's vacatur of the D.C. Circuit's judgment—this court is bound by the holdings and

---

[36]     Defendants argue that all of this Court's holdings preceding *Simon II* are fair game for revival, relying on
*United States v. Munsingwear, Inc.*, 340 U.S. 36, 40 (1950), for the proposition that "[w]hen the Supreme Court
takes an appeal but does not consider one or more of the arguments at issue before the lower courts . . . , [it] vacates
the entire decision on the merits, leaving the parties free to relitigate the issues on remand."  Defs.' Reply at 14–15.
*Munsingwear*, however, provides a narrower rule, that the proper Supreme Court response in a federal civil case that
becomes moot with Supreme Court review still pending is "to reverse or vacate the judgment below and remand
with a direction to dismiss."  *Munsingwear*, 340 U.S. at 39.  That is simply not the situation here.  Indeed, the parties
present *no* case law invoking *Munsingwear* in the context of evaluating the precedential effect of a vacated opinion.

[37]     None of these D.C. Circuit cases directly addresses the apparent contradiction with the Supreme Court's
rule that "[o]f necessity [its] decision vacating the judgment of [a] Court of Appeals deprives that Court's opinion of
precedential effect," *O'Connor*, 422 U.S. at 577 n.12.  This Court, however, must follow the Circuit's consistent line
of authority on this issue.

reasoning in *Mazars II* that the Supreme Court left untouched.  The court concludes that it is. . . .

Because the Supreme Court declined to opine on the merits of the D.C. Circuit's analysis of

improper purpose, the Circuit's holding on that issue—at least with respect to the evidence then

in the record—is binding on this court." (footnotes omitted)).[38]

    All told, under the D.C. Circuit's rule regarding the continuing precedential effect of

vacated opinions, *Simon II*'s central holdings—on which the Supreme Court did not opine[39]—

remain the law of the Circuit, bind this Court, and foreclose defendants' renewed prudential

arguments for dismissal.[40]

    First, abstention from exercising subject matter jurisdiction under the FSIA on the basis

of international comity is prohibited in this Circuit.  *See Simon II*, 911 F.3d at 1181; *see also*

*Philipp v. Federal Republic of Germany*, 894 F.3d 406 (D.C. Cir. 2018) ("[T]he FSIA,

Congress's comprehensive statement of foreign sovereign immunity, which is, and always has

---

[38]    A former Chief Judge of this Court suggested some difference in the effect of vacatur depending on the nature of the Supreme Court's order, explaining that: "[A] general order of the Supreme Court vacating the judgment of the Court of Appeals deprives [the Court of Appeals's] opinion of precedential effect.  The Supreme Court's GVR [("grant, vacate, and remand")] order in this case, however, was not a general vacation but rather a specific order vacating the Court of Appeals' judgment and remanding for further consideration in light of the Supreme Court's decision in [another case].  Such a GVR order that directs reconsideration in light of a new Supreme Court decision is of a much more limited nature than a general vacation."  *Boehner v. McDermott*, 332 F. Supp. 2d 149, 156 (D.D.C. 2004) (Hogan, C.J.) (second alteration in original), *aff'd*, 484 F.3d 573 (D.C. Cir. 2007).  Under this dichotomy, the Supreme Court's disposition with vacatur of *Simon II* more closely resembles its GVR practice, again leaving *Simon II*'s holdings binding on this Court in this case.

[39]    The vacatur of *Simon II* in light of *Philipp* should not be read to imply a view by the Supreme Court on the merits of *Simon II*.  *See Tyler v. Cain*, 533 U.S. 656, 666 n.6 (2001).

[40]    Some authority suggests that *Simon II*'s holdings may be the "law of the Circuit" but *not* the "law of the case."  When confronted with a previous vacated appellate opinion *in the same case*, there *may* be a distinction between the concepts of "law of the circuit" and "law of the case."  *See Action All.*, 930 F.2d at 83 ("[A] decision vacating a judgment necessarily prevents the opinion of the lower court from being the law of the case . . . ." (quoting *Davis*, 440 U.S. at 646 n.10 (Powell, J., dissenting))); *Hopkins v. Price Waterhouse*, 920 F.2d 967, 975 n.5 (D.C. Cir. 1990) (same); *Coal. to End Permanent Congress v. Runyon*, 979 F.2d 219, 221 n.2 (D.C. Cir. 1992) (Silberman, J., dissenting from the *per curiam* disposition) ("And even a vacated opinion, while no longer the law of the case, still may carry 'persuasive authority,' and even some precedential value." (citation omitted)).  Perhaps the difference would be meaningful if this Court were now presented with a record on these issues that differed from that before the Circuit in *Simon II*.  Absent such a change, however, whether *Simon II* is also "law of the case" matters little, since even if defendants were free to relitigate, and this Court free to reconsider, the prudential arguments, their disposition is preordained under the binding law of the *Circuit*.

been, a matter of grace and comity, leaves no room for a common-law exhaustion doctrine based on the very same considerations of comity." (citation and quotation marks omitted)), *vacated on other grounds*, 141 S. Ct. 703 (2021).[41]  This Court therefore must decline defendants' invitation to reassert the prudential exhaustion logic of *Simon-2017*.

Lest there be any residual uncertainty as to whether the *Simon II* prohibition on international-comity-based abstention is still good law, writing after *Philipp*, a panel of the D.C. Circuit extinguished it by reaching a similar conclusion with respect to the FSIA's "tortious acts exception."  *See Usoyan v. Republic of Turkey*, 6 F.4th 31, 38, 48–49 (D.C. Cir. 2021).[42]  In *Usoyan*, plaintiffs brought suit against Turkey for personal injuries sustained when the security detail for Turkey's President Recep Tayyip Erdogan attacked a group of anti-Erdogan protestors assembled near the residence of the Turkish ambassador.  *Id.* at 35–37.  The Circuit upheld the district court's denial of Turkey's motion to dismiss on all three grounds asserted: foreign sovereign immunity, political question doctrine, and international comity.  *Id.* at 36.  As relevant here, the *Usoyan* panel characterized the comity-based argument as "ask[ing] [it] to 'abstain from hearing' the suit altogether" and "in effect asserting an alternative basis for sovereign immunity."  *Id.* at 49.  The FSIA's "'comprehensive framework for resolving any claim of sovereign immunity,'" however, deprives courts of any "authority to override the FSIA's express exception for tortious conduct based on the sort of 'ambiguous and politically charged standards that the FSIA replaced.'"  *Id.* (quoting *Altmann*, 541 U.S. at 699).  This argument, that the FSIA provides "the *sole* and *exclusive* standards to be used in resolving questions of sovereign

---

[41]      The comity-based abstention holding in the D.C. Circuit's vacated *Philipp* opinion, which *Simon II* mirrored, continues to have precedential weight for the same reason as does *Simon II*.

[42]      Coincidentally, the *Usoyan* panel was comprised entirely of judges who decided either *Simon I* (Judges Henderson and Wilkins) or *Simon II* (Judge Millett).

immunity," *id.* (emphasis in original) (quoting *MacArthur Area Citizens Ass'n v. Republic of Peru*, 809 F.2d 918, 919 (D.C. Cir. 1987)), is entirely consistent with both the logic and the outcome of *Simon II*.[43]

Finally, this case cannot be dismissed on the basis of *forum non conveniens*.  Under *the same facts* as here, a divided panel of the Circuit has held—even while purportedly applying a deferential abuse of discretion standard—that while, unlike prudential exhaustion, "*forum non conveniens* is not displaced by the FSIA," *Simon II*, 911 F.3d at 1181, the relevant factors "point strongly in favor of [plaintiffs'] forum choice" and "certainly do not tilt decisively in favor of the Hungarian forum," *id.* at 1190.

## IV.    CONCLUSION

Defendants' fourth Motion to Dismiss is GRANTED IN PART and DENIED IN PART. Each named plaintiff in this action falls into one of three groups for the purpose of this disposition.

On the current record, four plaintiffs—Zehava Friedman, Vera Deutsch Danos, Ella Feuerstein Schlanger, and Tzvi Zelikovitch (through his heirs)—were Hungarian nationals at the time property was expropriated from them by defendants between 1941 and 1945.  Those expropriations fall within the domestic takings rule and therefore are not within the scope of the FSIA's expropriation exception.  The default grant of sovereign immunity to defendants is

---

[43]    Although the *Usoyan* panel did not expressly cite the vacated *Simon II* or *Philipp* circuit opinions as authority supporting its analogous conclusion barring dismissal on the grounds of international comity, it conspicuously and pointedly cited *Simon II*—including identifying its subsequent history of vacatur in the citation—for the mundane proposition that its review of the district court's holding was *de novo*.  *Usoyan*, 6 F.4th at 48 (citing *Simon II*, 911 F.3d at 1180 (citing *Philipp*, 894 F.3d at 410)).  While this citation stops short of proclaiming the continuing vitality of *Simon II*, the choice of citation is notable given the ample alternate—and more recent—authority available establishing this standard of review in the FSIA context.  *See, e.g.*, *Khochinsky v. Republic of Poland*, 1 F.4th 1, 8 (D.C. Cir. 2021); *Ivanenko v. Yanukovich*, 995 F.3d 232, 236 (D.C. Cir. 2021); *LLC SPC Stileks v. Republic of Moldova*, 985 F.3d 871, 877 (D.C. Cir. 2021); *Valambhia v. United Republic of Tanzania*, 964 F.3d 1135, 1139 (D.C. Cir. 2020).

therefore preserved with respect to these plaintiffs' claims.  Accordingly, defendants' fourth Motion to Dismiss is GRANTED as to plaintiffs Friedman, Danos, Schlanger, and Zelikovitch, who are dismissed with prejudice.

The allegations and evidence proffered concerning one plaintiff, Ze'ev Tibi Ram, are sufficiently ambiguous as to leave the Court unsure as to whether he can be reasonably inferred to have been a national of Hungary or of Czechoslovakia at the time of the expropriations at issue.  Accordingly, defendants' motion is GRANTED as to Mr. Ram, who is dismissed without prejudice.

Finally, based on the allegations in the Second Amended Complaint and other unrefuted evidence adduced, nine plaintiffs—Rosalie Simon, Helen Herman, Charlotte Weiss, Helena Weksberg, Rose Miller, Magda Kopolovich Bar-Or, Yitzhak Pressburger, Alexander Speiser, and Moshe Perel—each allege plausible facts giving rise to a reasonable inference that he or she was not a Hungarian national at the time property was expropriated from them by defendants between 1941 and 1945.  Accordingly, they may invoke the FSIA's expropriation exception unencumbered by the domestic takings rule and thereby overcome the default grant of sovereign immunity to defendants.  Defendants' fourth Motion to Dismiss is therefore DENIED as to plaintiffs Simon, Herman, Weiss, Weksberg, Miller, Bar-Or, Pressburger, Speiser, and Perel.

An Order consistent with this Memorandum Opinion will be entered contemporaneously.


Date: December 30, 2021

_____
BERYL A. HOWELL
Chief Judge